No. 16-10521-HH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

MAURICE WALKER, on behalf of himself
and others similarly situated,

Plaintiff-Appellee

v.

CITY OF CALHOUN, GEORGIA,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN

_____

JOHN A. HORN
  United States Attorney
    Northern District of Georgia

LISA FOSTER
  Director, Office for Access to Justice

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

TOVAH R. CALDERON
CHRISTINE H. KU
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9044

Case No. 16-10521-HH

*Maurice Walker* v. *City of Calhoun, Georgia*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, *Amicus Curiae* United States certifies that, in addition to the persons and entities identified in the briefs of defendant-appellant, plaintiff-appellee, and all of the *amici curiae*, the following persons may have an interest in the outcome of this case:

1.   Calderon, Tovah R., United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States;

2.   Foster, Lisa, United States Department of Justice, Office for Access to Justice, counsel for *amicus curiae* United States;

3.   Gupta, Vanita, United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States;

4.   Horn, John A., United States Attorney, Northern District of Georgia, counsel for *amicus curiae* United States;

5.   Ku, Christine H., United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States.

s/ Christine H. Ku
CHRISTINE H. KU
Attorney

Date: August 18, 2016

C1 of 1

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT

INTEREST OF THE UNITED STATES ..................................................................1

STATEMENT OF THE ISSUE..................................................................................4

STATEMENT OF THE CASE...................................................................................4

     1.    *Overview Of Bail In The United States* .................................................4

     2.    *Relevant Facts And Procedural History* ..............................................8

SUMMARY OF THE ARGUMENT ......................................................................12

ARGUMENT

     A BAIL PRACTICE VIOLATES THE FOURTEENTH
     AMENDMENT IF, WITHOUT CONSIDERATION OF
     ABILITY TO PAY AND ALTERNATIVE METHODS OF
     ASSURING APPEARANCE AT TRIAL, IT RESULTS IN
     THE PRETRIAL DETENTION OF INDIGENT DEFENDANTS .............13

          A.    *The Fourteenth Amendment Prohibits Incarcerating*
               *Individuals Without Meaningful Consideration Of*
               *Indigence And Alternative Methods Of Achieving A*
               *Legitimate Government Interest* ................................................13

          B.    *Bail Systems That Keep Indigent Defendants In Jail*
               *Solely Because They Cannot Pay Bail Result In*
               *Unnecessary Pretrial Detention And Impede The*
               *Fair Administration Of Justice* .................................................21

CONCLUSION .......................................................................................................24

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                                         **PAGE**

*Allen* v. *United States*, 386 F.2d 634 (D.C. Cir. 1967) ..............................................7

*Barker* v. *Wingo*, 407 U.S. 514 (1972) .............................................................. 22-23

*Barnett* v. *Hopper*, 548 F.2d 550 (5th Cir. 1977)
  vacated as moot, 439 U.S. 1041 (1978).......................................................16

*Bearden* v. *Georgia*, 461 U.S. 660 (1983).......................................12, 16-17, 20-21

*Bonner* v. *City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) .................19

*Griffin* v. *Illinois*, 351 U.S. 12 (1956) ............................................................. 12-15

*Hudson* v. *Parker*, 156 U.S. 277 (1895) ....................................................................22

*M.L.B.* v. *S.L.J.*, 519 U.S. 102 (1996)........................................................................20

*Pierce* v. *City of Velda City*, No. 4:15-cv-570,
  2015 WL 10013006 (E.D. Mo. June 3, 2015) .................................................8

*Pugh* v. *Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc) .............. 5, 13, 19, 22

*Smith* v. *Bennett*, 365 U.S. 708 (1961) ....................................................................14

*Snow* v. *Lambert*, No. 3:15-cv-567 (M.D. La. Sept. 3, 2015) ...................................8

*Tate* v. *Short*, 401 U.S. 395 (1971) .................................................................. 16, 19

*United States* v. *City of Ferguson*,
  No. 4:16-cv-180 (E.D. Mo. Apr. 19, 2016)..................................................2, 8

*United States* v. *Salerno*, 481 U.S. 739 (1987)..........................................4-5, 17-18

*Varden* v. *City of Clanton*, No. 2:15-cv-34,
  2015 WL 5387219 (M.D. Ala. Sept. 14, 2015)................................... 3, 8, 19

**CASES (continued):**                                                    **PAGE**

*Washington* v. *Davis*, 426 U.S. 229 (1976) ............................................................20

\*Williams* v. *Illinois*, 399 U.S. 235 (1970) ...................................................... 15-16

**STATUTES:**

Civil Rights of Institutionalized Persons Act (CRIPA),
    42 U.S.C. 1997 *et seq.* ......................................................................................2

18 U.S.C. 3142(c)(2) ...........................................................................................7

18 U.S.C. 3142(g) ................................................................................................7

42 U.S.C. 1983 ...................................................................................................10

42 U.S.C. 14141 ...................................................................................................2

Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214 ............................... 6-7

Ga. Code Ann. § 17-6-1(b)(1) (West 2014)..........................................................9

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 98-1121, 98th Cong., 2d Sess. 12 (1984)..........................................7

**MISCELLANEOUS:**

Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful
    Convictions*, 42 Am. Crim. L. Rev. 1123 (2005) ...........................................22

ABA Standards for Criminal Justice:  Pretrial Release (3d ed. 2007),
    available at http://www.americanbar.org/publications/criminal_
    justice_section_archive/crimjust_standards_pretrialrelease_
    blk.html#10-1.1..........................................................................................5, 23

**MISCELLANEOUS (continued):**                                      **PAGE**

*Attorney General Loretta E. Lynch Delivers Remarks at White House*
    *Convening on Incarceration and Poverty* (Dec. 3, 2015), available at
    https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-
    delivers-remarks-white-house-convening-incarceration-and...................... 2-3

Department of Justice, *Address by Attorney General Robert F. Kennedy*,
    *American Bar Association House of Delegates* (Aug. 6, 1962), available at
    http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/
    08-06-1962%20Pro.pdf .................................................................................6

*Justice Department Announces Resources to Assist State and Local*
    *Reform of Fine and Fee Practices* (Mar. 14, 2016), available at
    https://www.justice.gov/opa/pr/justice-department-announces-
    resources-assist-state-and-local-reform-fine-and-fee-practices .....................3

Letter from Vanita Gupta, Principal Deputy Assistant Attorney General,
    Civil Rights Div., Dep't of Justice, and Lisa Foster, Director,
    Office for Access to Justice, to Colleagues (Mar. 14, 2016),
    available at https://www.justice.gov/crt/file/832461/download.....................4

Mary T. Phillips, New York City Criminal Justice Agency, Inc.,
    *Bail, Detention, and Felony Case Outcomes*, *Research Brief*
    *No. 18* (2008), available at http://www.nycja.org/lwdcms/doc-
    view.php?module=reports&module_id=597&doc_name=doc................... 22

Open Society Justice Initiative, *The Socioeconomic Impact of*
    *Pretrial Detention* (2001), available at http://www.pretrial.org/
    download/research/OSI%20Socioeconomic%20Impact%
    20Pretrial%20Detention%202011.pdf...........................................................23

Ram Subramaniam, *et al.*, Vera Institute of Justice, *Incarceration's Front*
    *Door: The Misuse of Jails in America* (updated July 29, 2015),
    available at http://archive.vera.org/sites/default/files/
    resources/downloads/incarcerations-front-door-report_02.pdf.................. 7-8

**MISCELLANEOUS (continued):**                                    **PAGE**

Richard Williams, *Bail or Jail*, State Legislatures (May 2012),
    available at http://www.ncsl.org/research/civil-and-criminal-
    justice/bail-or-jail.aspx ...................................................................................21

Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*,
    117 Harv. L. Rev. 2463 (2004).......................................................................22

*Testimony by Attorney General Robert F. Kennedy on Bail Legislation*
    *Before the Subcomms. on Constitutional Rights and Improvements*
    *in Judicial Machinery of the S. Judiciary Comm.* (Aug. 4, 1964) (*Testimony*
    *by RFK*), available at http://www.justice.gov/sites/default
    /files/ag/legacy/2011/01/20/08-04-1964.pdf. ...................................................6

Todd D. Minton & Zhen Zeng, United States Department of Justice,
    Bureau of Justice Statistics, *Jail Inmates at Midyear 2014*,
    NCJ 248629 (2015), available at http://www.bjs.gov/content/pub/
    pdf/jim14.pdf ...................................................................................................21

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 16-10521-HH

MAURICE WALKER, on behalf of himself
and others similarly situated,

Plaintiff-Appellee

v.

CITY OF CALHOUN, GEORGIA,

Defendant-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN
_____

## INTEREST OF THE UNITED STATES

The United States has a strong interest in ensuring that criminal justice systems, including bail practices within those systems, are fair and nondiscriminatory.  In March 2010, the Department of Justice (Department or DOJ) established the Office for Access to Justice, whose mission is to help criminal and civil justice systems efficiently deliver fair and accessible outcomes, irrespective of wealth and status.  The Department also has authority to investigate

- 2 -

unlawful criminal justice practices, including the problematic use of fines and fees and bond procedures.  See, *e.g.*, Consent Decree at 1-2, 83, 86-87 (Doc. 41), *United States* v. *City of Ferguson*, No. 4:16-cv-180 (E.D. Mo. Apr. 19, 2016) (consent decree effectuated pursuant to the Department's authority under 42 U.S.C. 14141).  By encouraging practices that avoid unnecessary and excessive incarceration, the Department strives to reduce the risk of unconstitutional conditions of confinement, which the Attorney General is authorized to address under the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. 1997 *et seq.*

In the context of bail, the Department has promoted practices that do not discriminate against the poor.  From the National Symposium on Pretrial Justice, which the Department's Office of Justice Programs helped convene in 2011, to the White House and DOJ Convening on the Cycle of Incarceration:  Prison, Debt and Bail Practices in 2015, the Department has sought to call attention to the problem of discriminatory bail practices in state and local courts.  At the White House convening, Attorney General Lynch discussed discriminatory bail practices, reiterating the Department's commitment "[t]o ensur[e] that in the United States

there is indeed no price tag on justice."[1]  In addition, the Department's Bureau of

Justice Assistance funds the National Task Force on Fines, Fees and Bail Practices,

a joint project of the Conference of Chief Justices and the Conference of State

Court Administrators, along with a $2.5 million grant program entitled *The Price

of Justice:  Rethinking the Consequences of Justice Fines and Fees*.[2]  Both are

intended to encourage state and local court reforms aimed at ending practices,

including bail practices, that unfairly discriminate against the poor.  These recent

initiatives build upon DOJ's efforts since the 1960s to help reform bail practices.

See pp. 5-6, *infra*.

In February 2015, the Department filed a statement of interest (SOI) arguing

that bail practices that incarcerate indigent individuals before trial solely because

of their inability to pay for their release violates the Fourteenth Amendment.  See

U.S. SOI, *Varden* v. *City of Clanton*, No. 2:15-cv-34, 2015 WL 5387219 (M.D.

Ala. Sept. 14, 2015).  And in March 2016, the Department issued a Dear Colleague

---

[1]  *Attorney General Loretta E. Lynch Delivers Remarks at White House Convening on Incarceration and Poverty* (Dec. 3, 2015), available at https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-white-house-convening-incarceration-and.

[2]  See *Justice Department Announces Resources to Assist State and Local Reform of Fine and Fee Practices* (Mar. 14, 2016), available at https://www.justice.gov/opa/pr/justice-department-announces-resources-assist-state-and-local-reform-fine-and-fee-practices.

- 4 -

Letter advising state and local courts that due process and equal protection principles require that, among other things, they "must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release."[3]

## STATEMENT OF THE ISSUE

The United States will address the following question only:

Whether a bail practice that results in the incarceration of indigent individuals without meaningful consideration of their ability to pay and alternative methods of assuring their appearance at trial violates the Fourteenth Amendment.[4]

## STATEMENT OF THE CASE

1.   *Overview Of Bail In The United States*

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States* v. *Salerno*, 481 U.S. 739, 755 (1987).  Courts have recognized that it is within this limited exception that conditions can be imposed, or in rare circumstances, release can be denied, to

---

[3] Letter from Vanita Gupta, Principal Deputy Assistant Attorney General, Civil Rights Div., Dep't of Justice, and Lisa Foster, Director, Office for Access to Justice, to Colleagues 2 (Mar. 14, 2016), available at https://www.justice.gov/crt/file/832461/download.

[4] The United States takes no position on the facts of this case or on any other issue raised in appellant's brief.

achieve legitimate goals like preventing the flight of defendants before trial or

protecting the public from future danger.  See *id.* at 754-755.  Future appearance in

court and public safety often can be assured through the imposition of

nonmonetary conditions, such as supervised release or reasonable restrictions on

activities and movements.  See ABA Standards for Criminal Justice:  Pretrial

Release 10-1.4, 10-5.2 (3d ed. 2007).[5]  Financial conditions (often referred to

simply as "bail"), however, "should be used only when no other conditions will

ensure appearance."  *Id.* 10-1.4(c).  This is because "[a] primary function of bail is

to safeguard the courts' role in adjudicating the guilt or innocence of defendants."

*Salerno*, 481 U.S. at 753; see also *Pugh* v. *Rainwater*, 572 F.2d 1053, 1057 (5th

Cir. 1978) (en banc) (recognizing bail's limited function "of assuring the presence

of [the] defendant").

　　Until the reform of the federal bail system in the 1960s, however, pretrial

detention was effectively the norm rather than the exception for indigent federal

defendants.  Federal courts routinely set monetary bail conditions without regard

for indigence, and "often the sole consideration in fixing bail [was] the nature of

---

[5]  Available at http://www.americanbar.org/publications/criminal_justice_
section_archive/crimjust_standards_pretrialrelease_blk.html#10-1.1.

the crime."[6]  In 1962, Attorney General Robert F. Kennedy called national

attention to the "problem of bail," pointing out that pretrial detention "is directly

influenced by how wealthy [a defendant] is."[7]  In testifying to Congress about the

problems associated with bail systems that fail to account for indigence, Attorney

General Kennedy told the story of an individual who spent 54 days in jail because

he could not afford the $300 bail amount for a traffic offense for which the

maximum penalty was only five days in jail.  See *Testimony by RFK* 3.  Under

Attorney General Kennedy's leadership, the Department pressed for expansive

reforms that culminated in the Attorney General's National Conference on Bail and

Criminal Justice in 1964 and the Bail Reform Act of 1966, Pub. L. No. 89-465, 80

Stat. 214.

The Bail Reform Act abolished the use of bail conditions that discriminate

against indigent arrestees in the federal system.  The Act's purpose was to revise

federal bail practices "to assure that all persons, regardless of their financial status,

---

[6]  *Testimony by Attorney General Robert F. Kennedy on Bail Legislation Before the Subcomms. on Constitutional Rights and Improvements in Judicial Machinery of the S. Judiciary Comm.* 2 (Aug. 4, 1964) (*Testimony by RFK*), available at http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-04-1964.pdf.

[7]  Department of Justice, *Address by Attorney General Robert F. Kennedy, American Bar Association House of Delegates* (Aug. 6, 1962), available at https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-06-1962%20Pro.pdf.

- 7 -

shall not needlessly be detained pending their appearance  *  *  *  when detention serves neither the ends of justice nor the public interest."  Bail Reform Act of 1966 § 2; see also *Allen* v. *United States*, 386 F.2d 634, 637 (D.C. Cir. 1967) (Bazelon, J., dissenting) ("It plainly appears from the language and history of the Bail Reform Act that its central purpose was to prevent pretrial detention because of indigency.").  In 1984, the Act was amended to make clear that a "judicial officer may not impose a financial condition that results in the pretrial detention of the person."  18 U.S.C. 3142(c)(2); see H.R. Rep. No. 98-1121, 98th Cong., 2d Sess. 12 (1984).  This express mandate helps ensure that federal courts base pretrial detention decisions on an individualized assessment of dangerousness and risk of flight and that indigent defendants are not detained without meaningful consideration of an individual's ability to pay and alternative methods of achieving the government's interests.  See also 18 U.S.C. 3142(g) (listing factors that judicial officers should consider to "reasonably assure" the appearance of an individual in court and the safety of others).

Many other jurisdictions, however, still maintain bail systems that incarcerate people without regard for indigency.[8]  But as noted above, the

---

[8]  Indeed, the use of monetary bail has increased substantially since 1990. See Ram Subramaniam, *et al.*, Vera Institute of Justice, *Incarceration's Front Door:  The Misuse of Jails in America* 29 (updated July 29, 2015), available at

(continued…)

- 8 -

Department is working with state and local courts to reform their systems and promote constitutional bail practices. In *Varden*, after the Department filed its SOI, the parties reached a settlement agreeing to a bail policy that allows for release on an unsecured bond as the norm rather than the exception. See *Varden* v. *City of Clanton*, No. 2:15-cv-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015); see also Consent Decree, *City of Ferguson*, *supra*. Lawsuits challenging bail practices in other local jurisdictions have also been resolved by agreement or court order. See, *e.g.*, *Pierce* v. *City of Velda City*, No. 4:15-cv-570, 2015 WL 10013006 (E.D. Mo. June 3, 2015) (adopting a settlement agreeing to a new bail policy and declaring that, under the Equal Protection Clause, no defendant can be held in custody based solely on inability to post a monetary bond); *Snow* v. *Lambert*, No. 3:15-cv-567 (M.D. La. Sept. 3, 2015) (accepting a settlement prohibiting use of a secured monetary bond to hold misdemeanor arrestees in jail who cannot afford the bond).

2.    *Relevant Facts And Procedural History*

a. Plaintiff Maurice Walker is a 54-year old man who was arrested by the Calhoun Police Department for being a pedestrian under the influence and was

---

(…continued)
http://archive.vera.org/sites/default/files/resources/downloads/incarcerations-front-door-report_02.pdf.

kept in jail for six nights without making bail.  Doc. 29-2, at 1.[9]  He filed this class

action alleging that the City of Calhoun, Georgia, employs an unconstitutional bail

practice that imprisons indigent defendants because of their inability to pay fixed

bail amounts for misdemeanors, traffic offenses, and ordinance violations.  Doc. 1,

at 5-7, 13.

   According to the complaint, Walker has a serious mental health disability

and limited income with no assets.  He lives with his sister, who manages his only

income of $530 per month of Social Security disability benefits.  Doc. 1, at 3.

When Walker was arrested on September 3, 2015, he was informed that he would

not be released unless he paid the $160 fixed cash bond amount set by the City for

the misdemeanor of being a pedestrian under the influence.  Georgia law provides

that "at no time  *  *  *  shall any person charged with a misdemeanor be refused

bail."  Ga. Code Ann. § 17-6-1(b)(1) (West 2014).  But Walker alleged that,

contrary to state law, the City's policy and practice was to immediately release

individuals arrested for minor traffic or misdemeanor offenses if they can pay

preset bond amounts (which vary by offense), but to hold those who cannot afford

the bond in jail until their first court appearance.  See Doc. 1, at 2; Doc. 29-5, at 9-

10, 12, 15 (Calhoun's Bail Schedule).  By contrast, Walker contended that many

---

[9] Citations to "Doc. __, at __" are to documents on the district court docket
sheet and relevant page numbers.

other cities provide for release of misdemeanor arrestees on recognizance or unsecured bonds.  These forms of security involve promises to appear with penalties for failing to appear in court, such as an added criminal charge or a monetary fine.  Doc. 1, at 5-6.

Walker alleged that because he is indigent, and because he could not afford the fixed bail amount, he was kept in jail for several nights to await his court appearance.  Doc. 1, at 4-5.  When this lawsuit was filed, the City held court only on non-holiday Mondays, and because Walker was arrested on the Thursday before Labor Day, he remained in jail for six days until his counsel could secure his release on his own recognizance.  Doc. 29, at 2.  During his pretrial detention, Walker claimed that he was unable to take his daily medication, and that he was allowed out of his cell for only one hour each day.  Doc. 1, at 5.  Walker also alleged that "[e]ach Monday [when court is held], there are commonly about four to six indigent defendants who were not able to pay  *  *  *  to secure their release."  Doc. 1, at 7.

On behalf of himself and those similarly situated, Walker sued the City under 42 U.S.C. 1983, alleging that its bail practice violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  He sought damages on behalf of himself and declaratory and injunctive relief on behalf of the class.  Doc. 1, at 3, 13-14.

b.  On January 28, 2016, the district court granted Walker's motion for a preliminary injunction.  The court ordered the City to implement constitutional post-arrest procedures and, in the interim, to release any misdemeanor arrestees on their own recognizance or on an unsecured bond.  Doc. 40, at 72.  The court held, among other things, that there was a substantial likelihood that Walker would succeed on the merits of his claim, because "[a]ny bail or bond scheme that mandates payment of pre-fixed amounts for different offenses to obtain pretrial release, without any consideration of indigence or other factors, violates the Equal Protection Clause."  Doc. 40, at 49.  In reaching this conclusion, the district court reviewed Supreme Court and circuit precedent recognizing that equal protection and due process principles prohibit punishing people for their poverty.  The court then determined that this rule was "especially true" for pretrial detainees who had yet to be found guilty of a crime.  Doc. 40, at 49-52; see also Doc. 40, at 52-56 (observing that other courts have reached similar conclusions).[10]

---

[10]  The district court also determined that the City's new Standing Bail Order, which was adopted after the lawsuit was filed, neither mooted Walker's claims nor remedied the constitutional deficiencies in the prior bail policy.  Doc. 40, at 56, 59-62.  Again, the United States takes no position on these or any other issues in this case that is not addressed herein.

- 12 -

## SUMMARY OF THE ARGUMENT

If this Court reaches the issue, it should affirm the district court's holding that a bail scheme that mandates payment of fixed amounts to obtain pretrial release, without meaningful consideration of an individual's indigence and alternatives that would serve the City's interests, violates the Fourteenth Amendment.

In a long line of cases beginning with *Griffin* v. *Illinois*, 351 U.S. 12 (1956), the Supreme Court has held that denying equal access to justice—including and especially through incarceration—without consideration of ability to pay and possible alternatives to achieve a legitimate governmental interest, violates the Fourteenth Amendment. In these cases, the Court has recognized that the proper analysis reflects both equal protection and due process principles, and has rejected use of the traditional equal protection inquiry. The appropriate inquiry focuses instead on "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose." *Bearden* v. *Georgia*, 461 U.S. 660, 666-667 (1983) (citation omitted; brackets in original).

As the district court recognized, the Supreme Court's holdings and analysis apply with special force in the bail context, where deprivations of liberty are at issue and defendants are presumed innocent. Under *Bearden* and other cases in

- 13 -

*Griffin*'s progeny, a bail scheme that imposes financial conditions, without individualized consideration of ability to pay and whether such conditions are necessary to assure appearance at trial, violates the Fourteenth Amendment.  Thus, as the former Fifth Circuit acknowledged, while the use of fixed bail schedules may provide a convenient way to administer pretrial release, incarcerating those who cannot afford to pay the bail amounts, without meaningful consideration of alternatives, infringes on equal protection and due process requirements.  See *Pugh* v. *Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).

In addition to violating the Fourteenth Amendment, such bail systems result in the unnecessary incarceration of people and impede the fair administration of justice for indigent arrestees.  Thus, they are not only unconstitutional, but they also constitute bad public policy.

## ARGUMENT

## A BAIL PRACTICE VIOLATES THE FOURTEENTH AMENDMENT IF, WITHOUT CONSIDERATION OF ABILITY TO PAY AND ALTERNATIVE METHODS OF ASSURING APPEARANCE AT TRIAL, IT RESULTS IN THE PRETRIAL DETENTION OF INDIGENT DEFENDANTS

A.    *The Fourteenth Amendment Prohibits Incarcerating Individuals Without Meaningful Consideration Of Indigence And Alternative Methods Of Achieving A Legitimate Government Interest*

The Supreme Court has long held that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has."  *Griffin* v.

- 14 -

*Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion); accord *Smith* v. *Bennett*, 365 U.S. 708, 710 (1961). As explained more fully below, in a long line of cases beginning with *Griffin*, the Court has repeatedly reaffirmed that denying access to equal justice, without meaningful consideration of indigence and alternative methods of achieving a legitimate government interest, violates the Fourteenth Amendment. Although a jurisdiction has discretion to determine which rights and penalties beyond what the Constitution minimally requires are appropriate to achieve its legitimate interests, the Fourteenth Amendment prohibits a jurisdiction from categorically imposing different criminal consequences—including and especially incarceration—on poor people without accounting for their indigence.

In *Griffin*, the Court first considered whether a State "may, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, * * * deny adequate appellate review [of a criminal conviction] to the poor while granting such review to all others." 351 U.S. at 13. The Court held that once a State decides to grant appellate rights, it may not "do so in a way that discriminates against some convicted defendants on account of their poverty." *Id*. at 18. The Court therefore found it unconstitutional to deny indigent criminal defendants appellate review by effectively requiring them to furnish appellate courts with a trial transcript, which cost money, before they could appeal their convictions. See *id*. at 18-19. In holding that "[d]estitute defendants must be afforded as adequate

- 15 -

appellate review as defendants who have money enough to buy transcripts," *id*. at

19, the Court declined to hold that the State "must purchase a stenographer's

transcript in every case where a defendant cannot buy it," *id*. at 20. Instead, it held

that the State "may find other means of affording adequate and effective appellate

review to indigent defendants." *Ibid*.

In a line of cases building on *Griffin*, the Supreme Court has held that

incarcerating individuals solely because of their inability to pay a fine or fee,

without regard for indigence and a meaningful consideration of alternative

methods of achieving the government's interests, effectively denies equal

protection to one class of people within the criminal justice system while also

offending due process principles. In *Williams* v. *Illinois*, 399 U.S. 235, 244

(1970), for example, the Court struck down a practice of incarcerating an indigent

individual beyond the statutory maximum term because he could not pay the fine

and court costs to which he had been sentenced. The Court held that "once the

State has defined the outer limits of incarceration necessary to satisfy its

penological interests and policies, it may not then subject a certain class of

convicted defendants to a period of imprisonment beyond the statutory maximum

solely by reason of their indigency." *Id.* at 241-242. The Court made clear,

however, that "[t]he State is not powerless to enforce judgments against those

financially unable to pay a fine." *Id*. at 244. On the contrary, nothing in the

- 16 -

Court's holding "limits the power of the sentencing judge to impose alternative sanctions" under state law." *Id*. at 245.

Similarly, in *Tate* v. *Short*, 401 U.S. 395, 398 (1971), the Court held that incarcerating an indigent individual convicted of fines-only offenses to "satisfy" his outstanding fines constituted unconstitutional discrimination because it "subjected [him] to imprisonment solely because of his indigency." *Id.* at 397-398. The Court explained that the scheme in *Tate* suffered from the same constitutional defect as that in *Williams*, and again emphasized that there "other alternatives to which the State may constitutionally resort to serve its concededly valid interest in enforcing payment of fines." *Id*. at 399.[11]

And in *Bearden* v. *Georgia*, 461 U.S. 660 (1983), the Court held that the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution "without determining that [the defendant] had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist." *Id.* at 661-662. Such treatment of indigent defendants would amount to "little more than punishing a person for his poverty." *Id.* at 662.

---

[11]  See also *Barnett* v. *Hopper*, 548 F.2d 550, 554 (5th Cir. 1977) (relying on *Williams* and *Tate* to hold that "[t]o imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws"), vacated as moot, 439 U.S. 1041 (1978).

- 17 -

The *Bearden* Court further explained that, because "[d]ue process and equal protection principles converge in the Court's analysis in these cases," 461 U.S. at 665, the traditional equal protection framework that usually requires analysis under a particular level of scrutiny does not apply.  Because "indigency in this context is a relative term rather than a classification, fitting the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished." *Id.* at 666 n.8 (internal quotation marks omitted).  "Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis." *Id.* at 666.  Instead, the relevant analysis "requires a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose." *Id*. at 666-667 (citation and internal quotation marks omitted; brackets in original).

Although *Bearden* and other cases in *Griffin*'s progeny have arisen in the sentencing and post-conviction contexts, their holdings apply with equal, if not greater, force in the bail context.  Indeed, defendants who have not been found guilty have an especially "strong interest in liberty." *United States* v. *Salerno*, 481 U.S. 739, 750, 755 (1987).  Because of that liberty interest, pretrial release should be the norm, and pretrial detention "the carefully limited exception." *Ibid*.  To be

sure, in certain circumstances, such as when a court finds that a defendant poses a threat to others or presents a flight risk, this fundamentally important right may be circumscribed on a case-by-case basis. See, *e.g.*, *id.* at 750-751, 754-755. If a court finds that no other conditions may reasonably assure an individual's appearance at trial, financial conditions may be constitutionally imposed—but "bail must be set by a court at a sum designed to ensure that goal, and *no more*." *Id*. at 754 (emphasis added). Although the imposition of bail in such circumstances may result in a person's incarceration, the deprivation of liberty in such circumstances is not based *solely* on inability to pay.

But fixed bail schedules that allow for the pretrial release of only those who can pay, without accounting for ability to pay and alternative methods of assuring future appearance, do not provide for such individualized determinations, and therefore unlawfully discriminate based on indigence. Under such bail schemes, arrestees who can afford to pay the fixed bail amount are promptly released whenever they are able to access sufficient funds for payment, even if they are likely to miss their assigned court date or pose a danger to others. Conversely, the use of such schedules effectively denies pretrial release to those who cannot afford to pay the fixed bail amount, even if they pose no flight risk, and even if alternative methods of assuring appearance (such as an unsecured bond or supervised release) could be imposed. Such individuals are unnecessarily kept in jail until their court

- 19 -

appearance often for even minor offenses, such as a traffic or ordinance violation,

including violations that are not punishable by incarceration.

As the former Fifth Circuit recognized in an en banc decision, while

"[u]tilization of a master bond schedule provides speedy and convenient release for

those who have no difficulty in meeting its requirements," the "incarceration of

those who cannot, without meaningful consideration of other possible alternatives,

infringes on both due process and equal protection requirements." *Pugh* v.

*Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).[12]  Although the court in

*Pugh* found moot plaintiffs' claim challenging the use of monetary bail to

incarcerate defendants pretrial without meaningful consideration of alternatives, it

acknowledged "that imprisonment solely because of indigent status is invidious

discrimination and not constitutionally permissible."  *Id.* at 1056 (citing *Williams*,

*supra*; *Tate*, *supra*); see also *Varden*, *supra*, at *2 (concluding that "[t]he

Fourteenth Amendment prohibits punishing a person for his poverty, and this

includes deprivations of liberty based on the inability to pay fixed-sum bail

amounts"—a principle that "applies with special force" to pretrial defendants

(internal citation and quotation marks omitted)).  In fact, where fixed bail

---

[12]  Decisions of the former Fifth Circuit rendered before October 1, 1981, serve as binding precedent of the Eleventh Circuit.  See *Bonner* v. *City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

schedules are used without meaningful consideration of alternatives that account

for inability to pay, indigent arrestees seeking bail are faced with precisely the

same type of "illusory choice" that the Supreme Court has recognized "works an

invidious discrimination." *Williams*, 399 U.S. at 242.

Although fixed bail schedules appear to be neutral on their face, the

Supreme Court has explained that policies that impose sanctions on only indigent

individuals are not neutral in their operation. Thus, contrary to the City's argument

(Appellant's Br. 45-46), its policies do not fall outside the Fourteenth

Amendment's prohibition of disparate treatment. The City relies on *Washington* v.

*Davis*, 426 U.S. 229, 244-245 (1976), which held that, absent evidence of a

discriminatory purpose, a facially neutral law with a racially discriminatory effect

does not violate equal protection. But the Supreme Court has rejected this

argument with respect to policies that implicate due process concerns and

discriminate against the indigent in the sanctions imposed, explaining that, because

such policies "expose[] *only indigents*" to an additional sanction, they are "not

merely *disproportionate* in impact. Rather, they are wholly contingent on one's

ability to pay, and thus 'visi[t] different consequences on two categories of

persons[]'; they apply to all indigents and do not reach anyone outside that class."

*M.L.B.* v. *S.L.J.*, 519 U.S. 102, 127 (1996) (internal citation omitted; second

brackets in original); see also *Bearden*, 461 U.S. at 664 (applying "*Griffin*'s

principle of 'equal justice'" post-*Washington* v. *Davis* to prohibit revocations of probation without inquiring into ability to pay and consideration of alternatives); *Williams*, 399 U.S. at 242 ("Here the Illinois statutes as applied to Williams works an invidious discrimination solely because he is unable to pay the fine.").

In sum, under *Bearden* and other cases in *Griffin*'s progeny, a jurisdiction may not use a bail system that incarcerates indigent individuals without meaningful consideration of their indigence and alternative methods of assuring their appearance at trial.

B.   *Bail Systems That Keep Indigent Defendants In Jail Solely Because They Cannot Pay Bail Result In Unnecessary Pretrial Detention And Impede The Fair Administration Of Justice*

Bail practices that do not account for indigence result in the unnecessary incarceration of numerous individuals who are presumed innocent. Of the more than 730,000 individuals incarcerated in local jails nationwide in 2011, for example, about 60% were pretrial detainees (a rate unchanged since 2005), and most of them were accused of nonviolent offenses.[13] Unnecessary pretrial detention significantly burdens the limited resources of taxpayers and state and

---

[13]   See Richard Williams, *Bail or Jail*, State Legislatures (May 2012), available at http://www.ncsl.org/research/civil-and-criminal-justice/bail-or-jail.aspx; see also Todd D. Minton & Zhen Zeng, United States Department of Justice, Bureau of Justice Statistics, *Jail Inmates at Midyear 2014*, NCJ 248629, at 1, 3 (2015), available at http://www.bjs.gov/content/pub/pdf/jim14.pdf.

local governments.  It also creates additional problems as jails become

overcrowded.

The repercussions of unnecessary pretrial detention that disproportionately

affect indigent individuals can reverberate in other parts of the criminal justice

process and impede the fair administration of justice.  The "traditional right to

freedom before conviction permits the unhampered preparation of a defense, and

serves to prevent the infliction of punishment prior to conviction."  *Pugh*, 572 F.2d

at 1056-1057 (en banc) (citing *Hudson* v. *Parker*, 156 U.S. 277, 285 (1895)).  But

incarceration could hinder a defendant's "ability to gather evidence, contact

witnesses, or otherwise prepare his defense."  *Barker* v. *Wingo*, 407 U.S. 514, 533

(1972).  Excessive pretrial detention could also induce the innocent to plead guilty

for a speedier release or result in a detention period that exceeds the expected

sentence.[14]  And because "[m]ost jails offer little or no recreational or rehabilitative

programs," pretrial detention is not likely to reduce recidivism.  *Ibid.*

_____

[14]  See, *e.g.*, Andrew D. Leipold, *How the Pretrial Process Contributes to
Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123, 1154 (2005); Mary T. Phillips,
New York City Criminal Justice Agency, Inc., *Bail, Detention, and Felony Case
Outcomes*, *Research Brief No. 18*, at 7 (2008), available at http://www.nycja.org/
lwdcms/doc-view.php?module=reports&module_id=597&doc_name=doc;
Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev.
2463, 2492 (2004).

Pretrial incarceration also "often means loss of a job; it disrupts family life; and it enforces idleness." *Barker*, 407 U.S. at 532; see also ABA Standards for Criminal Justice: Pretrial Release 10-1.1 ("Deprivation of liberty pending trial is harsh and oppressive, subjects defendants to economic and psychological hardship, interferes with their ability to defend themselves, and, in many instances, deprives their families of support.").[15]  This impact may be exacerbated for indigent individuals who, as a consequence of their poverty, are already in vulnerable situations.[16]

In short, bail practices that fail to account for indigence are not only unconstitutional, but also conflict with sound public policy considerations.

---

[15] Available at http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pretrialrelease_blk.html#10-1.1.

[16] See Open Society Justice Initiative, *The Socioeconomic Impact of Pretrial Detention* 27-32 (2001) (examining the costs to pretrial detainees and their families as measured by income, employment, education, incarceration-related expenses, and long-term effects), available at http://www.pretrial.org/download/research/OSI%20Socioeconomic%20Impact%20Pretrial%20Detention%202011.pdf.

- 24 -

## CONCLUSION

If this Court reaches the issue presented herein, the Court should affirm the district court's holding that a bail scheme violates the Fourteenth Amendment if, without a court's meaningful consideration of ability to pay and alternative methods of assuring appearance at trial, it results in the detention of indigent defendants pretrial.

Respectfully submitted,

JOHN A. HORN
  United States Attorney
    Northern District of Georgia

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

s/ Christine H. Ku
TOVAH R. CALDERON

LISA FOSTER
  Director, Office for Access to Justice

CHRISTINE H. KU
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9044

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29 and 32(a)(7), because:

This brief contains 4491 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because:

This brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Times New Roman font.

s/ Christine H. Ku
CHRISTINE H. KU
  Attorney

Date:  August 18, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2016, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that on August 18, 2016, I will cause seven paper copies of this brief to be sent to the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by certified U.S. mail, postage prepaid and will cause one paper copy of the same to be mailed to the following counsel by certified U.S. mail, postage prepaid:

Bradley Williams Cornett
Ford Howard & Cornett, PC
140 S 9th ST
Gadsden, AL  35902

Lorelei Lein
Alabama League of Municipalities
535 Adams Ave
Montgomery, AL  36104-4333

s/ Christine H. Ku
CHRISTINE H. KU
 Attorney

# Fundamentals
# of Bail



A Resource Guide for Pretrial Practitioners and
a Framework for American Pretrial Reform





U.S. Department of Justice
National Institute of Corrections

# Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform

Authors: Timothy R. Schnacke

August 2014

Robert Brown
Acting Director

Harry Fenstermaker
Acting Deputy Director

Jim Cosby
Chief, Community Services
Division

Lori Eville
Project Manager

DISCLAIMER

This document was funded by cooperative agreement number 13CS02GK04 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice. The National Institute of Corrections reserves the right to reproduce, publish, translate, or otherwise use and to authorize others to publish and use all or any part of the copyrighted material contained in this publication.

ACCESSION NUMBER

NIC Accession Number: 028360

NIC's mission is to provide training, information and technical assistance to the nation's jails, prisons, and community corrections facilities. More information can be found at www.nicic.gov.



National Institute of Corrections

## Table of Contents

Preface ...................................................................................................................... i

Acknowledgments ................................................................................................... ii

Executive Summary ................................................................................................ iii

    Why Do We Need Pretrial Improvements? ........................................................ iii

    The History of Bail ........................................................................................... iv

    The Legal Foundations of Pretrial Justice ........................................................ v

    Pretrial Research .............................................................................................. v

    The National Standards on Pretrial Release ...................................................... vi

    Pretrial Terms and Phrases .............................................................................. vi

    Guidelines for Pretrial Reform ........................................................................ vi

Introduction ........................................................................................................... 1

Chapter 1: Why Do We Need Pretrial Improvements? ........................................... 7

    The Importance of Understanding Risk ........................................................... 7

    The Importance of Equal Justice ..................................................................... 8

    Negative Outcomes Associated with the Traditional Money Bail System ........ 10

    Unnecessary Pretrial Detention ...................................................................... 12

    Other Areas in Need of Pretrial Reform ......................................................... 17

    The Third Generation of Bail/Pretrial Reform ............................................... 18

Chapter 2: The History of Bail .............................................................................. 21

    The Importance of Knowing Bail's History ..................................................... 21

    Origins of Bail ................................................................................................ 23

    The Evolution to Secured Bonds/Commercial Sureties .................................... 26

    The "Bail/No Bail" Dichotomy ...................................................................... 29

    "Bail" and "No Bail" in America ..................................................................... 31

    Intersection of the Two Historical Phenomena ................................................ 36

    The Current Generation of Bail/Pretrial Reform ............................................ 40

    What Does the History of Bail Tell Us? .......................................................... 42

Chapter 3: Legal Foundations of Pretrial Justice .................................................. 45

History and Law ................................................................................................. 45

Fundamental Legal Principles........................................................................... 48

   The Presumption of Innocence ..................................................................... 48

   The Right to Bail ............................................................................................ 51

   Release Must Be the Norm............................................................................ 56

   Due Process ..................................................................................................... 56

   Equal Protection ............................................................................................. 57

   Excessive Bail and the Concept of Least Restrictive Conditions ................... 59

   Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose) . 64

   The Bail Process Must Be Individualized ....................................................... 65

   The Right to Counsel ..................................................................................... 66

   The Privilege Against Compulsory Self-Incrimination .................................. 67

   Probable Cause ............................................................................................... 67

Other Legal Principles........................................................................................ 68

What Do the Legal Foundations of Pretrial Justice Tell Us? ............................ 68

Chapter 4: Pretrial Research .............................................................................. 71

The Importance of Pretrial Research ................................................................. 71

Research in the Last 100 Years: The First Generation ......................................... 75

The Second Generation .................................................................................... 78

The Third Generation ....................................................................................... 80

Current Research – Special Mention ................................................................. 88

Empirical Risk Assessment Instruments ............................................................ 88

Effects of Release Types and Conditions on Pretrial Outcomes ........................ 91

Application and Implications............................................................................. 92

What Does the Pretrial Research Tell Us? ......................................................... 93

Chapter 5: National Standards on Pretrial Release ................................... 96

The ABA Standards .......................................................................................... 96

Chapter 6: Pretrial Terms and Phrases ........................................................ 99

The Importance of a Common Vocabulary ........................................................ 99

The Meaning and Purpose of "Bail" ................................................................. 100

Other Terms and Phrases.........................................................................105

Chapter 7: Application – Guidelines for Pretrial Reform .....................................107

Individual Action Leading to Comprehensive Cultural Change ....................107

Individual Decisions.............................................................................108

Individual Roles ..................................................................................109

Judicial Leadership .............................................................................112

Conclusion .............................................................................................115

# Preface

Achieving pretrial justice is like sharing a book – it helps when everyone is on the same page. So this document, "Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Justice," is primarily designed to help move America forward in its quest for pretrial reform by getting those involved in that quest on the same page. Since I began studying, researching, and writing about bail I (along with others, including, thankfully, the National Institute of Corrections) have seen the need for a document that figuratively steps back and takes a broader view of the issues facing America when it comes to pretrial release and detention. The underlying premise of this document is that until we, as a field, come to a common understanding and agreement about certain broad fundamentals of bail and how they are connected, we will see only sporadic rather than widespread improvement. In my opinion, people who endeavor to learn about bail will be most effective at whatever they hope to do if their bail education covers each of the fundamentals – the history, the law, the research, the national standards, and its terms and phrases.

Timothy R. Schnacke

Executive Director

Center for Legal and Evidence-Based Practices

# Acknowledgments

Many different people contributed to this paper in different ways, and it is not possible to list and thank them all by name. Nevertheless, a few entities and people warrant special mention. The first is the National Institute of Corrections, and especially Lori Eville and Katie Green, for conceiving the idea for the paper and allowing me the time to flesh it out. The NIC has been in the forefront of pretrial justice for many years, and I am honored to be able to add to their long list of helpful pretrial literature.

Cherise Fanno Burdeen and the National Association of Pretrial Services Agencies, through the helpful assistance of John Clark and Ken Rose, provided invaluable input on the draft, and Spurgeon Kennedy saved the day with his usual excellent editorial assistance. Also, I am especially grateful to my friend Dan Cordova and his staff at the Colorado Supreme Court Law Library. Their extraordinary expertise and service has been critical to everything I have written for the past seven years. Special thanks, as well, go to my friend and mentor, Judge Truman Morrison, who continues daily to teach and inspire me on issues surrounding bail and pretrial justice.

I would also like to thank my dear friend and an extraordinary criminal justice professor, Eric Poole, who patiently listened and helped me to mold the more arcane concepts from the paper. Moreover, I am also indebted to my former boss, Tom Giacinti, whose foresight and depth of experience in criminal justice allowed him to forge a path in this generation of American bail reform.

Finally, I give my deepest thanks and appreciation to Claire Brooker (Jefferson County, Colorado) and Mike Jones (Pretrial Justice Institute), who not only inspired most of the paper, but also acted (as usual) as my informal yet indispensable editors. It is impossible to list all of their contributions to my work, but the biggest is probably that Claire and Mike have either conceived or molded – through their intellectual and yet practical lenses – virtually every thought I have ever had concerning bail. If America ever achieves true pretrial justice, it will be due to the hard work of people like Claire Brooker and Mike Jones.

# Executive Summary

Pretrial justice in America requires a common understanding and agreement on all of the component parts of bail. Those parts include the need for pretrial justice, the history of bail, the fundamental legal principles underlying bail, the pretrial research, the national standards on pretrial release and detention, and how we define our basic terms and phrases.

## Why Do We Need Pretrial Improvements?

If we can agree on why we need pretrial improvements in America, we are halfway toward implementing those improvements. As recently as 2007, one of the most frequently heard objections to bail reform was the ubiquitous utterance, "If it ain't broke, don't fix it." That has changed. While various documents over the last 90 years have consistently pointed toward the need to improve the administration of bail, literature from this current generation of pretrial reform gives us powerful new information from which we can articulate exactly why we need to make changes, which, in turn, frames our vision of pretrial justice designed to fix what is most certainly broken.

Knowing that our understanding of pretrial risk is flawed, we can begin to educate judges and others on how to embrace risk first and mitigate risk second so that our foundational American precept of equal justice remains strong. Knowing that the traditional money-based bail system leads both to unnecessary pretrial detention of lower risk persons and the unwise release of many higher risk persons, we can begin to craft processes that are designed to correct this illogical imbalance. Knowing and agreeing on each issue of pretrial justice, from infusing risk into police officer stops and first advisements to the need for risk-based bail statutes and constitutional right-to-bail language, allows us as a field to look at each state (or even at all states) with a discerning eye to begin crafting solutions to seemingly insoluble problems.

## The History of Bail

Knowing the history of bail is critical to understanding why America has gone through two generations of bail reform in the 20th century and why it is currently in a third. History provides the contextual answers to virtually every question raised at bail. Who is against pretrial reform and why are they against it? What makes this generation of pretrial reform different from previous generations? Why did America move from using unsecured bonds administered through a personal surety system to using mostly secured bonds administered through a commercial surety system and when, exactly, did that happen? In what ways are our current constitutional and statutory bail provisions flawed? What are historical solutions to the dilemmas we currently see in the pretrial field? What is bail, and what is the purpose of bail? How do we achieve pretrial justice? All of these questions, and more, are answered through knowledge of the history of bail.

For example, the history tells us that bail should be viewed as "release," just as "no bail" should be viewed as detention. It tells us that whenever (1) bailable defendants (or those whom we feel should be bailable defendants) are detained, or (2) unbailable defendants (or those whom we feel should be unbailable defendants) are released, history demands a correction to ensure that, instead, bailable defendants are released and unbailable defendants are detained. Knowledge of this historical need for correction, by itself, points to why America is currently in a third generation of pretrial reform.

The history also tells us that it is the collision of two historical threads – the movement from an unsecured bond/personal surety system to a secured bond/commercial surety system colliding with the creation and nurturing of a "bail/no bail" dichotomy, in which bailable defendants are released and unbailable defendants are detained – that has led to the acute need for bail reform in the last 100 years. Thus, the history of bail instructs us not only on relevant older practices, but also on the important lessons from more recent events, including the first two generations of bail reform in America in the 20th century. It tells us how we can change state laws, policies, and practices so that bail can be administered in a lawful and effective manner, thereby greatly diminishing, if not avoiding altogether, the need for future reform.

## The Legal Foundations of Pretrial Justice

The history of bail and the law underlying the administration of bail are intertwined (with the law in most cases confirming and solidifying the history), but the law remains as the framework and boundary for all that we do in the pretrial field. Unfortunately, however, the legal principles underlying bail are uncommon in our court opinions; rarely, if ever, taught in our law schools and colleges; and have only recently been resurrected as subjects for continuing legal education. Nevertheless, in a field such as bail, which strives to follow "legal and evidence-based practices," knowledge of the fundamental legal principles and why they matter to the administration of bail is crucial to pretrial justice in America. Knowing "what works" – the essence of following the evidence in any particular field – is not enough in bail. We must also know the law and how the fundamental legal principles apply to our policies and practices.

Each fundamental principle of national applicability, from probable cause and individualization to excessiveness, due process, and equal protection, is thus a rod by which we measure our daily pretrial practices so that they further the lawful goals underlying the bail process. In many cases, the legal principles point to the need for drastic changes to those practices. Moreover, in this generation of bail reform we are beginning to learn that our current state and local laws are also in need of revision when held up to the broader legal foundations. Accordingly, as changing concepts of risk are infused into our knowledge of bail, shedding light on practices and local laws that once seemed practical but now might be considered irrational, the fundamental legal principles rise up to instruct us on how to change our state constitutions and bail statutes so that they again make sense.

## Pretrial Research

The history of bail and the law intertwined with that history tell us that the three goals underlying the bail process are to maximize release while simultaneously maximizing court appearance and public safety. Pretrial social research that studies what works to effectuate all three of these goals is superior to research that does not, and as a field we must agree on the goals as well as know the difference between superior and inferior research.

Each generation of bail reform in America has had a body of literature supporting pretrial improvements, and while more research is clearly needed (in

all genres, including, for example, social, historical, and legal research) this generation nonetheless has an ample supply from which pretrial practitioners can help ascertain what works to achieve our goals. Current research that is highly significant to today's pretrial justice movement includes research used to design empirical risk assessment instruments and to gauge the effectiveness of release types or specific conditions on pretrial outcomes.

## The National Standards on Pretrial Release

The pretrial field benefits significantly from having sets of standards and recommendations covering virtually every aspect of the administration of bail. In particular, the American Bar Association Standards, first promulgated in 1968, are considered not only to contain rational and practical "legal and evidence-based" recommendations, but also to serve as an important source of authority and have been used by legislatures and cited by courts across the country.

As a field we must recognize the importance of the national standards and stress the benefits from jurisdictions holding up their practices against what most would consider to be "best" practices. On the other hand, we must recognize that the rapidly evolving pretrial research may ultimately lead to questioning and possibly even revising those standards.

## Pretrial Terms and Phrases

A solid understanding of the history of bail, the legal foundations of bail, the pretrial research, and the national standards means, in many jurisdictions, that even such basic things as definitions of terms and phrases are in need of reform. For example, American jurisdictions often define the term "bail" in ways that are not supported by the history or the law, and these improper definitions cause undue confusion and distraction from significant issues. As a field seeking some measure of pretrial reform, we must all first agree on the proper and universally true definitions of our key terms and phrases so that we speak with a unified voice.

## Guidelines for Pretrial Reform

Pretrial justice in America requires a complete cultural change from one in which we primarily associate bail with money to one in which we do not. But cultural change starts with individuals making individual decisions to act. It may seem daunting, but it is not; many persons across America have decided to follow the

research and the evidence to assess whether pretrial improvements are necessary, and many of those same persons have persuaded entire jurisdictions to make improvements to the administration of bail. What these persons have in common is their knowledge of the fundamentals of bail. When they learn the fundamentals, light bulbs light, the clouds of confusion part, and what once seemed impossible becomes not only possible, but necessary and seemingly long overdue.

This document is designed to help people come to the same epiphany that has led so many to focus on pretrial reform as one of the principle criminal justice issues facing our country today. It is a resource guide written at a time when the resources are expanding exponentially and pointing in a single direction toward reform. More importantly, however, it represents a mental framework – a slightly new and interconnected way of looking at things – so that together we can finally and fully achieve pretrial justice in America.

# Introduction

It is a paradox of criminal justice that bail, created and molded over the centuries in England and America primarily to facilitate the release of criminal defendants from jail as they await their trials, today often operates to deny that release. More unfortunate, however, is the fact that many American jurisdictions do not even recognize the paradox; indeed, they have become gradually complacent with a pretrial process through which countless bailable defendants are treated as unbailable through the use of money. To be paradoxical, a statement must outwardly appear to be false or absurd, but, upon closer examination, shown to be true. In many jurisdictions, though, a statement such as, "The defendant is being held on $50,000 bail," a frequent tagline to any number of newspaper articles recounting a criminal arrest, seems to lack the requisite outward absurdity to qualify as paradoxical. After all, defendants are "held on bail" all the time. But the idea of being held or detained on bail is, in fact, absurd. An equivalent statement would be that the accused has been freed and is now at liberty to serve time in prison.

Recognizing the paradox is paramount to fully understanding the importance of bail, and the importance of bail cannot be overstated. Broadly defined, the study of bail includes examining all aspects of the non-sentence release and detention decision during a criminal defendant's case.[1] Internationally, bail is the subject of numerous treaties, conventions, rules, and standards. In America, bail has been the focus of two significant generations of reform in the 20th century, and appears now to be firmly in the middle of a third. Historically speaking, bail has existed since Roman times and has been the catalyst for such important criminal jurisprudential innovations as preliminary hearings, habeas corpus, the notion of "sufficient sureties," and, of course, prohibitions on pretrial detention without charge and on "excessive" bail as foundational to our core constitutional rights. Legally, decisions at bail trigger numerous foundational principles, including

---

[1] A broad definition of the study of criminal bail would thus appropriately include, and has in the past included, discussion of issues occasionally believed to be outside of the bail process, such as the use of citations in order to avoid arrest altogether or pretrial diversion as a dispositional alternative to the typical pretrial release or detention/trial/adjudication procedure. A broad definition would certainly include discussions of post-conviction bail, but because of fundamental differences between pretrial defendants and those who have been convicted, that subject is beyond the scope of this paper. For purposes of this paper, "bail" will refer to the pretrial process.

due process, the presumption of innocence, equal protection, the right to counsel, and other key elements of federal and state law. In the realm of criminal justice social science research, bail is a continual source of a rich literature, which, in turn, helps criminal justice officials as well as the society at large to decide the most effective manner in which to administer the release and detention decision. And finally, the sheer volume and resulting outcomes of the decisions themselves – decisions affecting over 12 million arrestees per year – further attest to the importance of bail as a topic that can represent either justice or injustice on a grand scale.

### Getting Started – What is Bail?
### What is Bond?

Later in this paper we will see how the history, the law, the social science research, and the national best practice standards combine to help us understand the proper definitions of terms and phrases used in the pretrial field. For now, however, the reader should note that the terms "bail" and "bond" are used differently across America, and often inaccurately when held up to history and the law. In the 1995 edition to his Dictionary of Modern Legal Usage, Bryan Garner described the word "bail" as a "chameleon-hued" legal term, with strikingly different meanings depending on its overall use as a noun or a verb. And indeed, depending on the source, one will see "bail" defined variously as money, as a person, as a particular type of bail bond, and as a process of release. Occasionally, certain definitions will conflict with other definitions or word usage even within the same source. Accordingly, to reflect an appropriate legal and historical definition, the term "bail" will be used in this paper to describe a process of releasing a defendant from jail or other governmental custody with conditions set to provide reasonable assurance of court appearance or public safety.

The term "bond" describes an obligation or a promise, and so the term "bail bond" is used to describe the agreement between a defendant and the court, or between the defendant, a surety (commercial or noncommercial), and the court that sets out the details of the agreement. There are many types of bail bonds – secured and unsecured, with or without sureties, and with or without other conditions – that fall under this particular definition. Later we will also see how defining types of bonds primarily based on their use of money in the process (such as a "cash" bond or a "personal recognizance bond") is misleading and inaccurate.

This paper occasionally mentions the terms "money bail," and the "traditional money bail system." "Money bail" is typically used as a shorthand way to describe the bail process or a bail bond using secured financial conditions (which

necessarily includes money that must be paid up-front prior to release). The two central issues concerning money bail are: (1) its tendency to cause unnecessary incarceration of defendants who cannot afford to pay secured financial conditions either immediately or even after some period of time; and (2) its tendency to allow for, and sometimes foster, the release of high-risk defendants, who should more appropriately be detained without bail.

The "traditional money bail system" typically describes the predominant American system (since about 1900) of primarily using secured financial conditions on bonds administered through commercial sureties. More broadly, however, it means any system of the administration of bail that is over-reliant on money, typically when compared to the American Bar Association's National Standards on Pretrial Release. Some of its hallmarks include monetary bail bond schedules, overuse of secured bonds, a reliance on commercial sureties (for-profit bail bondsmen), financial conditions set to protect the public from future criminal conduct, and financial conditions set without consideration of the defendant's ability to pay, or without consideration of non-financial conditions or other less-restrictive conditions that would likely reduce risk.

**Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 2nd ed. 1995); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011).

The importance of bail foreshadows the significant problems that can arise when the topic is not fully understood. Those problems, in turn, amplify the paradox. A country founded upon liberty, America leads the world in pretrial detention at three times the world average. A country premised on equal justice, America tolerates its judges often conditioning pretrial freedom based on defendant wealth – or at least on the ability to raise money – versus important and constitutionally valid factors such as the risk to public and victim safety. A country bound by the notion that liberty not be denied without due process of law, America tolerates its judges often ordering de-facto pretrial detention through brief and perfunctory bail hearings culminating with the casual utterance of an arbitrary and often irrational amount of money. A country in which the presumption of innocence is "axiomatic and elementary"[2] to its administration of criminal justice and foundational to the right to bail,[3] America, instead, often projects a presumption of guilt. These issues are exacerbated by the fact that the type of pretrial justice a person gets in this country is also determined, in large part, on where he or she is, with some jurisdictions

---

[2] *Coffin v. United States*, 156 U.S. 432, 453 (1895).
[3] *See Stack v. Boyle*, 342 U.S. 1, 4 (1951).

endeavoring to follow legal and evidence-based pretrial practices but with others woefully behind. In short, the administration of bail in America is unfair and unsafe, and the primary cause for that condition appears simply to be: (1) a lack of bail education that helps to illuminate solutions to a number of well-known bail problems; and (2) a lack of the political will to change the status quo.

> *"It is said that no one truly knows a nation until one has been inside its jails. A nation should not be judged by how it treats its highest citizens, but its lowest ones."*
>
> Nelson Mandela, 1995

Fortunately, better than any other time in history, we have now identified, and in many cases have actually illustrated through implementation, solutions to the most vexing problems at bail. But this knowledge is not uniform. Moreover, even where the knowledge exists, we find that jurisdictions are in varying stages of fully understanding the history of bail, legal foundations of bail, national best practice recommendations, terms and phrases used at bail, and legal and evidence-based practices that fully implement the fair and transparent administration of pretrial release and detention. Pretrial justice requires that those seeking it be consistent with both their vision and with the concept of pretrial best practices, and this document is designed to help further that goal. It can be used as a resource guide, giving readers a basic understanding of the key areas of bail and the criminal pretrial process and then listing key documents and resources necessary to adopt a uniform working knowledge of legal and evidence-based practices in the field.

Hopefully, however, this document will serve as more than just a paper providing mere background information, for it is designed, instead, to also provide the intellectual framework to finally achieve pretrial justice in America. As mentioned previously, in this country we have undertaken two generations of pretrial reform, and we are currently in a third. The lessons we have learned from the first two generations are monumental, but we have not fully implemented them, leading to the need for some "grand unifying theory" to explore how this third generation can be our last. In my opinion, that theory comes from a solid consensus understanding of the fundamentals of bail, why

they are important, and how they work together toward an idea of pretrial justice that all Americans can embrace.

The paper is made up of seven chapters designed to help jurisdictions across America to reach consensus on a path to pretrial justice. In the first chapter, we will briefly explore the need for pretrial improvements as well as the reasons behind the current generation of reform. In the second chapter, we will examine the evolution of bail through history, with particular emphasis on why the knowledge of certain historical themes is essential to reforming the pretrial process. In the third chapter, we will list and explain fundamental legal foundations underpinning the pretrial field. The fourth chapter will focus on the evolution of empirical pretrial research, looking primarily at research associated with each of the three generations of bail reform in America in the 20th and 21st centuries.

The fifth chapter will briefly discuss how the history, law, and research come together in the form of national pretrial standards and best practice recommendations. In the sixth chapter, we will further discuss how bail's history, law, research, and best practice standards compel us to agree on certain changes to the way we define key terms and phrases in the field. In the seventh and final chapter, we will focus on practical application – how to begin to apply the concepts contained in each of the previous sections to lawfully administer bail based on best practices. Throughout the document, through sidebars, the reader will also be introduced to other important but sometimes neglected topics relevant to a complete understanding of the basics of bail.

Direct quotes are footnoted, and other, unattributed statements are either the author's own or can be found in the "additional sources and resources" sections at the end of most chapters. In the interest of space, footnoted sources are not necessarily listed again in those end sections, but should be considered equally important resources for pretrial practitioners. Throughout the paper, the author occasionally references information that is found only in various websites. Those websites are as follows:

The American Bar Association: http://www.americanbar.org/aba.html;

The Bureau of Justice Assistance: https://www.bja.gov/;

The Bureau of Justice Statistics: http://www.bjs.gov/;

The Carey Group: http://www.thecareygroup.com/;

The Center for Effective Public Policy: http://cepp.com/;

The Crime and Justice Institute: http://www.crj.org/cji;

The Federal Bureau of Investigation Crime Reports: http://www.fbi.gov/about-us/cjis/ucr/ucr;

Human Rights Watch: http://www.hrw.org/;

Justia: http://www.justia.com/;

The Justice Management Institute: http://www.jmijustice.org/;

The Justice Policy Institute: http://www.justicepolicy.org/index.html;

NACo Pretrial Resources, http://www.naco.org/programs/csd/Pages/PretrialJustice.aspx;

The National Association of Pretrial Services Agencies: http://napsa.org/;

The National Criminal Justice Reference Service: https://www.ncjrs.gov/;

The National Institute of Corrections, http://nicic.gov;

The National Institute of Justice: http://www.nij.gov/Pages/welcome.aspx;

The Pretrial Justice Institute: http://www.pretrial.org/;

The Pretrial Services Agency for the District of Columbia, http://www.psa.gov/;

The United States Census Bureau, http://www.census.gov/;

The Vera Institute of Justice: http://www.vera.org/;

The Washington State Institute for Public Policy: http://www.wsipp.wa.gov/.

# Chapter 1: Why Do We Need Pretrial Improvements?

## The Importance of Understanding Risk

Of all the reasons for studying, identifying, and correcting shortcomings with the American system of administering bail, two overarching reasons stand out as foundational to our notions of freedom and democracy. The first is the concept of risk. From the first bail setting in Medieval England to any of a multitude of bail settings today, pretrial release and detention has always been concerned with risk, typically manifested by the prediction of pretrial misbehavior based on the risk that any particular defendant will not show up for court or commit some new crime if released. But often missing from our discussions of pretrial risk are the reasons for why we allow risk to begin with. After all, pretrial court appearance rates (no failures to appear) and public safety rates (no new crimes while on pretrial release) would most certainly hover near 100% if we could simply detain 100% of defendants.

The answer is that we not only allow for risk in criminal justice and bail, we demand it from a society that is based on liberty. In his Commentaries on the Laws of England (the eighteenth century treatise on the English common law used extensively by the American Colonies and our Founding Fathers) Sir William Blackstone wrote, "It is better that ten guilty persons escape than that one innocent suffer,"[4] a seminal statement of purposeful risk designed to protect those who are governed against unchecked despotism. More specifically related to bail, in 1951, Justice Robert H. Jackson succinctly wrote, "Admission to bail always involves a risk . . . a calculated risk which the law takes as the price of our system of justice."[5] That system of justice – one of limited government powers and of fundamental human rights protected by the Constitution, of defendants cloaked with the presumption of innocence, and of increasingly arduous evidentiary hurdles designed to ensure that only the guilty suffer punishment at the hands of the state – inevitably requires us to *embrace* risk at bail as fundamental to maintaining our democracy. Our notions of equality, freedom, and the rule of law demand that we embrace risk, and embracing risk requires us

---

[4] William Blackstone, *Commentaries on the Laws of England*, Book 4, ch. 27 (Oxford 1765-1769).

[5] *Stack v. Boyle*, 342 U.S. 1, 8 (1951) (Jackson, J., concurring).

to err on the side of release when considering the right to bail, and on "reasonable assurance," rather than complete assurance, when limiting pretrial freedom.

Despite the fact that risk is necessary, however, many criminal justice leaders lack the will to undertake it. To them, a 98% court appearance rate is 2% too low, one crime committed by a defendant while on pretrial release is one crime too many, and detaining some large percentage of defendants pretrial is an acceptable practice if it avoids those relatively small percentage failures. Indeed, the fears associated with even the smallest amount of pretrial failure cause those leaders to focus first and almost entirely on mitigating perceived risk, which in turn leads to unnecessary pretrial detention.

> *"All too often our current system permits the unfettered release of dangerous defendants while those who pose minimal, manageable risk are held in costly jail space."*
>
> Tim Murray, Pretrial Justice Institute, 2011

But these fears misapprehend the entire concept of bail, which requires us first to embrace the risk created by releasing defendants (for the law presumes and very nearly demands the release of bailable defendants) and then to seek to mitigate it only to reasonable levels. Indeed, while the notion may seem somewhat counterintuitive, in this one unique area of the law, everything that we stand for as Americans reminds us that when court appearance and public safety rates are high, we must at least consider taking the risk of releasing more defendants pretrial. Accordingly, one answer to the question of why pretrial improvements are necessary, and the first reason for correcting flaws in the current system, is that criminal justice leaders must continually take risks in order to uphold fundamental precepts of American justice; unfortunately, however, many criminal justice leaders, including those who administer bail today, often fail to fully understand that connection and have actually grown risk averse.

The Importance of Equal Justice

The second foundational reason for studying and correcting the administration of bail in America is epitomized by a quote from Judge Learned Hand uttered during a keynote address for the New York City Legal Aid Society in 1951. In his

speech, Judge Hand stated, "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice."[6] Ten years later, the statement was repeated by Attorney General Robert Kennedy when discussing the need for bail reform, and it became a foundational quote in the so-called "Allen Committee" report, the document from the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice that provided a catalyst for the first National Conference on Bail and Criminal Justice in 1964. Judge Hand's quote became a rallying cry for the first generation of American bail reform, and it remains poignant today, for in no other area of criminal procedure do we so blatantly restrict allotments of our fundamental legal principles. Like our aversion to risk, our rationing of justice at bail is something to which we have grown accustomed. And yet, if Judge Hand is correct, such rationing means that our very form of government is in jeopardy. Accordingly, another answer for why pretrial improvements are necessary, and a second reason for correcting flaws in the current system, is that allowing justice for some, but not all Americans, chips away at the founding principles of our democracy, and yet those who administer bail today have grown content with a system in which justice capriciously eludes persons based on their lack of financial resources.

Arguably, it is America's aversion to risk that has led to its complacency toward rationing pretrial justice. That is because bail, and therefore the necessary risk created by release, requires an in-or-out, release/no release decision. As we will see later in this paper, since at least 1275, bail was meant to be an in-or-out proposition, and only since about the mid to late 1800s in America have we created a process that allows judges to delegate that decision by merely setting an amount of up-front money. Unfortunately, however, setting an amount of money is typically not a release/no release decision; indeed, it can often cause both unintended releases and detentions. Setting money, instead, creates only the illusion of a decision for when money is a precondition to release, the actual release (or, indeed, detention) decision is then made by the defendant, the defendant's family, or perhaps some third party bail bondsman who has analyzed the potential for profit. This illusion of a decision, in turn, has masked our aversion to risk, for it appears to all that some decision has been made. Moreover, it has caused judges across America to be content with the negative outcomes of such a non-decision, in which pretrial justice appears arbitrarily rationed out only to those with access to money.

---

[6] *See* The Legal Aid Society website at http://www.legal-aid.org/en/las/thoushaltnotrationjustice.aspx.

Negative Outcomes Associated with the Traditional Money Bail System

Those negative outcomes have been well-documented. Despite overall drops in total and violent crime rates over the last twenty years, jail incarceration rates remain high – so high, in fact, that if we were to jail persons at the 1980 incarceration rate, a rate from a time in which crime rates were actually higher than today, our national jail population would drop from roughly 750,000 inmates to roughly 250,000 inmates. Moreover, most of America's jail inmates are classified as pretrial defendants, who today account for approximately 61% of jail populations nationally (up from approximately 50% in 1996). As noted previously, the United States leads the world in numbers of pretrial detainees, and detains them at a rate that is three times the world average.

## Understanding Your Jail Population

Knowing who is in your jail as well as fundamental jail population dynamics is often the first step toward pretrial justice. Many jurisdictions are simply unaware of who is in the jail, how they get into the jail, how they leave the jail, and how long they stay, and yet knowing these basic data is crucial to focusing on particular jail populations such as pretrial inmates.

A jail's population is affected not only by admissions and lengths of stay, but also by the discretionary decisionmaking by criminal justice officials who, whether on purpose or unwittingly, often determine the first two variables. For example, a local police department's policy of arresting and booking (versus release on citation) more defendants than other departments or to ask for unusually high financial conditions on warrants will likely increase a jail's number of admissions and can easily add to its overall daily population. As another example, national data has shown that secured money at bail causes pretrial detention for some defendants and delayed release for others, both increasing the lengths of stay for that population and sometimes creating jail crowding. Accordingly, a decision by one judge to order mostly secured (i.e., cash or surety) bonds will increase the jail population more than a judge who has settled on using less-restrictive means of limiting pretrial freedom while mitigating pretrial risk.

Experts on jail population analysis thus advise jurisdictions to adopt a systems perspective, create the infrastructure to collect and analyze system data, and collect and track trend data not only on inmate admissions and lengths of stay, but also on criminal justice decisionmaking for policy purposes.

**Sources and Resources:** David M. Bennett & Donna Lattin, *Jail Capacity Planning Guide: A Systems Approach* (NIC, Nov. 2009); Cherise Fanno Burdeen, *Jail Population Management: Elected County Officials' Guide to Pretrial Services* (NACo/BJA/PJI, 2009); Mark A. Cunniff, *Jail Crowding: Understanding Jail Population Dynamics,* (NIC, Jan. 2002); Robert C. Cushman, *Preventing Jail Crowding: A Practical Guide* (NIC, 2nd ed., May 2002); Todd D. Minton, *Jail Inmates at Midyear- 2012 Statistical Tables*, (BJS, 2013 and series). **Policy Documents Using Jail Population Analysis:** Jean Chung, *Baltimore Behind Bars, How to Reduce the Jail Population, Save Money and Improve Public Safety* (Justice Policy Institute, Jun. 2010); Marie VanNostrand, *New Jersey Jail Population Analysis: Identifying Opportunities to Safely and Responsibly Reduce the Jail Population* (Luminosity/Drug Policy Alliance, Mar. 2013).

These trends are best explained by the justice system's increasing use of secured financial conditions on a population that appears less and less able to afford them. In 2013, the Census Bureau announced that the poverty rate in America was 15%, about one in every seven persons and higher than in 2007, which was

just before the most recent recession. Nevertheless, according to the Bureau of Justice Statistics, the percentage of cases for which courts have required felony defendants to post money in order to obtain release has increased approximately 65% from 1990 to 2009 (from 37% to 61% of cases overall, mostly from the large increase in use of surety bonds), and the amounts of those financial conditions have steadily risen over the same period.

## Unnecessary Pretrial Detention

The problem highlighted by these data comes from the fact that secured financial conditions at bail cause unnecessary pretrial detention. In a recent and rigorous study of 2,000 Colorado cases comparing the effects between defendants ordered to be released on secured financial conditions (requiring either money or property to be paid in advance of release) and those ordered released on unsecured financial conditions (requiring the payment of either money or property only if the defendant failed to appear and not as a precondition to release), defendants with unsecured financial conditions were released in "statistically significantly higher" numbers no matter how high or low their individual risk.[7] Essentially, defendants ordered to be released but forced to pay secured financial conditions: (1) took longer to get out of jail (presumably for the time needed to gather the necessary money or to find willing sureties); and (2) in many cases did not get out at all. In short, using secured bonds leads to the detention of bailable defendants by delaying or preventing pretrial release. These findings are consistent with comparable national data; indeed, the federal government has estimated the percentage of felony defendants detained for the duration of their pretrial period nationally to be approximately 38%, and the percentage of those defendants detained simply due to the lack of money to be approximately 90% of that number.

There are numerous reasons to conclude that anytime a bailable defendant is detained for lack of money (rather than detained because of his or her high risk for pretrial misbehavior), that detention is unnecessary. First, secured money at bail is the most restrictive condition of release – it is typically the only precondition to release itself – and, in most instances, other less-restrictive alternatives are available to respond to pretrial risk without the additional financial condition. Indeed, starting in the 1960s, researchers have demonstrated that courts can use alternatives to release on money bonds that have acceptable

---

[7] Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option,* 12 (PJI 2013).

outcomes concerning risk to public safety and court appearance. Second, the money itself cannot serve as motivation for anything until it is actually posted. Until then, the money merely detains, and does so unequally among defendants resulting in the unnecessary detention of releasable inmates. This problem is exacerbated by the fact that the financial condition of a bail bond is typically arbitrary; even when judges are capable of expressing reasons for a particular amount, there is often no rational explanation for why a second amount, either lower or higher, might not arguably serve the same purposes. Third, money set with a purpose to detain is likely unlawful under numerous theories of law, and is also unnecessary given the Supreme Court's approval of a lawful detention scheme that uses no money whatsoever. Financial conditions of release are indicators of decisions to release, not to detain; accordingly, any resulting detention due to money bonds used outside of a lawful detention process makes that money-based detention unnecessary or potentially unlawful. Fourth, no study has ever shown that money can protect the public. Indeed, in virtually every American jurisdiction, financial conditions of bail bonds cannot even be forfeited for new crimes or other breaches in public safety, making the setting of a money bond for public safety irrational. Given that irrationality, any pretrial detention resulting from that practice is per se unnecessary.

Fifth, ever since 1968, when the American Bar Association openly questioned the basic premise that money serves as a motivator for court appearance, no valid study has been conducted to refute that uncertainty. Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money does not matter when it comes to either public safety or court appearance, but it is directly related to pretrial detention. This hypothesis was supported most recently by the Colorado study, mentioned above, which compared outcomes for defendants released on secured bonds with outcomes for defendants released on unsecured bonds. In 2,000 cases of defendants from all risk categories, this research showed that while having to pay the money up-front led to statistically significantly higher detention rates, whether judges used secured or unsecured money bonds did not lead to any differences in court appearance or public safety rates.

A sixth reason for concluding that bailable defendants held on secured financial conditions constitutes unnecessary pretrial detention is that we know of at least one jurisdiction, Washington D.C., that uses virtually no money at all in its bail setting process. Instead, using an "in or out," "bail/no bail" scheme of the kind contemplated by American law, the District of Columbia releases 85-88% of all defendants – detaining the rest through rational, fair, and transparent detention

procedures – and yet maintains high court appearance (no FTA) and public safety (no new crime) rates. Moreover, that jurisdiction does so day after day, with all types of defendants charged with all types of crimes, using almost no money whatsoever.

Unnecessary pretrial detention is also suggested whenever we look at the adjudicatory outcomes of defendants' cases to see if they are the sorts of individuals who must be absolutely separated from society. When we look at those outcomes, however, we see that even though we foster a culture of pretrial detention, very few persons arrested or admitted to jail are ultimately sentenced to significant incarceration post-trial. Indeed, only a small fraction of jail inmates nationally (from 3-5%, depending on the source) are sent to prison. In one statewide study, only 14% of those defendants detained for the *entire duration* of their case were sentenced to prison. Thirteen percent had their cases dismissed (or the cases were never filed), and 37% were sentenced to noncustodial sanctions, including probation, community corrections, or home detention. Accordingly, over 50% of those pretrial detainees were released into the community once their cases were done. In another study, more than 25% of felony pretrial detainees were acquitted or had their cases dismissed, and approximately 20% were ultimately sentenced to a noncustodial sentence. Clearly, another disturbing paradox at bail involves the dynamic of releasing presumptively innocent defendants back into the community only after they have either pleaded or been found guilty of a particular crime.

In addition, and as noted by the Pretrial Justice Institute (PJI), these statistics vary greatly across the United States, and that variation itself hints at the need for reform. According to PJI:

> Looking at the counties individually shows the great disparity in pretrial release practices and outcomes. In 2006, pretrial release rates ranged from a low of 31% in one county to a high of 83% in another. Non-financial release rates ranged from lows of zero in one county, 3% in another, and 5% in a third to a high of 68%.[8]

---

[8] *Important Data on Pretrial Justice* (PJI 2011).

## Different Laws/Different Practices

Bail laws are different among the states, often due to the extent to which those states have fully embraced the principles and practices evolving out of the two previous generations of bail reform in the 1960s and 1980s. Even in states with similar laws, however, pretrial practices can nonetheless vary widely. Indeed, local practices can vary among jurisdictions under the same state laws, and, given the great discretion often afforded at bail, even among judges within individual jurisdictions. Disparity beyond that needed to individualize bail settings can rightfully cause concerns over equal justice, through which Americans can be reasonably assured that the laws will not have widely varying application depending on their particular geographical location, court, or judge.

Normally, state and federal constitutional law would provide adequate benchmarks to maintain equal justice, but with bail we have an unfortunate scarcity of language and opinions from which to gauge particular practices or even the laws from which those practices derive. Fortunately, however, we have best practice standards on pretrial release and detention that take fundamental legal principles and marry them with research to make recommendations concerning virtually every issue surrounding pretrial justice. In this current generation of pretrial reform, we are realizing that both bail practices and the laws themselves – from court rules to constitutions – must be held up to best practices and the legal principles underlying them to create bail schemes that are fair and applied somewhat equally among the states.

The American Bar Association's (ABA's) Criminal Justice Standards on Pretrial Release can provide the benchmarks that we do not readily find in bail law. When followed, those Standards provide the framework from which pretrial practices or even laws can be measured, implemented, or improved. For example, the use of monetary bail schedules (a document assigning dollar amounts to particular charges regardless of the characteristics of any individual defendant) are illegal in some states but actually required by law in others. There is very little law on the subject, but the ABA standards (using fundamental legal principles, such as the need for individuality in bail setting as articulated by the United States Supreme Court), research (indicating that release or detention based on individual risk is a superior practice to any mechanism based solely on charge and wealth), and logic (the standards call schedules "arbitrary and inflexible") reject the use of monetary bail schedules, thus suggesting that any state that either mandates or permits their use should consider statutory amendment.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice – Pretrial Release* (3rd ed. 2007).

Pretrial detention, whether for a few days or for the duration of the case, imposes certain costs, and unnecessary pretrial detention does so wastefully. In a purely monetary sense, these costs can be estimated, such as the comparative cost of incarceration (from $50 to as much as $150 per day) versus community supervision (from as low as $3 to $5 per day). Given the volume of defendants and their varying lengths of stays, individual jails can incur costs of millions of dollars per year simply to house lower risk defendants who are also presumed innocent by the law. Indeed, the United States Department of Justice estimates that keeping the pretrial population behind bars costs American taxpayers roughly 9 billion dollars per year. Jails that are crowded can create an even more costly scenario for taxpayers, as new jail construction can easily reach $75,000 to $100,000 per inmate bed. Added to these costs are dollars associated with lost wages, economic mobility (including intergenerational effects), possible welfare costs for defendant families, and a variety of social costs, including denying the defendant the ability to assist with his or her own defense, the possibility of imposing punishment prior to conviction, and eroding justice system credibility due to its complacency with a wealth-based system of pretrial freedom.

Perhaps more disturbing, though, is research suggesting that pretrial detention alone, all other things being equal, leads to harsher treatment and outcomes than pretrial release. Relatively recent research from both the Bureau of Justice Statistics and the New York City Criminal Justice Agency continues to confirm studies conducted over the last 60 years demonstrating that, controlling for all other factors, defendants detained pretrial are convicted and plead guilty more often, and are sentenced to prison and receive harsher sentences than those who are released. Moreover, as recently as November 2013, the Laura and John Arnold Foundation released a study of over 150,000 defendants finding that – all other things being equal – defendants detained pretrial were over four times more likely to be sentenced to jail (and with longer sentences) and three times more likely to be sentenced to prison (again with longer sentences) than defendants who were not detained.[9]

While detention for a defendant's entire pretrial period has decades of documented negative effects, the Arnold Foundation research is also beginning to demonstrate that even small amounts of pretrial detention – perhaps even the few days necessary to secure funds to pay a cash bond or fee for a surety bond – have negative effects on defendants and actually makes them more at risk for

---

[9] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, at 10-11 (Laura & John Arnold Found. 2013).

pretrial misbehavior.[10] Looking at the same 150,000 case data set, the Arnold researchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly *increasing* the danger to the public – both short and long-term – is cause for radically rethinking the way we administer bail.

## Other Areas in Need of Pretrial Reform

Unnecessary pretrial detention is a deplorable byproduct of the traditional money bail system, but it is not the only part of that system in need of significant reform. In many states, the overreliance on money at bail takes the place of a transparent and due-process-laden detention scheme based on risk, which would allow for the detention of high-risk defendants with no bail. Indeed, the traditional money bail system fosters processes that allow certain high-risk defendants to effectively purchase their freedom, often without being assessed for their pretrial risk and often without supervision. These processes include using bail schedules (through which defendants are released by paying an arbitrary money amount based on charge alone), a practice of dubious legal validity and counter to any notions of public safety. They include using bail bondsmen, who operate under a business model designed to maximize profit based on getting defendants back to court but with no regard for public safety. And they include setting financial conditions to help protect the public, a practice that is both legally and empirically flawed. In short, the use of money at bail at the expense of risk-based best practices tends to create the two main reasons cited for the need for pretrial reform: (1) it needlessly and unfairly keeps lower risk defendants in jail, disproportionately affecting poor and minority defendants and at a high cost to taxpayers; and (2) it too often allows higher risk defendants out of jail at the expense of public safety and integrity of the justice system. Both of these reasons were illustrated by the Colorado study, cited above, which documented that when making bail decisions without the benefit of an empirical risk instrument, judges often set financial conditions that not only

---

[10] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013).

kept lower risk persons in jail, but also frequently allowed the highest risk defendants out.

While the effect of money at bail is often cited as a reason for pretrial reform, research over the last 25 years has also illuminated other issues ripe for pretrial justice improvements. They include the need for (1) bail education among all criminal justice system actors; (2) data-driven policies and infrastructure to administer bail; (3) improvements to procedures for release through citations and summonses; (4) better prosecutorial and defense attorney involvement at the front-end of the system; (5) empirically created pretrial risk assessment instruments; (6) traditional (and untraditional) pretrial services functions in jurisdictions without those functions; (7) improvements to the timing and nature of first appearances; (8) judicial release and detention decision-making to follow best practices; (9) systems to allocate resources to better effectuate best practices; and (10) changes in county ordinances, state statutes, and even state constitutions to embrace and facilitate pretrial justice and best practices at bail.

> *"What has been made clear . . . is that our present attitudes toward bail are not only cruel, but really completely illogical. . . . '[O]nly one factor determines whether a defendant stays in jail before he comes to trial [and] that factor is, simply, money."*
>
> Attorney General Robert Kennedy, 1962
>
> *Many pretrial inmates "are forced to remain in custody . . . because they simply cannot afford to post the bail required – very often, just a few hundred dollars."*
>
> Attorney General Eric Holder, 2011

## The Third Generation of Bail/Pretrial Reform

The traditional money bail system that has existed in America since the turn of the 20th century is deficient legally, economically, and socially, and virtually every neutral and objective bail study conducted over the last 90 years has called for its reform. Indeed, over the last century, America has undergone two generations of bail reform, but those generations have not sufficed to fully achieve what we know today constitutes pretrial justice. Nevertheless, we are

entering a new generation of pretrial reform with the same three hallmarks seen in previous generations.

First, like previous generations, we now have an extensive body of research literature – indeed, we have more than previous generations – pointing uniformly in a single direction toward best practices at bail and toward improvements over the status quo. Second, we have the necessary meeting of minds of an impressive number of national organizations – from police chiefs and sheriffs, to county administrators and judges – embracing the research and calling for data-driven pretrial improvements. Third, and finally, we are now seeing jurisdictions actually changing their laws, policies, and practices to reflect best practice recommendations for improvements. Fortunately, through this third generation of pretrial reform, we already know the answers to most of the pressing issues at bail. We know what changes must be made to state laws, and we know how to follow the law and the research to create bail schemes in which pretrial practices are rational, fair, and transparent.

A deeper understanding of the foundations of bail makes the need for pretrial improvements even more apparent. The next three parts of this paper are designed to summarize the evolution and importance of three of the most important foundational aspects of bail – the history, the law, and the research.

**Additional Sources and Resources:** American Bar Association Standards for Criminal Justice – Pretrial Release (3rd ed. 2007); Spike Bradford, *For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice* (JPI 2012); E. Ann Carson & William J. Sabol, *Prisoners in 2011* (BJS 2012); *Case Studies: the D.C. Pretrial Services Agency: Lessons From Five Decades of Innovation and Growth* (PJI), found at http://www.pretrial.org/download/pji-reports/Case%20Study-%20DC%20Pretrial%20Services%20-%20PJI%20202009.pdf; Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties*, 2006 (BJS 2010); Jean Chung, *Bailing on Baltimore: Voices from the Front Lines of the Justice System* (JPI 2012); Thomas H. Cohen & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts* (BJS 2007); Jamie Fellner, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City* (Human Rights Watch 2010); *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012); Robert F. Kennedy, *Address by Attorney General Robert F. Kennedy to the American Bar Association House of Delegates, San Francisco, Cal.,* (Aug. 6, 1962) available at http://www.justice.gov/ag/rfkspeeches/1962/08-06-1962%20Pro.pdf; Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Barry

Mahoney, Bruce D. Beaudin, John A. Carver, III, Daniel B. Ryan, & Richard B. Hoffman, *Pretrial Services Programs: Responsibilities and Potential* (NIJ 2001); Todd D. Minton, *Jail Inmates at Midyear 2012 – Statistical Tables* (BJS 2013); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJA 2011); Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail* (JPI 2012); Mary T. Phillips, *Bail, Detention, and Non-Felony Case Outcomes, Research Brief Series No. 14* (NYCCJA 2007); Mary T. Phillips, *Pretrial Detention and Case Outcomes, Part 2, Felony Cases, Final Report* (NYCCJA 2008); *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process* (PJI/MacArthur Found. 2012); Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009 – Statistical Tables* (BJS 2013); *Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice* (Univ. of Mich. 2011) (1963); *Responses to Claims About Money Bail for Criminal Justice Decision Makers* (PJI 2010); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *The Third Generation of Bail Reform* (Univ. Den. L. Rev. online, 2011); Standards on Pretrial Release (NAPSA, 3rd ed. 2004); Bruce Western & Becky Pettit, *Collateral Costs: Incarceration's Effect on Economic Mobility* (The PEW Charitable Trusts 2010).

# Chapter 2: The History of Bail

According to the American Historical Association, studying history is crucial to helping us understand ourselves and others in the world around us. There are countless quotes on the importance of studying history from which to draw, but perhaps most relevant to bail is one from philosopher Soren Kierkegaard, who reportedly said, "Life must be lived forward, but it can only be understood backward." Indeed, much of bail today is complex and confusing, and the only way to truly understand it is to view it through a historical lens.

## The Importance of Knowing Bail's History

Understanding the history of bail is not simply an academic exercise. When the United States Supreme Court equated the right to bail to a "right to release before trial," and likened the modern practice of bail with the "ancient practice of securing the oaths of responsible persons to stand as sureties for the accused,"[11] the Court was explaining the law by drawing upon notions discernible only through knowledge of history. When the commercial bail insurance companies argue that pretrial services programs have "strayed" beyond their original purpose, their argument is not fully understood without knowledge of 20th century bail, and especially the improvements gained from the first generation of bail reform in the 1960s. Some state appellate courts have relied on sometimes detailed accounts of the history of bail in order to decide cases related to release under "sufficient sureties," a term fully known only through the lens of history.

> *"This difference [between the U.S. and the Minnesota Constitution] is critical to our analysis and to fully understand this critical difference, some knowledge of the history of bail is necessary. Therefore, it is important to examine the origin of bail and its development in Anglo-American jurisprudence."*
>
> *State v. Brooks*, 604 N.W.2d 345 (Minn. 2000)

In short, knowledge of the history of bail is necessary to pretrial reform, and therefore it is crucial that this history be shared. Indeed, the history of bail is the

---

[11] *Stack v. Boyle,* 342 U.S. 1, 4-5 (1951).

starting point for understanding all of pretrial justice, for that history has shaped our laws, guided our research, helped to mold our best practice standards, and forced changes to our core definitions of terms and phrases. Fundamentally, though, the history of bail answers two pressing questions surrounding pretrial justice: (1) given all that we know about the deleterious effects of money at bail, how did America, as opposed to the rest of the world, come to rely upon money so completely?; and (2) does history suggest solutions to this dilemma, which might lead to American pretrial justice?

### Civil Rights, Poverty, and Bail

Anyone who has read the speeches of Robert F. Kennedy while he was Attorney General knows that civil rights, poverty, and bail were three key issues he wished to address. Addressing them together, as he often did, was no accident, as the three topics were, and continue to be, intimately related.

In 1961, philanthropist Louis Schweitzer and magazine editor Herbert Sturz took their concerns over the administration of bail in New York City (a system "that granted liberty based on income") to Robert Kennedy and Daniel Freed, Department of Justice liaison to the newly created Committee on Poverty and the Administration of Federal Criminal Justice, known as the "Allen Committee." Schweitzer's and Sturz's efforts ultimately led to the creation of the Vera Foundation (now the Vera Institute of Justice), whose pioneering work on the Manhattan Bail Project heavily influenced the first generation of bail reform by finding effective alternatives to the commercial bail system. Freed, in turn, took the Vera work and incorporated it into an entire chapter of the Allen Committee's report, leading to the first National Conference on Bail and Criminal Justice in 1964.

At the same time that these bail and poverty reformers were working to change American notions of equal justice, civil rights activists were taking on a traditionally difficult hurdle for Southern blacks – the lack of money to bail themselves and others out of jail – and using it to their advantage. Through the "jail, no bail" policy, activists refused to pay bail or fines after being arrested for sit-ins, opting instead to have the government incarcerate them, and sometimes to force them to work hard labor, to bring more attention to their cause.

The link between civil rights, poverty, and bail was probably inevitable, and Kennedy set out to rectify overlapping injustices seen in all three areas. But despite promising improvements encompassed in the war on poverty, the civil rights movement, and the first generation of bail reform in the 1960s, we remain unfortunately tolerant of a bail process inherently biased against the poor and disproportionately affecting persons of color. Studies continue to demonstrate that bail amounts are empirically related to increased (and typically needless)

pretrial detention, and other studies are equally consistent in demonstrating racial disparity in the application of bail and detention.

Fortunately, however, just like those persons pursuing civil rights and equal justice in the 20th century, the current generation of pretrial reform is fueled by committed individuals urging cultural changes to a system manifested by disparate state laws, unfair practices, and irrational policies that negatively affect the basic human rights of the most vulnerable among us. The commitment of those individuals, stemming from the success of past reformers, remains the catalyst for pretrial justice across the nation.

**Sources and Resources:** Thomas H. Cohen and Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts, 1990-2004* (BJS Nov. 2007); Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations,* 16 N.Y.U. J. Legis. & Pub. Pol'y 919 (2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (PJI Oct. 2013); Besiki Kutateladze, Vanessa Lynn, & Edward Liang, *Do Race and Ethnicity Matter in Prosecution? Review of Empirical Studies* (1st Ed.) (Vera Institute of Justice 2012) at 11-12; *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 35-35 and citations therein (PJI/BJA 2011) (statement of Professor Cynthia Jones).

## Origins of Bail

While bail can be traced to ancient Rome, our traditional American understanding of bail derives primarily from English roots. When the Germanic tribes the Angles, the Saxons, and the Jutes migrated to Britain after the fall of Rome in the fifth century, they brought with them the blood feud as the primary means of settling disputes. Whenever one person wronged another, the families of the accused and the victim would often pursue a private war until all persons in one or both of the families were killed. This form of "justice," however, was brutal and costly, and so these tribes quickly settled on a different legal system based on compensation (first with goods and later with money) to settle wrongs. This compensation, in turn, was based on the concept of the "wergeld," meaning "man price" or "man payment" and sometimes more generally called a "bot," which was a value placed on every person (and apparently on every person's property) according to social rank. Historians note the existence of detailed tariffs assigning full wergeld amounts to be paid for killing persons of various ranks as well as partial amounts payable for injuries, such as loss of limbs or other wrongs. As a replacement to the blood feud between families, the wergeld system was also initially based on concepts of kinship and private justice, which

meant that wrongs were still settled between families, unlike today, where crimes are considered to be wrongs against all people or the state.

With the wergeld system as a backdrop, historians agree on what was likely a prototypical bail setting that we now recognize as the ancestor to America's current system of release. Author Hermine Meyer described that original bail process as follows:

> Since the [wergeld] sums involved were considerable and could rarely be paid at once, the offender, through his family, offered sureties, or *wereborh*, for the payment of the *wergeld*. If accepted, the injured party met with the offender and his surety. The offender gave a *wadia*, a *wed*, such as a stick, as a symbol or pledging or an indication of the assumption of responsibility. The creditor then gave it to the surety, indicating that he recognized the surety as the trustee for the debt. He thereby relinquished his right to use force against the debtor. The debtor's pledge constituted a pledging of person and property. Instead of finding himself in the hands of the creditor, the debtor found himself, up to the date when payment fell due, in the hands of the surety.[12]

This is, essentially, the "ancient practice of securing the oaths" referred to by the Supreme Court in *Stack v. Boyle,* and it has certain fundamental properties that are important to note. First, the surety (also known as the "pledge" or the "bail") was a person, and thus the system of release became known as the "personal surety system." Second, the surety was responsible for making sure the accused paid the wergeld to avoid a feud, and he did so by agreeing in early years to stand in completely for the accused upon default of his obligations ("body for body," it was reported, meaning that the surety might also suffer some physical punishment upon default), and in later years to at least pay the wergeld himself in the event of default. Thus, the personal surety system was based on the use of recognizances, which were described by Blackstone as obligations or debts that would be voided upon performance of specified acts. Though not completely the same historically, they are essentially what we might now call unsecured bonds using co-signors, with nobody required to pay any money up-front, and with the

---

[12] Hermine Herta Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139, 1146 (1971-1972) (citing and summarizing Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275,* 3-15 (NY, AMS Press, 1966).

security on any particular bond coming from the sureties, or persons, who were willing to take on the role and acknowledge the amount potentially owed upon default.

Third, the surety was not allowed to be repaid or otherwise profit from this arrangement. As noted above, the wadia, or the symbol of the suretyship arrangement, was typically a stick or what historians have described as some item of trifling value. In fact, as discussed later, even reimbursing or merely promising to reimburse a surety upon default – a legal concept known as indemnification – was declared unlawful in both England and America and remained so until the 1800s.

Fourth, the surety's responsibility over the accused was great and was based on a theory of continued custody, with the sureties often being called "private jailers" or "jailers of [the accused's] own choosing."[13] Indeed, it was this great responsibility, likely coupled with the prohibition on reimbursement upon default and on profiting from the system, which led authorities to bestow great powers to sureties as jailers to produce the accused – powers that today we often associate with those possessed by bounty hunters under the common law. Fifth, the purpose of bail in this earliest of examples was to avoid a blood feud between families. As we will see, that purpose would change only once in later history. Sixth and finally, the rationale behind this original bail setting made sense because the amount of the payment upon default was identical to the amount of the punishment. Accordingly, because the amount of the promised payment was identical to the wergeld, for centuries there was never any questioning whether the use of that promised amount for bail was arbitrary, excessive, or otherwise unfair.

The administration of bail has changed enormously from this original bail setting, and these changes in America can be attributed largely to the intersection during the 20th century of two historical phenomena. The first was the slow evolution from the personal surety system using unsecured financial conditions to a commercial surety system (with profit and indemnification) primarily using secured financial conditions. The second was the often misunderstood creation and nurturing of a "bail/no bail" or "release/no release" dichotomy, which continues to this day.

---

[13] *Reese v. United States*, 76 U.S. (9 Wall.) 13, 21 (1869).

## The Evolution to Secured Bonds/Commercial Sureties

The gradual evolution from a personal surety system using unsecured bonds to the now familiar commercial surety system using secured bonds in America began with the Norman Invasion. When the Normans arrived in 1066, they soon made changes to the entire criminal justice system, which included moving from a private justice system to a more public one through three royal initiatives. First, the crown initiated the now-familiar idea of crimes against the state by making certain felonies "crimes of royal concern." Second, whereas previously the commencement of a dispute between families might start with a private summons based upon sworn certainty, the crown initiated the mechanism of the presentment jury, a group of individuals who could initiate an arrest upon mere suspicion from third parties. Third, the crown established itinerant justices, who would travel from shire to shire to exert royal control over defendants committing crimes of royal concern. These three changes ran parallel to the creation of jails to hold various arrestees, although the early jails were crude, often barbaric, and led to many escapes.

These changes to the criminal justice process also had a measurable effect on the number of cases requiring bail. In particular, the presentment jury process led to more arrests than before, and the itinerant justice system led to long delays between arrest and trial. Because the jails at the time were not meant to hold so many persons and the sheriffs were reluctant to face the severe penalties for allowing escapes, those sheriffs began to rely more frequently upon personal sureties, typically responsible (and preferably landowning) persons known to the sheriff, who were willing to take control of the accused prior to trial. The need for more personal sureties, in turn, was met through the growth of the parallel institutions of local government units known as tithings and hundreds – a part of the overall development of the frankpledge system, a system in which persons were placed in groups to engage in mutual supervision and control.

While there is disagreement on whether bail was an inherent function of frankpledge, historians have frequently documented sheriffs using sureties from within the tithings and hundreds (and sometimes using the entire group), indicating that that these larger non-family entities served as a safety valve so that sheriffs or judicial officials rarely lacked for "sufficient" sureties in any particular case. The fundamental point is that in this period of English history, sureties were individuals who were willing to take responsibility over defendants – for no money and with no expectation of indemnification upon default – and the sufficiency of the sureties behind any particular release on bail

came from finding one or more of these individuals, a process that was made exceedingly simpler through the use of the collective, non-family groups.

All of this meant that the fundamental purpose of bail had changed: whereas the purpose of the original bail setting process of providing oaths and pledges was to avoid a blood feud between families while the accused met his obligations, the use of more lengthy public processes and jails meant that the purpose of bail would henceforth be to provide a mechanism for release. As before, the purpose of conditioning that release by requiring sureties was to motivate the accused to face justice – first to pay the debt but now to appear for court – and, indeed, court appearance remained the sole purpose for limiting pretrial freedom until the 20th century.

Additional alterations to the criminal process occurred after the Norman Invasion, but the two most relevant to this discussion involve changes in the criminal penalties that a defendant might face as well as changes in the persons, or sureties, and their associated promises at bail. At the risk of being overly simplistic, punishments in Anglo-Saxon England could be summed up by saying that if a person was not summarily executed or mutilated for his crime (for that was the plight of persons with no legal standing, who had been caught in the act, or persons of "ill repute" or long criminal histories, etc.), then that person would be expected to make some payment. With the Normans, however, everything changed. Slowly doing away with the wergeld payments, the Normans introduced first afflictive punishment, in the form of ordeals and duels, and later capital and other forms of corporal punishment and prison for virtually all other offenses.

The changes in penalties had a tremendous impact on what we know today as bail. Before the Norman Invasion, the surety's pledge matched the potential monetary penalty perfectly. If the wergeld was thirty silver pieces, the surety was expected to pay exactly thirty silver pieces upon default of the primary debtor. After the Invasion, however, with increasing use of capital punishment, corporal punishment, and prison sentences, it became frequently more difficult to assign the amount that ought to be pledged, primarily because assigning a monetary equivalent to either corporal punishment or imprisonment is largely an arbitrary act. Moreover, the threat of these seemingly more severe punishments led to increasing numbers of defendants who refused to stay put, which created additional complexity to the bail decision. These complexities, however, were not enough to cause society to radically change course from its use of the personal surety system. Instead, that change came when both England and America began running out of the sureties themselves.

As noted previously, the personal surety system generally had three elements:
(1) a reputable person (the surety, sometimes called the "pledge" or the "bail");
(2) this person's willingness to take responsibility for the accused under a private
jailer theory and with a promise to pay the required financial condition on the
back-end – that is, only if the defendant forfeited his obligation; and (3) this
person's willingness to take the responsibility without any initial remuneration
or even the promise of any future payment if the accused were to forfeit the
financial condition of bail or release. This last requirement addressed the concept
of indemnification of sureties, which was declared unlawful by both England
and America as being against the fundamental public policy for having sureties
take responsibility in the first place. In both England and America, courts
repeatedly articulated (albeit in various forms) the following rationale when
declaring surety indemnification unlawful: once a surety was paid or given a
promise to be paid the amount that could potentially be forfeited, that surety lost
all interest and motivation to make sure that the condition of release was
performed. Thus, a prohibition on indemnifying sureties was a foundational part
of the personal surety system.

And indeed, the personal surety system flourished in England and America for
centuries, virtually ensuring that those deemed bailable were released with
"sufficient sureties," which were designed to provide assurance of court
appearance. Unfortunately, however, in the 1800s both England and America
began running out of sureties. There are many reasons for this, including the
demise of the frankpledge system in England, and the expansive frontier and
urban areas in America that diluted the personal relationships necessary for a
personal surety system. Nevertheless, for these and other reasons, the demand
for personal sureties gradually outgrew supply, ultimately leading to many
bailable defendants being unnecessarily detained.

It is at this point in history that England and the United States parted ways in
how to resolve the dilemma of bailable defendants being detained for lack of
sureties. In England (and, indeed, in the rest of the world), the laws were
amended to allow judges to dispense with sureties altogether when justice so
required. In America, however, courts and legislatures began chipping away at
the laws against surety indemnification. This transformation differed among the
states. In the end, however, across America states gradually allowed sureties to
demand re-payment upon a defendant's default and ultimately to profit from the
bail enterprise itself. By 1898, the first commercial surety was reportedly opened
for business in America. And by 1912, the United States Supreme Court wrote,
"The distinction between bail [i.e., common law bail, which forbade

indemnification] and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary."[14]

Looking at court opinions from the 1800s, we see that the evolution from a personal to a commercial surety system (in addition to the states gradually increasing defendants ability to self-pay their own financial conditions, a practice that had existed before, but that was used only rarely) was done in large part to help release bailable defendants who were incarcerated due only to their inability to find willing sureties. However, that evolution ultimately virtually assured unnecessary pretrial incarceration because bondsmen began charging money up-front (and later requiring collateral) to gain release in addition to requiring a promise of indemnification. While America may have purposefully moved toward a commercial surety system from a personal surety system to help release bailable defendants, perhaps unwittingly, and certainly more importantly, it moved to a secured money bail system (requiring money to be paid before release is granted) from an unsecured system (promising to pay money only upon default of obligations). The result has been an increase in the detention of bailable defendants over the last 100 years.

## The "Bail/No Bail" Dichotomy

The second major historical phenomenon involved the creation and nurturing of a "bail/no bail" dichotomy in both England and America. Between the Norman Invasion and 1275, custom gradually established which offenses were bailable and which were not. In 1166, King Henry II bolstered the concept of detention based on English custom through the Assize of Clarendon, which established a list of felonies of royal concern and allowed detention based on charges customarily considered unbailable. Around 1275, however, Parliament and the Crown discovered a number of abuses, including sheriffs detaining bailable defendants who refused or could not pay those sheriffs a fee, and sheriffs releasing unbailable defendants who were able to pay some fee. In response, Parliament enacted the Statute of Westminster in 1275, which hoped to curb abuses by establishing criteria governing bailability (largely based on a prediction of the outcome of the trial by examining the nature of the charge, the weight of the evidence, and the character of the accused) and, while doing so, officially categorized presumptively bailable and unbailable offenses.

---

[14] *Leary v. United States*, 224 U.S. 567, 575 (1912).

Importantly, this statutory enactment began the legal tradition of expressly articulating a bail/no bail scheme, in which a right to bail would be given to some, but not necessarily to all defendants. Perhaps more important, however, are other elements of the Statute that ensured that bailable defendants would be released and unbailable defendants would be detained. In 1275, the sheriffs were expressly warned through the Statute that to deny the release of bailable defendants or to release unbailable defendants was against the law; all defendants were to be either released or detained (depending on their category), and without any additional payment to the sheriff. Doing otherwise was deemed a criminal act.

> *"And if the Sheriff, or any other, let any go at large by Surety, that is not replevisable . . . he shall lose his Fee and Office for ever. . . . And if any withhold Prisoners replevisable, after that they have offered sufficient Surety, he shall pay a grievous Amerciament to the King; and if he take any Reward for the Deliverance of such, he shall pay double to the Prisoner, and also shall [be in the great mercy of] the King."*
>
> Statute of Westminster 3 Edward I. c. 15, *quoted in* Elsa de Haas, Antiquities of Bail, Origin and Historical Development in Criminal Cases to the Year 1275 (NY AMS Press 1966).

Accordingly, in 1275 the right to bail was meant to equal a right to release and the denial of a right to bail was meant to equal detention, and, generally speaking, these important concepts continued through the history of bail in England. Indeed, throughout that history any interference with bailable defendants being released or with unbailable (or those defendants whom society deemed unbailable) defendants being lawfully detained, typically led to society recognizing and then correcting that abuse. Thus, for example, when Parliament learned that justices were effectively detaining bailable defendants through procedural delays, it passed the Habeas Corpus Act of 1679, which provided procedures designed to prevent delays prior to bail hearings. Likewise, when corrupt justices were allowing the release of unbailable defendants, thus causing what many believed to be an increase in crime, it was rearticulated in 1554 that unbailable defendants could not be released, and that bail decisions be held in open session or by two or more justices sitting together. As another example, when justices began setting financial conditions for bailable defendants in prohibitively high amounts, the abuse led William and Mary to consent to the

English Bill of Rights in 1689, which declared, among other things, that "excessive bail ought not to be required."[15]

## "Bail" and "No Bail" in America

Both the concept of a "bail/no bail" dichotomy as well as the parallel notions that "bail" should equal release and "no bail" should equal detention followed into the American Colonies. Generally, those Colonies applied English law verbatim, but differences in beliefs about criminal justice, customs, and even crime rates led to more liberal criminal penalties and bail laws. For example, in 1641 the Massachusetts Body of Liberties created an unequivocal right to bail to all except for persons charged with capital offenses, and it also removed a number of crimes from its list of capital offenses. In 1682, Pennsylvania adopted an even more liberal law, granting bail to all persons except when charged with a capital offense "where proof is evident or the presumption great," adding an element of evidentiary fact finding so as to also allow bail even for certain capital defendants. This provision became the model for nearly every American jurisdiction afterward, virtually assuring that "bail/no bail" schemes would ultimately find firm establishment in America.

Even in the federal system – despite its lack of a right to bail clause in the United States Constitution – the Judiciary Act of 1789 established a "bail/no bail," "release/detain" scheme that survived radical expansion in 1984 and that still exists today. Essentially, any language articulating that "all persons shall be bailable . . . unless or except" is an articulation of a bail/no bail dichotomy. Whether that language is found in a constitution or a statute, it is more appropriately expressed as "release (or freedom) or detention" because the notion that bailability should lead to release was foundational in early American law.

---

[15] English Bill of Rights, 1 W. & M., 2nd Sess., Ch. 2 (1689).

## "Bail" and "No Bail" in the Federal and District of Columbia Systems

Both the federal and the District of Columbia bail statutes are based on "bail/no bail" or "release/no release" schemes, which, in turn, are based on legal and evidence-based pretrial practices such as those found in the American Bar Association's Criminal Justice Standards on Pretrial Release. Indeed, each statute contains general legislative titles describing the process as either "release" or "detention" during the pretrial phase, and each starts the bail process by providing judges with four options: (1) release on personal recognizance or with an unsecured appearance bond; (2) release on a condition or combination of conditions; (3) temporary detention; or (4) full detention. Each statute then has provisions describing how each release or detention option should function.

Because they successfully separate bailable from unbailable defendants, thus allowing the system to lawfully and transparently detain unbailable defendants with essentially none of the conditions associated with release (including secured financial conditions), both statutes are also able to include sections forbidding financial conditions that result in the preventive detention of the defendant – an abuse seen frequently in states that have not fully incorporated notions of a release/no release system.

The "bail" or "release" sections of both statutes use certain best practice pretrial processes, such as presumptions for release on recognizance, using "least restrictive conditions" to provide reasonable assurance of public safety and court appearance, allowing supervision through pretrial services entities for both public safety and court appearance concerns, and prompt review and appeals for release and detention orders.

The "no bail" or "detention" sections of both statutes are much the same as when the United States Supreme Court upheld the federal provisions against facial due process and 8th Amendment claims in *United States v. Salerno* in 1987. The *Salerno* opinion emphasized key elements of the existing federal statute that helped it to overcome constitutional challenges by "narrowly focusing" on the issue of pretrial crime. Moreover, the Supreme Court wrote, the statute appropriately provided "extensive safeguards" to further the accuracy of the judicial determination as well as to ensure that detention remained a carefully limited exception to liberty. Those safeguards included: (1) detention was limited to only "the most serious of crimes;" (2) the arrestee was entitled to a prompt hearing and the maximum length of pretrial detention was limited by stringent speedy trial time limitations; (3) detainees were to be housed separately from those serving sentences or awaiting appeals; (4) after a finding of probable cause, a "fullblown adversary hearing" was held in which the government was required to convince a neutral decision maker by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure court appearance or the safety of the community or any person; (5) detainees had a

right to counsel, and could testify or present information by proffer and cross-examine witnesses who appeared at the hearing; (6) judges were guided by statutorily enumerated factors such as the nature of the charge and the characteristics of the defendant; (7) judges were to include written findings of fact and a written statement of reasons for a decision to detain; and (8) detention decisions were subject to immediate appellate review.

While advances in pretrial research are beginning to suggest the need for certain alterations to the federal and D.C. statutes, both laws are currently considered "model" bail laws, and the Summary Report to the National Symposium on Pretrial Justice specifically recommends using the federal statute as a structural template to craft meaningful and transparent preventive detention provisions.

**Sources and Resources**: District of Columbia Code, §§ 23-1301-09, 1321-33; Federal Statute, 18 U.S.C. §§ 3141-56; *United States v. Salerno*, 481 U.S. 739 (1987); *National Symposium on Pretrial Justice: Summary Report of Proceedings*, at 42 (PJI/BJA 2011).

Indeed, given our country's foundational principles of liberty and freedom, it is not surprising that this parallel notion of bailable defendants actually obtaining release followed from England to America. William Blackstone, whose Commentaries on the Laws of England influenced our Founding Fathers as well as the entire judicial system and legal community, reported that denying the release of a bailable defendant during the American colonial period was considered itself an offense. In examining the administration of bail in Colonial Pennsylvania, author Paul Lermack reported that few defendants had trouble finding sureties, and thus, release.

This notion is also seen in early expressions of the law derived from court opinions. Thus, in the 1891 case of *United States v. Barber*, the United States Supreme Court articulated that in criminal bail, "it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time."[16] Four years later, in *Hudson v. Parker*, the Supreme Court wrote that the laws of the United States "have been framed upon the theory that [the accused] shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment."[17] Indeed, it was *Hudson* upon which the Supreme

---

[16] *United States v. Barber*, 140 U.S. 164, 167 (1891).
[17] *United States v. Hudson*, 156 U.S. 277, 285 (1895).

Court relied in *Stack v. Boyle* in 1951, when the Court wrote its memorable quote equating the right to bail with the right to release and freedom:

> From the passage of the Judiciary Act of 1789, to the present Federal Rules of Criminal Procedure, Rule 46 (a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.[18]

In his concurring opinion, Justice Jackson elaborated on the Court's reasoning:

> The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty. Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense. To open a way of escape from this handicap and possible injustice, Congress commands allowance of bail for one under charge of any offense not punishable by death . . . providing: 'A person arrested for an offense not punishable by death shall be admitted to bail' . . . before conviction.[19]

And finally, in perhaps its best known expression of the right to bail, the Supreme Court did not explain that merely having one's bail set, whether that setting resulted in release or detention, was at the core of the right. Instead, the Court wrote that "liberty" – a state necessarily obtained from actual release – is the American "norm."[20]

Nevertheless, in the field of pretrial justice we must also recognize the equally legitimate consideration of "no bail," or detention. It is now fairly clear that the

---

[18] 342 U.S. 1, 4 (1951) (internal citations omitted).

[19] *Id.* at 7-8.

[20] *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception").

federal constitution does not guarantee an absolute right to bail, and so it is more appropriate to discuss the right as one that exists when it is authorized by a particular constitutional or legislative provision. The Court's opinion in *United States v. Salerno* is especially relevant because it instructs us that when examining a law with no constitutionally-based right-to-bail parameters (such as, arguably, the federal law), the legislature may enact statutory limits on pretrial freedom (including detention) so long as: (1) those limitations are not excessive in relation to the government's legitimate purposes; (2) they do not offend due process (either substantive or procedural); and (3) they do not result in a situation where pretrial liberty is not the norm or where detention has not been carefully limited as an exception to release.

It is not necessarily accurate to say that the Court's opinion in *Salerno* eroded its opinion in *Stack,* including *Stack's* language equating bail with release. *Salerno* purposefully explained *Stack* and another case, *Carlson v. Landon*, together to provide cohesion. And therefore, while it is true that the federal constitution does not contain an explicit right to bail, when that right is granted by the applicable statute (or in the various states' constitutions or statutes), it should be regarded as a right to pretrial freedom. The *Salerno* opinion is especially instructive in telling us how to create a fair and transparent "no bail" side of the dichotomy, and further reminds us of a fundamental principle of pretrial justice: both bail and no bail are lawful if we do them correctly.

Liberalizing American bail laws during our country's colonial period meant that these laws did not always include the English "factors" for initially determining bailability, such as the seriousness of the offense, the weight of the evidence, and the character of the accused. Indeed, by including an examination of the evidence into its constitutional bail provision, Pennsylvania did so primarily to allow bailability despite the defendant being charged with a capital crime. Nevertheless, the historical factors first articulated in the Statute of Westminster survived in America through the judge's use of these factors to determine *conditions* of bail.

Thus, technically speaking, bailability in England after 1275 was determined through an examination of the charge, the evidence, and the character or criminal history of the defendant, and if a defendant was deemed bailable, he or she was required to be released. In America, bailability was more freely designated, but judges would still typically look at the charge, the evidence, and the character of the defendant to set the only limitation on pretrial freedom available at that time – the amount of the financial condition. Accordingly, while bailability in America was still meant to mean release, by using those factors traditionally used to

determine bailability to now set the primary condition of bail or release, judges found that those factors sometimes had a determining effect on the actual release of bailable defendants. Indeed, when America began running out of personal sureties, judges, using factors historically used to determine bailability, were finding that these same factors led to unattainable financial conditions creating, ironically, a state of unbailability for technically bailable defendants.

> *"Bail is a matter of confidence and personal relation. It should not be made a matter of contract or commercialism. . . . Why provide for a bail piece, intended to promote justice, and then destroy its effect and utility? Why open the door to barter freedom from the law for money?"*
>
> *Carr v Davis* 64 W. Va. 522, 535 (1908) (Robinson, J. dissenting).

## Intersection of the Two Historical Phenomena

The history of bail in America in the 20th century represents an intersection of these two historical phenomena. Indeed, because it involved requiring defendants to pay money up-front as a prerequisite to release, the blossoming of a secured bond scheme as administered through a commercial surety system was bound to lead to perceived abuses in the bail/no bail dichotomy to such an extent that history would demand some correction. Accordingly, within only 20 years of the advent of commercial sureties, scholars began to study and critique that for-profit system.

In the first wave of research, scholars focused on the inability of bailable defendants to obtain release due to secured financial conditions and the abuses in the commercial surety industry. The first generation of bail reform, as it is now known, used research from the 1920s to the 1960s to find alternatives to the commercial surety system, including release on recognizance and nonfinancial conditional release. Its focus was on the "bail" side of the dichotomy and how to make sure bailable defendants would actually obtain release.

The second generation of bail reform (from the 1960s to the 1980s) focused on the "no bail" side, with a wave of research indicating that there were some defendants whom society believed should be detained without bail (rather than by using money) due to their perceived dangerousness through documented instances of defendants committing crime while released through the bail process. That generation culminated with the United States Supreme Court's

approval of a federal detention statute, and with states across America changing their constitutions and statutes to reflect not only a new constitutional purpose for restricting pretrial liberty – public safety – but also detention provisions that followed the Supreme Court's desired formula.

## Three Generations of Bail Reform: Hallmarks and Highlights

Since the evolution from a personal surety system using unsecured bonds to primarily a commercial surety system using secured bonds, America has seen two generations of bail or pretrial reform and is currently in a third. Each generation has certain elements in common, such as significant research, a meeting of minds, and changes in laws, policies, and practices.

**The First Generation – 1920s to 1960s: Finding Alternatives to the Traditional Money Bail System; Reducing Unnecessary Pretrial Detention of Bailable Defendants**

**Significant Research –** This generation's research began with Roscoe Pound and Felix Frankfurter's *Criminal Justice in Cleveland* (1922) and Arthur Beeley's *The Bail System in Chicago* (1927), continued with Caleb Foote's study of the Philadelphia process found in *Compelling Appearance in Court: Administration of Bail in Philadelphia* (1954), and reached a peak through the research done by the Vera Foundation and New York University Law School's Manhattan Bail Project (1961) as well as similar bail projects such as the one created in Washington D.C. in 1963.

**Meeting of Minds –** The meeting of minds for this generation culminated with the 1964 Attorney General's National Conference on Bail and Criminal Justice and the Bail Reform Act of 1966.

**Changes in Laws, Policies and Practices –** The Supreme Court's ruling in *Stack v. Boyle* (1951) had already guided states to better individualize bail determinations through their various bail laws. The Bail Reform Act of 1966 (and state statutes modeled after the Act) focused on alternatives to the traditional money bail system by encouraging release on least restrictive, nonfinancial conditions as well as presumptions favoring release on recognizance, which were based on information gathered concerning a defendant's community ties to help assure court appearance. The American Bar Association's Criminal Justice Standards on Pretrial Release in 1968 made legal and evidence-based recommendations for all aspects of release and detention decisions. Across America, though, states have not fully incorporated the full panoply of laws, policies, and practices designed to reduce unnecessary pretrial detention of bailable defendants

**The Second Generation – late 1960s to 1980s: Allowing Consideration of Public Safety as a Constitutionally Valid Purpose to Limit Pretrial Freedom; Defining the Nature and Scope of Preventive Detention**

**Significant Research –** Based on discussions in the 1960s, the American Bar Association Standards on Pretrial Release first addressed preventive detention (detaining a defendant with no bail based on danger and later expressly encompassing risk for failure to appear) in 1968, a position later adopted by other organizations' best practice standards. Much of the "research" behind this wave of reform focused on: (1) philosophical debates surrounding the 1966 Act's inability to address public safety as a valid purpose for limiting pretrial freedom; and (2) judges' tendencies to use money to detain defendants due to the lack of alternative procedures for defendants who pose high risk to public safety or for failure to appear for court. The research used to support Congress's finding of "an alarming problem of crimes committed by persons on release" (noted by the U.S. Supreme Court in *United States v. Salerno*) is contained in the text and references from Senate Report 98-225 to the Bail Reform Act of 1984. Other authors, such as John Goldkamp (*see Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1 (1985)) and Senator Ted Kennedy (*see A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform*, 48 Fordham L. Rev. 423 (1980)), also contributed to the debate and relied on a variety of empirical research in their papers.

**Meeting of Minds –** Senate Report 98-225 to the Bail Reform Act of 1984 cited broad support for the idea of limiting pretrial freedom up to and including preventive detention based on public safety in addition to court appearance. This included the fact that consideration of public safety already existed in the laws of several states and the District of Columbia, the fact that the topic was addressed by the various national standards, and the fact that it also had the support from the Attorney General's Task Force on Violent Crime, the Chief Justice of the United States Supreme Court, and even the President.

**Changes in Laws, Policies and Practices –** Prior to 1970, court appearance was the only constitutionally valid purpose for limiting a defendant's pretrial freedom. Congress first allowed public safety to be considered equally to court appearance in the District of Columbia Court Reform and Criminal Procedure Act of 1970, and many states followed suit. In 1984, Congress passed the Bail Reform Act of 1984 (part of the Comprehensive Crime Control Act), which included public safety as a valid purpose for limiting pretrial freedom and procedures designed to allow preventive detention without bail for high-risk defendants. In 1987, the United States Supreme Court upheld the Bail Reform Act of 1984 against facial due process and excessive bail challenges in *United States v, Salerno*. However, as in the first generation of bail reform, states across America have not fully implemented the laws, policies, and practices needed to adequately and lawfully detain defendants when necessary.

**The Third Generation – 1990 to present: Fixing the Holes Left by States Not Fully Implementing Improvements from the First Two Generations of Bail Reform; Using Legal and Evidence-Based Practices to Create a More Risk-Based System of Release and Detention**

**Significant Research –** Much of the research in this generation revisits deficiencies caused by the states not fully implementing adequate "bail" and "no bail" laws, policies, and practices developed in the previous two generations. Significant legal, historical, and empirical research sponsored by the Department of Justice, the Pretrial Justice Institute, the New York City Criminal Justice Agency, the District of Columbia Pretrial Services Agency, the Administrative Office of the U.S. Courts, various universities, and numerous other public, private, and philanthropic entities across America have continued to hone the arguments for improvements as well as the solutions to discreet bail issues. Additional groundbreaking research involves the creation of empirical risk assessment instruments for local, statewide, and now national use, along with research focusing on strategies for responding to predicted risk while maximizing release.

**Meeting of Minds –** The meeting of minds for this generation has been highlighted so far by the Attorney General's National Symposium on Pretrial Justice in 2011, along with the numerous policy statements issued by national organizations favoring the administration of bail based on risk.

**Changes in Laws, Policies and Practices –** Jurisdictions are only now beginning to make changes reflecting the knowledge generated and shared by this generation of pretrial reform. Nevertheless, changes are occurring at the county level (such as in Milwaukee County, Wisconsin, which has implemented a number of legal and evidence-based pretrial practices), the state level (such as in Colorado, which passed a new bail statute based on pretrial best practices in 2013), and even the national level (such as in the federal pretrial system, which continues to examine its release and detention policies and practices).

## The Current Generation of Bail/Pretrial Reform

The first two generations of bail reform used research to attain a broad meeting of the minds, which, in turn, led to changes to laws, policies, and practices. It is now clear, however, that these two generations did not go far enough. The traditional money bail system, which includes heavy reliance upon secured bonds administered primarily through commercial sureties, continues to flourish in America, thus causing the unnecessary detention of bailable defendants. Moreover, for a number of reasons, the states have not fully embraced ways to fairly and transparently detain persons without bail, choosing instead to maintain a primarily charge-and-money-based bail system to respond to threats to public safety. In short, the two previous generations of bail reform have instructed us on how to properly implement both "bail" (release) and "no bail" (detention), but many states have instead clung to an outmoded system that leads to the detention of bailable defendants (or those whom we believe should be bailable defendants) and the release of unbailable defendants (or those whom we believe should be unbailable defendants) – abuses to the "bail/no bail" dichotomy that historically demand correction.

Fortunately, the current generation of pretrial reform has a vast amount of relevant research literature from which to fashion solutions to these problems. Moreover, like previous generations, this generation also shaped a distinct meeting of minds of numerous individuals, organizations, and government agencies, all of which now believe that pretrial improvements are necessary.

At its core, the third generation of pretrial reform thus has three primary goals. First, it aims to fully implement lawful bail/no bail dichotomies so that the right persons (and in lawful proportions) are deemed bailable and unbailable. Second, using the best available research and best pretrial practices, it seeks to lawfully effectuate the release and subsequent mitigation of pretrial risk of defendants deemed bailable and the fair and transparent detention of those deemed unbailable. Third, it aims to do this primarily by replacing charge-and-money-based bail systems with systems based on empirical risk.

# Generations of Reform and the Commercial Surety Industry

The first generation of bail reform in America in the 20th century focused almost exclusively on finding alternatives to the predominant release system in place at the time, which was one based primarily on secured financial conditions administered through a commercial surety system. In hindsight, however, the second generation of bail reform arguably has had more of an impact on the for-profit bail bond industry in America. That generation focused primarily on public safety, and it led to changes in federal and state laws providing ways to assess pretrial risk for public safety, to release defendants with supervision designed to mitigate the risk to public safety, and even to detain persons deemed too risky.

Despite this national focus on public safety, however, the commercial surety industry did not alter its business model of providing security for defendants solely to help provide reasonable assurance of court appearance. Today, judges concerned with public safety cannot rely on commercial bail bondsmen because in virtually every state allowing money as condition of bail, the laws have been crafted so that financial conditions cannot be forfeited for breaches in public safety such as new crimes. In those states, a defendant who commits a new crime may have his or her bond revoked, but the money is not lost. When the bond is revoked, bondsmen, when they are allowed into the justice system (for most countries, four American states, and a variety of other large and small jurisdictions have ceased allowing profit at bail), can simply walk away, even though the justice system is not yet finished with that particular defendant. Bondsmen are free to walk away and are even free re-enter the system – free to negotiate a new surety contract with the same defendant, again with the money forfeitable only upon his or her failing to appear for court. Advances in our knowledge about the ineffectiveness and deleterious effects of money at bail only exacerbate the fundamental disconnect between the commercial surety industry, which survives on the use of money for court appearance, and what our society is trying to achieve through the administration of bail.

There are currently two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Commercial bail agents and the insurance companies that support them are concerned with only one – court appearance – because legally money is simply not relevant to public safety. Historically speaking, America's gradual movement toward using pretrial services agencies, which, when necessary, supervise defendants both for court appearance and public safety concerns, is due, at least in part, to the commercial surety industry's purposeful decision not to take responsibility for public safety at bail.

## What Does the History of Bail Tell Us?

The history of bail tells us that the pretrial release and detention system that worked effectively over the centuries was a "bail/no bail" system, in which bailable defendants (or those whom society deemed should be bailable defendants) were expected to be released and unbailable defendants (or those whom society deemed should be unbailable defendants) were expected to be detained. Moreover, the bail side of the dichotomy functioned most effectively through an uncompensated and un-indemnified personal surety system based on unsecured financial conditions. What we in America today know as the traditional money bail system – a system relying primarily on secured financial conditions administered through commercial sureties – is, historically speaking, a relatively new system that was encouraged to solve America's dilemma of the unnecessary detention of bailable defendants in the 1800s. Unfortunately, however, the traditional money bail system has only exacerbated the two primary abuses that have typically led to historical correction: (1) the unnecessary detention of bailable defendants, whom we now often categorize as lower risk; and (2) the release of those persons whom we feel should be unbailable defendants, and whom we now often categorize as higher risk.

The history of bail also instructs us on the proper purpose of bail. Specifically, while avoiding blood feuds may have been the primary purpose for the original bail setting, once more public processes and jails were fully introduced into the administration of criminal justice, the purpose of bail changed to one of providing a mechanism of conditional release. Concomitantly, the purpose of "no bail" was and is detention. Historically speaking, the only purpose for limiting or conditioning pretrial release was to assure that the accused come to court or otherwise face justice. That changed in the 1970s and 1980s, as jurisdictions began to recognize public safety as a second constitutionally valid purpose for limiting pretrial freedom.[21]

---

[21] Occasionally, a third purpose for limiting pretrial freedom has been articulated as maintaining or protecting the integrity of the courts or judicial process. Indeed, the third edition of the ABA Standards changed "to prevent intimidation of witnesses and interference with the orderly administration of justice" to "safeguard the integrity of the judicial process" as a "third purpose of release conditions." ABA Standards *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.2 (a) (history of the standard) at 107. The phrase "integrity of the judicial process," however, is one that has been historically misunderstood (its meaning requires a review of

The American history of bail further instructs us on the lessons of the first two generations of bail and pretrial reform in the 20th century. If the first generation provided us with practical methods to better effectuate the release side of the "bail/no bail" dichotomy, the second generation provided us with equally effective methods for lawful detention. Accordingly, despite our inability to fully implement what we now know are pretrial best practices, the methods gleaned from the first two generations of bail reform as well as the research currently contributing to the third generation have given us ample knowledge to correct perceived abuses and to make improvements to pretrial justice. In the next section, we will see how the evolution of the law and legal foundations of pretrial justice provide the parameters for those improvements.

**Additional Sources and Resources:** William Blackstone, *Commentaries on the Laws of England* (Oxford 1765-1769); June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail,* 34 Syracuse L. Rev. 517 (1983); Stevens H. Clarke, *Pretrial Release: Concepts, Issues, and Strategies for Improvement,* 1 Res. in Corr. 3:1 (1988); Comment, *Bail: An Ancient Practice Reexamined,* 70 Yale L. J. 966 (1960-61); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Praeger Pub. 1991); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System,* 33 Hous. L. Rev. 731 (1996-97); William F. Duker, *The Right to Bail: A Historical Inquiry,* 42 Alb. L. Rev. 33 (1977-78); Caleb Foote, *The Coming Constitutional Crisis in Bail: I and II,* 113 Univ. Pa. L. Rev. 959 and 1125 (1965); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Ronald Goldfarb, *Ransom: A Critique of the American Bail System* (Harper & Rowe 1965); James V. Hayes, *Contracts to Indemnify Bail in Criminal Cases,* 6 Fordham L. Rev. 387 (1937); William Searle Holdsworth, *A History of English Law* (Methuen & Co., London, 1938); Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 (1977); Evie Lotze, John Clark, D. Alan Henry, & Jolanta Juszkiewicz, *The Pretrial Services Reference Book: History, Challenges, Programming* (Pretrial Servs. Res. Ctr. 1999); Hermine Herta

---

appellate briefs for decisions leading up to the Supreme Court's opinion in *Salerno*), and that typically begs further definition. Nevertheless, in most, if not all cases, that further definition is made unnecessary as being adequately covered by court appearance and public safety. Indeed, the ABA Standards themselves state that one of the purposes of the pretrial decision is "maintaining the integrity of the judicial process by securing defendants for trial." *Id.* Std. 10-1.1, at 36.

Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139 (1971-72); Gerald P. Monks, *History of Bail* (1982); Luke Owen Pike, *The History of Crime in England* (Smith, Elder, & Co. 1873); Frederick Pollock & Frederic Maitland, *The History of English Law Before the Time of Edward I* (1898); Timothy R. Schnacke, Michael R. Jones, Claire M. B. Brooker, *The History of Bail and Pretrial Release* (PJI 2010); Wayne H. Thomas, Jr. *Bail Reform in America* (Univ. CA Press 1976); Peggy M. Tobolowsky & James F. Quinn, *Pretrial Release in the 1990s: Texas Takes Another Look at Nonfinancial Release Conditions,* 19 New Eng. J. on Crim. & Civ. Confinement 267 (1993); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 320 (1987-88). **Cases:** *United States v. Edwards,* 430 A. 2d 1321 (D.C. 1981) (en banc); *State v. Brooks,* 604 N.W. 2d 345 (Minn. 2000); *State v. Briggs,* 666 N.W. 2d 573 (Iowa 2003).

# Chapter 3: Legal Foundations of Pretrial Justice

### History and Law

History and the law clearly influence each other at bail. For example, in 1627, Sir Thomas Darnell and four other knights refused to pay loans forced upon them by King Charles I. When the King arrested the five knights and held them on no charge (thus circumventing the Statute of Westminster, which required a charge, and the Magna Carta, on which the Statute was based), Parliament responded by passing the Petition of Right, which prohibited detention by any court without a formal charge. Not long after, however, officials sidestepped the Petition of Right by charging individuals and then running them through numerous procedural delays to avoid release. This particular practice led to the Habeas Corpus Act of 1679. However, by expressly acknowledging discretion in setting amounts of bail, the Habeas Corpus Act also unwittingly allowed determined officials to begin setting financial conditions of bail in prohibitively high amounts. That, in turn, led to passage of the English Bill of Rights, which prohibited "excessive" bail. In America, too, we see historical events causing changes in the laws and those laws, in turn, influencing events thereafter. One need only look to events before and after the two American generations of bail reform in the 20th century to see how history and the law are intertwined.

And so it is that America, which had adopted and applied virtually every English bail reform verbatim in its early colonial period, soon began a process of liberalizing both criminal laws generally, and bail in particular, due to the country's unique position in culture and history. Essentially, America borrowed the best of English law (such as an overall right to bail, habeas corpus, and prohibition against excessiveness) and rejected the rest (such as varying levels of discretion potentially interfering with the right to bail as well as harsh criminal penalties for certain crimes). The Colonies wrote bail provisions into their charters and re-wrote them into their constitutions after independence. Among those constitutions, we see broader right-to-bail provisions, such as in the model Pennsylvania law, which granted bail to all except those facing capital offenses (limited to willful murder) and only "where proof is evident or the presumption

great."[22] Nevertheless, some things remained the same. For example, continuing the long historical tradition of bail in England, the sole purpose of limiting pretrial freedom in America remained court appearance, and the only means for doing so remained setting financial conditions or amounts of money to be forfeited if a defendant missed court.

> *"The end of law is not to abolish or restrain, but to preserve and enlarge freedom. For in all the states of created beings capable of law, where there is no law, there is no freedom."*
>
> John Locke, 1689

In America, the ultimate expression of our shared values is contained in our founding documents, the Declaration of Independence and the Constitution. But if the Declaration can be viewed as amply supplying us with certain fundamental principles that can be interwoven into discussions of bail, such as freedom and equality, then the Constitution has unfortunately given us some measure of confusion on the topic. The confusion stems, in part, from the fact that the Constitution itself explicitly covers only the right of habeas corpus in Article 1, Section 9 and the prohibition on excessive bail in the 8th Amendment, which has been traced to the Virginia Declaration of Rights. There is no express right to bail in the U.S. Constitution, and that document provides no illumination on which persons should be bailable and which should not. Instead, the right to bail in the federal system originated from the Judiciary Act of 1789, which provided an absolute right to bail in non-capital federal criminal cases. Whether the constitutional omission was intentional is subject to debate, but the fact remains that when assessing the right to bail, it is typical for a particular state to provide superior rights to the United States Constitution. It also means that certain federal cases, such *United States v. Salerno*, must be read realizing that the Court was addressing a bail/no bail scheme derived solely from legislation. And it means that any particular bail case or dispute has the potential to involve a fairly complex mix of state and federal claims based upon any particular state's bail scheme.

---

[22] June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 531 (1983) (quoting 5 American Charters 3061, F. Thorpe ed. 1909).

> ### The Legal "Mix"
>
> There are numerous sources of laws surrounding bail and pretrial practices, and each state – and often a jurisdiction within a state – has a different "mix" of sources from that of all other jurisdictions. In any particular state or locality, bail practices may be dictated or guided by the United States Constitution and United States Supreme Court opinions, federal appellate court opinions, the applicable state constitution and state supreme court and other state appellate court decisions, federal and state bail statutes, municipal ordinances, court rules, and even administrative regulations. Knowing your particular mix and how the various sources of law interact is crucial to understanding and ultimately assessing your jurisdiction's pretrial practices.

The fact that we have separate and sometimes overlapping federal and state pretrial legal foundations is one aspect of the evolution of bail law that adds complexity to particular cases. The other is the fact that America has relatively little authoritative legal guidance on the subject of bail. In the federal realm, this may be due to issues of incorporation and jurisdiction, but in the state realm it may also be due to the relatively recent (historically speaking) change from unsecured to secured bonds. Until the nineteenth century, historians suggest that bail based on unsecured bonds administered through a personal surety system led to the release of virtually all bailable criminal defendants. Such a high rate of release leaves few cases posing few constitutional issues that require an appellate court's attention. But even in the 20th century, we really have only two (or arguably three) significant United States Supreme Court cases discussing the important topic of the release decision at bail. It is apparently a topic that lawyers, and thus federal and state trial and appellate courts, have largely avoided. This avoidance, in turn, potentially stands in the way of jurisdictions looking for the bright line of the law to guide them through the process of improving the administration of bail.

On the other hand, what we lack in volume of decisions is made up to some extent by the importance of the few opinions that we do have. Thus, we look at *Salerno* not as merely one case among many from which we may derive guidance; instead, *Salerno* must be scrutinized and continually referenced as a foundational standard as we attempt to discern the legality of proposed improvements. The evolution of law in America, whether broadly encompassing all issues of criminal procedure, or more narrowly discussing issues related directly to bail and pretrial justice, has demonstrated conclusively the law's

importance as a safeguard to implementing particular practices in the criminal process. Indeed, in other fields we speak of using evidence-based practices to achieve the particular goals of the discipline. In bail, however, we speak of "legal and evidence-based practices,"[23] because it is the law that articulates those disciplinary goals to begin with. The phrase legal and evidence-based practices acknowledges the fact that in bail and pretrial justice, the empirical evidence, no matter how strong, is always subservient to fundamental legal foundations based on fairness and equal justice.

## Fundamental Legal Principles

While all legal principles affecting the pretrial process are important, there are some that demand our particular attention as crucial to a shared knowledge base. The following list is derived from materials taught by D.C. Superior Court Judge Truman Morrison, III, in the National Institute of Corrections' Orientation for New Pretrial Executives, and occasionally supplemented by information contained in Black's Law Dictionary (9th ed.) as well as the sources footnoted or cited at the end of the chapter.

### The Presumption of Innocence

Perhaps no legal principle is as simultaneously important and misunderstood as the presumption of innocence. Technically speaking, it is the principle that a person may not be convicted of a crime unless and until the government proves guilt beyond a reasonable doubt, without any burden placed on the defendant to prove his or her innocence. Its importance is emphasized in the Supreme Court's opinion in *Coffin v. United States*, in which the Court wrote: "a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."[24] In *Coffin,* the Court traced the presumption's origins to various extracts of Roman law, which included language similar to the "better that ten guilty persons go free" ratio articulated by Blackstone. The importance of the presumption of innocence has not waned, and the Court has expressly quoted the "axiomatic and elementary" language in just the last few years.

---

[23] Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

[24] *Coffin v. United States,* 156 U.S. 432, 453 (1895).

Its misunderstanding comes principally from the fact that in *Bell v. Wolfish*, the Supreme Court wrote that the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun,"[25] a line that has caused many to argue, incorrectly, that the presumption of innocence has no application to bail. In fact, *Wolfish* was a "conditions of confinement" case, with inmates complaining about various conditions (such as double bunking), rules (such as prohibitions on receiving certain books), and practices (such as procedures involving inmate searches) while being held in a detention facility. In its opinion, the Court was clear about its focus in the case: "We are not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails. . . . Instead, what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment, and his understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point."[26] Specifically, and as noted by the Court, the parties were not disputing whether the government could detain the prisoners, the government's purpose for detaining the prisoners, or even whether complete confinement was a legitimate means for limiting pretrial freedom, all issues that would necessarily implicate the right to bail, statements contained in *Stack v. Boyle*, and the presumption of innocence. Instead, the issue before the Court was whether, after incarceration, the prisoners' complaints could be considered punishment in violation of the Due Process Clause.

Accordingly, the presumption of innocence has everything to do with bail, at least so far as determining which classes of defendants are bailable and the constitutional and statutory rights flowing from that decision. And therefore, the language of *Wolfish* should in no way diminish the strong statements concerning the right to bail found in *Stack v. Boyle* (and other state and federal cases that have quoted *Stack*), in which the Court wrote, "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."[27] The idea that the right to bail (that is, the right to release when the accused is bailable) necessarily triggers serious consideration of the presumption of innocence is also clearly seen

---

[25] *Bell v. Wolfish*, 441 U.S. 520, 533 (1979).

[26] *Id.* at 533-34 (internal citations omitted).

[27] 342 U.S. 1, 4 (1951) (internal citation omitted).

through Justice Marshall's dissent in *United States v. Salerno,* in which he wrote, albeit unconvincingly, that "the very pith and purpose of [the Bail Reform Act of 1984] is an abhorrent limitation of the presumption of innocence."[28]

As explained by the Court in *Taylor v. Kentucky*, the phrase is somewhat inaccurate in that there is no true presumption – that is, no mandatory inference to be drawn from evidence. Instead, "it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence."[29] Moreover, the words "presumption of innocence" themselves are found nowhere in the United States Constitution, although the phrase is linked to the 5th, 14th, and 6th Amendments to the Constitution. *Taylor* suggests an appropriate way of looking at the presumption as "a special and additional caution" to consider beyond the notion that the government must ultimately prove guilt. It is the idea that "no surmises based on the present situation of the accused"[30] should interfere with the jury's determination. Applying this concept to bail, then, the presumption of innocence is like an aura surrounding the defendant, which prompts us to set aside our potentially negative surmises based on the current arrest and confinement as we determine the important question of release or detention.

> *"Here we deal with a right, the right to release of presumably innocent citizens. I cannot conceive that such release should not be made as widely available as it reasonably and rationally can be."*
>
> *Pugh v. Rainwater,* 572 F.2d 1053 (5th Cir. 1978) (Gee, J. specially concurring)

---

[28] *United States v. Salerno*, 481 U.S. 739, 762-63 (1987).

[29] *Taylor v Kentucky*, 436 U.S. 478, 483 n. 12 (1978).

[30] *Id.* at 485 (quoting 9 J. Wigmore, Evidence § 2511 (3d ed. 1940) at 407).

**The Right to Bail**

*When granted by federal or state law,* the right to bail should be read as a right to release through the bail process. It is often technically articulated as the "right to non-excessive" bail, which goes to the reasonableness of any particular conditions or limitations on pretrial release.

The preface, "when granted by federal or state law" is crucial to understand because we now know that the "bail/no bail" dichotomy is one that legislatures or the citizenry are free to make though their statutes and constitutions. Ever since the Middle Ages, there have been certain classes of defendants (typically expressed by types of crimes, but changing now toward categories of risk) who have been refused bail – that is, denied a process of release altogether. The bail/no bail dichotomy is exemplified by the early bail provisions of Massachusetts and Pennsylvania, which granted bail to some large class of persons "except," and with the exception being the totality of the "no bail" side. These early provisions, as well as those copied by other states, were technically the genesis of what we now call "preventive detention" schemes, which allow for the detention of risky defendants – the risk at the time primarily being derived from the seriousness of the charge, such as murder or treason.

The big differences between detention schemes then and now include: (1) the old schemes were based solely on risk for failure to appear for court; we may now detain defendants based on a second constitutionally valid purpose for limiting pretrial freedom – public safety; (2) the old schemes were mostly limited to findings of "proof evident and presumption great" for the charge; today preventive detention schemes often have more stringent burdens for the various findings leading to detention; (3) overall, the states have largely widened the classes of defendants who may lawfully be detained – they have, essentially, changed the ratio of bailable to unbailable defendants to include potentially more unbailable defendants than were deemed unbailable, say, during the first part of the 20th century; and (4) in many cases, the states have added detailed provisions to the detention schemes (in addition to their release schemes). Presumably, this was to follow guidance by the United States Supreme Court from its opinion in *United States v. Salerno,* which approved the federal detention scheme based primarily on that law's inclusion of certain procedural due process elements designed to make the detention process fair and transparent.

How a particular state has defined its "bail/no bail" dichotomy is largely due to its constitution, and arguably on the state's ability to easily amend that

constitution. According to legal scholars Wayne LaFave, et al., in 2009 twenty-three states had constitutions modeled after Pennsylvania's 1682 language that guaranteed a right to bail to all except those charged with capital offenses, where proof is evident or the presumption is great. It is unclear whether these states today choose to remain broad "right-to-bail" states, or whether their constitutions are simply too difficult to amend. Nevertheless, these states' laws likely contain either no, or extremely limited, statutory pretrial preventive detention language.[31]

Nine states had constitutions mirroring the federal constitution – that is, they contain an excessive bail clause, but no clause explicitly granting a right to bail. The United States Supreme Court has determined that the federal constitution does not limit Congress' ability to craft a lawful preventive detention statute, and these nine states likewise have the same ability to craft preventive detention statutes (or court rules) with varying language.

The remaining 18 states had enacted in their constitutions relatively recent amendments describing more detailed preventive detention provisions. As LaFave, et al., correctly note, these states may be grouped in three ways: (1) states authorizing preventive detention for certain charges, combined with the requirement of a finding of danger to the community; (2) states authorizing preventive detention for certain charges, combined with some condition precedent, such as the defendant also being on probation or parole; and (3) states combining elements of the first two categories.

There are currently two fundamental issues concerning the right to bail in America today. The first is whether states have created the right ratio of bailable to unbailable defendants. The second is whether they are faithfully following best practices using the ratio that they currently have. The two issues are connected.

---

[31] *See* Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009). Readers should be vigilant for activity changing these numbers. For example, the 2010 constitutional amendment in Washington State likely adds it to the category of states having preventive detention provisions in their constitutions. Moreover, depending on how one reads the South Carolina constitution, the counts may, in fact, reveal 9 states akin to the federal scheme, 21 states with traditional right to bail provisions, and 20 states with preventive detention amendments.

American law contemplates a presumption of release, and thus there are limits on the ratio of bailable to unbailable defendants. The American Bar Association Standards on Pretrial Release describes its statement, "the law favors the release of defendants pending adjudication of charges" as being "consistent with Supreme Court opinions emphasizing the limited permissible scope of pretrial detention."[32] It notes language from *Stack v. Boyle*, in which the Court equates the right to bail to "[the] traditional right to freedom before conviction,"[33] and from *United States v. Salerno*, in which the Court wrote, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[34] Beyond these statements, however, we have little to tell us definitively and with precision how many persons should remain bailable in a lawful bail/no bail scheme.

We do know, however, that the federal "bail/no bail" scheme was examined by the Supreme Court and survived at least facial constitutional attacks based on the Due Process Clause and the 8th Amendment. Presumably, a state scheme fully incorporating the detention-limiting elements of the federal law would likely survive similar attacks. Accordingly, using the rest of the *Salerno* opinion as a guide, one can look at any particular jurisdiction's bail scheme to assess whether that scheme appears, at least on its face, to presume liberty and to restrict detention by incorporating the numerous elements from the federal statute that were approved by the Supreme Court. For example, if a particular state included a provision in either its constitution or statute opening up the possibility of detention for all defendants no matter what their charges, the scheme should be assessed for its potential to over-detain based on *Salerno's* articulated approval of provisions that limited detention to defendants "arrested for a specific category of extremely serious offenses."[35] Likewise, any jurisdiction that does not "carefully" limit detention – that is, it detains carelessly or without thought possibly through the casual use of money – is likely to be seen as running afoul of the foundational principles underlying the Court's approval of the federal law.

The second fundamental issue concerning the right to bail – whether states are faithfully following the ratio that they currently have – is connected to the first. If states have not adequately defined their bail/no bail ratio, they will often see money still being used to detain defendants whom judges feel are extreme risks,

---

[32] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.1 (commentary) at 38.

[33] 342 U.S. 1, 4 (1951).

[34] 481 U.S. 739, 755 (1987).

[35] *Id.* at 750.

which is essentially the same practice that led to the second generation of American bail reform in the 20th century. Simply put, a proper bail/no bail dichotomy should lead naturally to an in-or-out decision by judges, with bailable defendants released pursuant to a bond with reasonable conditions and unbailable defendants held with no bond. Without belaboring the point, judges are not faithfully following any existing bail/no bail dichotomy whenever they (1) treat a bailable defendant as unbailable by setting unattainable conditions, or (2) treat an unbailable defendant as bailable in order to avoid the lawfully enacted detention provisions. When these digressions occur, then they suggest either that judges should be compelled to comply with the existing dichotomy, or that the balance of the dichotomy must be changed.

This latter point is important to repeat. Among other things, the second generation of American bail reform was, at least partially, in response to judges setting financial conditions of bail at unattainable levels to protect the public despite the fact that the constitution had not been read to allow public safety as a proper purpose for limiting pretrial freedom. Judges who did so were said to be setting bail "sub rosa," in that they were working secretively toward a possibly improper purpose of bail. The Bail Reform Act of 1984, as approved by the United States Supreme Court, was designed to create a more transparent and fair process to allow the detention of high-risk defendants for the now constitutionally valid purpose of public safety. From that generation of reform, states learned that they could craft constitutional and statutory provisions that would effectively define the "bail" and "no bail" categories so as to satisfy both the Supreme Court's admonition that liberty be the "norm" and the public's concern that the proper persons be released and detained.

Unfortunately, many states have not created an appropriate balance. Those that have attempted to, but have done so inadequately, are finding that the inadequacy often lies in retaining a charge-based rather than a risk-based scheme to determine detention eligibility. Accordingly, in those states judges continue to set unattainable financial conditions at bail to detain bailable persons whom they consider too risky for release. If a proper bail/no bail balance is not crafted through a particular state's preventive detention provisions, and if money is left as an option for conditional release, history has shown that judges will use that money option to expeditiously detain otherwise bailable defendants. On the other hand, if the proper balance is created so that high-risk defendants can be detained through a fair and transparent process, money can be virtually eliminated from the bail process without negatively affecting public safety or court appearance rates.

Despite certain unfortunate divergences, the law, like the history, generally considers the right to bail to be a right to release. Thus, when a decision has been made to "bail" a particular defendant, every consideration should be given, and every best practice known should be employed, to effectuate and ensure that release. Bailable defendants detained on unattainable conditions should be considered clues that the bail process is not functioning properly. Judicial opinions justifying the detention of bailable defendants (when the bailable defendant desires release) should be considered aberrations to the historic and legal notion that the right to bail should equal the right to release.

---

### What Can International Law and Practices Tell Us About Bail?

Unnecessary and arbitrary pretrial detention is a worldwide issue, and American pretrial practitioners can gain valuable perspective by reviewing international treaties, conventions, guidelines, and rules as well as reports documenting international practices that more closely follow international norms.

According to the American Bar Association's Rule of Law Initiative,

"International standards strongly encourage the imposition of noncustodial measures during investigation and trial and at sentencing, and hold that deprivation of liberty should be imposed only when non-custodial measures would not suffice. The overuse of detention is often a symptom of a dysfunctional criminal justice system that may lack protection for the rights of criminal defendants and the institutional capacity to impose, implement, and monitor non-custodial measures and sanctions. It is also often a cause of human rights violations and societal problems associated with an overtaxed detention system, such as overcrowding; mistreatment of detainees; inhumane detention conditions; failure to rehabilitate offenders leading to increased recidivism; and the imposition of the social stigma associated with having been imprisoned on an ever-increasing part of the population. Overuse of pretrial detention and incarceration at sentencing are equally problematic and both must be addressed in order to create effective and lasting criminal justice system reform."

International pretrial practices, too, can serve as templates for domestic improvement. For example, bail practitioners frequently cite to author F.E. Devine's study of international practices demonstrating various effective alternatives to America's traditional reliance on secured bonds administered by commercial bail bondsmen and large insurance companies.

**Sources and Resources:** David Berry & Paul English, *The Socioeconomic Impact of Pretrial Detention* (Open Society Foundation 2011); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Greenwood Publishing Group 1991); Anita H. Kocsis, *Handbook of International Standards on Pretrial Detention Procedure* (ABA, 2010); Amanda Petteruti & Jason Fenster, *Finding Direction:*

*Expanding Criminal Justice Options by Considering Policies of Other Nations* (Justice Policy Institute, 2011). There are also several additional documents and other resources available from the Open Society Foundation's Global Campaign for Pretrial Justice online website, found at http://www.opensocietyfoundations.org/projects/global-campaign-pretrial-justice.

### Release Must Be the Norm

This concept is part of the overall consideration of the right to bail, discussed above, but it bears repeating and emphasis as its own fundamental legal principle. The Supreme Court has said, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[36] As noted previously, in addition to suggesting the ratio of bailable to unbailable defendants, the second part of this quote cautions against a release process that results in detention as well as a detention process administered haphazardly. Given that the setting of a financial bail condition often leaves judges and others wondering whether the defendant will be able to make it – i.e., the release or detention of that particular defendant is now essentially random based on any number of factors – it is difficult to see how such a detention caused by money can ever be considered a "carefully limited" process.

### Due Process

Due Process refers generally to upholding people's legal rights and protecting individuals from arbitrary or unfair federal or state action pursuant to the rights afforded by the Fifth and Fourteenth Amendments of the United States Constitution (and similar or equivalent state provisions). The Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."[37] The Fourteenth Amendment places the same restrictions on the states. The concept is believed to derive from the Magna Carta, which required King John of England to accept certain limitations to his power, including the limitation that no man be imprisoned or otherwise deprived of his rights except by lawful judgment of his peers or the law of the land. Many of the original provisions of the Magna Carta were incorporated into the Statute of Westminster of 1275, which included important provisions concerning bail.

---

[36] *Id.* at 755.
[37] U.S. Const. amend. V.

As noted by the Supreme Court in *United States v. Salerno*, due process may be further broken down into two subcategories:

> So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process.[38]

In *Salerno,* the Court addressed both substantive and procedural fairness arguments surrounding the federal preventive detention scheme. The substantive due process argument dealt with whether detention represented punishment prior to conviction and an ends-means balancing analysis. The procedural issue dealt with how the statute operated – whether there were procedural safeguards in place so that detention could be ordered constitutionally. People who are detained pretrial without having the benefit of the particular safeguards enumerated in the *Salerno* opinion could, theoretically, raise procedural due process issues in an appeal of their bail-setting.

A shorthand way to think about due process is found in the words "fairness" or "fundamental fairness." Other words, such as "irrational," "unreasonable," and "arbitrary" tend also to lead to due process scrutiny, making the Due Process Clause a workhorse in the judicial review of bail decisions. Indeed, as more research is being conducted into the nature of secured financial conditions at bail – their arbitrariness, the irrationality of using them to provide reasonable assurance of either court appearance or public safety, and the documented negative effects of unnecessary pretrial detention – one can expect to see many more cases based on due process clause claims.

### Equal Protection

If the Due Process Clause protects against unfair, arbitrary, or irrational laws, the Equal Protection Clause of the Fourteenth Amendment (and similar or equivalent state provisions) protects against the government treating similarly situated persons differently under the law. Interestingly, "equal protection" was not mentioned in the original Constitution, despite the phrase practically embodying what we now consider to be the whole of the American justice

---

[38] 481 U.S 739, 746 (internal citations omitted).

system. Nevertheless, the Fourteenth Amendment to the United States Constitution now provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[39] While there is no counterpart to this clause that is applicable to the federal government, federal discrimination may be prohibited as violating the Due Process Clause of the Fifth Amendment.

> *"The only stable state is the one in which all men are equal before the law."*
>
> Aristotle, 350 B.C.

Over the years, scholars have argued that equal protection considerations should serve as an equally compelling basis as does due process for mandating fair treatment in the administration of bail, especially when considering the disparate effect of secured money bail bonds on defendants due only to their level of wealth. This argument has been bolstered by language from Supreme Court opinions in cases like *Griffin v. Illinois*, which dealt with a defendant's ability to purchase a transcript required for appellate review. In that case, Justice Black wrote, "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."[40] Moreover, sitting as circuit justice to decide a prisoner's release in two cases, Justice Douglas uttered the following dicta frequently cited as support for equal protection analysis: (1) "Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?";[41] and (2) "[N]o man should be denied release because of indigence. Instead, under our constitutional system, a man is entitled to be released on 'personal recognizance' where other relevant factors make it reasonable to believe that he will comply with the orders of the Court."[42] Overall, despite scholarly arguments to invoke equal protection analysis to the issue of bail (including any further impact caused by the link between income and race), the courts have been largely reluctant to do so.

---

[39] U.S. Const. amend. XIV, § 1.
[40] 351 U.S. 12, 19 (1956).
[41] *Bandy v. United States*, 81 S. Ct. 197, 198 (1960).
[42] *Bandy v. United States*, 82 S. Ct. 11, 13 (1961).

**Excessive Bail and the Concept of Least Restrictive Conditions**

Excessive bail is a legal term of art used to describe bail that is unconstitutional pursuant to the 8th Amendment to the United States Constitution (and similar or equivalent state provisions). The 8th Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[43] The Excessive Bail Clause derives from reforms made by the English Parliament in the 1600s to curb the abuse of judges setting impossibly high money bail to thwart the purpose of bail to afford a process of pretrial release. Indeed, historians note that justices began setting high amounts on purpose after King James failed to repeal the Habeas Corpus Act, and the practice represents, historically, the first time that a condition of bail rather than the actual existence of bail became a concern. The English Bill of Rights of 1689 first used the phrase, "Excessive bail ought not to be required," which was incorporated into the 1776 Virginia Declaration of rights, and ultimately found its way into the United States and most state constitutions. Excessiveness must be determined by looking both at federal and state law, but a rule of thumb is that the term relates overall to reasonableness.

"Excessive bail" is now, in fact, a misnomer, because bail more appropriately defined as a process of release does not lend itself to analysis for excessiveness. Instead, since it was first uttered, the phrase excessive bail has always applied to conditions of bail or limitations on pretrial release. The same historical factors causing jurisdictions to define bail as money are at play when one says that bail can or cannot be excessive; hundreds of years of having only one condition of release – money – have caused the inevitable but unfortunate blurring of bail and one of its conditions. Accordingly, when we speak of excessiveness, we now more appropriately speak in terms of limitations on pretrial release or freedom.

Looking at excessiveness in England in the 1600s requires us to consider its application within a personal surety system using unsecured amounts. Bail set at a prohibitively high amount meant that no surety (i.e., a person), or even group of sureties, would willingly take responsibility for the accused. Even before the prohibition, however, amounts were often beyond the means of any particular defendant, requiring sometimes several sureties to provide "sufficiency" for the bail determination. Accordingly, as is the case today, it is likely that some indicator of excessiveness at a time of relatively plentiful sureties for any particular defendant was continued detention of an otherwise bailable

---

[43] U.S. Const. amend. VIII.

defendant. Nevertheless, before the abuses leading to the English Bill of Rights and Habeas Corpus Act, there was no real indication that high amounts required of sureties led to detention in England. And in America, "[a]lthough courts had broad authority to deny bail for defendants charged with capital offenses, they would generally release in a form of pretrial custody defendants who were able to find willing custodians."[44] In a review of the administration of bail in Colonial Pennsylvania, author Paul Lermack concluded that "bail . . . continued to be granted routinely . . . for a wide variety of offenses . . . [and] [a]lthough the amount of bail required was very large in cash terms and a default could ruin a guarantor, few defendants had trouble finding sureties."[45]

The current test for excessiveness from the United States Supreme Court is instructive on many points. In *United States v. Salerno*, the Court wrote as follows:

> The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more. *Stack v. Boyle, supra*. We believe that, when Congress has mandated detention on the basis of a compelling interest other than prevention of flight, as it has here, the 8th Amendment does not require release on bail.[46]

Thus, as explained in *Galen v. County of Los Angeles,* to determine excessiveness, one must

> look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests. The state may not set bail to achieve invalid interests . . . nor in an amount

---

[44] Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 323, 323-24 (1987-88) (internal citations omitted).

[45] Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 at 497, 505 (1977).

[46] 481 U.S. 739, 754-55 (1987).

> that is excessive in relation to the valid interests it seeks to achieve.[47]

*Salerno* thus tells us at least three important things. First, the law of *Stack v. Boyle* is still strong: when the state's interest is assuring the presence of the accused, "[b]ail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the 8th Amendment."[48] The idea of "reasonable" calculation necessarily compels us to assess how judges are typically setting bail, which might be arbitrarily (such as through a bail schedule) or irrationally (such as through setting financial conditions to protect the public when those conditions cannot be forfeited for breaches in public safety, or when they are otherwise not effective at achieving the lawful purposes for setting them, which recent research suggests).

Second, financial conditions (i.e., amounts of money) are not the only conditions vulnerable to an excessive bail claim. Any unreasonable condition of release, including a nonfinancial condition, that has no relationship to mitigating an identified risk, or that exceeds what is needed to reasonably assure the constitutionally valid state interest, might be deemed constitutionally excessive.

Third, the government must have a proper purpose for limiting pretrial freedom. This is especially important because scholars and courts (as well as Justice Douglas, again sitting as circuit justice) have indicated that setting bail with a purpose to detain an otherwise bailable defendant would be unconstitutional. In states where the bail/no bail dichotomy has been inadequately crafted, however, judges are doing precisely that.

While the Court in *Salerno* upheld purposeful pretrial detention pursuant to the Bail Reform Act of 1984, it did so only because the statute contained "numerous procedural safeguards" that are rarely, if ever, satisfied merely through the act of setting a high money bond. Therefore, when a state has established a lawful method for preventively detaining defendants, setting financial conditions designed to detain otherwise bailable defendants outside of that method could still be considered an unlawful purpose. Purposeful pretrial detention through a process of the type endorsed by the United States Supreme Court is entirely different from purposeful pretrial detention done through setting unattainable financial conditions of release.

---

[47] 477 F.3d 652, 660 (9th Cir. 2007) (internal citations omitted).
[48] 342 U.S. 1, 5 (1951).

When the United States Supreme Court says that conditions of bail must be set at a level designed to assure a constitutionally valid purpose for limiting pretrial freedom "and no more," as it did in *Salerno,* then we must also consider the related legal principle of "least restrictive conditions" at bail. The phrase "least restrictive conditions" is a term of art expressly contained in the federal and District of Columbia statutes, the American Bar Association best practice standards on pretrial release, and other state statutes based on those Standards (or a reading of *Salerno*). Moreover, the phrase is implicit through similar language from various state high court cases articulating, for example, that bail may be met only by means that are "the least onerous" or that impose the "least possible hardship" on the accused.

Commentary to the ABA Standard recommending release under the least restrictive conditions states as follows:

> This Standard's presumption that defendants should be released under the least restrictive conditions necessary to provide reasonable assurance they will not flee or present a danger is tied closely to the presumption favoring release generally. It has been codified in the Federal Bail Reform Act and the District of Columbia release and pretrial detention statute, as well as in the laws and court rules of a number of states. The presumption constitutes a policy judgment that restrictions on a defendant's freedom before trial should be limited to situations where restrictions are clearly needed, and should be tailored to the circumstances of the individual case. Additionally, the presumption reflects a practical recognition that unnecessary detention imposes financial burdens on the community as well as on the defendant.[49]

The least restrictive principle is foundational, and is expressly reiterated throughout the ABA Standards when, for example, those Standards recommend citation release or summonses versus arrest. Moreover, the Standards' overall scheme creating a presumption of release on recognizance, followed by release on nonfinancial conditions, and finally release on financial conditions is directly tied to this foundational premise. Indeed, the principle of least restrictive conditions transcends the Standards and flows from even more basic

---

[49] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.2 (commentary) at 39-40 (internal citations omitted).

understandings of criminal justice, which begins with presumptions of innocence and freedom, and which correctly imposes increasing burdens on the government to incrementally restrict one's liberty.

More specifically, however, the ABA Standards' commentary on financial conditions makes it clear that the Standards consider secured financial conditions to be more restrictive than both unsecured financial conditions and nonfinancial conditions: "When financial conditions are warranted, the least restrictive conditions principle requires that unsecured bond be considered first."[50] Moreover, the Standards state, "Under Standard 10-5.3(a), financial conditions may be employed, but only when no less restrictive non-financial release condition will suffice to ensure the defendant's appearance in court. An exception is an unsecured bond because such a bond requires no 'up front' costs to the defendant and no costs if the defendant meets appearance requirements."[51] These principles are well founded in logic: setting aside, for now, the argument that money at bail might not be of any use at all, it at least seems reasonably clear that secured financial conditions (requiring up-front payment) are always more restrictive than unsecured ones, even to the wealthiest defendant. Moreover, in the aggregate, we know that secured financial conditions, as typically the only condition precedent to release, are highly restrictive compared to all nonfinancial conditions and unsecured financial conditions in that they tend to cause pretrial detention. Like detention itself, any condition causing detention should be considered highly restrictive. In sum, money is a highly restrictive condition, and more so (and possibly excessive) when combined with other conditions that serve the same purpose.

---

[50] *Id.* Std. 10-1.4 (c) (commentary) at 43-44.
[51] *Id.* Std. 10-5.3 (a) (commentary) at 112.

<div style="border: 1px solid black; padding: 1em;">

### What Can the Juvenile Justice System Tell Us About Adult Bail?

In addition to the fact that the United States Supreme Court relied heavily on *Schall v. Martin,* a juvenile preventive detention case, in writing its opinion in *United States v. Salerno,* an adult preventive detention case, the juvenile justice system has an impressive body of knowledge and research that can be used to inform the administration of bail for adults.

Perhaps most relevant is the work being done through the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI), an initiative to promote changes to juvenile justice policies and practices to "reduce reliance on secure confinement, improve public safety, reduce racial disparities and bias, save taxpayers' dollars, and stimulate overall juvenile justice reforms."

In remarks at the National Symposium on Pretrial Justice in 2011, Bart Lubow, Director of the Juvenile Justice Strategy Center of the Foundation, stated that JDAI used cornerstone innovations of adult bail to inform its work with juveniles, but through collaborative planning and comprehensive implementation of treatments designed to address a wider array of systemic issues, the juvenile efforts have eclipsed many adult efforts by reducing juvenile pretrial detention an average of 42% with no reductions in public safety measures.

**Sources and Resources**: *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 23-24 (Statement of Bart Lubow) (PJI/BJA 2011); *Schall v. Martin,* 467 U.S 253 (1984); *United States v. Salerno,* 481 U.S. 739 (1987); Additional information may be found at the Annie E. Casey Foundation Website, found at http://www.aecf.org/.

</div>

**Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose)**

This principle is related to excessiveness, above, because analysis for excessiveness begins with looking at the government's purpose for limiting pretrial freedom. It is more directly tied to the Due Process Clause, however, and was mentioned briefly in *Salerno* when the Court was beginning its due process analysis. In *Bell v. Wolfish*, the Supreme Court had previously written, "The Court of Appeals properly relied on the Due Process Clause, rather than the 8th Amendment, in considering the claims of pretrial detainees. Due process

requires that a pretrial detainee not be punished."[52] Again, there are currently only two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Other reasons, such as punishment or, as in some states, to enrich the treasury, are clearly unconstitutional. And still others, such as setting a financial condition to detain, are at least potentially so.

### The Bail Process Must Be Individualized

In *Stack v. Boyle*, the Supreme Court wrote as follows:

> Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. The traditional standards, as expressed in the Federal Rules of Criminal Procedure [at the time, the nature and circumstances of the offense, the weight of the evidence against the defendant, and the defendant's financial situation and character] are to be applied in each case to each defendant.[53]

In his concurrence, Justice Jackson observed that if the bail in *Stack* had been set in a uniform blanket amount without taking into account differences between defendants, it would be a clear violation of the federal rules. As noted by Justice Jackson, "Each defendant stands before the bar of justice as an individual."[54]

At the time, the function of bail was limited to setting conditions of pretrial freedom designed to provide reasonable assurance of court appearance. Bail is still limited today, although the purposes for conditioning pretrial freedom have been expanded to include public safety in addition to court appearance. Nevertheless, pursuant to *Stack*, there must be standards in place relevant to these purposes. After *Stack*, states across America amended their statutes to include language designed to individualize bail setting for purposes of court appearance. In the second generation of bail reform, states included individualizing factors relevant to public safety. And today, virtually every state has a list of factors that can be said to be "individualizing criteria" relevant to the proper purposes for limiting pretrial freedom. To the extent that states do not use these factors, such as when over-relying on monetary bail bond schedules that

---

[52] 441 U.S. 520, 535 and n. 16 (1979).
[53] 342 U.S. 1, 5 (1951) (internal citations omitted).
[54] *Id.* at 9.

merely assign amounts of money to charges for all or average defendants, the non-individualized bail settings are vulnerable to constitutional challenge.

The concept of requiring standards to ensure that there exists a principled means for making non-arbitrary decisions in criminal justice is not without a solid basis under the U.S. Constitution. Indeed, such standards have been a fundamental precept of the Supreme Court's death penalty jurisprudence under the cruel and unusual punishment clause of the 8th Amendment.

> *"The term [legal and evidence-based practices] is intended to reinforce the uniqueness of the field of pretrial services and ensure that criminal justice professionals remain mindful that program practices are often driven by law and when driven by research, they must be consistent with the pretrial legal foundation and the underlying legal principles."*
>
> Marie VanNostrand, Ph.D., 2007

### The Right to Counsel

This principle refers to the Sixth Amendment right of the accused to assistance of counsel for his or her defense. There is also a 5th Amendment right, which deals with the right to counsel during all custodial interrogations, but the 6th Amendment right more directly affects the administration of bail as it applies to all "critical stages" of a criminal prosecution. According to the Supreme Court, the 6th Amendment right does not attach until a prosecution is commenced. Commencement, in turn, is "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[55] In *Rothgery v. Gillespie County*, the United States Supreme Court "reaffirm[ed]" what it has held and what "an overwhelming majority of American jurisdictions" have understood in practice: "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."[56]

---

[55] *See United States* v. *Gouveia*, 467 U. S. 180, 188 (1984) (quoting *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (plurality opinion)).
[56] 554 U.S. 191, 198, 213 (2008).

Both the American Bar Association's and the National Association of Pretrial Services Agencies' best practice standards on pretrial release recommend having defense counsel at first appearances in every court, and important empirical data support the recommendations contained in those Standards. Noting that previous attempts to provide legal counsel in the bail process had been neglected, in 1998 researchers from the Baltimore, Maryland, Lawyers at Bail Project sought to demonstrate empirically whether or not lawyers mattered during bail hearings. Using a controlled experiment (with some defendants receiving representation at the bail bond review hearing and others not receiving representation) those researchers found that defendants with lawyers: (1) were over two and one-half times more likely to be released on their own recognizance; (2) were over four times more likely to have their initially-set financial conditions reduced at the hearing; (3) had their financial conditions reduced by a greater amount; (4) were more likely to have the financial conditions reduced to a more affordable level ($500 or under); (5) spent less time in jail (an average of two days versus nine days for unrepresented defendants); and (6) had longer bail bond review hearings than defendants without lawyers at first appearance.

### The Privilege Against Compulsory Self-Incrimination

This foundational principle refers to the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment (in addition to similar or equivalent state provisions), which says that no person "shall be compelled, in any criminal case, to be a witness against himself . . ." At bail there can be issues surrounding pretrial interviews as well as with incriminating statements the defendant makes while the court is setting conditions of release. In that sense, the principle against compulsory self-incrimination is undoubtedly linked to the right to counsel in that counsel can help a particular defendant fully understand his or her other rights.

### Probable Cause

Black's Law Dictionary defines probable cause as reasonable cause, or a reasonable ground to suspect that a person has committed or is committing a crime or that a place contains specific items connected with a crime. Probable cause sometimes refers to having more evidence for than against. It is a term of art in criminal procedure referring to the requirement that arrests be based on probable cause. Probable cause to arrest is present when "at that moment [of the

arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person] had committed or was committing an offense."[57] In *County of Riverside v. McLaughlin,*[58] the Supreme Court ruled that suspects who are arrested without a warrant must be given a probable cause hearing within 48 hours.

As the arrest or release decision is technically one under the umbrella of a broadly defined bail or pretrial process, practices surrounding probable cause or the lack of it are crucial for study. Interestingly, because a probable cause hearing is a prerequisite only to "any significant pretrial restraint of liberty,"[59] jurisdictions that employ bail practices that are speedy and result in a large number of releases using least restrictive conditions (such as the District of Columbia) may find that they need not hold probable cause hearings for every arrestee prior to setting bail.

## Other Legal Principles

Of course, there are other legal principles that are critically important to defendants during the pretrial phase of a criminal case, such as certain rights attending trial, evidentiary rules and burdens of proof, the right to speedy trial, and rules affecting pleas. Moreover, there are principles that arise only in certain jurisdictions; for example, depending on which state a person is in, using money to protect public safety may be expressly unlawful and thus its prohibition may rise to the level of other, more universal legal principles beyond its inferential unlawfulness due to its irrationality. Nevertheless, the legal foundations listed above are the ones most likely to arise in the administration of bail. It is thus crucial to learn them and to recognize the issues that arise within them.

## What Do the Legal Foundations of Pretrial Justice Tell Us?

Pretrial legal foundations provide the framework and the boundaries within which we must work in the administration of bail. They operate uniquely in the pretrial phase of a criminal case, and together should serve as a cornerstone for all pretrial practices; they animate and inform our daily work and serve as a visible daily backdrop for our pretrial thoughts and actions.

---

[57] *Beck v. Ohio,* 379 U.S. 89, 91 (1964).

[58] 500 U.S. 44 (1991).

[59] *Gerstein v. Pugh,* 420 U.S. 103, 125 (1975).

For the most part, the legal foundations confirm and solidify the history of bail. The history of bail tells us that the purpose of bail is release, and the law has evolved to strongly favor, if not practically demand the release of bailable defendants as well as to provide us with the means for effectuating the release decision. The history tells us that "no bail" is a lawful option, and the law has evolved to instruct us on how to fairly and transparently detain unbailable defendants. History tells us that court appearance and public safety are the chief concerns of the bail determination, and the law recognizes each as constitutionally valid purposes for limiting pretrial freedom.

The importance of the law in "legal and evidence-based practices" is unquestioned. Pretrial practices, judicial decision making (for judges are sworn to uphold the law and their authority derives from it), and even state bail laws themselves must be continually held up to the fundamental principles of broad national applicability for legal legitimacy. Moreover, the law acts as a check on the evidence; a pretrial practice, no matter how effective, must always bow to the higher principles of equal justice, rationality, and fairness. Finally, the law provides us with the fundamental goals of the pretrial release and detention decision. Indeed, if evidence-based decision making is summarized as attempting to achieve the goals of a particular discipline by using best practices, research, and evidence, then the law is critically important because it tells us that the goals of bail are to maximize release while simultaneously maximizing court appearance and public safety. Accordingly, all of the research and pretrial practices must be continually questioned as to whether they inform or further these three inter-related goals. In the next section, we will examine how the evolution of research at bail has, in fact, informed lawful and effective bail decision making.

**Additional Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Douglas L. Colbert, Ray Paternoster, & Shawn Bushway, *Do Attorneys Really Matter? The Empirical and Legal Case for the Right to Counsel at Bail,* 32 Cardozo L. Rev. 1719 (2002); *Early Appointment of Counsel: The Law, Implementation, and Benefits* (Sixth Amend. Ctr./PJI 2014); Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009); Jack K. Levin & Lucan Martin, 8A American Jurisprudence 2d, *Bail and Recognizance* (West 2009); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011); Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services*

(CJI/NIC 2007); 3B Charles Allen Wright & Peter J. Henning, Federal Practice and Procedure §§ 761-87 (Thomson Reuters 2013).

# Chapter 4: Pretrial Research

## The Importance of Pretrial Research

Research allows the field of bail and pretrial justice to advance. Although our concepts of proper research have certainly changed over the centuries, arguably no significant advancement in bail or pretrial justice has ever occurred without at least some minimal research, whether that research was legal, historical, empirical, opinion, or any other way of better knowing things. This was certainly true in England in the 1200s, when Edward I commissioned jurors to study bail and used their documented findings of abuse to enact the Statute of Westminster in 1275. It is especially true in America in the 20th century, when research was the catalyst for the first two generations of bail reform and has arguably sparked a third.

While other research disciplines are important, the current workhorse of the various methods in bail is social research. According to noted sociologists Earl Babbie and Lucia Benaquisto, social research is important because we often already know the answers to life's most pressing problems, but we are still unable to solve them. Social science research provides us with the solutions to these problems by telling us how to organize and run our social affairs by analyzing the forms, values, and customs that make up our lives. This is readily apparent in bail, where many of the solutions to current problems are already known; social science research provides help primarily by illuminating how we can direct our social affairs so as to fully implement those solutions. By continually testing theories and hypotheses, social science research finds incremental explanations that simplify a complex life, and thus allows us to solve confounding issues such as how to reduce or eliminate unnecessary pretrial detention.

> *"We can't solve our social problems until we understand how they come about, persist. Social science research offers a way to examine and understand the operation of human social affairs. It provides points of view and technical procedures that uncover things that would otherwise escape our awareness."*
>
> Earl Babbie & Lucia Benaquisto, 2009

Like history and the law, social science research and the law are growing more and more entwined. In the 1908 case of *Muller v. Oregon,*[60] Louis Brandeis submitted a voluminous brief dedicated almost exclusively to social science research indicating the negative effects of long work hours on women. This landmark instance of the use of social research in the law, ultimately dubbed a "Brandeis brief," became the model for many legal arguments thereafter. One need only read the now famous footnote 11 of the Supreme Court's opinion in *Brown v. Board of Education,*[61] which ended racial segregation in America's schools and showed the detrimental effects of segregation on children, to understand how social science research can significantly shape our laws.

Social science research and the law are especially entwined in criminal justice and bail. Perhaps no single topic ignites as deep an emotional response as crime – how to understand it, what to do about it, and how to prevent it. And bail, for better or worse, ignites the same emotional response. Moreover, bail is deceptively complex because it superimposes notions of a defendant's freedom and the presumption of innocence on top of our societal desires to bring defendants to justice and to avoid pretrial misbehavior. Good social science research can aid us in simplifying the topic by answering questions surrounding the three legal and historical goals of bail and conditions of bail. Specifically, social science pretrial research tells us what works to simultaneously: (1) maximize release; (2) maximize public safety; and (3) maximize court appearance.

Because of the complex balance of bail, research that addresses all three of these goals is superior to research that does not. For example, studies showing only the effectiveness of release pursuant to a commercial surety bond at ultimately reducing failures to appear (whether true or not) is less helpful than also knowing how those bonds do or do not affect public safety and tend to detain otherwise bailable defendants. It is helpful to know that pretrial detention causes negative long-term effects on defendants; it is more helpful to learn how to reduce those effects while simultaneously keeping the community safe. It is helpful to know a defendant's risk empirically; it is more helpful to know how to best embrace risk so as to facilitate release and then to mitigate known risk to further the constitutionally valid purposes for limiting pretrial freedom.

Nevertheless, some research is always better than no research, even if that research is found on the lowest levels of an evidence-based decision making

---

[60] *Muller v. Oregon,* 208 U.S. 412 (1908).
[61] *Brown v. Board of Education,* 347 U.S. 483 (1954).

hierarchy of evidence pyramid. And that is simply because we are already making decisions every day at bail, often with no research at all, and typically based on customs and habits formed over countless decades of uninformed practice. To advance our policies, practices, and laws, we must at least become informed consumers of pretrial research. We must recognize the strengths and limitations of the research, understand where it is coming from, and even who is behind creating it. Ultimately, however, we must use it to help solve what we perceive to be our most pressing problems at bail.

---

### Research in the Context of Legal and Evidence-Based Practices

The term "evidence-based practices" is common to numerous professional fields. As noted earlier, however, due to the unique nature of the pretrial period of a criminal case as well as the importance of legal foundations to pretrial decision making, Dr. Marie VanNostrand has more appropriately coined the term "legal and evidence-based practices" for the pretrial field. Legal and evidence-based practices are defined as "interventions and practices that are consistent with the pretrial legal foundation, applicable laws, and methods research has proven to be effective in decreasing failures to appear in court and danger to the community during the pretrial stage."

In addition to holding up practices and the evidence behind them to legal foundations, to fully follow an evidence-based decision making model jurisdictions must also determine how much research is needed to make a practice "evidence-based." According to the U.S. Department of Health and Human Services (HHS), this is done primarily by assessing the strength of the evidence indicating that the practice leads to the desired outcome. To help with making this assessment, many fields employ the use of graphics indicating the varying "strength of evidence" for the kinds of data or research they are likely to use. For example, the Colorado Commission on Criminal and Juvenile Justice, a statewide commission that focuses on evidence-based recidivism reduction and cost-effective criminal justice expenditures, refers to the strength of evidence pyramid, below, which was developed by HHS's Substance Abuse and Mental Health Services Administration's Co-Occurring Center for Excellence (COCE).



As one can see, the levels vary in strength from lower to higher, with higher levels more likely to illuminate research that works better to achieve the goals of a particular field. As noted by the COCE, "Higher levels of research evidence derive from literature reviews that analyze studies selected for their scientific merit in a particular treatment area, clinical trial replications with different populations, and meta-analytic studies of a body of research literature. At the highest level of the pyramid are expert panel reviews of the research literature."

**Sources and Resources:** Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Information gathered from the Colorado Commission on Criminal and Juvenile Justice website, found at http://www.colorado.gov/cs/Satellite/CDPS-CCJJ/CBON/1251622402893; *Understanding Evidence-Based Practices for Co-Occurring Disorders* (SAMHSA's CORE) contained in SAMHSA's website, found online at http://www.samhsa.gov/co-occurring/topics/training/OP5-Practices-8-13-07.pdf.

Research in the Last 100 Years: The First Generation

If we focus on just the last 100 years, we see that major periods of bail research in America have led naturally to more intense periods of reform resulting in new policies, practices, and laws. Although French historian Alexis de Tocqueville informally questioned America's continued use of money bail in 1835, detailed studies of bail practices in America had their genesis in the 1920s, first from Roscoe Pound and Felix Frankfurter's study of criminal justice in Cleveland, Ohio, and then from Arthur Beeley's now famous study of bail in Chicago, Illinois. Observing secured-money systems primarily administered through the use of commercial bail bondsmen (that had really only existed since 1898), both of those 1920s studies found considerable flaws in the current way of administering bail. Beeley's seminal statement of the problem in 1927, made at the end of a painstakingly detailed report, is still relevant today:

> [L]arge numbers of accused, but obviously dependable persons are
> needlessly committed to Jail; while many others, just as obviously
> undependable, are granted a conditional release and never return
> for trial. That is to say, the present system, in too many instances,
> neither guarantees security to society nor safeguards the rights of
> the accused. The system is lax with those with whom it should be
> stringent and stringent with those with whom it could safely be less
> severe.[62]

Pound, Frankfurter, and Beeley began a period of bail research, advanced significantly by Caleb Foote in the 1950s, that culminated in the first generation of bail reform in the 1960s. That research consisted of several types – for example, one of the most important historical accounts of bail was published in 1940 by Elsa de Haas. But the most significant literature consisted of social science studies observing and documenting the deficiencies of the current system. As noted by author Wayne H. Thomas, Jr.,

> [These] studies had shown the dominating role played by
> bondsmen in the administration of bail, the lack of any meaningful
> consideration to the issue of bail by the courts, and the detention of
> large numbers of defendants who could and should have been
> released but were not because bail, even in modest amounts, was

---

[62] Arthur L. Beeley, *The Bail System in Chicago*, at 160 (Univ. of Chicago Press, 1927).

beyond their means. The studies also revealed that bail was often used to 'punish' defendants prior to a determination of guilt or to 'protect' society from anticipated future conduct, neither of which is a permissible purpose of bail; that defendants detained prior to trial often spent months in jail only to be acquitted or to receive a suspended sentence after conviction; and that jails were severely overcrowded with pretrial detainees housed in conditions far worse than those of convicted criminals.[63]

Clearly, the most impactful of this period's research was so-called "action research," in which bail practices were altered and outcomes measured in pioneering "bail projects" to study alternatives to the secured bond/commercial surety system of release. Perhaps the most well-known of these endeavors was the Manhattan Bail Project, conducted by the Vera Foundation (now the Vera Institute of Justice) and the New York University Law School beginning in 1960. The Manhattan Bail Project used an experimental design to demonstrate that given the right information, judges could release more defendants without the requirement of a financial bond condition and with no measurable impact on court appearance rates. At that time in American history, bail had only two goals – to release defendants while simultaneously maximizing court appearance – because public safety had not yet been declared a constitutionally valid purpose for limiting pretrial freedom. The Manhattan Bail Project was significant because it worked to achieve both of the existing goals. Based on the information provided by Vera, release rates increased while court appearance rates remained high.

---

[63] Wayne H. Thomas, Jr., *Bail Reform in America* at 15 (Univ. Cal. Press 1976).

## Caleb Foote's Unfulfilled Prediction
## Concerning Bail Research

At the National Conference on Bail and Criminal Justice in 1964, Professor of Law Caleb Foote explained to attendees that courts would likely move from their "wholly passive role" during the first generation of bail reform to a more active one, saying, "Certainly courts are not going to be immune to the sense of basic unfairness which alike has motivated scholarly research, foundation support for bail action projects, the Attorney General's Committee on Poverty, and your attendance at this Conference." Noting the lack of any definitive empirical evidence showing that pretrial detention alone adversely affected the quality of treatment given to criminal defendants, Foote nonetheless cited current studies attempting to show that very thing, and predicted:

"If it comes to be generally accepted that in the outcome of his case the jailed defendant is prejudiced compared with the defendant who has pretrial liberty, such a finding will certainly have a profound impact upon any judicial consideration of constitutional bail questions. It was such impermissible prejudicial effects, stemming from poverty, which formed the basis of the due process requirement of counsel in *Gideon v. Wainwright*."

Since then, numerous studies have highlighted the prejudicial effects of pretrial detention, with the research consistently demonstrating that when compared to defendants who are released, defendants detained pretrial – all other things being equal – plead guilty more often, are convicted more often, get sentenced to prison more often, and receive longer sentences. And yet, despite this overwhelming research, Foote's prediction of increased judicial interest and activity in the constitutional issues of bail has not come true.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* at 29 n. 1 (2007) (citing studies); John Clark, *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process*, at 2 (PJI/MacArthur Found. 2012) (same); *The National Conference on Bail and Criminal Justice, Proceedings and Interim Report*, at 224-25 (Washington, D.C. April 1965);

The Manhattan Bail Project was the center of discussion of bail reform at the 1964 National Conference on Bail and Criminal Justice, which in turn led to changes in both federal and state laws designed to facilitate the release of bailable defendants who were previously unnecessarily detained. Those changes included presumptions for release on recognizance, release on unsecured bonds (like those used for centuries in England and America prior to the 1800s), release on "least restrictive" nonfinancial conditions, and additional constraints on the

use of secured money bonds. The improvements were, essentially, America's attempt to solve the early 20th century's dilemma of bailable defendants not being released – a dilemma that, historically speaking, has always demanded correction.

## The Second Generation

Research flowing toward the second generation of pretrial reform in America followed the same general pattern of identifying abuses or areas in need of improvement and then gradually creating a meeting of minds on practical solutions to those abuses. In that generation, though, the identified "abuse" dealt primarily with the "no bail" side of the "bail/no bail" dichotomy – the side that determines who should not be released at all. As summarized by Senator Edward Kennedy in 1980,

> Historically, bail has been viewed as a procedure designed to ensure the defendant's appearance at trial by requiring him to post a bond or, in effect, make a promise to appear. Current findings, suggest, however, that this traditional approach, though noble in design, has one important shortcoming. It fails to deal effectively with those defendants who commit crimes while they are free on bail.[64]

Indeed, for nearly 1,500 years, the only acceptable purpose for limiting pretrial freedom was to assure that the defendant performed his or her duty to face justice, which ultimately came to mean appearing for court. Even when crafting their constitutional and statutory exceptions to any recognized right to bail, the states and the federal government had always done so with an eye toward court appearance. To some, limiting freedom based on future dangerousness was un-American, more akin to tyrannical practices of police states, and contrary to all notions of fundamental human rights. Indeed, there was considerable debate over whether it could *ever* be constitutional to do so.

Nevertheless, many judges felt compelled to respond to legitimate fears for public safety even if the law did not technically allow for it. Accordingly, those judges often followed two courses of action when faced with obviously dangerous defendants who perhaps posed virtually no risk of flight: (1) if those

---

[64] Edward M. Kennedy, *A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform,* 48 Fordham L. Rev. 423, 423 (1980) (internal footnotes omitted).

defendants happened to fall in the categories listed as "no bail," judges could deny their release altogether; (2) if they did not fall into a "no bail" category, judges could and would set high monetary conditions of bail to effectively detain the defendant. The practice of detaining persons for public safety, or preventive detention, was known at the time as furthering a "sub rosa" or secret purpose for limiting freedom, and it was done with little interference from the appellate courts.

The research leading to reform in this area was multifaceted. Law reviews published articles on the right to bail, the Excessive Bail Clause, and on due process concerns. Historians examined the right to bail in England and America to determine if and how it could be restricted or even denied altogether for purposes of public safety. Politicians and others looked to the experiences of states that had already changed their laws to account for public safety and danger. And social scientists documented what Congress ultimately called "the alarming problem of crimes committed by persons on release"[65] by conducting empirical studies of pretrial release and re-arrest rates in a number of American jurisdictions.

Ultimately, this research led to dramatic changes in the administration of bail. Congress passed the Bail Reform Act of 1984, which expanded the law to allow for direct, fair, and transparent detention of certain dangerous defendants after a due process hearing. In *United States v. Salerno*, the Supreme Court upheld the Act, giving constitutional validity to public safety as a limitation on pretrial freedom. If they had not already done so, many states across the country changed their statutes and constitutions to allow consideration of dangerousness in the release and detention decision and by re-defining the "no bail" side of their schemes to better reflect which defendants should be denied the right to bail altogether.

---

[65] S. Rep. No. 98-225, P. L. 98-473 p. 3 (1983).

## The Third Generation

The previous generations of bail research have followed the pattern of identifying abuses or issues of concern and then finding consensus on solutions, and the current generation is no different. Some of the research in this generation of bail reform is merely a continuation of studies begun in previous generations. For example, a body of literature examining the effects of pretrial detention on ultimate outcomes of cases (guilty pleas, sentences, etc.) began in the 1950s and has continued to this day. As another example, after Congress passed the Bail Reform Act of 1966, pretrial services programs gradually expanded from the "bail projects" of the early 1960s to more comprehensive agencies designed to carry out the mandates of new laws requiring risk assessment and often supervision of pretrial defendants. As these programs evolved, a body of research began to develop around their practices. In 1973, the National Association of Pretrial Services Agencies (NAPSA) was founded to, among other things, promote research and development in the field. In 1976, NAPSA and the Department of Justice created the Pretrial Services Resource Center (PSRC, now the Pretrial Justice Institute), an entity also designed to, among other things, collect and disseminate research and information relevant to the pretrial field. The data collected by these entities over the years, in addition to the numerous important reports they have issued analyzing that data, have been instrumental sources of fundamental pretrial research.

## A Meeting of Minds – Who is Currently In Favor of Pretrial Improvements?

The following national organizations have produced express policy statements generally supporting the use of evidence-based and best pretrial practices, which include risk assessment and fair and transparent preventive detention, at the front end of the criminal justice system:

The Conference of Chief Justices

The Conference of State Court Administrators

The National Association of Counties

The International Association of Chiefs of Police

The Association of Prosecuting Attorneys

The American Council of Chief Defenders

The National Association of Criminal Defense Lawyers

The American Jail Association

The American Bar Association

The National Judicial College

The National Sheriff's Association

The American Probation and Parole Association

The National Association of Pretrial Services Agencies

In addition, numerous other organizations and individuals are lending their support or otherwise partnering to facilitate pretrial justice in America. For a list of just those organizations participating in the Pretrial Justice Working Group, created in the wake of the National Symposium on Pretrial Justice, go to http://www.pretrial.org/infostop/pjwg/

As another example, in 1983, the PSRC – with funding from the Bureau of Justice Statistics (BJS) – initiated the National Pretrial Reporting Program, which was designed to create a national pretrial database by collecting local bail data and aggregating it at the state and national levels. In 1994, that program became BJS's State Court Processing Statistics (SCPS) program, which collected data on felony defendants in jurisdictions from the 75 most populous American counties. Research documents analyzing that data, including the *Felony Defendants from Large Urban Counties* series, and *Pretrial Release of Felony Defendants in State Courts*,

have become crucial, albeit sometimes misinterpreted sources of basic pretrial data, such as defendant charges and demographics, case outcomes, types of release and release rates, financial condition amounts, and basic information on pretrial misconduct. Most recently, BJS asked the Urban Institute to re-design and re-develop the National Pretrial Reporting Program as a replacement to SCPS.

## An Unusual, But Necessary, Research Warning

Since 1988, the Bureau of Justice Statistic's (BJS) State Court Processing Statistics (SCPS) program (formerly the National Pretrial Reporting Program) has been an important source of data on criminal processing of persons charged with felonies in the 75 most populous American counties. Issues surrounding pretrial release, in particular, have been tempting topics for study due to the SCPS's inclusion of data indicating whether defendants were released pretrial, the type of release (e.g., personal recognizance, surety bond), and whether the defendant misbehaved while on pretrial release. In some cases, researchers would use the SCPS data to make "evaluative" statements, that is, statements declaring that a particular type of release was superior to another based on the data showing pretrial misbehavior associated with each type. Moreover, when these studies favored the commercial bail bonding and insurance industry, that industry would repeat the researcher's evaluative statements (as well as make their own statements based on their own reading of the SCPS data), and claim that the data demonstrated that the use of a commercial surety bond was a superior form of release.

According to Bechtel, et.al, (2012) "The bonding industry's claims based on the SCPS data became so widespread that BJS was compelled to take the unusual and unprecedented step of issuing a 'Data Advisory.'" That advisory, issued in March of 2010, listed the limitations of the SCPS data, and specifically warned that, "Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading."



Despite the warning, there are those who persist in citing SCPS data to convince policy makers or others about the effectiveness of one type of release over another. Both Bechtel, et al., and VanNostrand, et al., have listed flaws in the various studies using the data and have given compelling reasons for adopting a more discriminating attitude whenever persons or entities begin comparing one type of release with another.

As mentioned in the body of this paper, the best research at bail, which will undoubtedly include future efforts at comparing release types, must not only comply with the rigorous standards necessary so as not to violate the BJS Data Advisory, but should also address all three legal and evidence-based goals underlying the bail decision, which include maximizing release while maximizing public safety and court appearance.

**Sources and Resources:** Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (PJI/BJA 2011).

Finally, a related body of ongoing research derives simply from pretrial services agencies and programs measuring themselves, which can be a powerful way to present and use data to affect pretrial practices. In 2011, the NIC published *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field,* which proposed standardized definitions and uniform suggested measures consistent with established pretrial standards to "enable pretrial services agencies to gauge more accurately their programs' effectiveness in meeting agency and justice system goals."[66] Broadly speaking, standardized guidelines and definitions for documenting performance measures and outcomes enables better communication and leads to better and more coordinated research efforts overall.

Other research flowing toward this current generation of pretrial reform, akin to Arthur Beeley's report on Chicago bail practices, has been primarily observational. That research, such as some of the multifaceted analyses performed in Jefferson County, Colorado, in 2007-2010, merely examines system practices to assess whether those practices or even the current laws can be improved. Other entities, such as Human Rights Watch and the Justice Policy Institute, have created similar research documents that include varying ratios of observational and original research. On the other hand, another body of this generation's research goes far beyond observation and uses large data sets and complex statistical tests to create empirical pretrial risk instruments that provide scientific structure and meaning to current lists dictating the factors judges must consider in the release and detention decision.

---

[66] *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field* (NIC 2011) at v.

In between is a body of research most easily identified by topic, but sometimes associated best with the person or entity producing it. For example, throughout the years researchers have been interested in analyzing judicial discretion and guided discretion in the decision to release, and so one finds numerous papers and studies examining that issue. In particular, though, Dr. John Goldkamp spent much of his distinguished academic career focusing on judicial discretion in the pretrial release decision, and published numerous important studies on his findings. Likewise, other local jurisdictions have delved deep into their own systems to look at a variety of issues associated with pretrial release and detention, but perhaps none have done so as consistently and thoroughly as the New York City Criminal Justice Agency, and its research continues to inspire and inform the nation.

Other topics of interest in this generation of reform include racial disparity, cost benefit analyses affecting pretrial practices, training police officers for first contacts and effects of that training on pretrial outcomes, citation release, the legality and effectiveness of monetary bail schedules, pretrial processes and outcomes measurements, re-entry from jail to the community, bail bondsmen and bounty hunters, special populations such as those with mental illness or defendants charged with domestic violence, and gender issues. Prominent organizations consistently working on publishing pretrial research literature include various agencies within the Department of Justice, including the National Institute of Corrections, the Bureau of Justice Assistance, the Bureau of Justice Statistics, and the National Institute of Justice. Other active entities include the Pretrial Justice Institute, the National Association of Counties, the United States Probation and Pretrial Services, the Pretrial Services Agency for the District of Columbia, the Vera Institute, the Urban Institute, and the Justice Policy Institute. Other organizations, such as the International Association of Chiefs of Police, the National Association of Drug Court Professionals, National Council on Crime and Delinquency, the Council of State Governments, the Pew Research Center, the American Probation and Parole Association, and various colleges and universities have also become actively involved in pretrial issues.

Along with these entities are a number of individuals who have consistently led the pretrial field by devoting much or all of their professional careers on pretrial research, such as Dr. John Goldkamp, D. Alan Henry, Dr. Marie VanNostrand, Dr. Christopher Lowenkamp, Dr. Alex Holsinger, Dr. James Austin, Dr. Mary Phillips, Dr. Brian Reaves, Dr. Thomas Cohen, Dr. Edward J. Latessa, Timothy Cadigan, Spurgeon Kennedy, John Clark, Kenneth J. Rose, Barry Mahoney, and Dr. Michael Jones. Often these individuals are sponsored by generous

philanthropic foundations interested in pretrial justice, such as the Public Welfare Foundation and the Laura and John Arnold Foundation.

---

## Public Opinion Research

An important subset of criminal justice research is survey research, which can include collecting data to learn how people feel about crime or justice policy. For example, in 2012 the PEW Center on the States published polling research by Public Opinion Strategies and the Mellman Group showing that while people desire public safety and criminal accountability, they also support sentencing and corrections reforms that reduce imprisonment, especially for non-violent offenders. In 2009, the National Institute of Corrections reported a Zogby International poll similarly showing that 87% of those contacted would support research-based alternatives to jail to reduce recidivism for non-violent persons.

Very little of this type of research had been done in the field of pretrial release and detention, but in 2013 Lake Research Partners released the results of a nationwide poll focusing on elements of the current pretrial reform movement. That research found "overwhelming support" for replacing a cash-based bonding system with risk-based screening tools. Moreover, that support was high among all demographics, including gender, age, political party identification, and region. Interestingly too, most persons polled were unaware of the current American situation, with only 36% of persons understanding that empirical risk assessment was not currently happening in most places.

**Sources and Resources:** *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems* (NIC, 2010); *Support for Risk Assessment Programs Nationwide* (Lake Research Partners 2013) found at http://www.pretrial.org/download/advocacy/Support%20for%20Risk%20Assessment%20Nationwide%20-%20Lake%20Research%20Partners.pdf. Public Opinion on Sentencing and Corrections Policy in America (Public Opinion Strategies/Mellman Group 2012) found at http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/PEW_NationalSurveyResearchPaper_FINAL.pdf;

All of this activity brings hope to a field that has recently been described as significantly limited in its research agenda and output. In 2011, the Summary Report to the National Symposium on Pretrial Justice listed four recommendations related to a national research agenda: (1) collect a comprehensive set of pretrial data needed to support analysis, research, and reform through the Bureau of Justice Statistics; (2) embark on comprehensive research that results in the identification of proven best pretrial practices through the National Institute of Justice; (3) develop and seek funding for research proposals relating to pretrial justice; and (4) prepare future practitioners and leaders to effectively address pretrial justice issues in a fair, safe, and effective manner.

In the wake of the Symposium, the Department of Justice's Office of Justice Programs (OJP) convened a Pretrial Justice Working Group, a standing, multidisciplinary group created to collaboratively address national challenges to moving toward pretrial reform. The Working Group, in turn, established a "Research Subcommittee," which was created to stimulate detailed pretrial data collection, increase quantitative and qualitative pretrial research, support existing OJP initiatives dealing with evidence-based practices in local justice systems, and develop pretrial justice courses of studies in academia. Due in part to that Subcommittee's purposeful focus, its members have begun a coordinated effort to identify pretrial research needs and to develop research projects designed specifically to meet those needs. Accordingly, across America, we are seeing great progress in both the interest and the output of pretrial research.

> *"Research is formalized curiosity. It is poking and prying with a purpose."*
>
> Zora Neale Hurston, 1942

However, there are many areas of the pretrial phase of a defendant's case that are in need of additional helpful research. For example, while Professor Doug Colbert has created groundbreaking and important research on the importance of defense attorneys at bail, and while the Kentucky Department of Public Advocacy has put that research into practice through a concentrated effort toward advancing pretrial advocacy, there is relatively little else on this very important topic. Similarly, other areas under the umbrella of pretrial reform, such as a police officer's decision to arrest or cite through a summons, the prosecutor's decision to charge, early decisions dealing with specialty courts, and diversion, suffer from a relative lack of empirical research. This is true in the legal field as well, as only a handful of scholars have recently begun to focus

again on fundamental legal principles or on how state laws can help or hinder our intent to follow evidence-based pretrial practices. In sum, there are still many questions that, if answered through research, would help guide us toward creating bail systems that are the most effective in maximizing release, public safety, and court appearance. Moreover, there exists today even a need to better compile, categorize, and disseminate the research that we do have. To that end, both the National Institute of Justice and the Pretrial Justice Institute have recently created comprehensive bibliographies on their websites.

## Current Research – Special Mention

One strand of current pretrial research warranting special mention, however, is research primarily focusing on one or both of the two following categories: (1) empirical risk assessment; and (2) the effect of release type on pretrial outcomes, including the more nuanced question of the effect of specific conditions of release on pretrial outcomes. The two topics are related, as often the data sets compiled to create empirical risk instruments contain the sort of data required to answer the questions concerning release type and conditions as well as the effects of conditional release or detention on risk itself. The more nuanced subset of how conditions of release affect pretrial outcomes can become quite complicated when we think about differential supervision strategies including questions of dosage, e.g., how much drug testing must we order (if any) to achieve the optimal pretrial court appearance and public safety rates?

## Empirical Risk Assessment Instruments

Researchers creating empirical pretrial risk assessment instruments take large amounts of defendant data and identify which specific factors are statistically related and how strongly they are related to defendant pretrial misconduct. Ever since the mid-20th century, primarily in response to the United States Supreme Court's opinion in *Stack v. Boyle,* states have enacted into their laws factors judges are supposed to consider in making a release or detention decision. For the most part, these factors were created using logic and later some research from the 1960s showing the value of community ties to the pretrial period. Unfortunately, however, little to no research existed to demonstrate which of the many enacted factors were actually predictive of pretrial misconduct and at what strength. Often, judges relied on one particular factor – the current charge or sometimes the charge and police affidavit – to make their decisions. Over the years, single jurisdictions, such as counties, occasionally created risk instruments

using generally accepted social science research methods, but their limited geographic influence and sometimes their lack of data from which to test multiple variables meant that research in this area spread slowly.

In 2003, however, Dr. Marie VanNostrand created the Virginia Pretrial Risk Assessment Instrument, most recently referred to by Dr. VanNostrand and others as simply the "Virginia Model," which was ultimately tested and validated in multiple Virginia jurisdictions and then deployed throughout the state. Soon after, other researchers developed other multi-jurisdictional risk instruments, including Kentucky, Ohio, Colorado, Florida, and the federal system, and now other American jurisdictions, including single counties, are working on similar instruments. Still others are "borrowing" existing instruments for use on local defendants while performing the process of validating them for their local population. Most recently, in November 2013, researchers sponsored by the Laura and John Arnold Foundation announced the creation of a "national" risk instrument, capable of accurately predicting pretrial risk (including risk of violent criminal activity) in virtually any American jurisdiction due to the extremely large database used to create it.

In its 2012 issue brief titled, *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants,* PJI and BJA summarize the typical risk instrument as follows:

> A pretrial risk assessment instrument is typically a one-page summary of the characteristics of an individual that presents a score corresponding to his or her likelihood to fail to appear in court or be rearrested prior to the completion of their current case. Instruments typically consist of 7-10 questions about the nature of the current offense, criminal history, and other stabilizing factors such as employment, residency, drug use, and mental health.
>
> Responses to the questions are weighted, based on data that shows how strongly each item is related to the risk of flight or rearrest during pretrial release. Then the answers are tallied to produce an overall risk score or level, which can inform the judge or other decisionmaker about the best course of action.[67]

---

[67] *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants* (PJI/BJA 2012) (internal footnote omitted).

Using a pretrial risk assessment instrument is an evidence-based practice, and to the extent that it helps judges with maximizing the release of bailable defendants and identifying those who can lawfully be detained, it is a legal and evidence-based practice. Nevertheless, it is a relatively new practice – it is too new for detailed discussion in the current ABA Criminal Justice Standards on Pretrial Release – and so the fast-paced research surrounding these instruments must be scrutinized and our shared knowledge constantly updated to provide for the best application of these powerful tools. In 2011, Dr. Cynthia Mamalian authored *The State of the Science of Pretrial Risk Assessment*, and noted many of the issues (including "methodological challenges") that surround the creation and implementation of these instruments.[68]

---

### Bail and the Aberrational Case

Social scientists primarily deal with aggregate patterns of behavior rather than with individual cases, but the latter is often what criminal justice professionals are used to. Cases that fall outside of a particular observable pattern might be called "outliers" or "aberrations" by social scientists and thus disregarded by the research that is most relevant to bail. Unfortunately, however, it is often these aberrational cases – typically those showing pretrial misbehavior – that drive public policy.

Thus, when making policy decisions about bail it is important for decision makers to embrace perspective by also studying aggregates. By looking at a problem from a distance, one can often see that the single episode that brought a particular case to the pretrial justice discussion table may not present the actual issue needing improvement. If the single case represents an aggregate pattern, however, or if that case illustrates some fundamental flaw in the system that demands correction, then that case may be worthy of further study.

In the aggregate, very few defendants misbehave while released pretrial (for example, the D.C. Pretrial Services Agency reports that in 2012, 89% of released defendants were arrest-free during their pretrial phase, and that only 1% of those arrested were for violent crimes; likewise, Kentucky reports a 92% public safety rate), and yet occasionally defendants will commit heinous crimes under all forms of supervision, including secured detention. In the aggregate, most people show up for court (again, D.C. Pretrial reports that 89% of defendants did not miss a single court date; likewise, Kentucky reports a 90% court appearance rate), and yet occasionally some high profile defendant will not appear, just as fifty may not show up for traffic court on the same day. In the aggregate, virtually all defendants will ultimately be released back into our communities and thus can be safety supervised within our communities while awaiting the disposition of

---

[68] *See* Cynthia A. Mamalian, *State of the Science of Pretrial Risk Assessment*, at 26 (PJI/BJA 2011).

their cases, and yet occasionally there are defendants who are so risky that they must be detained.

**Sources and Resources:** Tara Boh Klute & Mark Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges, and Recommendations* (KY Pretrial Servs. 2012); Michael G. Maxfield & Earl Babbie, Research Methods for Criminal Justice and Criminology (Wadsworth, 6th ed. 2008); D.C. Pretrial statistics found at http://www.psa.gov/.

Beyond those issues, however, is the somewhat under-discussed topic of what these "risk-based" instruments mean for states that currently have entire bail schemes created without pure notions of risk in mind. For example, many states have preventive detention provisions in their constitutions denying the right to bail for certain defendants, but often these provisions are tied primarily to the current charge or the charge and some criminal precondition. The ability to better recognize high-risk defendants, who perhaps should be detained but who, because of their charge, are not detainable through the available "no bail" process, has caused these states to begin re-thinking their bail schemes to better incorporate risk. The general move from primarily a charge-and-resource-based bail system to one based primarily on pretrial risk automatically raises questions as to the adequacy of existing statutory and constitutional provisions.

## Effects of Release Types and Conditions on Pretrial Outcomes

The second category of current research – the effect of release type as well as the effect of individual conditions on pretrial outcomes – continues to dominate discussions about what is next in the field. Once we know a particular defendant's risk profile, it is natural to ask "what works" to then mitigate that risk. The research surrounding this topic is evolving rapidly. Indeed, during the writing of this paper, the Pretrial Justice Institute released a rigorous study indicating that release on a secured (money paid up front) bond does nothing for public safety or court appearance compared to release on an unsecured (money promised to be paid only if the defendant fails to appear) bond, but that secured bonds have a significant impact on jail bed use through their tendency to detain defendants pretrial. Likewise, in November 2013, the Laura and John Arnold Foundation released its first of several research studies focusing on the impact of pretrial supervision. Though admittedly lacking detail in important areas, that study suggested that moderate and higher risk defendants who were supervised were significantly more likely to show up for court than non-supervised defendants.

In 2011, VanNostrand, Rose, and Weibrecht summarized the then-existing research behind a variety of release types, conditions, and differential supervision strategies, including court date notification, electronic monitoring, pretrial supervision and supervision with alternatives to detention, release types based on categories of bail bonds, and release guidelines, and that summary document, titled *State of the Science of Pretrial Release Recommendations and Supervision*, remains an important foundational resource for anyone focusing on the topic. Nevertheless, as the Pretrial Justice Institute explained in its conclusion to that report, we have far to go before we can confidently identify legal and evidence-based conditions and supervision methods:

> Great strides have been made in recent years to better inform [the pretrial release decision], both in terms of what is appropriate under the law and of what works according to the research, and to identify which supervision methods work best for which defendants.

> As this document demonstrates, however, there is still much that we do not know about what kinds of conditions are most effective. Moreover, as technologies advance to allow for the expansion of potential pretrial release conditions and the supervision of those conditions, we can anticipate that legislatures and courts will be called upon to define the limits of what is legally appropriate.[69]

## Application and Implications

Applying the research has been a major component of jurisdictions currently participating in the National Institute of Correction's (NIC's) Evidence-Based Decision Making Initiative, a collaborative project among the Center for Effective Public Policy, the Pretrial Justice Institute, the Justice Management Institute, and the Carey Group. The seven jurisdictions piloting the NIC's collaborative "Framework," which has been described as providing a "purpose and a process" for applying evidence-based decision making to all decision points in the justice system, are actively involved in applying research and evidence to real world issues with the aim toward reducing harm and victimization while maintaining certain core justice system values. Those Framework jurisdictions focusing on the

---

[69] Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision*, at 42 (conclusion by PJI) (PJI/BJA 2011).

pretrial release and detention decision are learning first hand which areas have sufficient research to fully inform pretrial improvements and which areas have gaps in knowledge, thus signifying the need for more research. Their work will undoubtedly inform the advancement of pretrial research in the future.

Finally, the weaving of the law with the research into pretrial application has the potential to itself raise significantly complex issues. For example, if GPS monitoring is deemed by the research to be ineffective, is it not then excessive under the 8th Amendment? If a secured money condition does nothing for public safety or court appearance, is it not then irrational, and thus also a violation of a defendant's right to due process, for a judge to set it? If certain release conditions actually increase a lower risk defendant's chance of pretrial misbehavior, can imposing them ever be considered lawful? These questions, and others, will be the sorts of questions ultimately answered by future court opinions.

## What Does the Pretrial Research Tell Us?

Pretrial research is crucial for telling us what works to achieve the purposes of bail, which the law and history explain are to maximize release while simultaneously maximizing public safety and court appearance. All pretrial research informs, but the best research helps us to implement laws, policies, and practices that strive to achieve all three goals. Each generation of bail or pretrial reform has a body of research literature identifying areas in need of improvement and creating a meeting of minds surrounding potential solutions to pressing pretrial issues. This current generation is no different, as we see a growing body of literature illuminating poor laws, policies, and practices while also demonstrating evidence-based solutions that are gradually being implemented across the country.

Nevertheless, in the field of pretrial research there are still many areas requiring attention, including areas addressed in this chapter such as risk assessment, risk management, the effects of money bonds, cost/benefit analyses, impacts and effects of pretrial detention, and racial disparity as well as areas not necessarily addressed herein, such as money bail forfeitures, fugitive recovery, and basic data on misdemeanor cases.

Most of us are not research producers. We are, however, research consumers. Accordingly, to further the goal of pretrial justice we must understand how rapidly the research is evolving, continually update our knowledge base of relevant research, and yet weed out the research that is biased, flawed, or

otherwise unacceptable given our fundamental legal foundations. We must strive to understand the general direction of the pretrial research and recognize that a change in direction may require changes in laws, policies, and practices to keep up. Most importantly, we must continue to support pretrial research in all its forms, for it is pretrial research that advances the field.

**Additional Sources and Resources:** Steve Aos, Marna Miller, & Elizabeth Drake, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (WSIPP 2006); Earl Babbie & Lucia Benaquisto, *Fundamentals of Social Research: Second Canadian Edition* (Cengage Learning 2009); Bernard Botein, *The Manhattan Bail Project: Its Impact on Criminology and the Criminal Law Processes*, 43 Tex. L. Rev. 319 (1964-65); Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); John Clark, *A Framework for Implementing Evidence-Based Practices in Pretrial Services,* Topics in Cmty. Corr. (2008); Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties, 2006* (BJS 2010); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); *Evidence-Based Practices in the Criminal Justice System (Annotated Bibliography)* (NIC updated 2013); Caleb Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia,* 102 Univ. of Pa. L. Rev. 1031 (1954); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Michael R. Jones, *Pretrial Performance Measurement: A Colorado Example of Going from the Ideal to Everyday Practice* (PJI 2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (PJI Oct. 2013); *Laura and John Arnold Foundation Develops National Model for Pretrial Risk Assessments* (Nov. 2013) found at [http://www.arnoldfoundation.org/laura-and-john-arnold-foundation-develops-national-model-pretrial-risk-assessments](http://www.arnoldfoundation.org/laura-and-john-arnold-foundation-develops-national-model-pretrial-risk-assessments); Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013); Michael G. Maxfield & Earl Babbie, *Research Methods for Criminal Justice and Criminology* (Wadsworth, 6th ed. 2008); *National Conference on Bail and Criminal Justice, Proceedings and Interim Report* (Washington, D.C. 1965); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJS 2011); Mary T. Phillips, *A Decade of Bail Research in*

*New York City* (N.Y. NYCCJA 2012); Roscoe Pound & Felix Frankfurter (Eds.), *Criminal Justice in Cleveland* (Cleveland Found. 1922); Marie VanNostrand, *Assessing Risk Among Pretrial Defendants In Virginia: The Virginia Pretrial Risk Assessment Instrument* (VA Dept. Crim. Just. Servs. 2003); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

# Chapter 5: National Standards on Pretrial Release

Pretrial social science research tells us what works to further the goals of bail. History and the law tell us that the goals of bail are to maximize release while simultaneously maximizing public safety and court appearance, and the law provides a roadmap of how to constitutionally deny bail altogether through a transparent and fair detention process. If this knowledge was all that any particular jurisdiction had to use today, then its journey toward pretrial justice might be significantly more arduous than it really is. But it is not so arduous, primarily because we have national best practice standards on pretrial release and detention, which combine the research and the law (which is intertwined with history) to develop concrete recommendations on how to administer bail.

In the wake of the 1964 National Conference on Bail and Criminal Justice and the 1966 Federal Bail Reform Act, various organizations began issuing standards designed to address relevant pretrial release and detention issues at a national level. The American Bar Association (ABA) was first in 1968, followed by the National Advisory Committee on Criminal Justice, the National District Attorneys Association, and finally the National Association of Pretrial Services Agencies (NAPSA). The NAPSA Standards, in particular, provide important detailed provisions dealing with the purposes, roles, and functions of pretrial services agencies.

## The ABA Standards

Among these sets of standards, however, the ABA Standards stand out. Their preeminence is based, in part, on the fact that they "reflect[] a consensus of the views of representatives of all segments of the criminal justice system,"[70] which includes prosecutors, defense attorneys, academics, and judges, as well as various groups such as the National District Attorneys Association, the National Association of Criminal Defense Lawyers, the National Association of Attorneys General, the U.S. Department of Justice, the Justice Management Institute, and other notable pretrial scholars and pretrial agency professionals.

More significant, however, is the justice system's use of the ABA Criminal Justice Standards as important sources of authority. The ABA's Standards have been

---

[70] Martin Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence,* 23 Crim. Just. (Winter 2009).

either quoted or cited in more than 120 U.S. Supreme Court opinions, approximately 700 federal circuit court opinions, over 2,400 state supreme court opinions, and in more than 2,100 law journal articles. By 1979, most states had revised their statutes to implement some part of the Standards, and many courts had used the Standards to implement new court rules. According to Judge Martin Marcus, Chair of the ABA Criminal Justice Standards Committee, "[t]he Standards have also been implemented in a variety of criminal justice projects and experiments. Indeed, one of the reasons for creating a second edition of the Standards was an urge to assess the first edition in terms of the feedback from such experiments as pretrial release projects."[71]

> *"The Court similarly dismisses the fact that the police deception which it sanctions quite clearly violates the American Bar Association's Standards for Criminal Justice – Standards which the Chief Justice has described as 'the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history,' and which this Court frequently finds helpful."*
>
> *Moran v. Burbine*, 475 U.S. 412 (1986) (Stevens, J. dissenting)

The ABA's process for creating and updating the Standards is "lengthy and painstaking," but the Standards finally approved by the ABA House of Delegates (to become official policy of the 400,000 member association) "are the result of the considered judgment of prosecutors, defense lawyers, judges, and academics who have been deeply involved in the process, either individually or as representatives of their respective associations, and only after the Standards have been drafted and repeatedly revised on more than a dozen occasions, over three or more years."[72]

Best practices in the field of pretrial release are based on empirically sound social science research as well as on fundamental legal principles, and the ABA Standards use both to provide rationales for its recommendations. For example, in recommending that commercial sureties be abolished, the ABA relies on numerous critiques of the money bail system going back nearly 100 years, social science experiments, law review articles, and various state statutes providing for its abolition. In recommending a presumption of release on recognizance and

---

[71] *Id.* (internal quotation omitted).

[72] *Id.*

that money not be used to protect public safety, the ABA relies on United States Supreme Court opinions, findings from the Vera Foundation's Manhattan Bail Project, discussions from the 1964 Conference on Bail and Criminal Justice, Bureau of Justice Statistics data, as well as the *absence* of evidence, i.e., "the absence of any relationship between the ability of a defendant to post a financial bond and the risk that a defendant may pose to public safety."[73]

The ABA Standards provide recommendations spanning the entirety of the pretrial phase of the criminal case, from the decision to release on citation or summons, to accountability through punishment for pretrial failure. They are based, correctly, on a "bail/no bail" or "release/detain" model, designed to fully effectuate the release of bailable defendants while providing those denied bail with fair and transparent due process hearing prior to detention.

Drafters of the 2011 Summary Report to the National Symposium on Pretrial Justice recognized that certain fundamental features of an ideal pretrial justice system are the same features that have been a part of the ABA Standards since they were first published in 1968. And while that Report acknowledged that simply pointing to the Standards is not enough to change the customs and habits built over 100 years of a bail system dominated by secured money, charge versus risk, and profit, the Standards remain a singularly important resource for all pretrial practitioners. Indeed, given the comprehensive nature of the ABA Standards, jurisdictions can at least use them to initially identify potential areas for improvement by merely holding up existing policies, practices, and even laws to the various recommendations contained therein.

---

[73] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.3 (a) (commentary) at 111.

# Chapter 6: Pretrial Terms and Phrases

## The Importance of a Common Vocabulary

It is only after we know the history, the law, the research, and the national standards that we can fully understand the need for a common national vocabulary associated with bail. The Greek philosopher Socrates correctly stated that, "The beginning of wisdom is a definition of terms." After all, how can you begin to discuss society's great issues when the words that you apply to those issues elude substance and meaning? But beyond whatever individual virtue you may find in defining your own terms, the undeniable merit of this ancient quote fully surfaces when applied to dialogue with others. It is one thing to have formed your own working definition of the terms "danger" or "public safety," for example, but your idea of danger and public safety can certainly muddle a conversation if another person has defined the terms differently. This potential for confusion is readily apparent in the field of bail and pretrial justice, and it is the wise pretrial practitioner who seeks to minimize it.

Minimizing confusion is necessary because, as noted previously, bail is already complex, and the historically complicated nature of various terms and phrases relating to bail and pretrial release or detention only adds to that complexity, which can sometimes lead to misuse of those terms and phrases. Misuse, in turn, leads to unnecessary quibbling and distraction from fundamental issues in the administration of bail and pretrial justice. This distraction is multiplied when the definitions originate in legislatures (for example, by defining bail statutorily as an amount of money) or court opinions (for example, by articulating an improper or incomplete purpose of bail). Given the existing potential for confusion, avoiding further complication is also a primary reason for finding consensus on bail's basic terms and phrases.

As also noted previously, bail is a field that is changing rapidly. For nearly 1,500 years, the administration of bail went essentially unchanged, with accused persons obtaining pretrial freedom by pledging property or money, which, in turn, would be forfeited if those persons did not show up to court. By the late 1800s, however, bail in America had changed from the historical personal surety system to a commercial surety system, with the unfortunate consequence of solidifying money at bail while radically transforming money's use from a condition subsequent (i.e., using unsecured bonds) to a condition precedent (i.e.,

using secured bonds) to release. Within a mere 20 years after the introduction of the commercial surety system in America, researchers began documenting abuses and shortcomings associated with that system based on secured financial conditions. By the 1980s, America had undergone two generations of pretrial reform by creating alternatives to the for-profit bail bonding system, recognizing a second constitutionally valid purpose for the government to impose restrictions on pretrial freedom, and allowing for the lawful denial of bail altogether based on extreme risk. These are monumental changes in the field of pretrial justice, and they provide further justification for agreeing on basic definitions to keep up with these major developments.

Finally, bail is a topic of increasing interest to criminal justice researchers, and criminal justice research begins with conceptualizing and operationalizing terms in an effort to collect and analyze data with relevance to the field. For example, until we all agree on what "court appearance rates" mean, we will surely struggle to agree on adequate ways to measure them and, ultimately, to increase them. In the same way, as a field we must agree on the meaning and purpose of so basic a term as "bail."

More important than achieving simple consensus, however, is that we agree on meanings that reflect reality or truth. Indeed, if wisdom begins with a definition of terms, wisdom is significantly furthered when those definitions hold up to what is real. For too long, legislatures, courts, and various criminal justice practitioners have defined bail as an amount of money, but that is an error when held up to the totality of the law and practice through history. And for too long legislatures, courts, and criminal justice practitioners have said that the purpose of bail is to provide reasonable assurance of public safety and/or court appearance, but that, too, is an error when held up against the lenses of history and the law. Throughout history, the definition of "bail" has changed to reflect what we know about bail, and the time to agree on its correct meaning for this generation of pretrial reform is now upon us.

## The Meaning and Purpose of "Bail"

For the legal and historical reasons articulated above, bail should never be defined as money. Instead, bail is best defined in terms of release, and most appropriately as a process of conditional release. Moreover, the purpose of bail is not to provide reasonable assurance of court appearance and public safety – that is the province and purpose of conditions of bail or limitations on pretrial freedom. The purpose of bail, rather, is to effectuate and maximize release. There

is "bail" – i.e., a process of release – and there is "no bail," – a process of detention. Constitutionally speaking, "bail" should always outweigh "no bail" because, as the U.S. Supreme Court has explained, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[74]

Historically, the term bail derives from the French "baillier," which means to hand over, give, entrust, or deliver. It was a delivery, or bailment, of the accused to the surety – the jailer of the accused's own choosing – to avoid confinement in jail. Indeed, even until the 20th century, the surety himself or herself was often known as the "bail" – the person to whom the accused was delivered. Unfortunately, however, for centuries money was also a major part of the bail agreement. Because paying money was the primary promise underlying the release agreement, the coupling of "bail" and money meant that money slowly came to be equated with the release process itself. This is unfortunate, as money at bail has never been more than a condition of bail – a limitation on pretrial freedom that must be paid upon forfeiture of the bond agreement. But the coupling became especially misleading in America after the 1960s, when the country attempted to move away from its relatively recent adoption of a secured money bond and toward other methods for releasing defendants, such as release on recognizance and release on nonfinancial conditions.

Legally, bail as a process of release is the only definition that (1) effectuates American notions of liberty from even colonial times; (2) acknowledges the rationales for state deviations from more stringent English laws in crafting their constitutions (and the federal government in crafting the Northwest Territory Ordinance of 1787); and (3) naturally follows from various statements equating bail with release from the United States Supreme Court from *United States v. Barber*[75] and *Hudson v. Parker,*[76] to *Stack v. Boyle*[77]

---

[74] *United States v. Salerno,* 481 U.S. 739, 755 (1987).

[75] 140 U.S. 164, 167 (1891) ("[I]n criminal cases it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time . . . .").

[76] 156 U.S 277, 285 (1895) ("The statutes of the United States have been framed upon the theory that a person accused of a crime shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment, but may be admitted to bail . . . .").

[77] 342 U.S. 1, 4 (1951) ("[F]ederal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction . . . .").

and *United States v. Salerno*.[78]

Bail as a process of release accords not only with history and the law, but also with scholars' definitions (in 1927, Beeley defined bail as the release of a person from custody), the federal government's usage (calling bail a process in at least one document), and use by organizations such as the American Bar Association, which has quoted Black's Law Dictionary definition of bail as a "process by which a person is released from custody."[79] States with older (and likely outdated) bail statutes often still equate bail with money, but many states with newer provisions, such as Virginia (which defines bail as "the pretrial release of a person from custody upon those terms and conditions specified by order of an appropriate judicial officer"),[80] Colorado (which defines bail as security like a pledge or a promise, which can include release without money),[81] and Florida (which defines bail to include "any and all forms of pretrial release"[82]) have enacted statutory definitions to recognize bail as something more than simply money. Moreover, some states, such as Alaska,[83] Florida,[84] Connecticut,[85] and Wisconsin,[86] have constitutions explicitly incorporating the word "release" into their right-to-bail provisions.

> *"In general, the term 'bail' means the release of a person from custody upon the undertaking, with or without one or more persons for him, that he will abide the judgment and orders of the court in appearing and answering the charge against him. It is essentially a delivery or bailment of a person to his sureties—the jailers of his own choosing—so that he is placed in their friendly custody instead of remaining in jail."*
>
> Arthur Beeley, 1927

A broad definition of bail, such as "release from governmental custody" versus simply release from jail, is also appropriate to account for the recognition that

---

[78] 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm . . . .").

[79] *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012).

[80] Va. Code. § 19.2-119 (2013).

[81] Colo. Rev. Stat. § 16-1-104 (2013).

[82] Fla. Stat. § 903.011 (2013).

[83] Alaska Const. art. I, § 11.

[84] Fla. Const. art. I, § 14.

[85] Conn. Const. art. 1, § 8.

[86] Wis. Const. art. 1, § 8.

bail, as a process of conditional release prior to trial, includes many mechanisms – such as citation or "station house release" – that effectuate release apart from jails and that are rightfully considered in endeavors seeking to improve the bail process.

---

### The Media's Use of Bail Terms and Phrases

Much of what the public knows about bail comes from the media's use, and often misuse, of bail terms and phrases. A sentence from a newspaper story stating that "the defendant was released without bail," meaning perhaps that the defendant was released without a secured financial condition or on his or her own recognizance, is an improper use of the term "bail" (which itself means release) and can create unnecessary confusion surrounding efforts at pretrial reform. Likewise, stating that someone is being "held on $50,000 bail" not only misses the point of bail equaling release, but also equates money with the bail process itself, reinforcing the misunderstanding of money merely as a condition of bail – a limitation of pretrial freedom which, like all such limitations, must be assessed for legality and effectiveness in any particular case. For several reasons, the media continues to equate bail with money and tends to focus singularly on the amount of the financial condition (as opposed to any number of non-financial conditions) as a sort-of barometer of the justice system's sense of severity of the crime. Some of those reasons are directly related to faulty use of terms and phrases by the various states, which define terms differently from one another, and which occasionally define the same bail term differently at various places within a single statute.

In the wake of the 2011 National Symposium on Pretrial Justice, the Pretrial Justice Working Group created a Communications Subcommittee to, among other things, create a media campaign for public education purposes. To effectively educate the public, however, the Subcommittee recognized that some measure of media education also needed to take place. Accordingly, in 2012 the John Jay College Center on Media, Crime, and Justice, with support from the Public Welfare Foundation, held a symposium designed to educate members of the media and to help them identify and accurately report on bail and pretrial justice issues. Articles written by symposium fellows are listed as they are produced, and continue to demonstrate how bail education leads to more thorough and accurate coverage of pretrial issues.

**Sources and Resources:** John Jay College and Public Welfare Foundation Symposium resources, found at http://www.thecrimereport.org/conferences/past/2012-05-jailed-without-conviction-john-jaypublic-welfare-sym. Pretrial Justice Working Group website and materials, found at http://www.pretrial.org/infostop/pjwg/.

To say that bail is a process of release and that the purpose of bail is to maximize release is not completely new (researchers have long described an "effective" bail decision as maximizing or fostering release) and may seem to be only a subtle shift from current articulations of meaning and purpose. Nevertheless, these ideas have not taken a firm hold in the field. Moreover, certain consequences flow from whether or not the notions are articulated correctly. In Colorado, for example, where, until recently, the legislature incorrectly defined bail as an amount of money, bail insurance companies routinely said that the sole function of bail was court appearance (which only makes sense when bail and money are equated, for legally the only purpose of money was court appearance), and that the right to bail was the right merely to have an amount of money set – both equally untenable statements of the law. Generally speaking, when states define bail as money their bail statutes typically reflect the definition by overemphasizing money over all other conditions throughout the bail process. This, in turn, drives individual misperceptions about what the bail process is intended to do.

Likewise, when persons inaccurately mix statements of purpose for bail with statements of purpose for conditions of bail, the consequences can be equally misleading. For example, when judges inaccurately state that the purpose of bail is to protect public safety (again, public safety is a constitutionally valid purpose for any particular condition of bail or limitation of pretrial freedom, not for bail itself), those judges will likely find easy justification for imposing unattainable conditions leading to pretrial detention – for many, the safest pretrial option available. When the purpose of bail is thought to be public safety, then the emphasis will be on public safety, which may skew decisionmakers toward conditions that lead to unnecessary pretrial detention. However, when the purpose focuses on release, the emphasis will be on pretrial freedom with conditions set to provide a reasonable assurance, and not absolute assurance, of court appearance and public safety.

Thus, bail defined as a process of release places an emphasis on pretrial release and bail conditions that are attainable at least in equal measure to their effect on court appearance and public safety. In a country, such as ours, where bail may be constitutionally denied, a focus on bail as release when the right to bail is granted is crucial to following *Salerno's* admonition that pretrial liberty be our nation's norm. Likewise, by correctly stating that the purpose of any particular bail condition or limitation on pretrial freedom is tied to the constitutionally valid rationales of public safety and court appearance, the focus is on the particular

condition – such as GPS monitoring or drug testing – and its legality and efficacy in providing reasonable assurance of the desired outcome.

## Other Terms and Phrases

There are other terms and phrases with equal need for accurate national uniformity. For example, many states define the word "bond" differently, sometimes describing it in terms of one particular type of bail release or condition, such as through a commercial surety. A bond, however, occurs whenever the defendant forges an agreement with the court, and can include an additional surety, or not, depending on that agreement. Prior definitions – and thus categories of bail bonds – have focused primarily on whether or how those categories employ money as a limitation on pretrial freedom, thus making those definitions outdated. Future use of the term bond should recognize that money is only one of many possible conditions, and, in light of legal and evidence-based practices, should take a decidedly less important role in the agreement forged between a defendant and the court. Accordingly, instead of describing a release by using terms such as "surety bond," "ten percent bond," or "personal recognizance bond," pretrial practitioners should focus first on release or detention, and secondarily address conditions (for release is always conditional) of the release agreement.

Other misused terms include: "pretrial" and "pretrial services," which are often inaccurately used as a shorthand method to describe pretrial services agencies and/or programs instead of their more appropriate use as (1) a period of time, and (2) the actual services provided by the pretrial agency or program; "court appearance rates" (and, concomitantly, "failure to appear rates") which is defined in various ways by various jurisdictions; "the right to bail," "public safety," "sureties" or "sufficient sureties," and "integrity of the judicial process." There have been attempts at creating pretrial glossaries designed to bring national uniformity to these terms and phrases, but acceptance of the changes in usage has been fairly limited. Until that uniformity is reached, however, jurisdictions should at least recognize the extreme variations in definitions of terms and phrases, question whether their current definitions follow from a study of bail history, law, and research, and be open to at least discussing the possibility of changing those terms and phrases that are misleading or otherwise in need of reform.

**Additional Sources and Resources:** Black's Law Dictionary (9th ed. 2009); *Criminal Bail: How Bail Reform is Working in Selected District Courts,* U.S. GAO Report to the Subcomm. on Courts, Civ. Liberties, and the Admin. of Justice (1987); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 3rd ed. 1995); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011) (currently available electronically on the PJI website).

# Chapter 7: Application – Guidelines for Pretrial Reform

In a recent op-ed piece for *The Crime Report,* Timothy Murray, then Executive Director of the Pretrial Justice Institute, stated that "the cash-based model [relying primarily on secured bonds] represents a tiered system of justice based on personal wealth, rather than risk, and is in desperate need of reform."[87] In fact, from what we know about the history of bail, because a system of pretrial release and detention based on secured bonds administered primarily through commercial sureties causes abuses to both the "bail" and "no bail" sides of our current dichotomy, reform is not only necessary – it is ultimately inevitable. But how should we marshal our resources to best accomplish reform? How can we facilitate reform across the entire country? What can we do to fully understand pretrial risk, and to fortify our political will to embrace it? And how can we enact and implement laws, policies, and practices aiming at reform so that the resulting cultural change will actually become firmly fixed?

## Individual Action Leading to Comprehensive Cultural Change

The answers to these questions are complex because every person working in or around the pretrial field has varying job responsibilities, legal boundaries, and, presumably, influence over others. Nevertheless, pretrial reform in America requires all persons – from entry-level line officers and pretrial services case workers to chief justices and governors – to embrace and promote improvements within their spheres of influence while continually motivating others outside of those spheres to reach the common goal of achieving a meaningful top to bottom (or bottom to top) cultural change. The common goal is collaborative, comprehensive improvement toward maximizing release, public safety, and court appearance through the use of legal and evidence-based practices, but we will only reach that goal through individual action.

---

[87] Timothy Murray, *Why the Bail Bond System Needs Reform,* The Crime Report (Nov. 19, 2013) found at http://www.thecrimereport.org/viewpoints/2013-11-why-the-bail-bond-system-needs-reform

## Individual Decisions

Individual action, in turn, starts with individual decisions. First, every person working in the field must decide whether pretrial improvements are even necessary. It is this author's impression, along with numerous national and local organizations and entities, that improvements are indeed necessary, and that the typical reasons given to keep the customary yet damaging practices based on a primarily money-based bail system are insufficient to reject the national movement toward meaningful pretrial reform. The second decision is to resolve to educate oneself thoroughly in bail and to make the necessary improvements by following the research, wherever that research goes and so long as it does not interfere with fundamental legal foundations. Essentially, the second decision is to follow a legal and evidence-based decision making model for pretrial improvement. By following that model, persons (or whole jurisdictions working collaboratively) will quickly learn (1) which particular pretrial justice issues are most pressing and in need of immediate improvement, (2) which can be addressed in the longer term, and (3) which require no action at all.

Third, each person must decide how to implement improvements designed to address the issues. This decision is naturally limited by the person's particular job and sphere of influence, but those limitations should not stop individual action altogether. Instead, the limitations should serve merely as motivation to recruit others outside of each person's sphere to join in a larger collaborative process. Fourth and finally, each person must make a decision to ensure those improvements "stick" by using proven implementation techniques designed to promote the comprehensive and lasting use of a research-based improvement.

Learning about improvements to the pretrial process also involves learning the nuances that make one's particular jurisdiction unique in terms of how much pretrial reform is needed. If, for example, in one single (and wildly hypothetical) act, the federal government enacted a provision requiring the states to assure that no amount of money could result in the pretrial detention of any particular defendant – a line that is a currently a crucial part of both the federal and District of Columbia bail statutes – some states would be thrust immediately into perceived chaos as their constitutions and statutes practically force bail practices that include setting high amounts of money to detain high-risk yet bailable defendants pretrial. Other states, however, might be only mildly inconvenienced, as their constitutions and statutes allow for a fairly robust preventive detention process that is simply unused. Still others might recognize that their preventive detention provisions are somewhat archaic because they rely primarily on

charge-based versus risk-based distinctions. Knowing where one's jurisdiction fits comparatively on the continuum of pretrial reform needs can be especially helpful when crafting solutions to pretrial problems. Some states underutilize citations and summonses, but others have enacted statutory changes to encourage using them more. Some jurisdictions rely heavily on money bond schedules, but some have eliminated them entirely. There is value in knowing all of this.

## Individual Roles

The process of individual decision making and action will look different depending on the person and his or her role in the pretrial process. For a pretrial services assessment officer, for example, it will mean learning everything available about the history, fundamental legal foundations, research, national standards, and terms and phrases, and then holding up his or her current practices against that knowledge to perhaps make changes to risk assessment and supervision methods. Despite having little control over the legal parameters, it is nonetheless important for each officer to understand the fundamentals so that he or she can say, for example, "Yes, I know that bail should mean release and so I understand that our statute, which defines bail as money, has provisions that can be a hindrance to certain evidence-based pretrial practices. Nevertheless, I will continue to pursue those practices within the confines of current law while explaining to others operating in other jobs and with other spheres of influence how amending the statute can help us move forward." This type of reform effort – a bottom to top effort – is happening in numerous local jurisdictions across America.

> *"Once you make a decision, the universe conspires to make it happen."*
>
> Ralph Waldo Emerson

For governors or legislators, it will mean learning everything available about the history, legal foundations, research, national standards, and terms and phrases, and then also holding up the state's constitution and statutes against that knowledge to perhaps make changes to the laws to better promote evidence-based practices. It is particularly important for these leaders to know the fundamentals and variances across America so that each can say, for example, "I now understand that our constitutional provisions and bail statutes are somewhat outdated, and thus a hindrance to legal and evidence-based practices

designed to fully effectuate the bail/no bail dichotomy that is already technically a part of our state bail system. I will therefore begin working with state leaders to pursue the knowledge necessary to make statewide improvements to bail and pretrial justice so that our laws will align with broad legal and evidence-based pretrial principles and therefore facilitate straightforward application to individual cases." This type of reform effort – a top to bottom effort – is also happening in America, in states such as New York, New Jersey, Delaware, and Kentucky.

Everyone has a role to play in pretrial justice, and every role is important to the overall effort. Police officers should question whether their jurisdiction uses objective pretrial risk assessment and whether it has and uses fair and transparent preventive detention (as the International Chiefs of Police/PJI/Public Welfare Foundation's Pretrial Justice Reform Initiative asks them to do), but they should also question their own citation policies as well as the utility of asking for arbitrary money amounts on warrants. Prosecutors should continue to advocate support for pretrial services agencies or others using validated risk assessments (as the Association of Prosecuting Attorneys policy statement urges them to do), but they should also question their initial case screening policies as well as whether justice is served through asking for secured financial conditions for any particular bond at first appearance. Defense attorneys, jail administrators, sheriffs and sheriff's deputies, city and county officials, state legislators, researchers and academics, persons in philanthropies, and others should strive individually to actively implement the various policy statements and recommendations that are already a part of the pretrial justice literature, and to question those parts of the pretrial system seemingly neglected by others.

Everyone has a part to play in pretrial justice, and it means individually deciding to improve, learning what improvements are necessary, and then implementing legal and evidence-based practices to further the goals of bail. Nevertheless, while informed individual action is crucial, it is also only a means to the end of a comprehensive collaborative culture change. In this generation of pretrial reform, the most successful improvement efforts have come about when governors and legislators have sat at the same table as pretrial services officers (and everyone else) to learn about bail improvements and then to find comprehensive solutions to problems that are likely insoluble through individual effort alone.

## Collaboration and Pretrial Justice

In a complicated justice system made up of multiple agencies at different levels of government, purposeful collaboration can create a powerful mechanism for discussing and implementing criminal justice system improvements. Indeed, in the National Institute of Corrections document titled *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems,* the authors call collaboration a "key ingredient" of an evidence-based system, which uses research to achieve system goals.

Like other areas in criminal justice, bail and pretrial improvements affect many persons and entities, making collaboration between system actors and decision makers a crucial part of an effective reform strategy. Across the country, local criminal justice coordinating committees (CJCCs) are demonstrating the value of coming together with a formalized policy planning process to reach system goals, and some of the most effective pretrial justice strategies have come from jurisdictions working through these CJCCs. Collaboration allows individuals with naturally limited spheres of influence to interact and achieve group solutions to problems that are likely insoluble through individual efforts. Moreover, through staff and other resources, CJCCs often provide the best mechanisms for ensuring the uptake of research so that full implementation of legal and evidence-based practices will succeed.

The National Institute of Corrections currently publishes two documents designed to help communities create and sustain CJCCs. The first, Robert Cushman's *Guidelines for Developing a Criminal Justice Coordinating Committee* (2002), highlights the need for system coordination, explains a model for a planning and coordination framework, and describes mechanisms designed to move jurisdictions to an "ideal" CJCC. The second, Dr. Michael Jones's *Guidelines for Staffing a Criminal Justice Coordinating Committee* (2012), explains the need and advantages of CJCC staff and how that staff can help collect, digest, and synthesize research for use by criminal justice decision makers.



Judicial Leadership

Finally, while everyone has a role and a responsibility, judges must be singled out as being absolutely critical for achieving pretrial justice in America. Bail is a judicial function, and the history of bail in America has consistently demonstrated that judicial participation will likely mean the difference between pretrial improvement and pretrial stagnation. Indeed, the history of bail is replete with examples of individuals who attempted and yet failed to make pretrial improvements because those changes affected only one or two of the three goals associated with evidence-based decision making at bail, and they lacked sufficient judicial input on the three together. Judges alone are the individuals who must ensure that the balance of bail – maximizing release (through an understanding of a defendant's constitutional rights) while simultaneously maximizing public safety and court appearance (through an understanding of the constitutionally valid purposes of limiting pretrial freedom, albeit tempered by certain fundamental legal foundations such as due process, equal protection, and excessiveness, combined with evidence-based pretrial practices) – is properly maintained. Moreover, because the judicial decision to release or detain any particular defendant is the crux of the administration of bail, whatever improvements we make to other parts of the pretrial process are likely to stall if judges do not fully participate in the process of pretrial reform. Finally, judges are in the best position to understand risk, to communicate that understanding to others, and to demonstrate daily the political will to embrace the risk that is inherent in bail as a fundamental precept of our American system of justice.

Indeed, this generation of bail reform needs more than mere participation by judges; this generation needs judicial leadership. Judges should be organizing and directing pretrial conferences, not simply attending them. Judges should be educating the justice system and the public, including the media, about the right to bail, the presumption of innocence, due process, and equal protection, not the other way around.

Fortunately, American judges are currently poised to take a more active leadership role in making the necessary changes to our current system of bail. In February of 2013, the Conference of Chief Justices, made up of the highest judicial officials of the fifty states, the District of Columbia, and the various American territories, approved a resolution endorsing certain fundamental

recommendations surrounding legal and evidence-based improvements to the administration of bail. Additionally, the National Judicial College has conducted focus groups with judges designed to identify opportunities for improvement. Moreover, along with the Pretrial Justice Institute and the Bureau of Justice Assistance, the College has created a teaching curriculum to train judges on legal and evidence-based pretrial decision making. Judges thus need only to avail themselves of these resources, learn the fundamentals surrounding legal and evidence-based pretrial practice, and then ask how to effectuate the Chief Justice Resolution in their particular state.

The Chief Justice Resolution should also serve as a reminder that all types of pretrial reform include both an evidentiary and a policy/legal component – hence the term legal and evidence-based practices. Indeed, attempts to increase the use of evidence or research-based practices without engaging the criminal justice system and the general public in the legal and policy justifications and parameters for those practices may lead to failure. For example, research-based risk assessment, by itself, can be beneficial to any jurisdiction, but only if implementing it involves a parallel discussion of the legal parameters for embracing and then mitigating risk, the need to avoid other practices that undermine the benefits of assessment, and the pitfalls of attempting to fully incorporate risk into a state legal scheme that is unable to adequately accommodate it. On the other hand, increasing the use of unsecured financial conditions, coupled with a discussion of how research has shown that those conditions can increase release without significant decreases in court appearance and public safety – the three major legal purposes underlying the bail decision – can move a jurisdiction closer to model bail practices that, among other things, ensure bailable defendants who are ordered release are actually released.

**Additional Sources and Resources:** Association of Prosecuting Attorneys, *Policy Statement on Pretrial Justice* (2012) found at http://www.apainc.org/html/APA+Pretrial+Policy+Statement.pdf. Conference of Chief Justices Resolution 3: *Endorsing the Conference of State Court Administrators Policy Paper on Evidence-Based Pretrial* Release (2013), found at http://www.pretrial.org/wp-content/uploads/2013/05/CCJ-Resolution-on-Pretrial.pdf; William F. Dressell & Barry Mahoney, *Pretrial Justice in Criminal Cases: Judges' Perspectives on Key Issues and Opportunities for Improvement* (Nat'l. Jud. College 2013); *Effective Pretrial Decision Making: A Model Curriculum for Judges* (BJA/PJI/Nat'l Jud. Coll. (2013) http://www.pretrial.org/download/infostop/Judicial%20Training.pdf; Dean L. Fixsen, Sandra F. Naoom, Karen A. Blase, Robert M. Friedman, and Frances Wallace, *Implementation Research: A Synthesis of the Literature* (Univ. S. Fla. 2005); International Chiefs of Police Pretrial Justice Reform Initiative, found at http://www.theiacp.org/Pretrial-Justice-Reform-Initiative.

# Conclusion

Legal and evidence-based pretrial practices, derived from knowing the history of bail, legal foundations, and social science pretrial research, and expressed as recommendations in the national best practice standards, point overwhelmingly toward the need for pretrial improvements. Fortunately, in this third generation of American bail reform, we have amassed the knowledge necessary to implement pretrial improvements across the country, no matter how daunting or complex any particular state believes that implementation process to be. Whether the improvements are minor, such as adding an evidence-based supervision technique to an existing array of techniques, or major, such as drafting new constitutional language to allow for the fair and transparent detention of high-risk defendants without the need for money bail, the only real prerequisites to reform are education and action. This paper is designed to further the process of bail education with the hope that it will lead to informed action.

As a prerequisite to national reform, however, that bail education must be uniform. Accordingly, achieving pretrial justice in America requires everyone both inside and outside of the field to agree on certain fundamentals, such as the history of bail, the legal foundations, the importance of the research and national standards, and substantive terms and phrases. This includes agreeing on the meaning and purpose of the word "bail" itself, which has gradually evolved into a word that often is used to mean anything but its historical and legal connotation of release. Fully understanding these fundamentals of bail is paramount to overcoming our national amnesia of a system of bail that worked for centuries in England and America – an unsecured personal surety system in which bailable defendants were released, in which non-bailable defendants were detained, and in which no profit was allowed.

> *"A sound pretrial infrastructure is not just a desirable goal – it is vital to the legitimate system of government and to safer communities."*
>
> Deputy Attorney General James M. Cole (2011).

Moreover, while we have learned much from the action generated by purely local pretrial improvement projects, we must not forget the enormous need for pretrial justice across the entire country. We must thus remain mindful that meaningful American bail reform will come about only when entire American

states focus on these important issues. Anything less than an entire state's complete commitment to examine all pretrial practices across jurisdictions and levels of government – by following the research from all relevant disciplines – means that any particular pretrial practitioner's foremost duty is to continue communicating the need for reform until that complete commitment is achieved. American pretrial justice ultimately depends on reaching a tipping point among the states, which can occur only when enough states have shown that major pretrial improvements are necessary and feasible.

In 1964, Robert Kennedy stated the following:

> [O]ur present bail system inflicts hardship on defendants and it inflicts considerable financial cost on society. Such cruelty and cost should not be tolerated in any event. But when they are *needless*, then we must ask ourselves why we have not developed a remedy long ago. For it is clear that the cruelty and cost of the bail system *are* needless.[88]

Fifty years later, this stark assessment remains largely true, and yet we now have significant reason for hope that this third generation of bail reform will be America's last. For in the last 50 years, we have accumulated the knowledge necessary to replace, once and for all, this "cruel and costly" system with one that represents safe, fair, and effective administration of pretrial release and detention. We have amassed a body of research literature, of best practice standards, and of experiences from model jurisdictions that together have created both public and criminal justice system discomfort with the status quo. It is a body of knowledge that points in a single direction toward effective, evidence-based pretrial practices, and away from arbitrary, irrational, and customary practices, such as the casual use of money. We now have the information necessary to recognize and fully understand the paradox of bail. We know what to do, and how to do it. We need only to act.

---

[88] Attorney General Robert F. Kennedy, Testimony on Bail Legislation Before the Subcommittee on Constitutional Rights and Improvements in the Judicial Machinery of the Senate Judiciary Committee 4 (Aug. 4, 1964) (emphasis in original) *available at* http://www.justice.gov/ag/rfkspeeches/1964/08-04-1964.pdf.

No. 16-10521

IN THE
United States Court of Appeals for the Eleventh Circuit
————————————————

MAURICE WALKER, on behalf of himself and others similarly situated,
*Plaintiff-Appellee*,

v.

CITY OF CALHOUN, G.A.,
*Defendant-Appellant*.
————————————————

On Appeal from the United States District Court
for the Northern District of Georgia
No. 4:15-cv-00170-HLM
————————————————

BRIEF *AMICUS CURIAE* OF THE CATO INSTITUTE
SUPPORTING PLAINTIFF-APPELLEE
AND AFFIRMANCE OF THE PRELIMINARY INJUNCTION

<div align="right">

Ilya Shapiro
    *Counsel of Record*
Randal J. Meyer
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

*Counsel for* Amicus Curiae

</div>

*Walker v. City of Calhoun, GA, No. 16-10521*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Cir. R. 26.1-1, the Cato Institute declares that it is a nonprofit public policy research foundation dedicated in part to the defense of constitutional liberties secured by law. Cato states that it has no parent corporation and only issues a handful of shares that are privately held by its directors. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the participation of Cato.

Further, the undersigned counsel certifies that, in addition to the list of interested persons certified in the Appellants' Brief and supplemented by the certificates in the Briefs of the State Appellees-Cross-Appellants and the Private Plaintiffs-Appellees, the following persons may have an interest in the outcome of this case, and that to the best of his knowledge, the list of persons and entities in the Briefs for Appellants and Appellees are otherwise complete:

COUNSEL FOR *AMICUS CURIAE*
Ilya Shapiro
  *Counsel of Record*
Randal J. Meyer

ASSOCIATIONS
Cato Institute


Ilya Shapiro
Counsel for *Amicus Curiae*
Cato Institute

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND  CORPORATE DISCLOSURE STATEMENT ...............................................................C-1

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF *AMICUS CURIAE*...........................................................1

ISSUE ADDRESSED BY *AMICUS CURIAE* .................................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ................................................................................2

I.   THE RIGHT TO BAIL EXISTS AT CONSTITUTIONAL AND COMMON LAW FOR MISDEMEANANTS AND MOST FELONS ..............2

   A. The English Authorities from before the Magna Carta to the Revolution Confirm the Right to Bail .................................................2

   B. American Constitutional and Common Law Incorporates and Upholds a Right to Bail ................................................................7

II.  THE RIGHT TO BAIL GUARANTEES NON-EXCESSIVE, INDIVIDUALIZED ASSESSMENTS NOT FIXED BY A PRE-DETERMINED SCHEME ......................................................12

   A. Pre-Revolutionary and Post-Revolutionary Constitutional and Common Law Commits Bail to Judicial Discretion to Avoid Excessive Bail for Indigents and to Ensure Sufficient Sureties ...................13

   B. Pre-Determined, Non-Individualized Bail Schemes Violate the Right to Pre-Trial Liberty, the Right to Bail, the Right Against Excessive Bail, and the Equal Protection Clause ...........................18

CONCLUSION...............................................................................19

CERTIFICATE OF COMPLIANCE.......................................................20

CERTIFICATE OF SERVICE .............................................................21

i

# TABLE OF AUTHORITIES

\* Authorities upon which we chiefly rely are marked with an asterisk

**Page(s)**

## Cases

*Bates v. Pilling*, 149 Eng. Rep. 805 (K.B. 1834)......................................................16

*Daw v. Swaine*, 1 Sid. 424, 21 Car. 2 424, 88 Eng. Rep. 1195 (C.P. 1670)............15

*Darnel's Case,* 3 How. St. Tr. 1 (1627)...............................................................6, 14

*Douglas v. California*, 372 U.S. 353 (1963)................................................. 2, 12, 18

*Ex Parte Hutchings*, 11 Tex. App. 28 (Tex. 1881)..................................................17

*Griffin v. Illinois*, 351 U.S. 12 (1956).......................................................... 2, 12, 18

*Jones v. Kelly*, 17 Mass. 116 (1821) ......................................................................17

*Kennedy v. Mendoza–Martinez*, 372 U.S. 144 (1963)..............................................5

*King v. Bowes*, 1 T.R. 696, 99 Eng. Rep. 1327 (K.B. 1787) ............................ 13, 16

*Neal v. Spencer*, 10 Will. 3 257, 88 Eng. Rep. 1305 (K.B. 1698)..........................15

*New Mexico v. Brown*, 338 P.3d 1276 (N.M. 2014)..............................................7, 8

*Parker v. Langley*, 11 Anne 145, 88 Eng. Rep. 667 (Q.B. 1712)...........................15

*Smith v. Boucher*, 10 Geo. 2 136, 27 Eng. Rep. 782 (K.B. 1736)......................6, 15

\* *Stack v. Boyle*, 342 U.S. 1 (1951) ...................................................................9-10

*United States v. Brawner*, 7 Fed. 86 (W.D. Tenn. 1881).......................................17

*United States v. Edwards*, 430 A.2d 1321 (D.C. Cir. 1981)....................................5

*United States v. Lawrence*, 26 Fed. Cas. 887 (No. 15,557) (D.C. Cir. 1835) .........17

*United States v. Radford*, 361 F.2d 777 (4th Cir. 1966).........................................17

\* *United States v. Salerno*, 481 U.S. 739 (1987) ............................................. 10, 18

*United States v. Wong-Alvarez*, 779 F.2d 583 (11th Cir. 1985) .............................19

*Walker v. City of Calhoun*, No. 4:15-CV-0170-HLM, 2016 U.S. Dist. Lexis
    12305 (N.D. Ga. Jan. 28, 2016).........................................................................19

*Whiting v. Putnam*, 17 Mass. 175 (1821) ..............................................................17

## Statutes

Judiciary Act of 1789, 1 Stat. 73, § 33 .................................................................... 8-9

Northwest Ordinance of 1787, art. 2 ........................................................................9

## Other Authorities

1166 Assize of Claredon ............................................................................................6

* Bill of Rights, 1 W. & M., c. 2 (1689) ................................................ 7, 11, 15, 17

Caleb Foote, The Coming Constitutional Crisis in Bail: I, 113 U. Pa. L. Rev.
   959 (1965) ...........................................................................................................8, 14

Co. Inst. 190 ..............................................................................................................5

Co. Inst. 191 .................................................................................................... 3, 5, 10

Daniel J. Freed & Patricia M. Wald, Bail in the United States: 1964 (1964) ..........3

* Elsa De Haas, Antiquities of Bail: Origin and Development in Criminal
   Cases to the Year 1275 (1966) ................................................................... *passim*

Habeas Corpus Act of 1679, 31 Cha. II. c2  .................................................. 6-7, 15

Henri de Bracton, De Legibus et Consuetudinibus Angliae 295
   (c. 1235, reprnt'd 1990) ...................................................................................3, 10

J. Chitty, A Practical Treatise on the Criminal Law (William Brown,
   Philadelphia 1819) ................................................................................................16

Magna Charta ch. 29 (1225) ....................................................................................5

Magna Charta ch. 32 (1216) ............................................................................ 5, 8, 11

Magna Charta ch. 39 (1215) ....................................................................................5

Massachusetts Body of Liberties (1641) ..................................................................8

Matthew J. Hegreness, America's Fundamental and Vanishing Right to Bail,
   55 Ariz. L. Rev. 909 (2013) ..................................................................................8

N.C. Const. Declaration of Rights § x (Dec. 18, 1776). ..........................................8

New York Charter of Liberties and Privileges (1683) ..............................................8

Petition of Right, 3 Car. I, c.1 (1628) ................................................................6, 14

Sir Edward Coke, A Little Treatise of Baile and Maineprize (1635) .................3, 10

Sir Edward Coke, The Selected Writings and Speeches of Sir Edward Coke
   1270 (Steve Sheppard, ed., 1st ed. 2003) .........................................................6, 14

* Sir Frederick William Pollock & Frederic William Maitland, The History of English Law Before the Time of Edward I (2d ed. 1898, reprnt'd 1984) ..................................................... 3, 4, 5, 13

Statute of Westminster I, 3 Edw. III, c. 3, 15 ..........................................5

Timothy R. Schacke, Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform (2014) .............4, 6

William Blackstone, Commentaries .............................................. 2, 4, 7

William Hawkins, A Treatise on the Pleas of the Crown (8th ed., 1716, reprnt'd 1824) ....................................................... 3, 13, 16

**Constitutional Provisions**

U.S. Const. amend. V ...............................................................8, 18

U.S. Const. amend. VIII.......................................................... 17, 18

U.S. Const. amend. XIV § 1 ...........................................................8, 18

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan policy research foundation established in 1977 and dedicated to the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to help restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*. The present case concerns Cato because holding prisoners pursuant to non-individualized bail schemes undermines due process, the Eighth Amendment, and equal protection.

## ISSUE ADDRESSED BY *AMICUS CURIAE*

This brief addresses the constitutional merits of Plaintiff Maurice Walker's claims that statutory bail schemes violate his due process rights.

## SUMMARY OF ARGUMENT

The decision of the court below is supported by nearly a *millennium* of Anglo-American constitutional and common law. The Eighth Amendment protects the specific right to non-excessive pre-trial bail that takes into account defendants' indigency. That right specifically incorporates a more general right to pre-trial

---

[1] Pursuant to Fed. R. App. P. 29, both parties, through their respective counsel, have consented to the filing of this brief. *Amicus* certifies that no counsel for any party authored this brief in whole or in part, that no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.

liberty protected by the Fifth and Fourteenth Amendments' Due Process Clauses. The addition of the Fourteenth Amendment to the Constitution in 1868 also protected the fundamental right to pre-trial liberty from denials of equal protection under the laws. *See generally Douglas v. California*, 372 U.S. 353 (1963); *Griffin v. Illinois*, 351 U.S. 12 (1956)). A predetermined, scheduled bail scheme that does not take into account individual indigency factors—like the City of Calhoun's—violates all of those rights. Accordingly, this court should affirm the court below and thus uphold the preliminary injunction.

## ARGUMENT

## I.   THE RIGHT TO BAIL EXISTS AT CONSTITUTIONAL AND COMMON LAW FOR MISDEMEANANTS AND MOST FELONS

Anglo-American law from the Saxon tribes to the Rehnquist Court support the existence of a procedural right to bail for bailable offenses attendant to the fundamental right to pre-trial liberty.

### A. The English Authorities from Before the Magna Carta to the Revolution Confirm the Right to Bail

Since time immemorial, concomitant to the general right to pre-trial liberty, bail has been a procedural right for all offenses against the Crown, except for those specifically excluded at law. *See*, *e.g.*, 4 William Blackstone, Commentaries \*295 ("By the ancient common law, before and since the [Norman] conquest, all felonies were bailable, till murder was excepted by statute; so that persons might

2

be admitted to bail before conviction almost in every case." (footnotes omitted));
*accord generally* 2 William Hawkins, A Treatise on the Pleas of the Crown, bk. 2,
ch. 15, at 138 (8th ed., 1716, reprnt'd 1824); 2 Co. Inst. 191; Sir Edward Coke, A
Little Treatise of Baile and Maineprize (1635) (listing the offenses for which a
person had a right to bail and no right to bail at common law); 2 Henri de Bracton,
De Legibus et Consuetudinibus Angliae 295 (c. 1235, reprnt'd 1990). This
tradition of bail rights continued through the Magna Carta, the English Revolution,
the English Restoration, the Colonial Era, and into American jurisprudence.

"[T]he root idea of the modern right to bail" originates from "tribal customs
on the continent of Europe," developing far earlier than parchment barrier
guarantees of freedom like the Magna Carta or the Constitution. Elsa De Haas,
Antiquities of Bail: Origin and Development in Criminal Cases to the Year 1275,
at 128 (1966); *accord* 2 Sir Frederick William Pollock & Frederic William
Maitland, The History of English Law Before the Time of Edward I, at 458-60 (2d
ed. 1898, reprnt'd 1984). Those customs used a financial bond "as a device to free
untried prisoners." Daniel J. Freed & Patricia M. Wald, Bail in the United States:
1964, at 1 (1964). Pre-Normal England was largely governed by the Germanic
tribal custom of *wergild*[2] carried over by the Saxons—*wergild* payment is the
ancient root of surety bail.  De Haas, *supra*, at 3-15. *Wergild* was the payment due

---

[2] Also known as *wirgeld* or *wergeld.*

3

to a family for the slaying or assault of a relative. *Id.* at 11-13. By providing sufficient surety that the *wergild* would be paid, the blood feud between the families subsided and the perpetrator was given safe conduct. *Id.* at 12-13. The surety of the *wergild* evolved into the concept of bail thereafter. This system pervaded until William the Conqueror imported Frankish law.

As the Germanic law evolved into the classic common law of post-Norman Conquest England, the *wergeld* surety became the crown pleas of replevy and mainprize, secured by bail pledges circa 1275. *See* 2 Pollock & Maitland, *supra*, at 584; De Haas, *supra*, at 32-33, 64-65, 68, 85 (noting that the pleas are listed in the Statute of Westminster I). The writs were aimed at the "release of the alleged criminal," as "bail as a right of free men assumed greater proportions of importance." De Haas, *supra*, at 85, 129. Near the end of the Danish and Wessex Kings' rule over the British Isles in the 1000s, King Canute II (the Great) instituted the frankpledge system which subdivided the people of the realm by household into groups of ten—a tithing—that were bound for the surety of each-other to appear in criminal offenses. Timothy R. Schacke, Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform 25 (2014); 4 William Blackstone, Commentaries, *249. The frankpledge system complimented a robust private surety system. De Haas, *supra* at 49-50.

In 1215, the Magna Carta codified the fundamental right to pretrial liberty: "No free man shall be arrested or imprisoned . . . or victimized in any other way . . . except by the lawful judgment of his peers or by the law of the land." Magna Carta ch. 32 (1216); *accord* Magna Carta ch. 39 (1215); Magna Carta ch. 29 (1225); 2 Co. Inst. 190, 191 ("[t]o deny a man replevin that is replisable, and thereby to detain him in prison, is a great offense . . ."); *see also Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 186 (1963) (noting the same). Thus, men were to be left at liberty until there is a verdict in their cases. Indeed, "the King's courts at Westminster" were greatly concerned with "'the liberty of the subject'" in bail cases. *Cf.* 2 Pollock & Maitland, *supra*, at 586. The 1275 Statute of Westminster laid out which crimes were bailable and those where the right to bail may be abrogated by the risk of disturbance of the peace of the community, as well as creating severe punishments for corrupt sheriffs. Statute of Westminster I, 3 Edw. III, c. 3, 15; De Haas, *supra*, at 95.

Following the Norman Conquest, it became apparent that the sheriffs (shire-reeves) responsible for groups of frankpledged tithings were corrupt in their administration of bail through writs of bail, replevy, and mainprize. *United States v. Edwards*, 430 A.2d 1321, 1326 (D.C. Cir. 1981) (en banc) (noting that sheriffs' bail "power was widely abused by sheriffs who extorted money from individuals entitled to release without charge" and "accepted bribes from those who were not

otherwise entitled to bail"); De Haas, *supra* at 90-95. In 1166, bail, mainprize, and replevy for crimes of royal "concern" were thus committed to judicial discretion as crown pleas that must be heard by a crown court. De Haas, *supra*, at 60-61. The Normans also incorporated grand juries into the justice system, and established a system of circuit-riding judges. Schacke, *supra*, at 25; De Haas, *supra* at 58-63 (discussing the 1166 Assize of Clarendon); *see also Smith v. Boucher*, 10 Geo. 2 136, 136, 27 Eng. Rep. 782, 783 (Hardwicke, J.) (K.B. 1736) ("[T]o settle the quantum of that bail . . . is still subject to the power of the Judge.").

Statutes between 1150 and the 1400s curtailed the powers of the sheriffs in bail in response to malpractice and heaped on penalties for abuses. De Haas, *supra* at 95-96 & n.277 (collecting statutes). Abuse of the right to bail by the Stuart King Charles I lead to the adoption of the Petition of Right in 1628, overruling the King's judges in *Darnel's Case* who interpreted the Magna Carta as not applying to pre-trial liberty. Petition of Right, 3 Car. I, c.1 (1628); *Darnel's Case*, 3 How. St. Tr. 1 (1627); 3 Sir Edward Coke, The Selected Writings and Speeches of Sir Edward Coke 1270 (Steve Sheppard, ed., 1st ed. 2003) (MP Sir Edward Coke's report on the framing of the Petition of Right to the Committee of the Whole Commons). In 1679, in response to further abuses of the Stuart kings and their sheriffs, Parliament passed the Habeas Corpus Act, strengthening the rights and protections of the Magna Carta and the Assize of Clarendon. Habeas Corpus Act of

1679, 31 Cha. II. c2. The Habeas Corpus Act secured judicial review of detention, including whether a person was replevable and thus entitled to bail release upon a pledging of sufficient surety. *Id.*

In 1689, Parliament underscored the importance of the right to pre-trial liberty by expressly including a right against excessive bail in the Bill of Rights, thereby legislating against a chief form of attack on the fundamental right to bail employed by the Stuart Kings—the unlawful holding of prisoners through unaffordable bail. Bill of Rights, 1 W. & M., c. 2 (1689). The common law of the right to pre-trial liberty through bail continued through to the Revolution and was carried into the federal Constitution, state constitutions and federal law. *E.g.*, 4 William Blackstone, Commentaries *295.

### B. American Constitutional and Common Law Incorporates and Upholds a Right to Bail

"In crossing the Atlantic, American colonists carried concepts embedded in these documents [the Magna Carta, 1275 Statute of Westminster I, Habeas Corpus Act of 1676, and the 1689 Bill of Rights] that became the foundation for our current system of bail." *New Mexico v. Brown*, 338 P.3d 1276, 1284 (N.M. 2014).

Both the colonies that became states and later states incorporated the right to bail into their own law. "One commentator who surveyed the bail laws in each of the states found that forty-eight states have protected, by constitution or statute, a

right to bail 'by sufficient sureties, except for capital offenses when the proof is evident or the presumption great.'" *Id.* (quoting Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 916 (2013)). Pennsylvania, New York, Massachusetts, North Carolina, and Virginia all adopted right to bail clauses either before or immediately after the founding. *Caleb Foote, The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 974-77 (1965); *see also generally* N.Y. Charter of Liberties and Privileges (1683); Mass. Body of Liberties (1641); N.C. Const. Declaration of Rights § x (Dec. 18, 1776).

On the federal level, this right to bail has been woven into the Constitution, federal statutory law, and federal court decisions. The general right to pre-trial liberty from the time of the Magna Carta was preserved on a constitutional level in the Constitution's Due Process Clauses. *Compare* U.S. Const. amend. V ("nor shall any person . . . be deprived of . . . liberty . . . without due process of law") *and* amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law") *with* Magna Carta ch. 32 (1216) ("No free man shall be arrested or imprisoned . . . or victimized in any other way . . . except by the lawful judgment of his peers or by the law of the land.").

In the Judiciary Act of 1789, Congress codified bail as the procedural mechanism for preserving the right to pre-trial liberty by enacting an absolute right to bail in non-capital cases and a limited right to bail in capital cases. 1 Stat. 73,

§ 33, at 91 ("Upon all arrests in criminal cases, bail shall be admitted, except where punishment may be by death, in which cases it shall not be admitted but by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise their discretion therein."). The Articles of Confederation Congress also recognized the right to pre-trial liberty through bail— the Northwest Ordinance of 1787 enacted that "[a]ll persons shall be bailable, unless for capital offenses, where the proof shall be evident or the presumption great. All fines shall be moderate; and no cruel or unusual punishments shall be inflicted. No man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land." Northwest Ordinance of 1787, art. 2.

The Supreme Court in *Stack v. Boyle* made clear that a "right to bail" as a functionary of pre-trial liberty is the proper interpretation of the law and has continued unabated as part of American law "[f]rom the passage of the Judiciary Act of 1789 . . . to the present Federal Rules of Criminal Procedure":

> [F]ederal law has unequivocally provided that a person arrested for a noncapital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. *See Hudson v. Parker*, 156 U.S. 277, 285 (1895). Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.
>
> The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.

*Stack v. Boyle*, 342 U.S. 1, 4 (1951) (Vinson, C.J.).

Since *Stack v. Boyle*, the Supreme Court has backed away from the idea that the Eighth Amendment's Excessive Bail Clause incorporates a general right to bail. *United States v. Salerno*, 481 U.S. 739, 752-54 (1987) ("The above-quoted dictum in *Stack v. Boyle* is far too slender a reed on which to rest this argument. The Court in *Stack* had no occasion to consider whether the Excessive Bail Clause requires courts to admit all defendants to bail"). Yet *Salerno* still incorporated a fundamental right to pre-trial liberty under the Due Process Clauses. *Id.* at 746-53.

The *Salerno* Court is correct that certain crimes are not and have not been bailable at common law—"the right to bail they have discovered in the Eighth Amendment is not absolute." *Id.* at 753. That has been clear since Bracton and Coke, 2 Co. Inst. 191; Sir Edward Coke, A Little Treatise of Baile and Maineprize (1635) (listing the offenses for which a person had a right to bail and no right to bail at common law); 2 Bracton, *supra* at 295, and as the Statute of Westminster I and the 1628 Petition of Right shows, the legislature clearly has the power to make policy decisions about who is and is not bailable—at least within the bounds of reason. *See supra* Part I.A; *cf. Salerno*, 481 U.S. at 755 (upholding the Bail Reform Act of 1984).

The confusion of the *Salerno* Court as to the Eighth Amendment is understandable and easily corrected. This amendment should not be the textual

anchor for the general right to bail and pre-trial liberty—though it clearly provides support in that it presumes such a right. As the *Salerno* Court found, the general right to pre-trial liberty is preserved in the Due Process Clauses—and bail is the due process mechanism for achieving pre-trial liberty—but the Eighth Amendment affirms a different yet related right against *excessive* bail. That right is conceptually separate from the general right to pre-trial liberty via bail, but it evolved out of the same common law. *Compare* Magna Carta ch. 32 (1216) (protecting pre-trial liberty in general with the predecessor to the Due Process Clauses), *with* Bill of Rights, 1 W. & M., c. 2 (1689) (incorporating a right against excessive bail); *see infra* Part II.A (discussing the common law considerations for setting "sufficient" bail and the codification of that right in 1689).

The heavy lifting of the general right to bail and pre-trial liberty is more properly done by the Due Process Clauses, while *excessive* bail challenges arise under the Eighth Amendment. Excessive bail claims give rise to claims of denial of bail altogether, however, so the Eighth Amendment can protect against a specific type of encroachment on rights generally guaranteed by the Due Process Clauses.

Finally, a denial of bail is also actionable under the Equal Protection Clause. Denying pre-trial liberty via bail because of indigency would, *a fortiori*, be to discriminate on the basis of indigency in the criminal-procedure context. *See*

*generally Douglas v. California*, 372 U.S. 353 (1963); *Griffin v. Illinois*, 351 U.S. 12 (1956)).

In sum, American law incorporates over 950 years of English constitutional and common law in establishing a fundamental right to the process of bail in order to secure pretrial liberty.

## II. THE RIGHT TO BAIL GUARANTEES NON-EXCESSIVE, INDIVIDUALIZED ASSESSMENTS NOT FIXED BY A PRE-DETERMINED SCHEME

*Amici* American Bail Coalition, Georgia Association of Professional Bondsmen, and Georgia Sheriffs' Association are absolutely correct that "[s]ince before the Founding, American communities have employed systems of bail to guarantee criminal defendants' appearance for prosecution while enabling the accused to secure their liberty before trial" and that "[t]he American colonies developed bail procedures based on English practices, and they retained those practices at independence." Am. Bail Coal. Br. at 4-5. But they are absolutely incorrect that those English and Colonial practices—and modern practice—would countenance non-individualized, pre-determined "systems of bail like the City of Calhoun's." *Id.* at 5. Since Norman England, bail has been supposed to be set with respect to the individual wealth circumstances of the criminal defendant.

## A. Pre-Revolutionary and Post-Revolutionary Constitutional and Common Law Commits Bail to Judicial Discretion to Avoid Excessive Bail for Indigents and to Ensure Sufficient Sureties

After the Norman Conquest of England and during the changes to pre-trial liberty and bail laws contemplated in the Magna Carta and the 1275 Statute of Westminster I, it became clear that bail is to be set with respect to the individual wealth circumstances of the defendant.

Defendants were required to put up "sufficient sureties," Am. Bail Coal. Br. at 4-6, but what is "sufficient" depended on the individual wealth circumstances of the defendant. *See, e.g.*, *King v. Bowes*, 1 T.R. 696, 700, 99 Eng. Rep. 1327, 1329 (K.B. 1787) (per curiam) (noting that "[e]xcessive bail is a relative term; it depends on the nature of the charge for which bail is required, upon the situation in life of the parties, and on various other circumstances"), (Archbald, J.) (allowing for a "lessening" of bail as there may be "difficulty" in procuring the sums); 2 Hawkins, at ch. 15, at 138-39 (discussing "[w]hat is said to be sufficient bail" and noting that judges ought to "take care that every one of the bail be of ability sufficient to answer the sum in which they are bound . . . upon consideration of the ability and quality of the prisoners, and the nature of the offence."). The rule Hawkins discusses extends back to early Norman common law. *See* De Haas, *supra*, at 84 ("It is noteworthy that no fixed amount seems to have been charged for the privilege of bail release . . . . It is our conclusion that they allowed themselves

considerable leeway in writing out the order for release, and that they failed generally to abide by any set formula."); 2 Pollock & Maitland, *supra*, at 514 (noting that in applying amercements to the sureties of those who fled on bail bond, "[a]ccount can now be taken of the offender's wealth or poverty . . . . there also seem to be maximum amercements depending on the wrong-doer's rank; the baron will not have to pay more than a hundred pounds, nor the routier more than five shillings").

These common-law roots were expanded and became more solidified with the abuses of the Stuart Kings before and after the English Civil War. In *Darnel's Case* in 1627, judges of the King's Bench "proved their subservience to the King [Charles I] by denying [habeas] release" to five knights committed to prison by special royal command for unnamed offenses. Foote, *supra*, at 966; *Darnel's Case*, 3 How. St. Tr. 1 (1627). That court found that, on due process grounds, the Magna Carta did not secure pre-trial liberty. Foote, *supra*, at 966; *Darnel's Case*, 3 How. St. Tr. 1 (1627). The House of Commons, under the leadership of Sir Edward Coke, took up the case and responded with the 1628 Petition of Right, asserting the right to pre-trial liberty under the Magna Carta and overruling *Darnel's Case*—"no freeman in any such manner as is before mentioned, be imprisoned or detained." Petition of Right, 3 Car. I, c.1 (1628); 3 How. St. Tr. 1, at 224 ¶ x; 3 Coke, Selected Writings and Speeches, at 1270; Foote, *supra*, at 967.

Further abuses of loopholes by Stuart King Charles II lead to the adoption of the Habeas Corpus Act of 1679, which noted that "many of the King's subjects have been and hereafter may be long detained in prison, in such cases where by law they are bailable." 31 Car. 2, c. 2 (1679). Having exhausted all of those loopholes, Charles II turned to "setting impossibly high bail" in order to "erect[] another obstacle to thwart the purpose of the law on pretrial detention." Foote, *supra*, at 967.

After William and Mary assumed the throne, Parliament responded to the Stuart high bail policy with the 1689 Bill of Rights. Bill of Rights, 1 W. & M., c. 2 (1689). Clause 10 of the Bill of Rights expressly provided that "excessive bail ought not be required." *Id.* The courts of the King's Bench bent to parliamentary supremacy after the destruction of Stuart absolutism and examined actions for excessive bail, respecting the rank and ability of the individual to post bond. *E.g.*, *Daw v. Swaine*, 1 Sid. 424, 21 Car. 2 424, 88 Eng. Rep. 1195, 1195 (C.P. 1670) (action for excessive bail); *Neal v. Spencer*, 10 Will. 3 257, 257-58, 88 Eng. Rep. 1305, 1305-06 & n.a (K.B. 1698) (collecting cases that note the diversity of bails given for the same offense in an action for excessive bail); *Parker v. Langley*, 11 Anne 145, 145-46, 88 Eng. Rep. 667, 667 (Q.B. 1712) (action for excessive bail); *Smith v. Boucher*, 10 Geo. 2 136, 136 27 Eng. Rep. 782, 783 (Hardwicke, J.) (K.B. 1736) ("[T]o settle the quantum of that bail . . . . is still subject to the power of the

15

Judge . . ."); *King v. Bowes*, 1 T.R. 696, 700, 99 Eng. Rep. 1327, 1329 (K.B. 1787) (Archbald, J.) (allowing for a "lessening" of bail as their may be "difficulty" in procuring the sums."); *Bates v. Pilling*, 149 Eng. Rep. 805, 805 (K.B. 1834) ("[A] defendant might be subjected to as much inconvenience by being compelled to put in bail to an excessive amount, as if he had been actually arrested."); *accord* 2 Hawkins, at ch. 15, at 138-39.

In the *King v. Bowes*, the per curiam King's Bench noted that "[e]xcessive bail is a relative term; it depends on the nature of the charge for which bail is required, upon the situation in life of the parties, and on various other circumstances." 1 T.R. at 700, 99 Eng. Rep. at 1329. Hawkins in his *Pleas of the Crown* repeated the rule that "sufficient" bond must take into account the wealth status of the defendant. 2 Hawkins, at ch. 15, at 138-39. Thus, "excessive" bail was not determined by examining a pre-determined, fixed amount, but rather by asking whether the amount was appropriate given the wealth of the defendant, for "a defendant might be subjected to as much inconvenience by being compelled to put in bail to an excessive amount, as if he had been actually arrested." *Bates*, 149 Eng. Rep. at 805; *accord* 1 J. Chitty, A Practical Treatise on the Criminal Law *131, at 88-89 (William Brown, Philadelphia 1819) ("[S]uch bail is only to be required as the party is able to procure; for otherwise the allowance of bail would be a mere colour for imprisoning the party on the charge.")

16

After the Revolution, the United States affirmed the specific right against excessive bail found in the English Bill of Rights but with stronger language. *Compare* U.S. Const. amend. VIII ("Excessive bail shall not be required"), *with* 1 W. & M., c. 2, cl. 10 (1689) ("[E]xcessive bail ought not be required."). Early American common law adopted the English understanding that setting bail includes particularization to an individual defendant's wealth circumstances, lest it be unconstitutionally "excessive" considering individual wealth circumstances. "'[T]o require larger bail than the prisoner could give would be to require excessive bail, and to deny bail in a case clearly bailable by law.'" *United States v. Brawner*, 7 Fed. 86 (W.D. Tenn. 1881) (quoting *United States v. Lawrence*, 26 Fed. Cas. 887, 888 (No. 15,557) (D.C. Cir. 1835)); *United States v. Radford*, 361 F.2d 777, 780 (4th Cir. 1966) ("[I]n a case clearly bailable by law, to require larger bail than the prisoner could give, would be to require excessive bail.");  *see also, e.g.*, *Jones v. Kelly*, 17 Mass. 116, 116-17 (1821) (finding bail to be excessive when a man could not secure sufficient sureties and reducing it from $3000 to $1000); *Whiting v. Putnam*, 17 Mass. 175, 175-78 (1821); *Ex Parte Hutchings*, 11 Tex. App. 28, 29 (Tex. 1881) (whether bail is "excessive and oppressive" depends "upon the pecuniary condition of the party. If wealthy the amount would be quite insignificant compared to a term in the penitentiary; if poor, very oppressive, if not

a denial of the bail."). The Supreme Court has often reaffirmed "the Eighth Amendment's proscription against excessive bail." *Salerno*, 481 U.S. at 746.

Accordingly, the established common law of the sufficiency of bail from the Norman Conquest of England through to the modern American law requires that magistrates and judges take into account the individual wealth circumstances of the defendant in setting bail.

### B. Pre-Determined, Non-Individualized Bail Schemes Violate the Right to Pre-Trial Liberty, the Right to Bail, the Right Against Excessive Bail, and the Equal Protection Clause

A pre-determined, scheduled bail scheme like the City of Calhoun's, by its very nature, does not give individualized determinations that the Fifth, Eighth and Fourteenth Amendments demand. U.S. Const. amend. V (granting a general right to pre-trial liberty and bail, see *supra* Part I); U.S. Const. amend. VIII (requires bail determinations with individualized wealth determination per common law, see *supra* Part II.A); U.S. Const. amend. XIV, § 1 (requiring the law not to abridge the fundamental right to pretrial liberty unequally on the basis of wealth, *see Douglas v. California*, 372 U.S. 353 (1963); *Griffin v. Illinois*, 351 U.S. 12 (1956)). There is no timely process afforded to set the bond respecting the individual wealth circumstances of the defendant.

Accordingly, the district court below properly concluded that, under the Fourteenth Amendment, "[t]he bail policy under which Plaintiff was arrested

clearly is unconstitutional" and issued a preliminary injunction. *Walker v. City of Calhoun*, No. 4:15-CV-0170-HLM, 2016 U.S. Dist. Lexis 12305, *36 (N.D. Ga. Jan. 28, 2016). That decision is supported by nearly a *millennium* of Anglo-American common law on bail. *See supra* Parts I, II. While this Court has not been presented with a case where indigency is the cause of the failure of a defendant to procure bond sureties, *United States v. Wong-Alvarez*, 779 F.2d 583, 585 (11th Cir. 1985), Walker's case is exactly that. This Court should not deviate from a *long* common law tradition and should uphold the good judgment of the court below.

## CONCLUSION

For the foregoing reasons, *amicus* Cato Institute urges the court to uphold the preliminary injunction and establish clearly that bail schemes may not discriminate against the indigent by pre-determining the sum of a bond.

Respectfully submitted this 12th day of August, 2016,

> Ilya Shapiro
> *Counsel of Record*
> Randal J. Meyer (admission pending)
> CATO INSTITUTE
> 1000 Massachusetts Ave., NW
> Washington, DC 20001
> (202) 842-0200
> ishapiro@cato.org
>
> _____
> Ilya Shapiro
> *Counsel for Amicus* Curiae
> *Cato Institute*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,719 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 point font.

Ilya Shapiro
*Counsel for Amicus Curiae*
*Cato Institute*

Dated: August 12, 2016

# CERTIFICATE OF SERVICE

I hereby certify that, on August 12, 2016, I filed the foregoing brief with this Court, by causing a copy to be electronically uploaded and by causing the original and six paper copies to be delivered by FedEx next business day delivery. I further certify that I caused this brief to be served on all participants through the CM/ECF system.

Ilya Shapiro
*Counsel for* Amicus Curiae
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

**U.S. Department of Justice**
Office of Justice Programs



# Bureau of Justice Statistics

*State Court Processing Statistics*

# Felony Defendants in Large Urban Counties, 1996

*Arrest charges*

*Demographic characteristics*

*Criminal history*

*Pretrial release and detention*

*Adjudication*

*Sentencing*

**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics



# Felony Defendants in Large Urban Counties, 1996

**Timothy C. Hart**

**and Brian A. Reaves, Ph.D.**

*BJS Statistician*s

**October 1999, NCJ-176981**

# Contents

**U.S. Department of Justice**
Bureau of Justice Statistics

Jan M. Chaiken, Ph.D.
Director

Brian A. Reaves and Timothy C. Hart,
BJS statisticians, prepared this report.
Tom Hester and Yvonne Boston super-
vised final production for printing,
assisted by Jayne Robinson.

The data were collected and processed
by the Pretrial Services Resource
Center under the supervision of Jolanta
Juszkiewicz.  Carma Hogue of the
Economic Statistical Methods and
Procedures Division, Bureau of the
Census, assisted with sample design.

Data presented in this report may be
obtained from the National Archive of
Criminal Justice Data at the University of
Michigan, 1-800-999-0960.  The report
and data are available on the Internet at:
  *http://www.ojp.usdoj.gov/bjs*

**Highlights**   iii

**State Court Processing Statistics**   1

**Arrest charges**   2

**Demographic characteristics**   4

**Criminal history**   8

Criminal justice status at time of arrest   8
Prior arrests   10
Prior convictions   12

**Pretrial release and detention**   16

Rates of release and detention   16
Bail amounts   18
Time from arrest to release   19
Criminal history and probability of release   20
Conduct of released defendants   21

**Adjudication**   23

Time from arrest to adjudication   23
Adjudication outcome   24
Case processing statistics   28

**Sentencing**   29

Time from conviction to sentencing   29
Type and length of sentence   30
Prior record and felony sentencing   35

**Methodology**   37

**Appendix**   40

## Highlights

### State Court Processing Statistics

Every 2 years, as part of its State Court Processing Statistics (SCPS) program, the Bureau of Justice Statistics tracks a sample of felony cases filed during the month of May in 40 of the Nation's 75 largest counties. The most recent SCPS study analyzed cases filed during May 1996.

### Trends in processing of felony defendants, 1990-96

Since 1990, the proportion of defendants charged with a violent offense has remained at about one-fourth. From 1992 to 1996, the proportion of drug defendants increased from 3 in 10 to about 3 in 8. In each year, approximately 1 in 3 defendants have been charged with a property crime and 1 in 12 with a public-order offense.

In 1996, the percentage of defendants age 40 or older was 18%, an increase from the 1994 level of 14%, and nearly twice the 10% found in the 1990 study. At the same time, the percentage of defendants under age 25 in 1996 was lower than in previous years.



**Age at arrest, felony defendants in the 75 largest counties, 1990, 1992, 1994, and 1996**

Percent of defendants
50%
40% — Age 25-39
30% — Under age 25
20%
10% — Age 40 or older
0%
1990  1992  1994  1996

Defendant demographics have been relatively consistent in terms of race and gender since 1990. The percentage of female defendants has been near 15% in all years. Non-Hispanic blacks have accounted for about half of defendants each year while non-Hispanic whites and Hispanics have comprised about a fourth each.

Since 1990, roughly 3 in 8 defendants have had an active criminal justice

status at the time of arrest in each of the SCPS studies. The percentage of defendants with a felony arrest record was higher in 1996 (60%) than in previous years when it averaged about 55%. The proportion of defendants with a felony conviction record has also increased somewhat — from 36% in 1990 to 40% in 1996.

Since 1990, the proportion of felony defendants released prior to case disposition has been fairly consistent, ranging from 62% to 65%. Likewise, the proportion of released defendants charged with misconduct such as failure to appear in court or rearrest has remained at just under one-third. Failure-to-appear rates have held steady at just under one-fourth.

After reaching a high of 61% in the 1994 study, the felony conviction rate for 1996 decreased to 55%. This rate was similar to that found in 1992, but higher than the 50% felony conviction rate in the 1990 study. The percentage of defendants convicted of a felony or a misdemeanor was 70% in 1996, similar to the conviction rates for 1994 (72%) and 1990 (68%), but higher than the 64% of defendants convicted in the 1990 SCPS study.

For defendants convicted of a felony, sentences were less likely to involve incarceration in 1994 (68%) and 1996 (69%) than in 1990 (75%) or 1992 (74%). This was primarily because of a drop in the percentage of defendants



**Most severe sentence received by defendants convicted of a felony in the 75 largest counties, 1990, 1992, 1994, and 1996**

Percent of defendants
50%
40% — Prison
       Jail
30%
20% — Probation
10%
0%
1990  1992  1994  1996

sentenced to prison, and an increase in the use of probation as the most severe sentence. In all years, about a third of felony convictions resulted in a jail sentence.

### Felony defendants in large urban counties, 1996

#### Arrest charges

An estimated 54,579 felony cases were filed in the State courts of the Nation's 75 largest counties during May 1996. A fourth of the defendants in these cases were charged with a violent offense, usually assault (11.4%) or robbery (7.1%). A small percentage of defendants were charged with murder (0.9%) or rape (1.5%).

About 2 in 3 defendants were charged with either a drug (37%) or property (31%) offense. Half of drug defendants, 18.5% of defendants overall, were charged with drug trafficking. A majority of property defendants were charged with theft (12.3% of all defendants) or burglary (8.1%). Eight percent of all defendants were charged with a public-order offense. Often these charges were weapons-related (2.8% of all defendants) or driving-related (2.7%).

#### Demographic characteristics

Eighty-four percent of defendants were male, with the largest percentages among those charged with rape (100%), murder (96%), a weapons offense (95%), or a driving-related offense (95%). Women accounted for about a fourth of the defendants charged with a property offense other than burglary.

Blacks comprised about two-thirds of the defendants charged with robbery or a weapons offense. Whites accounted for about two-thirds of those charged with a driving-related felony.

About half of defendants were under age 30. Nineteen percent were under age 21, including 32% of those charged with murder, and 38% of those charged with robbery. Four percent of defendants were under age 18, including 15% of robbery defendants and 10% of murder defendants.

*Criminal history*

At the time of arrest, more than a third of defendants had an active criminal justice status such as probation (16%), release pending disposition of a prior case (13%), or parole (6%). Robbery defendants (43%) were the most likely to have a criminal justice status.

Nearly three-fourths of all defendants had been arrested previously (72%), with 43% having at least five prior arrest charges. Sixty percent of defendants had a felony arrest record.

An estimated 40% of defendants had at least one prior conviction for a felony. Eighteen percent had a prior conviction for a violent felony, including about a fourth of murder, weapons, and robbery defendants.

*Pretrial release and detention*

Thirty-seven percent of all defendants were detained until the court disposed of their case, including 6% who were denied bail. A majority of defendants charged with murder (84%), robbery (61%), or burglary (53%) were detained. Sixty-one percent of murder defendants were denied bail.

Fifty-three percent of the defendants with an active criminal justice status were detained until case disposition, compared to 27% of those without such a status. Defendants on parole (73%) were the most likely to be detained, followed by those on probation (58%).

Released defendants were most likely to be released on personal recognizance (38% of all releases). The next most common type of pretrial release was surety bond (28%), followed by deposit bond (11%) and conditional release (9%).

Nearly a third (31%) of released defendants committed one or more types of pretrial misconduct while in a release status. Twenty-two percent failed to appear in court as scheduled, and 16% were rearrested for a new offense.

*Adjudication*

About a fourth of all defendants had their case adjudicated within 1 month of arrest, and about half within 3 months. At the end of the 1-year study period, 86% of all cases had been adjudicated.

Seventy percent of the cases adjudicated within 1 year resulted in a conviction. Conviction rates were highest for defendants charged with a driving-related offense (80%) or drug trafficking (78%) and lowest for defendants charged with assault (53%).

Fifty-five percent of all defendants were convicted of a felony, and 15% of a misdemeanor. Felony conviction rates were highest for defendants originally charged with drug trafficking (68%), murder (62%), burglary (62%), a driving-related offense (61%), or a weapons offense (59%). Assault defendants (33%) had the lowest felony conviction rate.

Ninety-four percent of convictions occurring during the 1-year study period were obtained through a guilty plea. Nearly 4 in 5 guilty pleas were to a felony. About half of murder convictions resulted from guilty pleas and about half from trial verdicts. Overall, 77% of trials resulted in a guilty verdict, including 86% of murder trials.

*Sentencing*

A majority (66%) of convicted defendants were sentenced within 1 day of adjudication. About two-thirds of all sentences were either to prison (30%) or jail (37%). Two-thirds of all jail sentences included a probation term. Nearly all convicted defendants who did not receive an incarceration sentence were placed on probation.

Thirty-five percent of the defendants convicted of a felony were sentenced to prison, including all of those convicted of murder. A majority of robbery (71%) and rape (56%) convictions resulted in prison sentences.

More than half of those with multiple prior felony convictions (58%) were sentenced to prison following a felony conviction in the current case, compared to about a fifth of those with no prior felony convictions (21%).

Excluding life sentences, the mean prison sentence imposed on defendants convicted of a violent felony was 8 years, and the median was 5 years. For those convicted of a nonviolent offense, the mean was 4 years and the median was 3 years. Murder (30 years) and rape (8 years) convictions carried the longest median prison sentences. About a fourth of convicted murderers received a life sentence.



**Probability of being convicted and sentenced to incarceration for felony defendants in the 75 largest counties, 1996**

Most serious arrest charge

Percent of defendants convicted and sentenced to prison or jail

**State Court Processing Statistics**

Since 1988, the Bureau of Justice Statistics (BJS) has sponsored a biennial data collection on the processing of felony defendants in the State courts of the Nation's 75 most populous counties.  Previously known as the National Pretrial Reporting Program, this data collection series was renamed the State Court Processing Statistics (SCPS) program to better reflect the wide range of data elements collected.

The SCPS program collects data on the demographic characteristics, criminal history, pretrial processing, adjudication, and sentencing of felony defendants.  The SCPS data do not include Federal defendants.  The reader should refer to the annual BJS *Compendium of Federal Justice Statistics* for information on the processing of Federal defendants.

The 1996 SCPS collected data for 15,474 felony cases filed during May 1996 in 40 large counties.  These cases, which were tracked for up to 1 year, were part of a 2-stage sample that was representative of the estimated 54,579 felony cases filed in the Nation's 75 most populous counties during that month.

In 1996, the 75 largest counties accounted for 37% of the U.S. population.  According to the FBI's Uniform Crime Reports program for 1996, these jurisdictions accounted for 50% of all reported serious violent crimes in the United States, including 63% of all robberies.  They accounted for 40% of all reported serious property crimes.

According to the BJS National Judicial Reporting Program, 43% of all felony convictions in 1996 occurred in the 75 largest counties.  For national estimates pertaining to felony convictions, see the BJS report *Felony Sentences in State Courts, 1996.*

## Arrest charges

About a fourth of the defendants charged with a felony in the 75 largest counties during May 1996 had been arrested for a violent offense (24.7%) (table 1).  Nearly half of those charged with a violent felony, 11.4% of defendants overall, faced charges for assault, and almost a third, 7.1% of defendants overall, were charged with robbery.  Murder defendants comprised about 3% of the defendants charged with a violent felony, and about 1% of all felony defendants.  Rape defendants represented nearly 6% of the defendants charged with a violent felony, 1.5% of all felony defendants  (See *Methodology* for the specific crimes included in each offense category.)

For more than a third of all defendants, the most serious arrest charge was a drug offense (36.8%).  About half of drug defendants were charged with drug trafficking.  Overall, defendants were more likely to be charged with drug trafficking (18.5%) or other drug offenses (18.2%) than any other type of offense (figure 1).

Nearly a third of all felony defendants were charged with a property offense (30.8%).  About 2 in 5 property defendants, 12.3% of defendants overall, were charged with theft, and just over a fourth, 8.1% overall, were charged with burglary.

Defendants charged with a public-order offense comprised 7.7% of all defendants.  About two-thirds of public-order defendants faced a weapons or driving-related charge.

The percentage of felony defendants in the 75 largest counties that faced a drug-related charge increased from 1994 to 1996 as it did from 1992 to 1994.  The proportion charged with a violent or public-order felony was about the same in 1996 as in 1990, 1992, or 1994.  The percentage of defendants charged with a property offense in 1996 was similar to that for 1994, but less than in 1992 (figure 2).



**The most frequently charged offenses of felony defendants in the 75 largest counties, 1996**

Most serious arrest charge

See *Methodology* for specific crimes included in each offense category.

Figure 1



**Most serious arrest charge of felony defendants in the 75 largest counties, 1988, 1990, 1992, 1994, and 1996**

Percent of defendants

Figure 2

**Table 1.  Felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Felony defendants in the 75 largest counties | |
|---|---|---|
| | Number | Percent |
| All offenses | 54,335 | 100.0% |
| Violent offenses | 13,434 | 24.7% |
| Murder | 465 | 0.9 |
| Rape | 788 | 1.5 |
| Robbery | 3,880 | 7.1 |
| Assault | 6,184 | 11.4 |
| Other violent | 2,117 | 3.9 |
| Property offenses | 16,710 | 30.8% |
| Burglary | 4,407 | 8.1 |
| Theft | 6,706 | 12.3 |
| Other property | 5,597 | 10.3 |
| Drug offenses | 19,986 | 36.8% |
| Trafficking | 10,075 | 18.5 |
| Other drug | 9,912 | 18.2 |
| Public-order offenses | 4,205 | 7.7% |
| Weapons | 1,524 | 2.8 |
| Driving-related | 1,484 | 2.7 |
| Other public-order | 1,197 | 2.2 |

Note: Data for the specific arrest charge were available for 99.6% of all cases.  Detail may not add to total because of rounding.

Slightly more than half of all felony defendants (54%) faced at least one additional charge and 39% were charged with at least one additional felony (table 2).  Nearly two-thirds of defendants whose most serious arrest charge was drug trafficking (65%), rape (64%), or robbery (63%) were charged with one or more additional offenses.

Defendants whose most serious arrest charge was drug trafficking (57%) or rape (56%) were the most likely to face at least 1 additional felony charge.  Just over half of murder (53%) or robbery (52%) defendants also faced 1 or more additional felony charges.  About a fourth of the defendants charged with a public-order offense (26%), or with a drug offense other than trafficking (23%) faced multiple felony charges.

**Table 2.  Level of second most serious charge of felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | |
|---|---|---|---|---|---|---|
| | | Total | No other charges | Most serious additional charge | | |
| | | | | Total | Felony | Misde- meanor |
| All offenses | 54,323 | 100% | 46% | 54% | 39% | 16% |
| Violent offenses | 13,430 | 100% | 41% | 59% | 43% | 16% |
| Murder | 465 | 100 | 46 | 54 | 53 | 1 |
| Rape | 788 | 100 | 36 | 64 | 56 | 9 |
| Robbery | 3,876 | 100 | 37 | 63 | 52 | 11 |
| Assault | 6,184 | 100 | 41 | 59 | 38 | 21 |
| Other violent | 2,117 | 100 | 45 | 55 | 35 | 20 |
| Property offenses | 16,702 | 100% | 50% | 50% | 37% | 13% |
| Burglary | 4,407 | 100 | 39 | 61 | 46 | 14 |
| Theft | 6,702 | 100 | 55 | 45 | 35 | 10 |
| Other property | 5,593 | 100 | 53 | 47 | 32 | 14 |
| Drug offenses | 19,986 | 100% | 44% | 56% | 40% | 16% |
| Trafficking | 10,075 | 100 | 35 | 65 | 57 | 8 |
| Other drug | 9,912 | 100 | 54 | 46 | 23 | 23 |
| Public-order offenses | 4,205 | 100% | 48% | 52% | 26% | 26% |
| Weapons | 1,524 | 100 | 47 | 53 | 29 | 24 |
| Driving-related | 1,484 | 100 | 44 | 56 | 29 | 27 |
| Other public-order | 1,197 | 100 | 56 | 44 | 18 | 26 |

Note:  Data for the most serious arrest charge and the next most serious arrest charge were available for 99.5% of all cases.  Detail may not add to total because of rounding.

## Demographic characteristics

Overall, 84% of felony defendants in the 75 largest counties were male (table 3).  Men comprised the largest percentages among defendants charged with rape (100%), murder (96%), weapons (95%), driving-related offenses (95%), robbery (93%), or burglary (91%).  Women accounted for 16% of defendants, including about a fourth of the defendants charged with property offenses other than burglary.

Without consideration of Hispanic origin, which was reported poorly in some jurisdictions (see *Methodology*), 58% of defendants were black, 40% were white, and 2% other races. Blacks comprised the largest percentages among defendants charged with robbery (69%), weapons offenses (64%), murder (63%), drug trafficking (63%), and assault (61%).  Whites accounted for two-thirds of the defendants facing driving-related charges (figure 3).



**Race of felony defendants in the 75 largest counties, by most serious arrest charge, 1996**

Figure 3

| Table 3.  Gender and race of felony defendants, by most serious arrest charge, 1996 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Most serious arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | Number of defendants | Percent of felony defendants in the 75 largest counties | | | |
| | | Total | Male | Female | | Total | Black | White | Other |
| All offenses | 54,296 | 100% | 84% | 16% | 48,728 | 100% | 58% | 40% | 2% |
| Violent offenses | 13,427 | 100% | 88% | 12% | 12,116 | 100% | 61% | 36% | 3% |
| Murder | 462 | 100 | 96 | 4 | 379 | 100 | 63 | 35 | 2 |
| Rape | 788 | 100 | 100 | 0 | 737 | 100 | 56 | 38 | 7 |
| Robbery | 3,880 | 100 | 93 | 7 | 3,426 | 100 | 69 | 28 | 3 |
| Assault | 6,184 | 100 | 82 | 18 | 5,673 | 100 | 61 | 36 | 3 |
| Other violent | 2,114 | 100 | 87 | 13 | 1,901 | 100 | 47 | 49 | 4 |
| Property offenses | 16,694 | 100% | 79% | 21% | 15,215 | 100% | 54% | 43% | 3% |
| Burglary | 4,404 | 100 | 91 | 9 | 3,948 | 100 | 52 | 45 | 3 |
| Theft | 6,696 | 100 | 78 | 22 | 6,140 | 100 | 55 | 42 | 3 |
| Other property | 5,594 | 100 | 71 | 29 | 5,127 | 100 | 55 | 43 | 2 |
| Drug offenses | 19,969 | 100% | 84% | 16% | 17,624 | 100% | 61% | 37% | 1% |
| Trafficking | 10,063 | 100 | 85 | 15 | 8,956 | 100 | 63 | 35 | 2 |
| Other drug | 9,906 | 100 | 82 | 18 | 8,668 | 100 | 59 | 40 | 1 |
| Public-order offenses | 4,205 | 100% | 91% | 9% | 3,773 | 100% | 47% | 51% | 2% |
| Weapons | 1,524 | 100 | 95 | 5 | 1,375 | 100 | 64 | 35 | 1 |
| Driving-related | 1,484 | 100 | 95 | 5 | 1,294 | 100 | 32 | 66 | 2 |
| Other public-order | 1,197 | 100 | 81 | 19 | 1,103 | 100 | 44 | 54 | 2 |

Note:  Data on gender of defendants were available for 99.9% of all cases and data on race of defendants were available for 90% of all cases.  Without consideration of Hispanic origin, Bureau of the Census data for 1996 indicate that the racial distribution of the population of the 75 largest counties was 75% white, 17% black, and 7% other races.  Detail may not add to total because of rounding.

About a fourth of defendants were Hispanic (24%), including nearly a third of those charged with a driving-related offense (32%) or drug trafficking (30%) (table 4). Non-Hispanic whites also comprised about a fourth of defendants (23%), including two-fifths of those charged with a driving-related offense. Non-Hispanic blacks accounted for half of all defendants, including a majority of those charged with robbery (60%), drug trafficking (54%), or weapons offenses (54%).

The average age of defendants at the time of arrest was 31 years (table 5). By specific offense, the average age ranged from 27 years for robbery defendants to 34 for those charged with a driving-related offense.

Within each of the four major offense categories (violent, property, drug, and public-order), about half of the defendants were under age 30. Eighteen percent of defendants were age 40 or older, including 27% of those charged with a driving-related offense. Four percent of defendants were under age 18, including 15% of robbery and 10% of murder defendants.

**Table 4. Race and Hispanic origin of felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | |
|---|---|---|---|---|---|---|
| | | Total | Black non-Hispanic | White non-Hispanic | Other non-Hispanic | Hispanic, any race |
| All offenses | 42,654 | 100% | 50% | 23% | 3% | 24% |
| Violent offenses | 10,702 | 100% | 52% | 21% | 4% | 23% |
| Murder | 320 | 100 | 51 | 19 | 2 | 28 |
| Rape | 598 | 100 | 51 | 19 | 8 | 22 |
| Robbery | 3,147 | 100 | 60 | 14 | 3 | 23 |
| Assault | 4,878 | 100 | 53 | 20 | 3 | 24 |
| Other violent | 1,759 | 100 | 39 | 37 | 4 | 20 |
| Property offenses | 12,429 | 100% | 48% | 28% | 3% | 20% |
| Burglary | 3,344 | 100 | 45 | 27 | 4 | 24 |
| Theft | 4,947 | 100 | 49 | 27 | 4 | 19 |
| Other property | 4,138 | 100 | 49 | 30 | 3 | 18 |
| Drug offenses | 16,250 | 100% | 53% | 20% | 2% | 26% |
| Trafficking | 8,193 | 100 | 54 | 14 | 2 | 30 |
| Other drug | 8,058 | 100 | 51 | 25 | 1 | 22 |
| Public-order offenses | 3,273 | 100% | 38% | 30% | 2% | 30% |
| Weapons | 1,122 | 100 | 54 | 19 | 1 | 25 |
| Driving-related | 1,197 | 100 | 24 | 42 | 2 | 32 |
| Other public-order | 953 | 100 | 36 | 29 | 3 | 33 |

Note: Data on both race and Hispanic origin of defendants were available for 79% of all cases. According to the Bureau of the Census data for 1996, the overall percentage of the population of the 75 largest counties was 61% white non-Hispanic, 15% black non-Hispanic, 7% other race non-Hispanic, and 17% Hispanics of any race. Detail may not add to total because of rounding.

**Table 5. Age at arrest of felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | | | | Average age at arrest |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under 18 | 18-20 | 21-24 | 25-29 | 30-34 | 35-39 | 40 or older | |
| All offenses | 54,287 | 100% | 4% | 15% | 15% | 18% | 17% | 13% | 18% | 31 yrs. |
| Violent offenses | 13,421 | 100% | 7% | 16% | 15% | 17% | 16% | 11% | 17% | 31 yrs. |
| Murder | 465 | 100 | 10 | 22 | 20 | 14 | 12 | 8 | 14 | 33 |
| Rape | 788 | 100 | 7 | 11 | 17 | 19 | 19 | 8 | 19 | 31 |
| Robbery | 3,875 | 100 | 15 | 23 | 16 | 16 | 13 | 8 | 10 | 27 |
| Assault | 6,181 | 100 | 4 | 14 | 14 | 17 | 17 | 14 | 20 | 32 |
| Other violent | 2,112 | 100 | 4 | 8 | 15 | 16 | 19 | 13 | 25 | 34 |
| Property offenses | 16,696 | 100% | 4% | 16% | 15% | 18% | 18% | 13% | 16% | 31 yrs. |
| Burglary | 4,401 | 100 | 3 | 17 | 14 | 17 | 20 | 13 | 15 | 30 |
| Theft | 6,704 | 100 | 4 | 18 | 14 | 17 | 17 | 14 | 16 | 30 |
| Other property | 5,591 | 100 | 4 | 13 | 17 | 20 | 17 | 13 | 17 | 31 |
| Drug offenses | 19,968 | 100% | 3% | 15% | 16% | 17% | 17% | 15% | 18% | 31 yrs. |
| Trafficking | 10,075 | 100 | 3 | 17 | 17 | 17 | 15 | 14 | 17 | 31 |
| Other drug | 9,893 | 100 | 3 | 12 | 14 | 17 | 18 | 16 | 19 | 32 |
| Public-order offenses | 4,203 | 100% | 2% | 11% | 14% | 20% | 17% | 14% | 22% | 32 yrs. |
| Weapons | 1,524 | 100 | 4 | 19 | 20 | 21 | 14 | 9 | 15 | 29 |
| Driving-related | 1,481 | 100 | 0 | 4 | 9 | 20 | 23 | 16 | 27 | 34 |
| Other public-order | 1,197 | 100 | 1 | 8 | 14 | 20 | 15 | 17 | 24 | 34 |

Note: Data on age of defendants were available for 99.5% of all cases. Detail may not add to total because of rounding.

About half of robbery (53%) and murder (52%) defendants were under age 25, compared to a third of defendants overall (figure 4). Defendants charged with assault (32%) or driving-related offenses (14%) were the least likely to be under age 25.

Robbery defendants (38%) were twice as likely as defendants overall (19%) to be under age 21. Murder defendants (32%) were also much more likely to be under age 21 than other defendants. Defendants charged with a driving-related offense (5%) were the least likely to be this young.

Males formed a higher percentage of defendants under age 18 (93%) than of other age groups (table 6). More than two-thirds of the defendants under age 18 were black, compared to three-fifths or less in other age groups.



**Felony defendants under age 25 and age 21 in the 75 largest counties, by most serious arrest charge, 1996**

*Includes "other" offenses.

Figure 4

Table 6.  Gender and race of felony defendants, by age at arrest, 1996

| Age at arrest | Number of defendants | Percent of felony defendants in the 75 largest counties | | | Number of defendants | Percent of felony defendants in the 75 largest counties | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Male | Female | | Total | Black | White | Other |
| All ages | 54,248 | 100% | 84% | 16% | 48,683 | 100% | 58% | 40% | 2% |
| Under 18 | 2,250 | 100% | 93% | 7% | 2,163 | 100% | 71% | 28% | 1% |
| 18-20 | 8,146 | 100 | 90 | 10 | 7,297 | 100 | 60 | 37 | 3 |
| 21-24 | 8,316 | 100 | 86 | 14 | 7,370 | 100 | 60 | 37 | 3 |
| 25-29 | 9,496 | 100 | 81 | 19 | 8,474 | 100 | 57 | 41 | 2 |
| 30-34 | 9,209 | 100 | 79 | 21 | 8,340 | 100 | 56 | 41 | 3 |
| 35-39 | 7,291 | 100 | 81 | 19 | 6,638 | 100 | 58 | 41 | 2 |
| 40 or older | 9,540 | 100 | 85 | 15 | 8,400 | 100 | 53 | 45 | 2 |

Note:  Data on defendant age and gender were available for 99.8% of all cases.
Data on defendant age and race were available for 90% of all cases.
Detail may not add to total because of rounding.

Black males comprised the largest proportion of defendants in each age group (figure 5).  This effect was most pronounced in the under 18 age category where black males (67%) accounted for more than twice the percentage accounted for by white males (26%).  It was least pronounced in the over 40 age category, where black males (45%) accounted for a proportion of defendants much closer to that accounted for by white males (37%).

Black females comprised a slightly higher percentage than white females in most of the age categories, but for no more than 13% of the defendants in any single age category.



**Race and gender of felony defendants in the 75 largest counties, by age at arrest, 1996**

*Figure 5*

# Criminal history

## Criminal justice status at time of arrest

Thirty-six percent of felony defendants had an active criminal justice status at the time of their arrest on the current felony charge (table 7).  Among defendants charged with a violent offense, a third had a criminal justice status, ranging from more than two-fifths of robbery defendants (43%) to about a fourth of assault defendants (26%).

Thirty-five percent of property defendants had a criminal justice status, including 41% of burglary defendants. Among drug defendants, 38% had a criminal justice status overall.  Those charged with drug trafficking (40%) were slightly more likely to have a criminal justice status than those charged with other drug offenses (36%).

Thirty-nine percent of public-order defendants had an active criminal justice status at the time of the current arrest.  This included 36% of those charged with a weapons offense, 40% of those charged with a driving-related offense, and 41% of those charged with other public-order offenses.

About 1 in 11 defendants with a criminal justice status had more than one type of status.  When just the most serious criminal justice status is considered, 16% of defendants were on probation, 13% had been released pending disposition of a previous case, and 6% were on parole at the time of the current arrest.  Allowing for defendants with multiple criminal justice statuses, 16% were on probation, 14% had been released on a prior case, and 6% were on parole.

**Table 7.  Criminal justice status of felony defendants at time of arrest, by most serious arrest charge, 1996**

| Most serious current arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties with an active criminal justice status at the time of arrest | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total | Probation | Pretrial release | Parole | In custody | Other |
| All offenses | 48,057 | 36% | 16% | 13% | 6% | 1% | -- |
| Violent offenses | 11,830 | 33% | 14% | 12% | 5% | 1% | 1% |
| Murder | 379 | 37 | 9 | 18 | 7 | 3 | 0 |
| Rape | 697 | 30 | 14 | 8 | 5 | 2 | 0 |
| Robbery | 3,424 | 43 | 17 | 16 | 9 | 1 | -- |
| Assault | 5,514 | 26 | 12 | 9 | 4 | 2 | 0 |
| Other violent | 1,816 | 33 | 18 | 11 | 3 | 1 | 0 |
| Property offenses | 14,888 | 35% | 16% | 12% | 6% | 1% | -- |
| Burglary | 3,969 | 41 | 21 | 11 | 8 | 2 | -- |
| Theft | 5,966 | 38 | 17 | 13 | 6 | 1 | -- |
| Other property | 4,953 | 27 | 11 | 12 | 4 | 1 | -- |
| Drug offenses | 17,789 | 38% | 16% | 14% | 7% | -- | -- |
| Trafficking | 8,823 | 40 | 14 | 18 | 7 | -- | -- |
| Other drug | 8,966 | 36 | 18 | 10 | 7 | -- | -- |
| Public-order offenses | 3,550 | 39% | 17% | 13% | 5% | 3% | -- |
| Weapons | 1,332 | 36 | 15 | 12 | 9 | 1 | -- |
| Driving-related | 1,202 | 40 | 22 | 14 | 4 | -- | 1 |
| Other public-order | 1,016 | 41 | 14 | 14 | 3 | 10 | 0 |

Note:  Data on criminal justice status at time of arrest were available for 88% of all cases. Nine percent of defendants with a criminal justice status had more than 1 type of status. For those cases, the status indicated is the most serious.
Detail may not add to total because of rounding.
--Less than 0.5%.

Defendants charged with robbery (8%) or a weapons offense (8%) were more than twice as likely as those charged with a driving-related offense (3%) or assault (3%) to have been on parole at the time of their arrest on the current charges (figure 6). Five percent of murder and rape defendants were parolees at the time of arrest.

Defendants charged with a driving-related offense (19%) or burglary (19%) were more likely than other defendants to have been on probation at the time of arrest. Those charged with murder (8%) were the least likely to have been on probation.

Defendants charged with drug trafficking (19%), robbery (18%), or murder (17%) were the most likely to have been on release pending disposition of a prior case when they were arrested on the current felony charge. These defendants were nearly twice as likely as those charged with assault (10%) or rape (10%) to have had such a status at the time of the current arrest.



**Criminal justice status of felony defendants in the 75 largest counties, 1996**

*Figure 6*

**Prior arrests**

Nearly three-fourths of all defendants had at least one prior felony or misde-meanor arrest (table 8).  By general offense category, the percentage of defendants with a prior arrest ranged from 67% of those currently charged with a violent offense to 77% of those charged with a drug offense.

Among defendants charged with a violent offense, those charged with robbery (72%) or murder (71%) were the most likely to have a prior arrest record, and those charged with rape (55%) the least likely.

Among property defendants, 79% of those charged with burglary had been arrested previously, compared to 72% of theft defendants, and 61% of those charged with other property offenses.

Among public-order defendants, about four-fifths of those charged with a driving-related felony (79%) had an arrest record.  About three-fourths of weapons defendants (73%) had been arrested previously as had about two-thirds of those charged with other public-order offenses (68%).

Among defendants with an arrest record, nearly all had been arrested more than once, and a majority had at least 5 prior arrest charges.  Overall, 63% of defendants had two or more prior arrest charges, and 43% had five or more.  Defendants charged with burglary (52%) were the most likely to have five or more prior arrest charges.

Twenty-six percent of all defendants had 10 or more prior arrest charges. This included 34% of burglary defen-dants, 29% of robbery and theft defen-dants, and 28% of defendants charged with drug trafficking.

**Table 8.  Number of prior arrest charges of felony defendants, by most serious current arrest charge, 1996**

| Most serious current arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | Without prior arrest | With prior arrest | | | | |
| | | | | Total | Number of prior arrest charges | | | |
| | | | | | 1 | 2-4 | 5-9 | 10 or more |
| All offenses | 50,678 | 100% | 28% | 72% | 10% | 20% | 17% | 26% |
| Violent offenses | 12,484 | 100% | 33% | 67% | 9% | 18% | 15% | 24% |
| Murder | 385 | 100 | 29 | 71 | 10 | 23 | 15 | 23 |
| Rape | 721 | 100 | 45 | 55 | 9 | 19 | 10 | 18 |
| Robbery | 3,586 | 100 | 28 | 72 | 8 | 18 | 17 | 29 |
| Assault | 5,816 | 100 | 36 | 64 | 9 | 18 | 16 | 22 |
| Other violent | 1,977 | 100 | 31 | 69 | 13 | 18 | 14 | 24 |
| Property offenses | 15,758 | 100% | 30% | 70% | 10% | 18% | 16% | 26% |
| Burglary | 4,201 | 100 | 21 | 79 | 8 | 18 | 18 | 34 |
| Theft | 6,340 | 100 | 28 | 72 | 10 | 18 | 16 | 29 |
| Other property | 5,217 | 100 | 39 | 61 | 11 | 19 | 15 | 16 |
| Drug offenses | 18,736 | 100% | 23% | 77% | 10% | 21% | 20% | 27% |
| Trafficking | 9,411 | 100 | 24 | 76 | 9 | 21 | 19 | 28 |
| Other drug | 9,325 | 100 | 22 | 78 | 10 | 21 | 21 | 26 |
| Public-order offenses | 3,699 | 100% | 27% | 73% | 9% | 22% | 18% | 25% |
| Weapons | 1,386 | 100 | 27 | 73 | 11 | 22 | 17 | 24 |
| Driving-related | 1,204 | 100 | 21 | 79 | 7 | 26 | 21 | 26 |
| Other public-order | 1,109 | 100 | 32 | 68 | 11 | 17 | 15 | 24 |

Note:  Data on prior arrests were available for 93% of all cases.
Detail may not add to total because of rounding.

About two-thirds of the defendants under the age of 18 had no previous arrests (figure 7).  This proportion dropped to 2 in 5 among defendants age 18 to 20, about a fourth among those in the 21-to-24 age group, and about a fifth among those age 25 to 49.  About a third of those age 50 or older had no arrest record.

About a fifth of the defendants age 18 to 20 had 5 or more prior arrests.  This proportion rose to more than a third of defendants in the 21-to-24 age range, and about half in the 25-to-49 age range.  In the latter age range, defendants were more than twice as likely to have five or more prior arrests as no prior arrests.

Among defendants with an arrest record, about 5 in 6 had been arrested at least once for a felony (table 9).  Overall, three-fifths of defendants had a felony arrest record (60%).  Nearly half had multiple prior felony arrest charges (47%), including 25% with five or more.



Figure 7

### Table 9.  Number of prior felony arrest charges of felony defendants, by most serious current arrest charge, 1996

| Most serious current arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Without prior felony arrest | | | With prior felony arrest | | | | |
| | | | | | | | Number of prior felony charges | | | |
| | | Total | Total | Non-felony arrests | No prior arrests | Total | 1 | 2-4 | 5-9 | 10 or more |
| All offenses | 50,933 | 100% | 40% | 12% | 28% | 60% | 13% | 22% | 14% | 11% |
| Violent offenses | 12,546 | 100% | 46% | 13% | 33% | 54% | 12% | 19% | 13% | 10% |
| Murder | 385 | 100 | 42 | 12 | 29 | 58 | 14 | 24 | 10 | 11 |
| Rape | 723 | 100 | 58 | 14 | 45 | 42 | 9 | 19 | 10 | 5 |
| Robbery | 3,609 | 100 | 38 | 10 | 28 | 62 | 11 | 22 | 17 | 12 |
| Assault | 5,848 | 100 | 48 | 12 | 36 | 52 | 13 | 18 | 12 | 9 |
| Other violent | 1,980 | 100 | 49 | 18 | 31 | 51 | 13 | 17 | 13 | 8 |
| Property offenses | 15,806 | 100% | 42% | 12% | 30% | 58% | 13% | 20% | 13% | 12% |
| Burglary | 4,201 | 100 | 32 | 11 | 21 | 68 | 13 | 20 | 18 | 17 |
| Theft | 6,366 | 100 | 40 | 12 | 28 | 60 | 13 | 20 | 14 | 13 |
| Other property | 5,240 | 100 | 52 | 13 | 39 | 48 | 12 | 19 | 9 | 7 |
| Drug offenses | 18,845 | 100% | 35% | 12% | 23% | 65% | 13% | 25% | 16% | 11% |
| Trafficking | 9,451 | 100 | 35 | 11 | 24 | 65 | 12 | 25 | 17 | 12 |
| Other drug | 9,394 | 100 | 35 | 13 | 22 | 65 | 15 | 24 | 15 | 10 |
| Public-order offenses | 3,736 | 100% | 41% | 15% | 26% | 59% | 13% | 24% | 12% | 9% |
| Weapons | 1,397 | 100 | 38 | 11 | 27 | 62 | 15 | 23 | 16 | 9 |
| Driving-related | 1,220 | 100 | 41 | 21 | 21 | 59 | 15 | 27 | 10 | 7 |
| Other public-order | 1,119 | 100 | 46 | 14 | 32 | 54 | 10 | 23 | 8 | 13 |

Note:  Data on prior felony arrests were available for 94% of all cases.
Detail may not add to total because of rounding.

Just over half of the defendants facing a current charge for a violent felony had been previously arrested for a felony, including 62% of robbery defendants and 58% of murder defendants. Twenty-nine percent of robbery defendants had 5 or more prior felony arrest charges, including 12% with 10 or more.

Nearly three-fifths of property defendants (58%) had one or more prior felony arrests. Those charged with burglary (68%) were the most likely to have a felony arrest record. About a third of burglary defendants had at least 5 prior felony arrest charges, and a sixth had 10 or more.

About two-thirds of drug defendants (65%) had at least 1 prior felony arrest. About a fourth had five or more prior felony arrest charges, including 29% of those whose most serious current charge was drug trafficking.

About three-fifths of public-order defendants also had been previously arrested for a felony, and a fifth had five or more prior felony charges. A fourth of weapons defendants had at least five prior felony charges.

**Prior convictions**

Fifty-nine percent of felony defendants in the 75 largest counties were known to have at least one prior conviction for a misdemeanor or a felony (table 10). About three-fourths of those with a conviction record, accounting for 44% of defendants overall, had more than one prior conviction. Twenty-two percent of all defendants had five or more prior convictions.

Among defendants charged with a violent offense, more than half (54%) had at least one prior conviction, with robbery defendants (58%) the most likely to have a conviction record, and rape defendants (46%) the least likely.

Forty-five percent of robbery defendants had more than one prior conviction, and 23% had at least five.

More than half of property defendants (57%) had been convicted previously, including about two-thirds of burglary defendants (68%). A majority of burglary defendants (57%) had multiple prior convictions, including 31% with five or more.

About three-fifths of drug defendants (62%) had at least one prior conviction. Nearly half had two or more prior convictions (47%), and about a fourth had five or more (23%). These percentages did not vary significantly by type of drug offense.

Among public-order defendants, 62% had a conviction record, and 24% had five or more. Sixty-nine percent of defendants facing driving-related charges had at least one prior conviction of some type, and 57% had multiple prior convictions.

**Table 10. Number of prior convictions of felony defendants, by most serious current arrest charge, 1996**

| | | | | With prior conviction | | | | |
| | | | Without | Total | Number of prior convictions | | | |
| Most serious current arrest charge | Number of defendants | Total | prior conviction | | 1 | 2-4 | 5-9 | 10 or more |
|---|---|---|---|---|---|---|---|---|
| All offenses | 50,008 | 100% | 41% | 59% | 14% | 22% | 13% | 9% |
| Violent offenses | 12,312 | 100% | 46% | 54% | 13% | 21% | 12% | 8% |
| Murder | 382 | 100 | 48 | 52 | 17 | 18 | 7 | 9 |
| Rape | 704 | 100 | 54 | 46 | 15 | 17 | 9 | 5 |
| Robbery | 3,558 | 100 | 42 | 58 | 12 | 22 | 14 | 9 |
| Assault | 5,737 | 100 | 48 | 52 | 13 | 20 | 12 | 7 |
| Other violent | 1,930 | 100 | 44 | 56 | 14 | 20 | 13 | 8 |
| Property offenses | 15,599 | 100% | 43% | 57% | 13% | 21% | 13% | 10% |
| Burglary | 4,157 | 100 | 32 | 68 | 11 | 26 | 19 | 12 |
| Theft | 6,266 | 100 | 42 | 58 | 14 | 18 | 14 | 12 |
| Other property | 5,177 | 100 | 52 | 48 | 14 | 19 | 8 | 6 |
| Drug offenses | 18,439 | 100% | 38% | 62% | 16% | 24% | 14% | 9% |
| Trafficking | 9,320 | 100 | 38 | 62 | 15 | 24 | 12 | 10 |
| Other drug | 9,119 | 100 | 37 | 63 | 16 | 24 | 15 | 9 |
| Public-order offenses | 3,657 | 100% | 38% | 62% | 15% | 24% | 15% | 9% |
| Weapons | 1,390 | 100 | 39 | 61 | 18 | 23 | 12 | 6 |
| Driving-related | 1,178 | 100 | 31 | 69 | 12 | 28 | 18 | 11 |
| Other public-order | 1,090 | 100 | 42 | 58 | 13 | 20 | 14 | 10 |

Note: Data on number of prior convictions were available for 92% of all cases.
Detail may not add to total because of rounding.

**Table 11.  Number of prior felony convictions of felony defendants,
by most serious current arrest charge, 1996**

| Most serious current arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Without prior felony conviction | | | With prior felony conviction | | | | |
| | | | | | | | Number of prior felony convictions | | | |
| | | Total | Total | Nonfelony only | No prior convictions | Total | 1 | 2-4 | 5-9 | 10 or more |
| All offenses | 50,557 | 100% | 60% | 19% | 41% | 40% | 16% | 18% | 4% | 2% |
| Violent offenses | 12,468 | 100% | 65% | 19% | 46% | 35% | 14% | 15% | 4% | 2% |
| Murder | 389 | 100 | 64 | 16 | 48 | 36 | 15 | 14 | 3 | 4 |
| Rape | 714 | 100 | 71 | 18 | 54 | 29 | 14 | 13 | 2 | -- |
| Robbery | 3,598 | 100 | 60 | 18 | 42 | 40 | 15 | 19 | 4 | 2 |
| Assault | 5,802 | 100 | 66 | 18 | 48 | 34 | 14 | 15 | 3 | 2 |
| Other violent | 1,965 | 100 | 69 | 24 | 44 | 31 | 12 | 12 | 4 | 2 |
| Property offenses | 15,716 | 100% | 60% | 17% | 43% | 40% | 15% | 17% | 6% | 2% |
| Burglary | 4,183 | 100 | 51 | 19 | 32 | 49 | 17 | 22 | 8 | 2 |
| Theft | 6,315 | 100 | 58 | 16 | 42 | 42 | 15 | 18 | 7 | 2 |
| Other property | 5,218 | 100 | 70 | 18 | 52 | 30 | 13 | 12 | 3 | 2 |
| Drug offenses | 18,651 | 100% | 57% | 19% | 38% | 43% | 17% | 20% | 4% | 2% |
| Trafficking | 9,396 | 100 | 57 | 19 | 38 | 43 | 17 | 19 | 4 | 2 |
| Other drug | 9,255 | 100 | 56 | 19 | 37 | 44 | 17 | 20 | 4 | 2 |
| Public-order offenses | 3,722 | 100% | 58% | 21% | 38% | 42% | 18% | 18% | 3% | 2% |
| Weapons | 1,401 | 100 | 54 | 14 | 39 | 46 | 21 | 20 | 3 | 3 |
| Driving-related | 1,215 | 100 | 62 | 31 | 31 | 38 | 16 | 18 | 1 | 3 |
| Other public-order | 1,106 | 100 | 60 | 18 | 42 | 40 | 17 | 16 | 5 | 2 |

Note:  Data on number of prior felony convictions were available for 93% of all cases.
Detail may not add to total because of rounding.
--Less than 0.5%.

About two-thirds of the defendants with a conviction record, 40% of defendants overall, had at least one prior conviction for a felony (table 11).

About a third of defendants whose current charge was for a violent felony (35%) had previously been convicted of a felony.  Among these defendants, the percentage with a prior felony conviction ranged from 40% among those charged with robbery to 29% of those charged with rape.

About two-fifths of defendants whose most serious current arrest charge was for a drug (43%), public-order (42%), or property (40%) offense had been previously convicted of a felony.

Among property defendants, those charged with burglary (49%) were the most likely to have a felony conviction record.  Among public-order defendants, those facing weapons charges (46%) were the most likely to have a prior felony conviction.

A majority of the defendants with a felony conviction record, 24% of defendants overall, had multiple prior felony convictions.  Six percent of all defendants had five or more prior felony convictions.

By specific offense, burglary (32%) and theft (27%) defendants were the most likely to have multiple prior felony convictions, while defendants charged with assault (20%) or rape (15%) were the least likely.

Eighty-five percent of defendants under age 18 at the time of the current arrest had no prior adult convictions (figure 8). Eleven percent had been previously convicted of at least one felony, while 4% had a prior conviction for at least one misdemeanor but no felonies. In the 18-to-20 age range, 59% of defendants had no prior convictions, while 26% had at least one prior felony conviction.

A majority of the defendants age 21 or older had a conviction record, and defendants 25 or older were more likely to have a felony conviction record than no prior convictions at all.

For about a third of the defendants with a prior felony conviction, 13% of defendants overall, their criminal history included at least one conviction for a violent felony (table 12). About a sixth of the defendants currently charged with a violent offense had a prior conviction for a violent felony.



**Most serious prior conviction of felony defendants in the 75 largest counties, by age at arrest, 1996**

*Figure 8*

**Table 12. Most serious prior conviction of felony defendants, by most serious current arrest charge, 1996**

| Most serious current arrest charge | Number of defendants | Percent of felony defendants in the 75 largest counties | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | Without prior conviction | Most serious prior conviction | | | | |
| | | | | Total | Felony | | | Misde-meanor |
| | | | | | Total | Violent | Nonviolent | |
| All offenses | 50,442 | 100% | 41% | 59% | 40% | 13% | 28% | 19% |
| Violent offenses | 12,419 | 100% | 46% | 54% | 35% | 16% | 20% | 19% |
| Murder | 385 | 100 | 48 | 52 | 36 | 17 | 19 | 16 |
| Rape | 710 | 100 | 54 | 46 | 29 | 14 | 16 | 17 |
| Robbery | 3,599 | 100 | 42 | 58 | 40 | 18 | 23 | 18 |
| Assault | 5,780 | 100 | 48 | 52 | 34 | 16 | 19 | 18 |
| Other violent | 1,944 | 100 | 44 | 56 | 31 | 14 | 18 | 24 |
| Property offenses | 15,720 | 100% | 43% | 57% | 40% | 11% | 29% | 18% |
| Burglary | 4,181 | 100 | 32 | 68 | 49 | 15 | 34 | 19 |
| Theft | 6,324 | 100 | 42 | 58 | 42 | 12 | 30 | 17 |
| Other property | 5,215 | 100 | 52 | 48 | 30 | 7 | 23 | 18 |
| Drug offenses | 18,583 | 100% | 38% | 62% | 43% | 11% | 32% | 19% |
| Trafficking | 9,390 | 100 | 38 | 62 | 43 | 11 | 32 | 19 |
| Other drug | 9,193 | 100 | 37 | 63 | 44 | 12 | 32 | 19 |
| Public-order offenses | 3,719 | 100% | 38% | 62% | 42% | 15% | 27% | 21% |
| Weapons | 1,408 | 100 | 39 | 61 | 46 | 18 | 28 | 15 |
| Driving-related | 1,205 | 100 | 31 | 69 | 39 | 7 | 31 | 30 |
| Other public-order | 1,105 | 100 | 42 | 58 | 40 | 18 | 22 | 18 |

Note: Data on most serious prior conviction were available for 93% of all cases. Detail may not add to total because of rounding.

By specific arrest charge, the percent-age of defendants previously convicted of a violent felony ranged from 29% of murder defendants to 15% of defen-dants charged with a driving-related offense (figure 9).

The most serious prior conviction was a nonviolent felony for about 1 in 3 defendants charged with burglary (32%).  This was also the case for more than a fourth of defendants charged with drug trafficking (29%), theft (28%), or a driving-related offense (28%).

Defendants charged with a driving-related offense (28%) were about twice as likely as other defendants to have a conviction record that consisted only of misdemeanors.



Figure 9

## Pretrial release and detention

### Rates of release and detention

An estimated 63% of felony defendants in the 75 largest counties were released prior to the final disposition of their case (table 13).  By general offense category, defendants charged with a violent offense (55%) were less likely to be released than those whose most serious arrest charge was a public-order (71%), drug (66%), or property (65%) offense.

Within the violent offense category, release rates varied greatly.  Just 16% of murder defendants were released compared to 66% of those charged with assault.  Fifty-one percent of rape defendants and 39% of robbery defendants were released before the court disposed of their case.

Among defendants charged with a property offense, about half of those charged with burglary (47%) were released, compared to two-thirds of theft (66%) defendants and about three-fourths (77%) of those charged with other property offenses.

Among drug defendants, those charged with drug trafficking (62%) were less likely to be released than those charged with other drug offenses (71%).  Among public-order defendants, those charged with a driving-related offense (78%) were the most likely to be released.

Among the 37% of defendants who were detained in jail until case disposition, about 5 in 6 had a bail amount set but did not post the money required to secure release.  Detained murder defendants were the exception to this rule, as about three-fourths of them, 61% of all murder defendants overall, were ordered held without bail (figure 10).  Overall, 6% of felony defendants in the 75 largest counties were denied bail.

**Table 13.  Felony defendants released before or detained until case disposition, by most serious arrest charge, 1996**

| Most serious arrest charge | Number of defendants | Percent of defendants in the 75 largest counties | | |
|---|---|---|---|---|
| | | Total | Released before case disposition | Detained until case disposition |
| All offenses | 51,234 | 100% | 63% | 37% |
| Violent offenses | 12,589 | 100% | 55% | 45% |
| Murder | 412 | 100 | 16 | 84 |
| Rape | 750 | 100 | 51 | 49 |
| Robbery | 3,686 | 100 | 39 | 61 |
| Assault | 5,776 | 100 | 66 | 34 |
| Other violent | 1,965 | 100 | 63 | 37 |
| Property offenses | 15,592 | 100% | 65% | 35% |
| Burglary | 4,154 | 100 | 47 | 53 |
| Theft | 6,246 | 100 | 66 | 34 |
| Other property | 5,192 | 100 | 77 | 23 |
| Drug offenses | 19,050 | 100% | 66% | 34% |
| Trafficking | 9,643 | 100 | 62 | 38 |
| Other drug | 9,407 | 100 | 71 | 29 |
| Public-order offenses | 4,003 | 100% | 71% | 29% |
| Weapons | 1,482 | 100 | 69 | 31 |
| Driving-related | 1,420 | 100 | 78 | 22 |
| Other public-order | 1,101 | 100 | 66 | 34 |

Note:  Data on detention/release outcome were available for 94% of all cases. Detail may not add to total because of rounding.



**Pretrial detention of felony defendants in the 75 largest counties, by most serious arrest charge, 1996**

Figure 10

**Table 14. Type of pretrial release or detention of felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Percent of felony defendants in the 75 largest counties | | | | | | | | | | Detained until case disposition | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Released before case disposition | | | | | | | | | | | |
| | Financial release | | | | | Nonfinancial release | | | | Emer-gency release | Held on bail | Denied bail |
| | Total financial | Surety bond | Deposit bond | Full cash bond | Property bond | Total non-financial | Recog-nizance | Con-ditional | Un-secured | | | |
| All offenses | 29% | 18% | 7% | 2% | 2% | 34% | 24% | 6% | 4% | 1% | 30% | 6% |
| Violent offenses | 29% | 19% | 6% | 2% | 2% | 26% | 19% | 5% | 1% | -- | 35% | 10% |
| Murder | 16 | 7 | 4 | 0 | 5 | 5 | 0 | 4 | 1 | 0 | 23 | 61 |
| Rape | 31 | 13 | 9 | 4 | 4 | 22 | 14 | 7 | 1 | 0 | 37 | 12 |
| Robbery | 18 | 11 | 4 | 1 | 2 | 25 | 21 | 3 | 1 | -- | 48 | 13 |
| Assault | 37 | 25 | 8 | 2 | 2 | 28 | 22 | 5 | 2 | -- | 29 | 5 |
| Other violent | 28 | 20 | 5 | 2 | 2 | 28 | 18 | 9 | 2 | 0 | 33 | 4 |
| Property offenses | 28% | 17% | 7% | 2% | 2% | 36% | 24% | 7% | 5% | 1% | 30% | 5% |
| Burglary | 22 | 14 | 5 | 2 | 2 | 24 | 15 | 6 | 3 | 1 | 47 | 6 |
| Theft | 31 | 20 | 6 | 3 | 2 | 36 | 22 | 10 | 5 | 1 | 29 | 5 |
| Other property | 28 | 16 | 8 | 2 | 2 | 45 | 34 | 5 | 7 | 1 | 19 | 4 |
| Drug offenses | 28% | 18% | 7% | 1% | 2% | 37% | 25% | 5% | 6% | 1% | 29% | 5% |
| Trafficking | 30 | 21 | 7 | 1 | 1 | 31 | 23 | 5 | 2 | 1 | 32 | 6 |
| Other drug | 26 | 15 | 7 | 2 | 2 | 42 | 27 | 5 | 9 | 1 | 25 | 4 |
| Public-order offenses | 31% | 18% | 9% | 3% | 1% | 40% | 29% | 6% | 5% | -- | 22% | 7% |
| Weapons | 32 | 14 | 13 | 3 | 2 | 32 | 18 | 4 | 10 | -- | 26 | 5 |
| Driving-related | 30 | 20 | 5 | 3 | 2 | 41 | 31 | 7 | 2 | 0 | 16 | 5 |
| Other public-order | 21 | 14 | 6 | 1 | -- | 34 | 28 | 5 | 1 | 0 | 23 | 12 |

Note: Data on type of pretrial release or detention were available for 90% of all cases.   Detail may not add to total because of rounding.
--Less than 0.5%.

A majority of the defendants released prior to case disposition, 34% of defendants overall, were released under nonfinancial conditions that did not require the posting of bail (see *Methodology* for definitions related to pretrial release) (table 14). Release on personal recognizance, granted to 24% of all defendants and 38% of released defendants, was the type of release used most often (figure 11).

Other nonfinancial types of release included conditional release (6% of all defendants and 9% of released defendants), and release on unsecured bond (4% and 7%).

Twenty-nine percent of defendants secured release through financial terms that involved the posting of a financial bond in the form of money or property. The most common type of financial release was surety bond (18% of all defendants and 29% of released defendants), which involves the services of a commercial bail bond

agent. Other types of financial release included deposit bond (7% of all defendants and 11% of released defendants), full cash bond (2% and 3%), and property bond (2% and 3%). These bonds are posted directly with the court without the use of a bail bond agent.

About 1% of defendants were released prior to case disposition as the result of an emergency release used to relieve jail crowding. Such releases did not involve the use of any of the types of release mentioned above.



**Pretrial release of felony defendants in the 75 largest counties, 1996**

*Figure 11*

## Bail amounts

About 3 in 5 felony defendants had a bail amount set by the court, and were required to post all or part of that amount to secure release while their case was pending. The remainder were granted nonfinancial release (34%), ordered held without bail (6%), or were part of an emergency release (1%). About half of those with a bail amount had it set at $10,000 or more, including 25% who had it set at $25,000 or more (table 15).

Among defendants with a bail amount set, those charged with a violent offense (40%) were about twice as likely as other defendants to have it set at $25,000 or more. Three-fourths of murder defendants with a bail amount had it set at $25,000 or more, as did just over half of robbery defendants (57%) and nearly half of rape defendants (47%).

Among property defendants with a bail amount set, those charged with burglary (27%) were about twice as likely to have bail set at $25,000 or more as other property defendants. Among drug defendants, those charged with drug trafficking (27%) were about twice as likely to have bail set at $25,000 or more as other drug defendants (13%).

Overall, defendants who were detained until case disposition had a median bail amount 3 times that of defendants who secured release ($15,000 versus $5,000) (table 16). The mean bail amount for detained defendants ($50,000) was more than 5 times that of defendants who secured release ($9,300).

Detained murder defendants had the highest median ($100,000) and mean ($198,400) bail amounts. Overall, the median bail amount for murder defendants was $50,000 and the mean was $133,100. Robbery defendants had an overall median bail amount of $25,000 and an overall mean bail amount of $75,900.

### Table 15. Bail amount set for felony defendants, by most serious arrest charge, 1996

| Most serious arrest charge | Number of defendants | Total | Under $5,000 | $5,000-$9,999 | $10,000-$24,999 | $25,000 or more |
|---|---|---|---|---|---|---|
| All offenses | 28,527 | 100% | 30% | 19% | 26% | 25% |
| Violent offenses | 7,613 | 100% | 18% | 16% | 26% | 40% |
| Murder | 126 | 100 | 0 | 6 | 19 | 75 |
| Rape | 477 | 100 | 9 | 13 | 32 | 47 |
| Robbery | 2,265 | 100 | 12 | 9 | 22 | 57 |
| Assault | 3,539 | 100 | 24 | 22 | 27 | 27 |
| Other violent | 1,205 | 100 | 17 | 15 | 26 | 42 |
| Property offenses | 8,687 | 100% | 38% | 21% | 24% | 17% |
| Burglary | 2,787 | 100 | 24 | 21 | 28 | 27 |
| Theft | 3,533 | 100 | 43 | 20 | 23 | 14 |
| Other property | 2,367 | 100 | 48 | 22 | 20 | 10 |
| Drug offenses | 10,224 | 100% | 31% | 20% | 28% | 21% |
| Trafficking | 5,623 | 100 | 23 | 19 | 31 | 27 |
| Other drug | 4,601 | 100 | 41 | 22 | 24 | 13 |
| Public-order offenses | 2,004 | 100% | 34% | 21% | 24% | 21% |
| Weapons | 850 | 100 | 29 | 22 | 27 | 22 |
| Driving-related | 656 | 100 | 38 | 20 | 22 | 19 |
| Other public-order | 498 | 100 | 34 | 22 | 23 | 20 |

Note: Data on bail amount were available for 98% of all defendants for whom a bail amount was set. Table excludes defendants given nonfinancial release. Detail may not add to 100% because of rounding.

### Table 16. Median and mean bail amounts set for felony defendants, by pretrial release/detention outcome and most serious arrest charge, 1996

| | Felony defendants in the 75 largest counties | | | | | |
|---|---|---|---|---|---|---|
| Most serious arrest charge | Median bail amount | | | Mean bail amount | | |
| | Total | Released | Detained | Total | Released | Detained |
| All offenses | $10,000 | $5,000 | $15,000 | $31,000 | $9,300 | $50,000 |
| Violent offenses | $15,000 | $7,500 | $30,000 | $52,400 | $12,400 | $82,100 |
| Murder | 50,000 | 25,000 | 100,000 | 133,100 | 24,200 | 198,400 |
| Rape | 20,000 | 10,000 | 35,000 | 63,500 | 20,700 | 93,600 |
| Robbery | 25,000 | 10,000 | 35,000 | 75,900 | 13,500 | 94,000 |
| Assault | 10,000 | 5,000 | 20,000 | 35,500 | 10,800 | 64,600 |
| Other violent | 20,000 | 7,500 | 35,000 | 45,100 | 13,000 | 74,100 |
| Property offenses | $5,000 | $3,000 | $10,000 | $17,800 | $6,000 | $28,000 |
| Burglary | 10,000 | 5,000 | 15,000 | 25,800 | 7,200 | 34,100 |
| Theft | 5,000 | 2,500 | 10,000 | 15,900 | 6,100 | 25,900 |
| Other property | 5,000 | 2,500 | 7,500 | 11,000 | 5,200 | 19,600 |
| Drug offenses | $7,500 | $5,000 | $10,000 | $29,400 | $10,300 | $46,700 |
| Trafficking | 10,000 | 7,500 | 15,000 | 37,600 | 14,500 | 56,700 |
| Other drug | 5,000 | 2,500 | 10,000 | 19,400 | 5,700 | 33,400 |
| Public-order offenses | $5,000 | $5,000 | $13,000 | $15,600 | $8,200 | $25,400 |
| Weapons | 7,500 | 5,000 | 15,000 | 16,600 | 8,200 | 26,700 |
| Driving-related | 5,000 | 5,000 | 10,000 | 13,900 | 7,700 | 25,400 |
| Other public-order | 5,000 | 5,000 | 10,000 | 16,000 | 8,900 | 23,400 |

Note: Data on bail amount were available for 98% of all defendants for whom a bail amount was set. Bail amounts have been rounded to the nearest hundred dollars. Table excludes defendants given nonfinancial release.

Overall, just under half (47%) of defendants who were required to post bail to secure release did so. About 7 in 10 defendants with a bail set at under $5,000 posted the amount needed for release, as did about 6 in 10 defendants with a bail amount of $5,000 to $9,999 (figure 12). In contrast, about 1 in 8 of those with bail set at $50,000 or more, and a fourth of those with a bail amount of at least $25,000 but less than $50,000 were able to meet the financial conditions required for release.

Among defendants given financial release, the average bail amount was highest for those released on property bond (a median of $7,500 and a mean of $12,400), and lowest for those released on full cash bond (a median of $1,000 and a mean of $2,900).

Defendants released on surety and deposit bond both had a median bail amount of $5,000. The mean for both was just under $10,000.

Unlike those released on full cash bond, defendants released on deposit bond generally posted 10% of the full bail amount with the court to secure release. However, they remained liable to the court for the full bail amount if they violated the terms of release.

Those released on surety bond paid a similar fee to a bail bond agent, who assumed liability to the court for the full bail amount if the defendant violated the terms of release.

| Type of release bond | Bail amount | |
|---|---|---|
| | Median | Mean |
| Surety | $5,000 | $9,500 |
| Deposit | 5,000 | 9,800 |
| Full cash | 1,000 | 2,900 |
| Property | 7,500 | 12,400 |
| | | |
| Unsecured | $5,000 | $10,000 |

Defendants released on an unsecured bond had a median bail amount of $5,000 and a mean bail amount of $10,000. These defendants did not have to post any of this amount, but like those on financial release, they were liable for the full bail amount if they violated the terms of release.



**Probability of release for felony defendants in the 75 largest counties, by bail amount set, 1996**

Figure 12

### Time from arrest to release

Among defendants who were released prior to case disposition, about half were released within 1 day (49%), and about four-fifths were released within 1 week (79%) (table 17). Nearly all releases during the 1-year study occurred within a month of arrest (92%).

By general offense category, defendants charged with a violent (41%) or drug (45%) offense were less likely to be released within 1 day of arrest than those charged with a public-order (57%) or property (56%) offense.

More than half of the defendants released after being charged with a property offense other than burglary, or a public-order offense that was not weapons-related were released within 1 day of their arrest.

**Table 17. Time from arrest to release for felony defendants released before case disposition, by most serious arrest charge, 1996**

| Most serious arrest charge | Released felony defendants in the 75 largest counties | | | |
|---|---|---|---|---|
| | Number of defendants | Percent who were released within: | | |
| | | 1 day | 1 week | 1 month |
| All offenses | 31,514 | 49% | 79% | 92% |
| Violent offenses | 6,807 | 41% | 72% | 89% |
| Murder | 67 | 24 | 42 | 66 |
| Rape | 368 | 38 | 62 | 83 |
| Robbery | 1,421 | 29 | 65 | 84 |
| Assault | 3,741 | 44 | 75 | 91 |
| Other violent | 1,210 | 48 | 73 | 89 |
| Property offenses | 9,828 | 56% | 79% | 92% |
| Burglary | 1,881 | 42 | 70 | 89 |
| Theft | 4,043 | 58 | 83 | 95 |
| Other property | 3,904 | 60 | 80 | 90 |
| Drug offenses | 12,117 | 45% | 79% | 93% |
| Trafficking | 5,749 | 40 | 77 | 92 |
| Other drug | 6,368 | 51 | 83 | 94 |
| Public-order offenses | 2,762 | 57% | 82% | 95% |
| Weapons | 970 | 47 | 79 | 94 |
| Driving-related | 1,081 | 59 | 83 | 95 |
| Other public-order | 711 | 68 | 85 | 95 |

Note: Data on time from arrest to release were available for 97% of all cases. Release data were collected for 1 year.

Defendants charged with murder typically waited the longest to be released. For example, after 1 month, 66% of all murder defendant releases had occurred, compared to more than 90% of the releases of other defendants.

When differences among types of offense are held constant, defendants released under financial terms generally took longer to secure their release than those who were released under nonfinancial conditions. Among defendants who were released under financial conditions, the amount of time from arrest to pretrial release tended to increase as the bail amount did.

**Criminal history and probability of release**

Court decisions about bail and pretrial release are primarily based on the judgment of whether a defendant will appear in court as scheduled and whether there is potential danger to the community from crimes that a defendant may commit if released. Many States have established specific criteria to be considered by the courts when setting release conditions.

The SCPS data illustrate how release rates vary with some of these factors. For example, 73% of the defendants without an active criminal justice status at the time of their arrest for the current offense were released prior to case disposition, compared to 47% of those with such a status (table 18). Defendants on parole (27%) at the time of arrest were the least likely to be released. This compared with 42% of those on probation and 66% of those released pending disposition of a prior case.

Eighty-one percent of the defendants with no prior arrests were released, compared to 57% of those who had been previously arrested. Among defendants with an arrest record,

those who had never missed a court appearance (62%) had a higher probability of being released than those who had failed to appear at least once during a previous case (53%).

Eighty percent of defendants without a prior conviction were released prior to disposition of the current case, compared to 53% of those with a conviction record. Among defendants with a conviction record, release rates ranged from 66% for those with a single prior conviction to 43% for those with five or more.

Less than half of the defendants with one or more prior felony convictions (47%) were released prior to disposition of the current case, compared to nearly two-thirds of those whose prior convictions involved only misdemeanors (65%). Those with a prior conviction for a violent felony (47%) had the same release rate as those whose most serious prior conviction was for a nonviolent felony (47%).

**Table 18. Percent of felony defendants who were released prior to case disposition, by criminal history, 1996**

| | | Felony defendants in the 75 largest counties | | | | | | |
| | | Released prior to case disposition | | | | Detained until case disposition | | |
| Criminal history | Number of defendants | Total released | Financial release | Non-financial release | Emergency release | Total | Held on bail | Denied bail |
|---|---|---|---|---|---|---|---|---|
| **Criminal justice status** | | | | | | | | |
| Any type | 16,576 | 47% | 23% | 23% | 1% | 53% | 42% | 12% |
| On parole | 2,679 | 27 | 13 | 13 | 1 | 73 | 55 | 17 |
| On probation | 7,319 | 42 | 24 | 18 | 1 | 58 | 48 | 10 |
| Open FTA warrant | 2,076 | 56 | 21 | 34 | 1 | 44 | 31 | 13 |
| On pretrial release* | 3,826 | 66 | 29 | 35 | 2 | 34 | 26 | 8 |
| None | 29,312 | 73 | 34 | 38 | 1 | 27 | 24 | 3 |
| **Court appearance history** | | | | | | | | |
| With prior arrest(s) | 35,266 | 57% | 27% | 29% | 1% | 43% | 35% | 8% |
| With prior failure to appear | 18,532 | 53 | 21 | 31 | 1 | 47 | 39 | 8 |
| Made all prior appearances | 14,035 | 62 | 35 | 27 | 1 | 38 | 31 | 7 |
| No prior arrests | 13,320 | 81 | 34 | 46 | -- | 19 | 16 | 3 |
| **Number of prior convictions** | | | | | | | | |
| With prior conviction(s) | 28,315 | 53% | 26% | 26% | 1% | 47% | 39% | 8% |
| 5 or more | 10,669 | 43 | 21 | 22 | 1 | 57 | 48 | 9 |
| 2-4 | 10,526 | 54 | 28 | 26 | 1 | 46 | 37 | 9 |
| 1 | 6,712 | 66 | 31 | 34 | 1 | 34 | 27 | 7 |
| None | 19,680 | 80 | 34 | 45 | 1 | 20 | 16 | 4 |
| **Most serious prior conviction** | | | | | | | | |
| Any type of felony | 21,084 | 47% | 25% | 22% | 1% | 53% | 44% | 10% |
| Violent felony | 8,597 | 47 | 24 | 23 | 1 | 53 | 41 | 11 |
| Nonviolent felony | 12,487 | 47 | 25 | 21 | 1 | 53 | 44 | 9 |
| Misdemeanor | 8,827 | 65 | 27 | 37 | 1 | 35 | 31 | 4 |

Note: Detail may not add to total because of rounding.
--Less than 0.5%.
*Includes all defendants released prior to case disposition.

## Conduct of released defendants

Among defendants who were released prior to case disposition, nearly a third committed some type of misconduct while in a release status (table 19). This may have been in the form of a failure to appear in court, an arrest for a new offense, or some other violation of release conditions that resulted in the revocation of that release by the court.

By original offense category, the proportion of defendants charged with pretrial misconduct ranged from about two-fifths among drug defendants (39%), to about a fourth of defendants charged with a public-order (24%) or violent offense (23%). Twenty-nine percent of property defendants committed some type of pretrial misconduct.

The widest range of misconduct rates was found within the violent offense category, ranging from 34% of robbery defendants to 12% of rape defendants.

### Failure to appear in court

Nearly four-fifths of the defendants who were released prior to case disposition made all scheduled court appearances (78%). Bench warrants for failing to appear in court were issued for the remaining 22% (table 20).

A higher percentage of released drug defendants (29%) and property defendants (22%) failed to appear in court than defendants charged with violent (14%) or public-order (14%) offenses.

Within the violent offense category, failure-to-appear rates were higher for defendants charged with robbery (20%) than for other defendants. About a fourth of the defendants who failed to appear in court, 6% of all defendants, were still fugitives at the end of the 1-year study period. The remainder were returned to the court (either voluntarily or not) before the end of the study.

Defendants released after being charged with a drug (8%) or property (6%) offense were about twice as likely to be a fugitive after 1 year as defendants released after being charged with other offenses. No released murder defendants were in a fugitive status at the end of the 1-year study period.

### Table 19. Released felony defendants committing misconduct, by most serious arrest charge, 1996

| Most serious arrest charge | Released felony defendants in the 75 largest counties Number | Percent with misconduct |
|---|---|---|
| All offenses | 32,503 | 31% |
| Violent offenses | 6,936 | 23% |
| Murder | 67 | 18 |
| Rape | 379 | 12 |
| Robbery | 1,443 | 34 |
| Assault | 3,810 | 21 |
| Other violent | 1,237 | 21 |
| Property offenses | 10,069 | 29% |
| Burglary | 1,947 | 35 |
| Theft | 4,132 | 32 |
| Other property | 3,989 | 25 |
| Drug offenses | 12,642 | 39% |
| Trafficking | 5,932 | 40 |
| Other drug | 6,710 | 38 |
| Public-order offenses | 2,857 | 24% |
| Weapons | 1,021 | 23 |
| Driving-related | 1,114 | 25 |
| Other public-order | 722 | 21 |

Note: Types of misconduct included failure to appear in court, rearrest for a new offense, or a technical violation of release conditions that resulted in the revocation of pretrial release. Data were collected for up to 1 year.

### Table 20. Released felony defendants who failed to make a scheduled court appearance, by most serious arrest charge, 1996

| Most serious arrest charge | Number of defendants | Percent of released felony defendants in the 75 largest counties who: Made all court appearances | Failed to appear in court Total | Returned to court | Remained a fugitive |
|---|---|---|---|---|---|
| All offenses | 31,786 | 78% | 22% | 17% | 6% |
| Violent offenses | 6,816 | 86% | 14% | 12% | 3% |
| Murder | 67 | 88 | 12 | 12 | 0 |
| Rape | 376 | 94 | 6 | 4 | 2 |
| Robbery | 1,428 | 80 | 20 | 17 | 4 |
| Assault | 3,745 | 86 | 14 | 11 | 3 |
| Other violent | 1,200 | 87 | 13 | 10 | 3 |
| Property offenses | 9,915 | 78% | 22% | 16% | 6% |
| Burglary | 1,914 | 77 | 23 | 18 | 5 |
| Theft | 4,093 | 77 | 23 | 16 | 7 |
| Other property | 3,908 | 80 | 20 | 16 | 4 |
| Drug offenses | 12,226 | 71% | 29% | 21% | 8% |
| Trafficking | 5,834 | 72 | 28 | 20 | 8 |
| Other drug | 6,391 | 70 | 30 | 22 | 8 |
| Public-order offenses | 2,829 | 86% | 14% | 11% | 4% |
| Weapons | 1,017 | 85 | 15 | 10 | 5 |
| Driving-related | 1,094 | 85 | 15 | 11 | 4 |
| Other public-order | 718 | 87 | 13 | 10 | 3 |

Note: Data on the court appearance record for the current case were available for 98% of cases involving a defendant released prior to case disposition. All defendants who failed to appear in court and were not returned to the court during the 1-year study period are counted as fugitives. Some of these defendants may have been returned to the court at a later date. Detail may not add to total because of rounding.

*Rearrest for a new offense*

Overall, 16% of released defendants were rearrested for a new offense allegedly committed while they awaited disposition of their original case (table 21). Sixty-two percent of these defendants, 10% of all released defendants, were charged with a new felony. Sixty-three percent of the new felony arrests were for the same type of offense as the original charge.

By original arrest offense category, released drug defendants (20%) had the highest rearrest rate. This included 23% of defendants released after being charged with drug trafficking (figure 13). Robbery defendants (22%) also had a higher rearrest rate than the overall average. Defendants released after being charged with murder (6%) or rape (8%) were the least likely to be rearrested.

**Table 21. Released felony defendants who were rearrested prior to case disposition, by most serious arrest charge, 1996**

| Most serious arrest charge | Number of defendants | Percent of released felony defendants in the 75 largest counties | | | | |
| | | Total | Not rearrested | Rearrested | | |
| | | | | Total | Felony | Misde-meanor |
| All offenses | 31,508 | 100% | 84% | 16% | 10% | 6% |
| Violent offenses | 6,771 | 100% | 87% | 13% | 7% | 6% |
| Murder | 63 | 100 | 94 | 6 | 6 | 0 |
| Rape | 376 | 100 | 92 | 8 | 3 | 5 |
| Robbery | 1,408 | 100 | 78 | 22 | 13 | 9 |
| Assault | 3,727 | 100 | 89 | 11 | 6 | 5 |
| Other violent | 1,196 | 100 | 90 | 10 | 4 | 6 |
| Property offenses | 9,850 | 100% | 86% | 14% | 9% | 5% |
| Burglary | 1,895 | 100 | 83 | 17 | 10 | 8 |
| Theft | 4,071 | 100 | 84 | 16 | 11 | 6 |
| Other property | 3,885 | 100 | 89 | 11 | 7 | 4 |
| Drug offenses | 12,086 | 100% | 80% | 20% | 13% | 7% |
| Trafficking | 5,763 | 100 | 77 | 23 | 15 | 8 |
| Other drug | 6,323 | 100 | 82 | 18 | 11 | 7 |
| Public-order offenses | 2,802 | 100% | 88% | 12% | 8% | 4% |
| Weapons | 1,003 | 100 | 88 | 12 | 6 | 6 |
| Driving-related | 1,088 | 100 | 88 | 12 | 10 | 2 |
| Other public-order | 711 | 100 | 88 | 12 | 6 | 6 |

Note: Rearrest data were available for 97% of released defendants. Rearrest data were collected for 1 year. Rearrests occurring after the end of this 1-year study period are not included in the table. Information on rearrests occurring in jurisdictions other than the one granting the pretrial release was not always available. Detail may not add to total because of rounding.



**Misconduct prior to case disposition by released felony defendants in the 75 largest counties, 1996**

Committing any type of misconduct

Rearrested for a new felony

*Figure 13*

## Adjudication

**Time from arrest to adjudication**

For about half of felony defendants in the 75 largest counties, adjudication of their case occurred within 3 months of arrest, and about 6 in 7 cases were adjudicated within 1 year of arrest (table 22). The median time from arrest to adjudication for murder defendants was greater than 1 year, a considerably longer time than for other defendants. An estimated 58% of murder defendants were awaiting adjudication of their case after 1 year, compared to a maximum of 19% in any other offense category.

After murder defendants, the longest median time from arrest to adjudication was for rape defendants (142 days). This was about twice the median time for defendants charged with burglary (70 days) or a public-order offense that was not weapons-related or driving-related (69 days).

For each offense other than murder (for which medians could not be calculated), the median time from arrest to adjudication was shorter for detained defendants than for those released pending case disposition.(figure 14).

The median time from arrest to adjudication was about 2 months longer for defendants released after being charged with rape, robbery, or assault than for those detained. Among those charged with a weapons offense, theft, drug trafficking, or a driving-related offense the median was about 3 months longer for those released than for those detained.

Excluding murder defendants, the longest median time from arrest to adjudication among released defendants was for those charged with rape (188 days), robbery (155 days), or drug trafficking (140 days). Detained driving-related defendants (33 days) had the shortest adjudication time.

**Table 22. Time from arrest to adjudication for felony defendants, by most serious arrest charge, 1996**

| Most serious arrest charge | Felony defendants in the 75 largest counties | | | | | |
|---|---|---|---|---|---|---|
| | Number of defendants | Median number of days | Cumulative percent of cases adjudicated within: | | | |
| | | | 1 week | 1 month | 3 months | 6 months | 1 year |
| All offenses | 53,108 | 89 days | 9% | 26% | 51% | 71% | 86% |
| Violent offenses | 13,089 | 105 days | 7% | 23% | 45% | 67% | 85% |
| Murder | 425 | -- | 3 | 5 | 9 | 22 | 42 |
| Rape | 784 | 142 | 6 | 14 | 34 | 60 | 81 |
| Robbery | 3,788 | 111 | 7 | 22 | 45 | 66 | 85 |
| Assault | 6,045 | 94 | 7 | 26 | 48 | 71 | 86 |
| Other violent | 2,046 | 95 | 6 | 25 | 47 | 71 | 88 |
| Property offenses | 16,388 | 75 days | 10% | 28% | 56% | 76% | 88% |
| Burglary | 4,347 | 70 | 8 | 30 | 59 | 80 | 91 |
| Theft | 6,588 | 76 | 11 | 28 | 55 | 75 | 87 |
| Other property | 5,453 | 82 | 10 | 25 | 53 | 76 | 88 |
| Drug offenses | 19,504 | 90 days | 9% | 27% | 50% | 68% | 83% |
| Trafficking | 9,845 | 90 | 9 | 26 | 50 | 70 | 85 |
| Other drug | 9,660 | 90 | 8 | 27 | 50 | 67 | 81 |
| Public-order offenses | 4,127 | 84 days | 8% | 26% | 52% | 75% | 89% |
| Weapons | 1,505 | 98 | 5 | 22 | 49 | 73 | 88 |
| Driving-related | 1,480 | 85 | 7 | 24 | 51 | 74 | 90 |
| Other public-order | 1,141 | 69 | 13 | 34 | 57 | 81 | 91 |

Note: Data on time from arrest to adjudication were available for 98% of all cases.
The median time from arrest to adjudication includes cases still pending at the end of the study. Knowing the exact times for these cases would not change the medians reported.
--The median time from arrest to adjudication for murder defendants extended beyond the 1-year study period and could not be calculated.



**Median time from arrest to adjudication for felony defendants in the 75 largest counties, by pretrial detention-release outcome, 1996**

Note: Murder defendants are excluded because their median time from arrest to adjudication exceeded the 1-year study period, and could not be calculated.

*Figure 14*

**Table 23.  Adjudication outcome for felony defendants, by most serious arrest charge, 1996**

| | | Percent of felony defendants in the 75 largest counties | | | | | | | | | | |
| | | Convicted | | | | | | | Not convicted | | | |
| Most serious arrest charge | Number of defendants | Total convicted | Felony | | | Misdemeanor | | | Total | Dis-missed | Ac-quitted | Other outcome* |
| | | | Total | Plea | Trial | Total | Plea | Trial | | | | |
| All offenses | 45,744 | 70% | 55% | 52% | 4% | 15% | 14% | 1% | 30% | 29% | 1% | -- |
| Violent offenses | 11,126 | 60% | 44% | 39% | 5% | 16% | 15% | 1% | 39% | 38% | 2% | 1% |
| Murder | 184 | 64 | 62 | 32 | 29 | 2 | 2 | 0 | 36 | 31 | 5 | 0 |
| Rape | 633 | 62 | 57 | 50 | 7 | 5 | 4 | -- | 37 | 36 | 1 | 1 |
| Robbery | 3,236 | 70 | 57 | 51 | 6 | 13 | 13 | -- | 29 | 28 | 1 | 1 |
| Assault | 5,260 | 53 | 33 | 29 | 4 | 20 | 18 | 1 | 47 | 45 | 2 | -- |
| Other violent | 1,813 | 63 | 47 | 44 | 3 | 16 | 15 | 1 | 37 | 35 | 2 | 0 |
| Property offenses | 14,493 | 72% | 55% | 52% | 3% | 17% | 16% | -- | 28% | 27% | 1% | -- |
| Burglary | 3,936 | 75 | 62 | 58 | 5 | 13 | 12 | 1 | 24 | 22 | 2 | -- |
| Theft | 5,726 | 71 | 55 | 52 | 3 | 15 | 15 | -- | 29 | 28 | 1 | -- |
| Other property | 4,832 | 71 | 50 | 48 | 2 | 21 | 21 | -- | 29 | 29 | -- | -- |
| Drug offenses | 16,386 | 74% | 63% | 61% | 3% | 10% | 10% | -- | 26% | 25% | 1% | -- |
| Trafficking | 8,490 | 78 | 68 | 64 | 4 | 11 | 10 | 1 | 21 | 20 | 1 | -- |
| Other drug | 7,896 | 68 | 59 | 57 | 2 | 10 | 10 | -- | 31 | 30 | 1 | -- |
| Public-order offenses | 3,739 | 74% | 53% | 50% | 3% | 21% | 21% | -- | 25% | 24% | 1% | -- |
| Weapons | 1,320 | 73 | 59 | 55 | 4 | 13 | 12 | 1 | 27 | 25 | 2 | -- |
| Driving-related | 1,351 | 80 | 61 | 58 | 3 | 20 | 20 | 0 | 20 | 18 | 1 | -- |
| Other public-order | 1,067 | 69 | 37 | 34 | 2 | 32 | 32 | -- | 31 | 29 | 1 | -- |

Note:  Fourteen percent of all cases were still pending adjudication at the end of the 1-year study period, and are excluded from the table.  Data on adjudication outcome were available for 98% of those cases that had been adjudicated.  Detail may not add to total because of rounding.
--Less than 0.5%.
*Includes diversion and deferred adjudication.

## Adjudication outcome

Seventy percent of the defendants who had their cases adjudicated within 1 year of arrest were convicted (table 23).  A large majority of these convictions were for a felony, with 55% of all defendants eventually convicted of a felony.

Three-fifths of defendants whose most serious arrest charge was a violent offense (60%) were eventually convicted of a felony or a misdemeanor, compared to about three-fourths of those originally charged with a property (72%), drug (74%), or public-order (74%) offense.  Defendants whose most serious arrest charge was a driving-related offense (80%) had the highest overall conviction rate, and defendants charged with felony assault (53%) had the lowest.

The probability of being convicted of a felony was highest for defendants whose most serious arrest charge was drug trafficking (68%).  The next highest felony conviction rates were found among defendants whose original arrest charge was murder (62%), burglary (62%), or a driving-related offense (61%).  The lowest felony conviction rate was for assault defendants (33%).

In most cases where the defendant was not convicted, it was because the charges against the defendant were dismissed by the prosecutor or the court.  Dismissal occurred in 29% of all cases.  Defendants charged with assault (45%) were more than twice as likely as those charged with a driving-related offense (18%) or drug trafficking (20%) to have their case dismissed.

Less than 1% of all cases had other outcomes such as diversion or deferred adjudication.  No murder defendants had their cases handled in this manner, nor did more than 1% of the defendants in any other offense category.

Nearly four-fifths of the defendants who were detained until case disposition (78%) were eventually convicted of some offense, compared to about two-thirds of those who were released pending disposition (66%) (table 24).  An estimated 69% of detained defendants were convicted of a felony, compared to 49% of released defendants.

**Table 24.  Adjudication outcome for felony defendants, by detention-release outcome and most serious arrest charge, 1996**

| Most serious arrest charge | Number of de-fendants | Convicted | |
| | | Total | Felony |
| **Released defendants** | | | |
| All offenses | 25,996 | 66% | 49% |
| Violent offenses | 5,592 | 52% | 32% |
| Property offenses | 8,258 | 71 | 52 |
| Drug offenses | 9,668 | 69 | 57 |
| Public-order offenses | 2,477 | 74 | 49 |
| **Detained defendants** | | | |
| All offenses | 17,384 | 78% | 69% |
| Violent offenses | 4,950 | 72% | 61% |
| Property offenses | 5,311 | 79 | 67 |
| Drug offenses | 6,023 | 84 | 78 |
| Public-order offenses | 1,099 | 77 | 67 |

**Table 25.  Adjudication outcome for felony defendants, by number and type of arrest charges, 1996**

| | | Percent of felony defendants in the 75 largest counties | | | | | | | | | | |
| | | Convicted | | | | | | | Not convicted | | | |
| Additional charges filed | Number of defendants | Total convicted | Felony | | | Misdemeanor | | | Total | Dis-missed | Acquitted | Other outcome* |
| | | | Total | Plea | Trial | Total | Plea | Trial | | | | |
| Additional felony | 17,703 | 75% | 64% | 59% | 5% | 11% | 11% | -- | 25% | 23% | 1% | -- |
| No additional felony | 28,017 | 67 | 50 | 47 | 3 | 17 | 16 | 1 | 33 | 32 | 1 | -- |
| Misdemeanor(s) only | 7,529 | 66 | 37 | 35 | 3 | 28 | 26 | 2 | 34 | 33 | 1 | -- |
| No additional charges | 20,488 | 67 | 54 | 52 | 3 | 12 | 12 | -- | 33 | 32 | 1 | -- |

Note:  Fourteen percent of all cases were still pending adjudication at the end of the 1-year study period.
Data on adjudication outcome were available for 98% of those cases that had been adjudicated.
--Less than 0.5%.
*Includes diversion and deferred adjudication.

Adjudication outcome was related to some extent to the number and type of the original arrest charges filed. Three-fourths of defendants who were originally charged with more than 1 felony were eventually convicted of some offense compared to about two-thirds of the defendants who had no additional felony charges (table 25).

Sixty-four percent of defendants whose original arrest charges included more than one felony were eventually convicted of a felony compared to 50% of those with no additional felony charges.  Among the defendants who had no additional felony charges but were charged with one or more misdemeanors, 37% were convicted of a felony.  Defendants in this latter group were about twice as likely as other defendants to eventually be convicted of a misdemeanor, usually by pleading guilty to such a charge instead of the original felony charge.

Overall, about two-thirds of defendants entered a guilty plea at some point, with 52% pleading guilty to a felony, and 14% to a misdemeanor.

About two-thirds of defendants charged with a nonviolent offense entered a guilty plea, and about half pleaded guilty to a felony.  Defendants charged with a driving-related offense (77%) were the most likely to enter a guilty plea (figure 15).  A majority of the defendants in each nonviolent offense category pleaded guilty to a felony, including 64% of those charged with drug trafficking.

Among defendants charged with a violent offense, robbery defendants (64%) had the highest overall plea rate, and murder defendants (35%) had the lowest.  About half of robbery (51%) and rape (50%) defendants pleaded guilty to a felony, compared to about a third of murder (33%) and assault (29%) defendants.



**Plea rate for felony defendants in the 75 largest counties, by most serious arrest charge, 1996**

*Figure 15*

An estimated 6% of the cases adjudicated within 1 year went to trial. These cases were evenly split between bench trials and jury trials. An estimated 77% of all trials ended with a guilty verdict, and 23% with an acquittal. Jury trials (84%) were more likely to result in a conviction than bench trials (72%). About 3 in 4 jury trials resulted in a felony conviction compared to 3 in 5 bench trials.

| Type of trial | Percent of trials resulting in a conviction | | |
|---|---|---|---|
| | Total | Felony | Misdemeanor |
| Total | 77% | 67% | 10% |
| Bench | 72 | 60 | 12 |
| Jury | 84 | 76 | 7 |

A third of defendants facing murder charges went to trial, compared to less than a tenth of defendants charged with other offenses (figure 16).

Regardless of the method of adjudication, defendants who were convicted were usually convicted of the same felony offense as the original arrest charge. This was most likely to be the case when the original arrest charge was for a nonviolent offense.



**Trial rates for felony defendants in the 75 largest counties, by most serious arrest charge, 1996**

*Figure 16*

**Table 26.  Conviction offense of defendants arrested for a violent offense and subsequently convicted, by most serious arrest charge, 1996**

| | | | | Percent of felony defendants in the 75 largest counties convicted of: | | | | | | | |
| | | | | | Violent felony | | | | | Non-violent felony | Misde-meanor |
| Most serious arrest charge | Number of defendants | Total | Total felony | Total violent | Murder | Rape | Robbery | Assault | Other | | |
| Murder | 118 | 100% | 97% | 97% | **59%** | 0% | 6% | 13% | 19% | 0% | 3% |
| Rape | 391 | 100 | 93 | 90 | 0 | **62** | 0 | 6 | 22 | 2 | 7 |
| Robbery | 2,248 | 100 | 81 | 69 | 0 | 0 | **62** | 6 | 1 | 13 | 19 |
| Assault | 2,744 | 100 | 62 | 55 | -- | -- | -- | **48** | 6 | 8 | 38 |

Note:  Detail may not add to total because of rounding.
--Less than 0.5%.

**Table 27.  Conviction offense of defendants arrested for a nonviolent offense and subsequently convicted, by most serious arrest charge, 1996**

| | | | | Percent of felony defendants in the 75  largest counties convicted of: | | | | | | | |
| | | | | | Nonviolent felony | | | | | Violent felony | Misde-meanor |
| Most serious arrest charge | Number of defendants | Total | Total felony | Total nonviolent | Burglary | Theft | Drug trafficking | Weapons | Driving-related | Other | | |
| Burglary | 2,969 | 100% | 83% | 82% | **68%** | 8% | -- | 0 | -- | 7% | 1% | 17% |
| Theft | 4,031 | 100 | 79 | 79 | 1 | **68** | -- | -- | -- | 9 | -- | 21 |
| Drug trafficking | 6,580 | 100 | 87 | 87 | 0 | 0 | **75** | 1 | -- | 11 | -- | 13 |
| Weapons | 960 | 100 | 83 | 82 | 0 | 0 | 0 | **82** | 0 | 0 | 1 | 17 |
| Driving-related | 1,084 | 100 | 77 | 77 | 0 | 0 | 0 | 1 | **75** | 1 | -- | 23 |

Note:  Detail may not add to total because of rounding.
--Less than 0.5%.

Among defendants arrested for murder and later convicted, 59% were convicted of murder (table 26). The corresponding percentages for other violent offenses were as follows: rape (62%), robbery (62%), and assault (48%).

Among defendants who were charged with a nonviolent offense and later convicted, the percentage whose conviction offense corresponded with their most serious arrest charge were as follows: weapons offense (82%), drug trafficking (75%), driving-related offense (75%), burglary (68%), and theft (68%) (table 27).

For most offenses a smaller percentage of defendants were in each felony conviction offense category than were

in the original distribution by arrest charge (tables 1 and 28). The biggest drop was in the violent felony category, which accounted for about 25% of all defendants by arrest charge, but just 14% of them by conviction charge.

Much of this change can be accounted for by the fact that about 11% of all defendants were originally facing felony assault charges, but just 5% of all convictions were for such an offense. Overall, 20% of convicted defendants were convicted at the misdemeanor level, including 38% of those convicted after being originally charged with felony assault.

Given arrest, about three-fifths of the defendants whose most serious arrest

charge was for a driving-related offense (59%), a weapons offense (59%), or drug trafficking (58%) were eventually convicted of that same offense (figure 17). About half of the defendants originally charged with burglary or theft were eventually convicted of those offenses.

Among defendants whose most serious arrest charge was for a violent offense, less than half were eventually convicted of that same felony offense. About two-fifths of defendants originally charged with robbery (43%), rape (39%), or murder (37%) were eventually convicted of those offenses. About a fourth of defendants originally charged with felony assault were eventually convicted of that offense (25%).

**Table 28. Felony defendants, by conviction offense, 1996**

| Most serious conviction offense | Felony defendants in the 75 largest counties | |
|---|---|---|
| | Number | Percent |
| All offenses | 31,943 | 100.0% |
| All felonies | 25,454 | 79.7% |
| Violent offenses | 4,339 | 13.6% |
| Murder | 74 | 0.2 |
| Rape | 257 | 0.8 |
| Robbery | 1,442 | 4.5 |
| Assault | 1,554 | 4.9 |
| Other violent | 1,031 | 3.2 |
| Property offenses | 8,237 | 25.8% |
| Burglary | 2,165 | 6.7 |
| Theft | 3,230 | 10.1 |
| Other property | 2,866 | 8.9 |
| Drug offenses | 10,298 | 32.2% |
| Trafficking | 5,194 | 16.2 |
| Other drug | 5,100 | 16.0 |
| Public-order offenses | 2,437 | 7.6% |
| Weapons | 1,015 | 3.1 |
| Driving-related | 897 | 2.8 |
| Other public-order | 540 | 1.7 |
| Other felonies | 143 | 0.4% |
| Misdemeanors | 6,488 | 20.3% |

Note: Data on conviction offense were available for 100% of cases involving defendants who had been convicted.



**Conviction probabilities for felony defendants in the 75 largest counties, by most serious arrest charge, 1996**

*Figure 17*

## Case processing statistics

Among the approximately 46,000 cases with a known adjudication outcome that occurred within 1 year of arrest, about 30,000 were disposed by a guilty plea (figure 18). About a fourth of these pleas occurred within 1 month of arrest and about three-fifths within 3 months of arrest.

The next most common type of adjudication, dismissal of the charges against the defendant, occurred in about 13,000 cases. About half of all dismissals occurred within the first month after arrest and three-fourths within 3 months.

Trials occurred in about 2,400 cases. About 1 in 10 trials were completed within a month of arrest and about 1 in 3 within 3 months of arrest.

Guilty pleas accounted for nearly all (94%) of the 32,000 convictions obtained within 1 year of arrest (figure 19). This included about 23,700 felony pleas and about 6,400 misdemeanor pleas. About a fourth of the felony pleas occurred within 1 month of arrest, and more than half were obtained within 3 months of arrest. About two-fifths of the misdemeanor pleas were obtained with 1 month of arrest, and about two-thirds within 3 months.

Of the approximately 1,900 trial convictions obtained within 1 year, nearly all were for a felony, with just 250 trials resulting in a misdemeanor conviction. Nearly a third of all trial convictions occurred within 3 months of arrest, and almost two-thirds within 6 months of arrest.



**Method of adjudication of felony cases filed in May 1996 and disposed within 1 year in the 75 largest counties**

*Figure 18*



**Method of conviction of felony cases filed in May 1996 and disposed within 1 year in the 75 largest counties**

*Figure 19*

## Sentencing

**Time from conviction to sentencing**

About 2 in 3 convicted defendants were sentenced within 1 day of adjudication (table 29).  Defendants convicted of a misdemeanor (88%) were more likely to be sentenced this quickly than those convicted of a felony (60%).

Sentencing after a felony conviction was more likely to occur within 1 day if the conviction was for a nonviolent offense (62%) than if it was for a violent offense (50%).  Within the violent offense category, the percentage of convicted defendants sentenced within 1 day ranged from 34% of those convicted of murder to 56% of those convicted of felony assault or robbery.

About 5 in 6 convicted defendants received their sentence within 30 days, including 79% of those convicted of a felony and 92% of those convicted of a misdemeanor.  Nearly all convicted defendants were sentenced within 60 days, including 97% of those convicted of a misdemeanor and 92% of those convicted of a felony.

**Table 29.  Time from conviction to sentencing for convicted defendants, by most serious conviction offense, 1996**

| Most serious conviction offense | Number of defendants | Percent of convicted defendants in the 75 largest counties who were sentenced within: | | | | |
|---|---|---|---|---|---|---|
| | | Total | 0-1 day | 2-30 days | 31-60 days | 61 days or more |
| All offenses | 30,696 | 100% | 66% | 16% | 12% | 7% |
| All felonies | 24,398 | 100% | 60% | 19% | 14% | 8% |
| Violent offenses | 4,102 | 100% | 50% | 21% | 18% | 10% |
| Murder | 70 | 100 | 34 | 34 | 23 | 9 |
| Rape | 246 | 100 | 47 | 16 | 23 | 14 |
| Robbery | 1,320 | 100 | 56 | 21 | 15 | 9 |
| Assault | 1,475 | 100 | 56 | 20 | 17 | 8 |
| Other violent | 991 | 100 | 37 | 26 | 22 | 15 |
| Property offenses | 8,018 | 100% | 66% | 15% | 11% | 8% |
| Burglary | 2,097 | 100 | 64 | 18 | 11 | 7 |
| Theft | 3,157 | 100 | 64 | 15 | 12 | 9 |
| Other property | 2,764 | 100 | 69 | 13 | 11 | 7 |
| Drug offenses | 9,813 | 100% | 59% | 21% | 13% | 7% |
| Trafficking | 4,888 | 100 | 52 | 25 | 14 | 9 |
| Other drug | 4,925 | 100 | 66 | 17 | 12 | 5 |
| Public-order offenses | 2,342 | 100% | 62% | 13% | 16% | 9% |
| Weapons | 983 | 100 | 66 | 17 | 11 | 6 |
| Driving-related | 846 | 100 | 55 | 12 | 22 | 11 |
| Other public-order | 513 | 100 | 67 | 10 | 14 | 10 |
| Misdemeanors | 6,298 | 100% | 88% | 4% | 5% | 3% |

Note:  Data on time from conviction to sentencing were available for 96% of cases that had reached sentencing.   Total for all felonies includes cases that could not be classified into 1 of the 4 major offense categories.  Detail may not add to total because of rounding.

## Type and length of sentence

About two-thirds of all convicted defendants were sentenced to incarceration in a State prison or local jail (table 30). Sixty-nine percent of the defendants convicted of a felony were sentenced to incarceration, compared to 57% of those convicted of a misdemeanor.

About half of the incarceration sentences following a felony conviction, 35% of felony sentences overall, were to State prison. All murder convictions resulted in a prison sentence, as did a majority of robbery (71%) and rape (56%) convictions.

Although less than half of defendants convicted of drug trafficking (44%), burglary (43%), felony assault (40%), or a weapons offense (37%) were sentenced to prison, this was still the most likely type of sentence for such defendants.

Nearly all of the incarceration sentences resulting from a misdemeanor conviction, 54% of all misdemeanor sentences, were to jail. Two-thirds of jail sentences included a probation term to be served in addition to the jail time. This was more likely to be the case for defendants convicted of a felony (75%) than those convicted of a misdemeanor (39%).

Among defendants who were convicted but not sentenced to incarceration, 98% of those convicted of a felony and 84% of those convicted of a misdemeanor received a probation term. Probation sentences may have included a fine, payment of restitution, and/or completion of a community service requirement.

Overall, about a third of convicted defendants received a sentence to probation (31%) without any incarceration. About a third of defendants convicted of theft, a felony drug offense other than trafficking, a felony public-order offense that was not driving-related, or a misdemeanor received a probation term without incarceration.

An estimated 2% of all defendants, 1% of those convicted of a felony, were ordered to pay a fine but were not sentenced to a term of incarceration or probation. These fines may have been in addition to court-ordered restitution and/or community service.

**Table 30. Most severe type of sentence received by convicted defendants, by most serious conviction offense, 1996**

| Most serious conviction offense | Number of defendants | Percent of convicted defendants in the 75 largest counties sentenced to: | | | | | | |
| | | Total | Incarceration | | | Nonincarceration | | |
| | | | Total | Prison | Jail | Total | Probation | Fine |
| All offenses | 28,775 | 100% | 67% | 30% | 37% | 33% | 31% | 2% |
| All felonies | 24,229 | 100% | 69% | 35% | 34% | 31% | 30% | 1% |
| Violent offenses | 4,073 | 100% | 80% | 51% | 29% | 20% | 20% | -- |
| Murder | 66 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Rape | 243 | 100 | 77 | 56 | 21 | 23 | 23 | 0 |
| Robbery | 1,307 | 100 | 90 | 71 | 19 | 10 | 10 | -- |
| Assault | 1,455 | 100 | 73 | 40 | 33 | 27 | 26 | -- |
| Other violent | 1,002 | 100 | 76 | 36 | 40 | 24 | 24 | 0 |
| Property offenses | 7,943 | 100% | 62% | 30% | 32% | 38% | 38% | -- |
| Burglary | 2,093 | 100 | 74 | 43 | 31 | 26 | 25 | 1 |
| Theft | 3,121 | 100 | 66 | 32 | 34 | 34 | 34 | -- |
| Other property | 2,728 | 100 | 48 | 17 | 31 | 52 | 52 | 1 |
| Drug offenses | 9,761 | 100% | 72% | 34% | 38% | 28% | 28% | 1% |
| Trafficking | 4,915 | 100 | 78 | 44 | 34 | 22 | 22 | -- |
| Other drug | 4,846 | 100 | 65 | 23 | 42 | 35 | 34 | 1 |
| Public-order offenses | 2,317 | 100% | 69% | 34% | 35% | 31% | 29% | 2% |
| Weapons | 962 | 100 | 64 | 37 | 27 | 36 | 34 | 2 |
| Driving-related | 850 | 100 | 75 | 35 | 40 | 25 | 21 | 3 |
| Other public-order | 506 | 100 | 66 | 27 | 40 | 34 | 32 | 1 |
| Misdemeanors | 4,547 | 100% | 57% | 3% | 54% | 43% | 36% | 7% |

Note: Data on type of sentence were available for 90% of cases involving defendants who had been convicted. Sixty-seven percent of jail sentences and 5% of prison sentences included a probation term. Twenty-three percent of prison sentences, 31% of jail sentences, and 29% of probation sentences included a fine. Fines may have included restitution or community service. Total for all felonies includes cases that could not be classified in 1 of the 4 major offense categories. Prison category includes 7 defendants who received a death sentence. Detail may not add to total because of rounding. --Less than 0.5%.

Among persons arrested and charged with a felony by the prosecutor, murder defendants had the highest probability of eventually being convicted and sentenced to prison (63%) (figure 20). The next highest probability of an eventual prison sentence was for defendants charged with robbery (45%).  About a third of defendants originally charged with drug trafficking (34%) or rape (33%) were eventually convicted and sentenced to prison. Defendants originally charged with felony assault (20%) or theft (22%) were the least likely to be eventually sentenced to prison.

Defendants originally charged with a driving-related offense (30%), drug trafficking (27%), or burglary (26%) were the most likely to be eventually convicted and receive a jail sentence. No murder defendants were convicted and sentenced to jail.

A majority of defendants charged with murder (63%), robbery (63%), drug trafficking (61%), a driving-related offense (59%), or burglary (56%) were eventually convicted and sentenced to either prison or jail.  Assault (38%) defendants were the least likely to be eventually convicted and sentenced to some type of incarceration.



**Probability of being convicted and sentenced to incarceration for felony defendants in the 75 largest counties, 1996**

*Figure 20*

**Table 31.   Length of prison sentence received by defendants convicted of a felony, by most serious conviction offense, 1996**

| Most serious felony conviction offense | Number of defendants | Number of months | | Felony defendants in the 75 largest counties convicted of a felony and sentenced to prison | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mean | Median | Percent receiving a maximum sentence length in months of: | | | | | | |
| | | | | Total | 1-24 | 25-48 | 49-72 | 73-120 | Over 120* | Life |
| All offenses | 8,502 | 58 | 36 | 100% | 35% | 32% | 15% | 11% | 7% | 1% |
| Violent offenses | 2,051 | 93 | 60 | 100% | 18% | 27% | 19% | 18% | 16% | 2% |
| Murder | 51 | 435 | 360 | 100 | 0 | 0 | 0 | 8 | 69 | 23 |
| Rape | 131 | 132 | 96 | 100 | 2 | 19 | 18 | 30 | 28 | 3 |
| Robbery | 926 | 94 | 60 | 100 | 12 | 26 | 21 | 22 | 18 | 1 |
| Assault | 581 | 67 | 48 | 100 | 24 | 30 | 18 | 15 | 10 | 2 |
| Other violent | 362 | 69 | 44 | 100 | 31 | 34 | 16 | 11 | 9 | 1 |
| Property offenses | 2,346 | 50 | 36 | 100% | 42% | 31% | 12% | 10% | 4% | -- |
| Burglary | 902 | 65 | 41 | 100 | 33 | 30 | 12 | 16 | 9 | -- |
| Theft | 988 | 39 | 24 | 100 | 52 | 26 | 14 | 6 | 2 | 0 |
| Other property | 456 | 41 | 36 | 100 | 38 | 44 | 8 | 7 | 1 | 1 |
| Drug offenses | 3,271 | 47 | 36 | 100% | 35% | 36% | 17% | 9% | 3% | -- |
| Trafficking | 2,156 | 54 | 42 | 100 | 23 | 40 | 21 | 11 | 4 | -- |
| Other drug | 1,115 | 33 | 24 | 100 | 59 | 27 | 8 | 4 | 2 | 1 |
| Public-order offenses | 783 | 34 | 24 | 100% | 50% | 35% | 10% | 3% | 1% | 1% |
| Weapons | 357 | 37 | 32 | 100 | 42 | 41 | 10 | 2 | 1 | 3 |
| Driving-related | 292 | 30 | 24 | 100 | 60 | 28 | 8 | 4 | 0 | 0 |
| Other public-order | 134 | 33 | 30 | 100 | 49 | 33 | 15 | 3 | 0 | 0 |

Note:  Data on length of prison sentence were available for 99% of all cases in which a defendant received a prison sentence.
Five percent of prison sentences included a probation term and 23% included a fine. Total for all offenses includes cases that could not be classified into 1 of the 4 major offense categories.
Detail may not add to total because of rounding.
--Less than 0.5%.
*Excludes life sentences.

Among defendants convicted of a felony and sentenced to prison, the mean sentence was 58 months and the median was 36 months (table 31). By general conviction offense category, defendants convicted of a violent felony received the longest prison sentences (a mean of 93 months and a median of 60 months), and those convicted of a public-order felony the shortest (a mean of 34 months and a median of 24 months).

By specific conviction offense, murderers received the longest prison terms, a mean of 435 months and a median of 360 months.  Next were defendants convicted of rape with a mean prison sentence of 132 months, and a median of 96 months.

Median sentences for other felony convictions included 60 months for robbery, 48 months for assault, 42 months for drug trafficking, 41 months for burglary, 32 months for weapons offenses, 24 months for theft, and 24 months for driving-related offenses (figure 21).

Twenty-three percent of all murder convictions resulted in a life sentence, compared to a maximum of 3% of the defendants convicted of any other offense. In addition to those receiving life sentences, 69% of the defendants convicted of murder were sentenced to more than 10 years in prison.  About 1 in 4 rape convictions, 1 in 6 robbery convictions, and 1 in 10 felony assault convictions resulted in a prison term of more than 10 years.



**Median prison sentence received by defendants convicted of a felony in the 75 largest counties, 1996**

Figure 21

For defendants convicted of a felony and subsequently sentenced to jail, the mean jail term was 6 months and the median was 5 months (table 32). Misdemeanor convictions resulted in a mean jail term of 3 months and a median of 2 months.

Excluding murder (for which all sentences were to prison), and rape (for which few cases resulted in a jail sentence), defendants sentenced to jail for robbery received the longest average sentence (a mean of 9 months and a median of 12 months).

About 2% of all jail sentences for a felony conviction were for a period greater than 1 year, including 9% of those that followed a conviction for robbery.  The longest jail sentence recorded during the study was for about 5 years.

**Table 32.  Length of jail sentence received by convicted defendants, by most serious conviction offense, 1996**

| Most serious conviction offense | Number of defendants | Number of months | | Percent  receiving a maximum sentence in months of : | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mean | Median | Total | 1 or less | 2-3 | 4-6 | 7-9 | 10-12 | Over 12 |
| All offenses | 10,743 | 5 | 4 | 100% | 24% | 23% | 28% | 7% | 17% | 1% |
| All felonies | 8,284 | 6 | 5 | 100% | 17% | 23% | 31% | 8% | 20% | 2% |
| Violent offenses* | 1,180 | 7 | 6 | 100% | 14% | 18% | 26% | 10% | 29% | 3% |
| Robbery | 247 | 9 | 12 | 100 | 3 | 15 | 20 | 5 | 48 | 9 |
| Assault | 485 | 6 | 6 | 100 | 20 | 18 | 23 | 11 | 25 | 2 |
| Other violent | 397 | 7 | 6 | 100 | 12 | 21 | 28 | 12 | 24 | 3 |
| Property offenses | 2,552 | 6 | 6 | 100% | 16% | 19% | 33% | 9% | 20% | 2% |
| Burglary | 648 | 7 | 6 | 100 | 8 | 21 | 30 | 15 | 22 | 3 |
| Theft | 1,053 | 6 | 6 | 100 | 17 | 16 | 36 | 8 | 20 | 2 |
| Other property | 851 | 5 | 4 | 100 | 21 | 22 | 31 | 6 | 17 | 2 |
| Drug offenses | 3,698 | 5 | 4 | 100% | 17% | 27% | 32% | 8% | 16% | 1% |
| Trafficking | 1,653 | 6 | 6 | 100 | 14 | 22 | 36 | 9 | 19 | 1 |
| Other drug | 2,045 | 5 | 3 | 100 | 20 | 32 | 28 | 6 | 14 | 1 |
| Public-order offenses | 802 | 5 | 4 | 100% | 19% | 26% | 28% | 6% | 21% | 1% |
| Weapons | 258 | 5 | 4 | 100 | 19 | 27 | 30 | 8 | 16 | 0 |
| Driving-related | 343 | 6 | 6 | 100 | 18 | 17 | 29 | 4 | 30 | 2 |
| Other public-order | 201 | 4 | 3 | 100 | 21 | 41 | 21 | 6 | 11 | 0 |
| Misdemeanors | 2,459 | 3 | 2 | 100% | 47% | 23% | 18% | 3% | 9% | -- |

Note:  Data on length of jail sentence were available for 100% of all cases in which a defendant received a jail sentence.
Sixty-seven percent of sentences to jail included a probation term and 31% included a fine.
Detail may not add to total because of rounding.
*Murder and rape have been excluded from the detail because no murder convictions and few rape convictions
resulted in a jail sentence.  The total for violent offenses, however, does include these cases.
--Less than 0.5%.

For defendants sentenced to probation without incarceration for a felony involving a violent, property, or drug offense, the median sentence length was 36 months.  For felony public-order convictions, and misdemeanors the median was 24 months (table 33). Two percent of defendants convicted of a felony were given a probation term of greater than 5 years.

An estimated 21% of defendants sentenced to probation were also required to pay a fine.  Some probation sentences were also supplemented by one or more special conditions.  For example, 21% of the defendants who received a probation sentence were required to perform a specified number of hours of community service work (table 34).

Twenty-one percent of offenders sentenced to probation were required to pay restitution, including 40% of those convicted for a property-related felony.  Six percent of probation sentences included a requirement that the defendant enter a drug treatment program.  Defendants convicted of a drug-related felony (12%) were the most likely to have this requirement.

**Table 33.  Length of probation sentence received by convicted defendants, by most serious conviction offense, 1996**

| Most serious conviction offense | Number of defendants | Median months | Felony defendants in the 75 largest counties sentenced to probation | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Percent  receiving a sentence in months of : | | | | | |
| | | | Total | 1-12 | 13-24 | 25-36 | 37-48 | 49-60 | Over 60 |
| All offenses | 8,872 | 36 | 100% | 17% | 30% | 32% | 3% | 16% | 2% |
| All felonies | 7,229 | 36 | 100% | 13% | 31% | 31% | 4% | 20% | 2% |
| Violent offenses | 804 | 36 | 100 | 16 | 20 | 30 | 4 | 25 | 5 |
| Property offenses | 3,000 | 36 | 100 | 14 | 29 | 31 | 4 | 21 | 1 |
| Drug offenses | 2,718 | 36 | 100 | 10 | 35 | 33 | 3 | 17 | 1 |
| Public-order offenses | 673 | 24 | 100 | 18 | 33 | 25 | 3 | 20 | 1 |
| Misdemeanors | 1,644 | 24 | 100% | 37% | 25% | 36% | 1% | 1% | 1% |

Note:  Data on length of probation sentence were available for 100% of all cases in which the most severe type of sentence a defendant received was probation.  Total for felonies includes cases that could not be classified into 1 of the 4 felony offense categories.
Detail may not add to total because of rounding.
--Less than 0.5%.

**Table 34.  Conditions of probation sentence received by convicted defendants, by most serious conviction offense, 1996**

| Most serious conviction offense | Number of defendants | Felony defendants in the 75 largest counties sentenced to probation | | | | |
|---|---|---|---|---|---|---|
| | | Percent whose sentence to probation included | | | | |
| | | Community service | Restitution | Intensive supervision | Electronic monitoring | Drug treatment |
| All offenses | 8,922 | 21% | 21% | 11% | 7% | 6% |
| All felonies | 7,260 | 21% | 22% | 11% | 6% | 8% |
| Violent offenses | 806 | 15 | 15 | 18 | 9 | 6 |
| Property offenses | 3,020 | 24 | 40 | 6 | 3 | 5 |
| Drug offenses | 2,720 | 21 | 6 | 13 | 9 | 12 |
| Public-order offenses | 680 | 17 | 11 | 11 | 5 | 6 |
| Misdemeanors | 1,662 | 19% | 19% | 12% | 10% | 2% |

Note:  Total for felonies includes cases that could not be classified into 1 of the 4 felony offense categories.  A defendant may have received more than one type of probation condition.
Not all defendants sentenced to probation received probation conditions.
Detail may not add to total because of rounding.
--Less than 0.5%.

## Prior record and felony sentencing

For defendants convicted of a felony on their current charge, the probability of receiving a sentence to incarceration was highest if they had multiple prior felony convictions (85%) (table 35).

Defendants with multiple prior felony convictions and whose current conviction was for a violent felony were the most likely of all defendants to be sentenced to incarceration (91%).

About three-fourths of defendants with just one prior felony conviction (76%) or only prior misdemeanor convictions (72%), were sentenced to incarceration following a felony conviction in the current case.  About half of those with no prior convictions of any type (52%) received an incarceration sentence for a felony conviction.

Defendants with no prior convictions whose current felony conviction was for a property offense were the least likely overall to be sentenced to incarceration (39%).

A majority (58%) of the defendants with more than one prior felony conviction were sentenced to prison for a new felony conviction, including 71% of those whose current conviction was for a violent offense.  Nearly half (45%) of the defendants with a single prior felony conviction were sentenced to prison following a felony conviction in the current case, including 65% of those convicted of a violent felony.

Overall, less than a fourth of defendants with no prior felony convictions received a prison sentence for a felony conviction in the current case. However, 40% of the defendants with no

prior felony convictions received a prison sentence if the current conviction was for a violent felony.

Defendants with a prior conviction record that consisted of only misdemeanors were more likely than other defendants to receive a jail sentence after being convicted of a felony (49%) on the current charge. This was most likely to be the case if the current conviction was for a nonviolent offense.

Defendants with no prior convictions of any kind were the most likely to receive a probation sentence (47%). Three-fifths of defendants convicted of a property-related felony and who had no prior convictions received a probation sentence.

### Table 35.  Most severe type of sentence received by defendants convicted of a felony, by prior conviction record, 1996

| Prior conviction record and most serious current felony conviction | Number of defendants | Percent of defendants in the 75 largest counties convicted of a felony and sentenced to: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | Incarceration | | | Nonincarceration | | |
| | | | Total | Prison | Jail | Total | Probation | Fine |
| **More than 1 prior felony conviction** | | | | | | | | |
| All offenses | 5,989 | 100% | 85% | 58% | 26% | 15% | 15% | -- |
| Violent offenses | 738 | 100 | 91 | 71 | 20 | 9 | 8 | 1 |
| Property offenses | 2,086 | 100 | 83 | 58 | 25 | 17 | 17 | -- |
| Drug offenses | 2,605 | 100 | 85 | 55 | 30 | 15 | 14 | -- |
| Public-order offenses | 529 | 100 | 83 | 61 | 22 | 17 | 16 | 1 |
| **1 prior felony conviction** | | | | | | | | |
| All offenses | 4,102 | 100% | 76% | 45% | 31% | 24% | 23% | 1% |
| Violent offenses | 667 | 100 | 84 | 65 | 19 | 16 | 16 | 1 |
| Property offenses | 1,219 | 100 | 74 | 40 | 33 | 26 | 26 | -- |
| Drug offenses | 1,793 | 100 | 75 | 41 | 34 | 25 | 25 | 1 |
| Public-order offenses | 408 | 100 | 79 | 44 | 34 | 21 | 21 | 0 |
| **Prior misdemeanor convictions only** | | | | | | | | |
| All offenses | 4,153 | 100% | 72% | 23% | 49% | 28% | 28% | -- |
| Violent offenses | 731 | 100 | 79 | 40 | 39 | 21 | 21 | 0 |
| Property offenses | 1,307 | 100 | 66 | 17 | 49 | 34 | 34 | -- |
| Drug offenses | 1,705 | 100 | 72 | 19 | 53 | 28 | 27 | -- |
| Public-order offenses | 382 | 100 | 71 | 22 | 49 | 29 | 29 | 0 |
| **No prior convictions** | | | | | | | | |
| All offenses | 7,949 | 100% | 52% | 20% | 32% | 48% | 47% | 1% |
| Violent offenses | 1,545 | 100 | 72 | 40 | 32 | 28 | 28 | 0 |
| Property offenses | 2,782 | 100 | 39 | 11 | 28 | 61 | 60 | 1 |
| Drug offenses | 2,947 | 100 | 55 | 19 | 36 | 45 | 44 | 1 |
| Public-order offenses | 634 | 100 | 46 | 18 | 28 | 54 | 51 | 3 |

Note:  Data on prior conviction record and type of sentence were available for 91% of all cases. Sentences to incarceration may have also included a probation term.  Sentences to prison, jail, or probation may have included a fine, restitution, or community service.  Fines may have included restitution or community service.  Detail may not add to total because of rounding.
--Less than 0.5%.

Defendants convicted of a violent felony were much more likely to be sentenced to prison than jail or probation if they had at least one prior felony conviction (figure 22). Those without a prior felony conviction were only slightly more likely to be sentenced to prison than jail.

Among defendants convicted of a nonviolent felony, prison was also the most likely sentence for those with prior felony convictions. However, this effect was much more pronounced for those with multiple prior felonies than those with a single prior felony.

Jail was the most probable sentence for a nonviolent felony among defendants who had a prior conviction record that consisted of only misdemeanors. Probation was the most likely sentence if they had no conviction record at all.



Figure 22

# Methodology

The SCPS sample was designed and selected by the U.S. Bureau of the Census under BJS supervision. It is a 2-stage stratified sample, with 40 of the 75 most populous counties selected at the first stage and a systematic sample of State court felony filings (defendants) within each county selected at the second stage. The 40 counties were divided into 4 first-stage strata based on court filing information obtained through a telephone survey. Twelve counties were included in the sample with certainty because of their large number of court filings. The remaining counties were allocated to the three noncertainty strata based on the variance of felony court dispositions.

The second-stage sampling (filings) was designed to represent all defendants who had felony cases filed with the court during the month of May 1996. The participating jurisdictions provided data for every felony case filed on selected days during that month. Depending on the first-stage stratum in which it had been placed, each jurisdiction provided data for 1, 2, or 4 weeks' filings in May 1996. Data from jurisdictions that were not required to provide a full month of filings were weighted to represent the full month (see Appendix Table A).

Data on 15,474 sample felony cases were collected from the 40 sampled jurisdictions. This sample represented 54,579 weighted cases filed during the month of May 1996 in the 75 most populous counties. A small number of cases (64 unweighted, 244 weighted) were omitted from the analysis because they could not be classified into one of the four major crime categories (violent, property, drug, public-order).

This report is based on data collected from the following counties and independent cities: Alabama (Jefferson); Arizona (Maricopa, Pima); California (Alameda, Los Angeles, Orange, Sacramento, San Bernardino, San Francisco, Santa Clara, Ventura); Florida (Broward, Dade, Hillsborough, Orange); Georgia (Fulton); Hawaii (Honolulu); Illinois (Cook, DuPage); Indiana (Marion); Kentucky (Jefferson); Maryland (Baltimore (city)); Michigan (Wayne); Missouri (Jackson, St. Louis); New York (Bronx, Erie, Kings, Monroe, New York, Queens, Suffolk); Ohio (Hamilton); Pennsylvania (Allegheny, Philadelphia); Tennessee (Shelby); Texas (Dallas, Harris); Washington (King); and Wisconsin (Milwaukee).

Because the data came from a sample, a sampling error (standard error) is associated with each reported number. In general, if the difference between two numbers is greater than twice the standard error for that difference, we can say that we are 95% confident of a real difference and that the apparent difference is not simply the result of using a sample rather than the entire population. All differences discussed in this report were statistically significant at or above the 95-percent confidence level.

## Race and Hispanic origin

Several jurisdictions did not provide complete reporting for defendants' Hispanic origin. As a result, the overall reporting level for race combined with Hispanic origin was 79%, compared to 90% for race alone. Because of this underreporting, the categories of race alone account for more defendants than the categories that include both race and Hispanic origin. A large preponderance of the defendants with a Hispanic origin were white, although the category includes all races.

## Offense categories

Felony offenses were classified into 13 categories for this report. These categories were further divided into the four major crime categories of violent, property, drug, and public-order offenses. The following listings contain a representative summary of most of the crimes contained in each category; however, these lists are not meant to be exhaustive. All offenses, except for murder, include attempts and conspiracies to commit.

## Violent offenses

*Murder* — Includes homicide, nonnegligent manslaughter, and voluntary homicide. Does not include attempted murder (classified as felony assault), negligent homicide, involuntary homicide, or vehicular manslaughter, which are classified as *other violent offenses.*

*Rape* — Includes forcible intercourse, sodomy, or penetration with a foreign object. Does not include statutory rape or nonforcible acts with a minor or someone unable to give legal consent, nonviolent sexual offenses, or commercialized sex offenses.

*Robbery* — Includes the unlawful taking of anything of value by force or threat of force.

*Assault* — Includes aggravated assault, aggravated battery, attempted murder, assault with a deadly weapon, felony assault or battery on a law enforcement officer, and other felony assaults. Does not include extortion, coercion, or intimidation.

*Other violent offenses* — Includes vehicular manslaughter, involuntary manslaughter, negligent or reckless homicide, nonviolent or nonforcible sexual assault, kidnaping, unlawful imprisonment, child or spouse abuse, cruelty to a child, reckless endangerment, hit-and-run with bodily injury, intimidation, and extortion.

**Property offenses**

*Burglary* — Includes any type of entry into a residence, industry, or business with or without the use of force with the intent to commit a felony or theft.  Does not include possession of burglary tools, trespassing, or unlawful entry for which the intent is not known.

*Theft* — Includes grand theft, grand larceny, motor vehicle theft, and any other felony theft.  Does not include receiving or buying stolen property, fraud, forgery, or deceit.

*Other property offenses* — Includes receiving or buying stolen property, forgery, fraud, embezzlement, arson, reckless burning, damage to property, criminal mischief, vandalism, bad checks, counterfeiting, criminal trespassing, possession of burglary tools, and unlawful entry.

**Drug offenses**

*Drug trafficking* — Includes trafficking, sales, distribution, possession with intent to distribute or sell, manufacturing, and smuggling of controlled substances.  Does not include possession of controlled substances.

*Other drug offenses* — Includes possession of controlled substances, prescription violations, possession of drug paraphernalia, and other drug law violations.

**Public-order offenses**

*Weapons* — Includes the unlawful sale, distribution, manufacture, alteration, transportation, possession, or use of a deadly weapon or accessory.

*Driving-related* — Includes driving under the influence of drugs or alcohol, driving with a suspended or revoked license, and any other felony in the motor vehicle code.

*Other public-order offenses* — Includes flight/escape, parole or probation violations, prison contraband, habitual offender, obstruction of justice, rioting, libel, slander, treason, perjury, prostitution/pandering, bribery, and tax law violations.

**Terms related to pretrial release**

*Released defendant* — Includes any defendant who was released from custody prior to the disposition of his or her case by the court.  Includes defendants who were detained for some period of time before being released and defendants who were returned to custody after being released because of a violation of the conditions of pretrial release.  The terms "on pretrial release" and "released pending disposition" are both used in this report to refer to all released defendants.

*Detained defendant* — Includes any defendant who remained in custody from the time of arrest until the disposition of his or her case by the court.  This report also refers to detained defendants as "not released."

*Failure to appear* — Occurs when a court issues a bench warrant for a defendant's arrest because he or she has missed a scheduled court appearance.

**Types of financial release**

*Surety bond* — A bail bond company signs a promissory note to the court for the full bail amount and charges the defendant a fee for the service (usually 10% of the full bail amount).  If the defendant fails to appear, the bond company is liable to the court for the full bail amount.  Frequently the bond company requires collateral from the defendant in addition to the fee.

*Deposit bond* — The defendant deposits a percentage (usually 10%) of the full bail amount with the court.  The percentage of the bail is returned after the disposition of the case, but the court often retains a small portion for administrative costs.  If the defendant fails to appear in court, he or she is liable to the court for the full amount of the bail.

*Full cash bond* — The defendant posts the full bail amount in cash with the court.  If the defendant makes all court appearances, the cash is returned.  If the defendant fails to appear in court, the bond is forfeited.

*Property bond* — Involves an agreement made by a defendant as a condition of pretrial release requiring that property valued at the full bail amount be posted as an assurance of his or her appearance in court.  If the defendant fails to appear in court, the property is forfeited.  Also known as "collateral bond."

**Types of nonfinancial release**

*Release on recognizance (ROR)* — The court releases the defendant on a signed agreement that he or she will appear in court as required.  In this report, the ROR category includes citation releases in which arrestees are released pending their first court appearance on a written order issued by law enforcement or jail personnel.

*Unsecured bond* — The defendant pays no money to the court but is liable for the full amount of bail should he or she fail to appear in court.

*Conditional release* — Defendants are released under conditions and are usually monitored or supervised by a pretrial services agency.  In some cases, such as those involving a third-party custodian or drug monitoring and treatment, another agency may be involved in the supervision of the defend-ant.  Conditional release sometimes includes an unsecured bond.

**Other type of release**

*Emergency release* — Defendants are released in response to a court order placing limits on a jail's population.

# Appendix

**Appendix table A.  Population, sampling weights, and number of cases, by SCPS jurisdiction, 1996**

| County (State) | Population | Sampling weights | | | Number of cases | |
|---|---|---|---|---|---|---|
| | | Filings | County | Total | Unweighted | Weighted |
| Jefferson (AL) | 662,000 | 2 | 2.00 | 4.00 | 300 | 1,200 |
| Maricopa (AZ) | 2,614,000 | 2 | 1.33 | 2.67 | 835 | 2,227 |
| Pima (AZ) | 779,000 | 1 | 3.30 | 3.30 | 348 | 1,148 |
| Alameda (CA) | 1,356,000 | 2 | 2.00 | 4.00 | 319 | 1,276 |
| Los Angeles (CA) | 9,056,000 | 4 | 1.00 | 4.00 | 1,375 | 5,500 |
| Orange (CA) | 2,606,000 | 2 | 1.33 | 2.67 | 522 | 1,392 |
| Sacramento (CA) | 1,116,000 | 2 | 1.33 | 2.67 | 398 | 1,061 |
| San Bernardino (CA) | 1,589,000 | 2 | 1.33 | 2.67 | 360 | 960 |
| San Francisco (CA) | 735,000 | 2 | 2.00 | 4.00 | 295 | 1,180 |
| Santa Clara (CA) | 1,594,000 | 2 | 1.33 | 2.67 | 356 | 949 |
| Ventura (CA) | 711,000 | 1 | 3.30 | 3.30 | 166 | 548 |
| Broward (FL) | 1,440,000 | 2 | 1.33 | 2.67 | 415 | 1,107 |
| Dade (FL) | 2,106,000 | 4 | 1.00 | 4.00 | 474 | 1,896 |
| Hillsborough (FL) | 893,000 | 2 | 1.33 | 2.67 | 329 | 877 |
| Orange (FL) | 763,000 | 2 | 2.00 | 4.00 | 427 | 1,708 |
| Fulton (GA) | 716,000 | 2 | 2.00 | 4.00 | 450 | 1,800 |
| Honolulu (HI) | 873,000 | 1 | 3.30 | 3.30 | 172 | 568 |
| Cook (IL) | 5,190,000 | 4 | 1.00 | 4.00 | 678 | 2,712 |
| DuPage (IL) | 860,000 | 1 | 3.30 | 3.30 | 147 | 485 |
| Marion (IN) | 815,000 | 1 | 3.30 | 3.30 | 635 | 2,095 |
| Jefferson (KY) | 671,000 | 4 | 1.00 | 4.00 | 132 | 528 |
| Baltimore (city) (MD) | 672,000 | 2 | 1.33 | 2.67 | 483 | 1,288 |
| Wayne (MI | 2,137,000 | 4 | 1.00 | 4.00 | 203 | 812 |
| Jackson (MO) | 650,000 | 1 | 3.30 | 3.30 | 398 | 1,313 |
| St. Louis (MO) | 1,003,000 | 1 | 3.30 | 3.30 | 371 | 1,224 |
| Bronx (NY) | 1,191,000 | 4 | 1.00 | 4.00 | 512 | 2,048 |
| Erie (NY) | 953,000 | 2 | 2.00 | 4.00 | 85 | 340 |
| Kings (NY) | 2,266,000 | 4 | 1.00 | 4.00 | 632 | 2,528 |
| Monroe (NY) | 720,000 | 1 | 3.30 | 3.30 | 213 | 703 |
| New York (NY) | 1,533,000 | 4 | 1.00 | 4.00 | 515 | 2,060 |
| Queens (NY) | 1,973,000 | 4 | 1.00 | 4.00 | 276 | 1,104 |
| Suffolk (NY) | 1,355,000 | 1 | 3.30 | 3.30 | 240 | 792 |
| Hamilton (OH) | 856,000 | 2 | 2.00 | 4.00 | 265 | 1,060 |
| Allegheny (PA) | 1,293,000 | 2 | 1.33 | 2.67 | 138 | 368 |
| Philadelphia (PA) | 1,472,000 | 4 | 1.00 | 4.00 | 324 | 1,296 |
| Shelby (TN) | 864,000 | 2 | 2.00 | 4.00 | 414 | 1,656 |
| Dallas (TX) | 1,989,000 | 4 | 1.00 | 4.00 | 142 | 568 |
| Harris (TX) | 3,107,000 | 4 | 1.00 | 4.00 | 428 | 1,712 |
| King (WA) | 1,618,000 | 2 | 2.00 | 4.00 | 199 | 796 |
| Milwaukee (WI) | 927,000 | 1 | 3.30 | 3.30 | 439 | 1,449 |

Note:  In 14 of the 40 counties included in the 1996 SCPS study, prosecutors did not screen out any felony arrests before filing charges.  In these counties, the SCPS sample cases are representative of all felony cases received by prosecutors, and any cases screened out by the prosecutor are included in the SCPS dismissal category.  These counties are Jefferson (AL); Maricopa (AZ); Pima (AZ); Hillsborough (FL); Fulton (GA); Marion (IN); Jefferson (KY);  Baltimore (city) (MD); Monroe (NY); Suffolk (NY); Hamilton (OH); Allegheny (PA); Shelby (TN);  and Dallas (TX).  In the other 26 SCPS jurisdictions, felony arrests were reviewed by prosecutors before the decision to file felony charges was made.  In these jurisdictions, the SCPS sample cases do not include those in which a person was arrested for a felony but felony charges were not filed.  Weights are rounded to second decimal place.

**Appendix table B.  Most serious arrest charge of felony defendants, by SCPS jurisdiction, 1996**

| County (State) | Total | Violent offenses | Property offenses | Drug offenses | Public-order offenses |
|---|---|---|---|---|---|
| Total | 100% | 25% | 31% | 37% | 8% |
| Jefferson (AL) | 100% | 18% | 34% | 45% | 4% |
| Maricopa (AZ) | 100 | 22 | 29 | 39 | 10 |
| Pima (AZ) | 100 | 26 | 26 | 38 | 10 |
| Alameda (CA) | 100 | 18 | 24 | 55 | 4 |
| Los Angeles (CA) | 100 | 23 | 28 | 43 | 6 |
| Orange (CA) | 100 | 13 | 26 | 55 | 5 |
| Sacramento (CA) | 100 | 32 | 29 | 26 | 14 |
| San Bernardino (CA) | 100 | 27 | 28 | 39 | 6 |
| San Francisco (CA) | 100% | 17% | 19% | 59% | 5% |
| Santa Clara (CA) | 100 | 19 | 28 | 46 | 8 |
| Ventura (CA) | 100 | 22 | 29 | 41 | 8 |
| Broward (FL) | 100 | 15 | 34 | 45 | 7 |
| Dade (FL) | 100 | 36 | 32 | 26 | 6 |
| Hillsborough (FL) | 100 | 27 | 29 | 38 | 6 |
| Orange (FL) | 100 | 29 | 38 | 28 | 6 |
| Fulton (GA) | 100 | 38 | 26 | 34 | 2 |
| Honolulu (HI) | 100% | 23% | 42% | 29% | 6% |
| Cook (IL) | 100 | 9 | 18 | 66 | 7 |
| DuPage (IL) | 100 | 7 | 65 | 14 | 14 |
| Marion (IN) | 100 | 21 | 43 | 28 | 8 |
| Jefferson (KY) | 100 | 36 | 36 | 27 | 2 |
| Baltimore (city) (MD) | 100 | 26 | 33 | 40 | 0 |
| Wayne (MI) | 100 | 33 | 31 | 27 | 9 |
| Jackson (MO) | 100 | 13 | 49 | 31 | 8 |
| St. Louis (MO) | 100% | 15% | 56% | 15% | 14% |
| Bronx (NY) | 100 | 24 | 15 | 53 | 8 |
| Erie (NY) | 100 | 32 | 25 | 32 | 12 |
| Kings (NY) | 100 | 34 | 18 | 37 | 11 |
| Monroe (NY) | 100 | 23 | 46 | 20 | 11 |
| New York (NY) | 100 | 28 | 25 | 41 | 6 |
| Queens (NY) | 100 | 37 | 32 | 21 | 10 |
| Suffolk (NY) | 100 | 17 | 35 | 18 | 30 |
| Hamilton (OH) | 100% | 27% | 46% | 20% | 7% |
| Allegheny (PA) | 100 | 38 | 42 | 11 | 9 |
| Philadelphia (PA) | 100 | 38 | 32 | 22 | 8 |
| Shelby (TN) | 100 | 28 | 32 | 31 | 10 |
| Dallas (TX) | 100 | 28 | 34 | 32 | 6 |
| Harris (TX) | 100 | 26 | 36 | 29 | 8 |
| King (WA) | 100 | 29 | 27 | 41 | 4 |
| Milwaukee (WI) | 100 | 31 | 34 | 23 | 11 |

Note:  Detail may not add to 100% because of rounding.

**Appendix table C.  Sex and age of felony defendants, by SCPS jurisdiction, 1996**

| County (State) | Percent of felony defendants | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Sex | | | Age at arrest | | | | |
| | Total | Male | Female | Total | Under 21 | 21-29 | 30-39 | 40 older |
| Total | 100% | 84% | 16% | 100% | 19% | 33% | 30% | 18% |
| Jefferson (AL) | 100% | 80% | 20% | 100% | 14% | 32% | 31% | 23% |
| Maricopa (AZ) | 100 | 84 | 16 | 100 | 15 | 35 | 33 | 17 |
| Pima (AZ) | 100 | 87 | 13 | 100 | 20 | 32 | 29 | 19 |
| Alameda (CA) | 100 | 81 | 19 | 100 | 14 | 34 | 33 | 19 |
| Los Angeles (CA) | 100 | 89 | 11 | 100 | 12 | 30 | 31 | 27 |
| Orange (CA) | 100 | 77 | 23 | 100 | 11 | 37 | 35 | 17 |
| Sacramento (CA) | 100 | 78 | 22 | 100 | 11 | 33 | 39 | 17 |
| San Bernardino (CA) | 100 | 83 | 17 | 100 | 15 | 33 | 35 | 18 |
| San Francisco (CA) | 100% | 83% | 17% | 100% | 12% | 32% | 35% | 21% |
| Santa Clara (CA) | 100 | 85 | 15 | 100 | 15 | 39 | 32 | 13 |
| Ventura (CA) | 100 | 81 | 19 | 100 | 16 | 37 | 30 | 16 |
| Broward (FL) | 100 | 81 | 19 | 100 | 15 | 35 | 31 | 19 |
| Dade (FL) | 100 | 86 | 14 | 100 | 14 | 33 | 34 | 19 |
| Hillsborough (FL) | 100 | 76 | 24 | 100 | 16 | 36 | 32 | 16 |
| Orange (FL) | 100 | 80 | 20 | 100 | 22 | 36 | 31 | 11 |
| Fulton (GA) | 100 | 82 | 18 | 100 | 18 | 30 | 30 | 22 |
| Honolulu (HI) | 100% | 79% | 21% | 100% | 11% | 30% | 45% | 15% |
| Cook (IL) | 100 | 87 | 13 | 100 | 26 | 36 | 25 | 13 |
| DuPage (IL) | 100 | 80 | 20 | 100 | 26 | 28 | 34 | 12 |
| Marion (IN) | 100 | 81 | 19 | 100 | 26 | 34 | 25 | 14 |
| Jefferson (KY) | 100 | 89 | 11 | 100 | 26 | 33 | 23 | 19 |
| Baltimore (city) (MD) | 100 | 84 | 16 | 100 | 21 | 35 | 30 | 14 |
| Wayne (MI) | 100 | 87 | 13 | 100 | 21 | 35 | 24 | 21 |
| Jackson (MO) | 100 | 76 | 24 | 100 | 14 | 36 | 33 | 18 |
| St. Louis (MO) | 100% | 78% | 22% | 100% | 20% | 32% | 33% | 15% |
| Bronx (NY) | 100 | 83 | 17 | 100 | 23 | 28 | 31 | 18 |
| Erie (NY) | 100 | 89 | 11 | 100 | 40 | 29 | 21 | 9 |
| Kings (NY) | 100 | 84 | 16 | 100 | 24 | 28 | 29 | 19 |
| Monroe (NY) | 100 | 82 | 18 | 100 | 34 | 28 | 27 | 11 |
| New York (NY) | 100 | 88 | 12 | 100 | 22 | 26 | 33 | 19 |
| Queens (NY) | 100 | 91 | 9 | 100 | 29 | 31 | 28 | 12 |
| Suffolk (NY) | 100 | 89 | 11 | 100 | 24 | 36 | 25 | 15 |
| Hamilton (OH) | 100% | 77% | 23% | 100% | 18% | 35% | 32% | 14% |
| Allegheny (PA) | 100 | 86 | 14 | 100 | 14 | 29 | 41 | 16 |
| Philadelphia (PA) | 100 | 86 | 14 | 100 | 24 | 34 | 26 | 16 |
| Shelby (TN) | 100 | 86 | 14 | 100 | 23 | 37 | 29 | 11 |
| Dallas (TX) | 100 | 84 | 16 | 100 | 20 | 23 | 39 | 18 |
| Harris (TX) | 100 | 79 | 21 | 100 | 23 | 34 | 25 | 19 |
| King (WA) | 100 | 83 | 17 | 100 | 11 | 39 | 29 | 21 |
| Milwaukee (WI) | 100 | 90 | 10 | 100 | 24 | 39 | 26 | 12 |

Note:  Detail may not add to 100% because of rounding.

**Appendix table D.  Race and Hispanic origin of felony defendants, by SCPS jurisdiction, 1996**

| | Percent of felony defendants | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Race | | | | Race and Hispanic origin | | | | |
| County (State) | Total | Black | White | Other | Total | Black, non-Hispanic | White, non-Hispanic | Other, non-Hispanic | Hispanic, any race |
| Total | 100% | 58% | 40% | 2% | 100% | 50% | 23% | 3% | 24% |
| | | | | | | | | | |
| Jefferson (AL) | 100% | 74% | 26% | 0% | ... | ... | ... | ... | ... |
| Maricopa (AZ) | 100 | 21 | 74 | 5 | 100 | 16 | 44 | 5 | 35 |
| Pima (AZ) | 100 | 13 | 83 | 4 | 100 | 13 | 43 | 4 | 40 |
| Alameda (CA) | 100 | 77 | 19 | 4 | 100 | 64 | 16 | 3 | 17 |
| Los Angeles (CA) | ... | ... | ... | ... | 100 | 28 | 17 | 2 | 53 |
| Orange (CA) | ... | ... | ... | ... | 100 | 7 | 46 | 4 | 43 |
| Sacramento (CA) | 100 | 32 | 65 | 3 | 100 | 32 | 46 | 3 | 19 |
| San Bernardino (CA) | 100 | 34 | 65 | 2 | ... | ... | ... | ... | ... |
| | | | | | | | | | |
| San Francisco (CA) | 100% | 45% | 51% | 4% | ... | ... | ... | ... | ... |
| Santa Clara (CA) | ... | ... | ... | ... | 100 | 14 | 29 | 7 | 50 |
| Ventura (CA) | 100% | 8 | 91 | 1 | 100 | 8 | 40 | 1 | 51 |
| Broward (FL) | 100 | 55 | 45 | 0 | 100 | 54 | 36 | 0 | 10 |
| Dade (FL) | 100 | 56 | 44 | -- | 100 | 52 | 13 | -- | 34 |
| Hillsborough (FL) | 100 | 51 | 49 | -- | 100 | 50 | 41 | -- | 8 |
| Orange (FL) | 100 | 52 | 48 | 0 | ... | ... | ... | ... | ... |
| Fulton (GA) | 100 | 93 | 7 | 0 | 100 | 93 | 6 | 0 | 1 |
| | | | | | | | | | |
| Honolulu (HI) | 100% | 10% | 29% | 62% | ... | ... | ... | ... | ... |
| Cook (IL) | 100 | 76 | 24 | -- | 100 | 76 | 14 | -- | 9 |
| DuPage (IL) | 100 | 23 | 75 | 2 | ... | ... | ... | ... | ... |
| Marion (IN) | 100 | 65 | 35 | 1 | 100 | 65 | 32 | 1 | 3 |
| Jefferson (KY) | 100 | 51 | 49 | 0 | 100 | 51 | 49 | 0 | 0 |
| Baltimore (city) (MD) | 100 | 88 | 11 | 1 | 100 | 88 | 11 | 1 | -- |
| Wayne (MI) | 100 | 90 | 10 | 1 | ... | ... | ... | ... | ... |
| Jackson (MO) | 100 | 64 | 36 | 1 | 100 | 62 | 35 | 1 | 3 |
| | | | | | | | | | |
| St. Louis (MO) | 100% | 55% | 45% | -- | ... | ... | ... | ... | ... |
| Bronx (NY) | 100 | 53 | 47 | 1 | 100 | 42 | 5 | 1 | 53 |
| Erie (NY) | 100 | 77 | 21 | 1 | 100 | 73 | 17 | 1 | 9 |
| Kings (NY) | 100 | 63 | 36 | 1 | 100 | 60 | 12 | 1 | 27 |
| Monroe (NY) | 100 | 74 | 25 | 1 | 100 | 62 | 22 | 1 | 15 |
| New York (NY) | 100 | 61 | 37 | 3 | 100 | 53 | 11 | 3 | 34 |
| Queens (NY) | 100 | 51 | 45 | 4 | 100 | 46 | 17 | 4 | 33 |
| Suffolk (NY) | 100 | 45 | 54 | 1 | 100 | 39 | 45 | 1 | 15 |
| | | | | | | | | | |
| Hamilton (OH) | 100% | 66% | 33% | 1% | 100% | 65% | 33% | 1% | 2% |
| Allegheny (PA) | 100 | 57 | 43 | 1 | ... | ... | ... | ... | ... |
| Philadelphia (PA) | 100 | 70 | 30 | 1 | 100 | 69 | 19 | 1 | 12 |
| Shelby (TN) | 100 | 84 | 15 | -- | ... | ... | ... | ... | ... |
| Dallas (TX) | 100 | 53 | 46 | 1 | 100 | 52 | 28 | 1 | 18 |
| Harris (TX) | 100 | 49 | 51 | 1 | 100 | 48 | 29 | 1 | 22 |
| King (WA) | 100 | 37 | 59 | 4 | 100 | 38 | 47 | 4 | 11 |
| Milwaukee (WI) | 100 | 73 | 24 | 2 | ... | ... | ... | ... | ... |

Note:  Detail may not add to 100% because of rounding.
...Data were available for less than two-thirds of all cases.
--Less than 0.5%.

**Appendix table E.  Felony defendants released before or detained until case disposition, by SCPS jurisdiction, 1996**

| County (State) | Total | Surety bond | Deposit bond | Full cash bond | Property bond | Recog-nizance* | Condi-tional | Un-secured bond | Emer-gency release | Total | Held on bail | Denied bail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Financial release | | | | Nonfinancial release | | | | Detained until case disposition | |
| Total | 63% | 18% | 7% | 2% | 2% | 24% | 6% | 4% | 1% | 37% | 30% | 6% |
| Jefferson (AL) | 79% | 27% | 0% | 2 | 38% | 2% | 1% | 8% | 0% | 21% | 19% | 2% |
| Maricopa (AZ) | 76 | 11 | 9 | -- | 0 | 40 | 15 | 1 | 0 | 24 | 14 | 10 |
| Pima (AZ) | 63 | 9 | 0 | 4 | 0 | 31 | 19 | 0 | 0 | 37 | 37 | 0 |
| Alameda (CA) | 60 | 26 | 0 | 0 | 0 | 33 | 0 | 0 | 0 | 40 | 23 | 17 |
| Los Angeles (CA) | 31 | 10 | 0 | 0 | 0 | 20 | -- | 0 | 0 | 69 | 69 | 1 |
| Orange (CA) | 47 | 11 | 0 | 1 | 0 | 35 | 0 | 0 | 0 | 53 | 51 | 2 |
| Sacramento (CA) | 53 | 27 | 0 | -- | 0 | 25 | 0 | 0 | 0 | 47 | 26 | 21 |
| San Bernardino (CA) | 37 | 10 | -- | 0 | 0 | 22 | 4 | 0 | 0 | 63 | 61 | 2 |
| San Francisco (CA) | 76% | 21% | 0% | 2% | 0% | 50% | 3% | 0% | 0% | 24% | 24% | 0% |
| Santa Clara (CA) | 52 | 18 | 0 | 1 | 0 | 17 | 16 | 0 | 0 | 48 | 46 | 2 |
| Ventura (CA) | 54 | 21 | 0 | 1 | 0 | 18 | 14 | 0 | 0 | 46 | 38 | 8 |
| Broward (FL) | 74 | 45 | -- | 12 | 0 | 2 | 8 | 0 | 7 | 26 | 15 | 11 |
| Dade (FL) | 51 | 12 | 10 | 2 | 3 | 3 | 17 | 3 | 0 | 49 | 37 | 12 |
| Hillsborough (FL) | 79 | 63 | 0 | 3 | 0 | 10 | 3 | 0 | 0 | 21 | 10 | 11 |
| Orange (FL) | 68 | 56 | 0 | 5 | 0 | 2 | 5 | 0 | 0 | 32 | 26 | 6 |
| Fulton (GA) | 75 | 47 | 0 | 3 | 7 | 7 | -- | 10 | 0 | 25 | 17 | 9 |
| Honolulu (HI) | 58% | 16% | 0% | 12% | 0% | 3% | 19% | 0% | 8% | 42% | 40% | 2% |
| Cook (IL) | 73 | -- | 34 | -- | 0 | 0 | 5 | 27 | 7 | 27 | 26 | 1 |
| DuPage (IL) | 72 | 0 | 69 | 0 | 0 | 1 | 1 | 0 | 0 | 28 | 28 | 0 |
| Marion (IN) | 82 | 34 | 6 | 1 | 0 | 36 | 4 | 0 | 0 | 18 | 12 | 6 |
| Jefferson (KY) | 73 | 0 | 23 | 1 | 2 | 43 | 4 | 0 | 1 | 27 | 26 | 1 |
| Baltimore (city) (MD) | 54 | 28 | -- | 0 | 4 | 13 | 8 | -- | 0 | 46 | 38 | 8 |
| Wayne (MI) | 68 | 1 | 41 | 0 | 0 | 0 | 0 | 21 | 5 | 32 | 20 | 12 |
| Jackson (MO) | 79 | 10 | 19 | 0 | -- | 4 | 0 | 45 | 0 | 21 | 20 | 1 |
| St. Louis (MO) | 70% | 10% | 23% | 1% | 10% | 3% | 0% | 23% | 0% | 30% | 21% | 9% |
| Bronx (NY) | 76 | 0 | 0 | 0 | 0 | 76 | 0 | 0 | 0 | 24 | 19 | 5 |
| Erie (NY) | 54 | 10 | 0 | 4 | 0 | 38 | 0 | 1 | 0 | 46 | 46 | 0 |
| Kings (NY) | 80 | 0 | 0 | 0 | 0 | 80 | 0 | 0 | 0 | 20 | 11 | 9 |
| Monroe (NY) | 65 | 0 | 0 | 1 | 0 | 48 | 16 | 0 | 0 | 35 | 28 | 7 |
| New York (NY) | 69 | 0 | 0 | 0 | 0 | 69 | 0 | 0 | 0 | 31 | 18 | 13 |
| Queens (NY) | 79 | 0 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 21 | 12 | 10 |
| Suffolk (NY) | 74 | 1 | 2 | 11 | 0 | 59 | -- | 0 | 0 | 26 | 12 | 15 |
| Hamilton (OH) | 58% | 2% | 20% | 0% | 10% | 4% | 22% | 0% | 0% | 42% | 37% | 6% |
| Allegheny (PA) | 80 | 6 | 27 | 15 | 0 | 31 | 0 | 0 | 0 | 20 | 18 | 2 |
| Philadelphia (PA) | 75 | 14 | 27 | 0 | 0 | 11 | 17 | 6 | 0 | 25 | 21 | 4 |
| Shelby (TN) | 65 | 52 | 0 | 0 | 0 | -- | 13 | 0 | 0 | 35 | 34 | 1 |
| Dallas (TX) | 51 | 43 | 0 | 1 | 0 | 2 | 0 | 3 | 0 | 49 | 47 | 1 |
| Harris (TX) | 49 | 42 | 0 | 1 | 0 | -- | 2 | 3 | 0 | 51 | 35 | 16 |
| King (WA) | 53 | 10 | 1 | 0 | 0 | 26 | 17 | 0 | 0 | 47 | 47 | 0 |
| Milwaukee (WI) | 60 | 0 | -- | 10 | 0 | 37 | 12 | 0 | -- | 40 | 30 | 10 |

Note:  Detail may not add to 100% because of rounding.
*Released on own recognizance.
--Less than 0.5%.

**Appendix table F.  Adjudication outcome for felony defendants, by SCPS jurisdiction, 1996**

| County (State) | Adjudicated within 1 year | Convicted Total | Convicted Felony | Convicted Misdemeanor | Not convicted Total | Not convicted Dismissed | Not convicted Acquitted | Other outcome* |
|---|---|---|---|---|---|---|---|---|
| Total | 86% | 70% | 55% | 15% | 30% | 29% | 1% | -- |
| | | | | | | | | |
| Jefferson (AL) | 49% | 62% | 47% | 15% | 38% | 38% | 0% | 0% |
| Maricopa (AZ) | 86 | 56 | 48 | 8 | 44 | 43 | -- | -- |
| Pima (AZ) | 96 | 46 | 44 | 2 | 54 | 52 | 1 | 0 |
| Alameda (CA) | 81 | 82 | 71 | 12 | 17 | 17 | 0 | -- |
| Los Angeles (CA) | 95 | 85 | 79 | 6 | 15 | 15 | -- | 1 |
| Orange (CA) | 88 | 83 | 75 | 8 | 17 | 16 | 1 | 0 |
| Sacramento (CA) | 93 | 80 | 58 | 22 | 20 | 19 | 1 | 0 |
| San Bernardino (CA) | 91 | 83 | 69 | 15 | 16 | 16 | 1 | 1 |
| | | | | | | | | |
| San Francisco (CA) | 74% | 80% | 57% | 22% | 19% | 19% | 0% | 1% |
| Santa Clara (CA) | 86 | 87 | 81 | 6 | 13 | 13 | 0 | -- |
| Ventura (CA) | 89 | 88 | 85 | 3 | 12 | 11 | 1 | 0 |
| Broward (FL) | 87 | 74 | 71 | 2 | 26 | 26 | 1 | -- |
| Dade (FL) | 91 | 59 | 52 | 7 | 40 | 30 | 10 | -- |
| Hillsborough (FL) | 90 | 73 | 64 | 10 | 27 | 26 | -- | 0 |
| Orange (FL) | 94 | 73 | 59 | 14 | 27 | 26 | 1 | -- |
| Fulton (GA) | 79 | 37 | 32 | 5 | 63 | 63 | 0 | 0 |
| | | | | | | | | |
| Honolulu (HI) | 75% | 88% | 87% | 1% | 12% | 10% | 2% | 0% |
| Cook (IL) | 84 | 60 | 58 | 2 | 40 | 36 | 4 | 0 |
| DuPage (IL) | 85 | 94 | 92 | 2 | 6 | 6 | 1 | 0 |
| Marion (IN) | 87 | 51 | 40 | 11 | 49 | 47 | 2 | 0 |
| Jefferson (KY) | 91 | 63 | 25 | 38 | 37 | 37 | 0 | 0 |
| Baltimore (city) (MD) | 84 | 37 | 27 | 10 | 63 | 60 | 2 | -- |
| Wayne (MI) | 88 | 67 | 65 | 2 | 33 | 29 | 4 | 0 |
| Jackson (MO) | 80 | 62 | 57 | 5 | 38 | 38 | -- | 0 |
| | | | | | | | | |
| St. Louis (MO) | 95% | 86% | 78% | 8% | 14% | 14% | 1 | 0% |
| Bronx (NY) | 81 | 69 | 29 | 40 | 30 | 29 | -- | 1 |
| Erie (NY) | 94 | 73 | 28 | 46 | 25 | 25 | 0 | 1 |
| Kings (NY) | 93 | 62 | 21 | 41 | 37 | 37 | 0 | 1 |
| Monroe (NY) | 80 | 65 | 38 | 28 | 35 | 34 | 1 | 0 |
| New York (NY) | 91 | 63 | 35 | 29 | 36 | 36 | -- | 1 |
| Queens (NY) | 89 | 65 | 26 | 39 | 34 | 34 | 0 | 1 |
| Suffolk (NY) | 91 | 98 | 74 | 24 | 2 | 2 | 0 | 0 |
| | | | | | | | | |
| Hamilton (OH) | 96% | 68% | 48% | 20% | 31% | 31% | 1% | -- |
| Allegheny (PA) | 79 | 83 | 66 | 17 | 17 | 17 | 0 | 1 |
| Philadelphia (PA) | 72 | 52 | 43 | 9 | 48 | 42 | 6 | 0 |
| Shelby (TN) | 72 | 75 | 42 | 33 | 25 | 25 | -- | 0 |
| Dallas (TX) | 77 | 83 | 74 | 8 | 17 | 17 | 1 | 0 |
| Harris (TX) | 77 | 79 | 64 | 16 | 20 | 20 | -- | 1 |
| King (WA) | 97 | 85 | 85 | 0 | 13 | 13 | 1 | 1 |
| Milwaukee (WI) | 89 | 87 | 81 | 6 | 13 | 13 | 1 | 0 |

Note:  Detail may not add to 100% because of rounding.
--Less than 0.5%.
*Includes diversion and deferred adjudication.

**Appendix table G.   Most severe type of sentence received
by defendants convicted of a felony, by SCPS jurisdiction, 1996**

| County (State) | Percent of felony defendants | | | | | |
|---|---|---|---|---|---|---|
| | Incarceration | | | Nonincarceration | | |
| | Total | Prison | Jail | Total | Probation | Fine |
| Total | 69% | 35% | 34% | 31% | 30% | 1% |
| Jefferson (AL) | 27% | 27% | 0% | 73% | 71% | 2% |
| Maricopa (AZ) | 59 | 26 | 33 | 41 | 40 | -- |
| Pima (AZ) | 59 | 47 | 12 | 41 | 41 | 0 |
| Alameda (CA) | 94 | 29 | 65 | 6 | 6 | 0 |
| Los Angeles (CA) | 89 | 47 | 42 | 11 | 11 | -- |
| Orange (CA) | 83 | 34 | 49 | 17 | 17 | 0 |
| Sacramento (CA) | 88 | 35 | 53 | 12 | 12 | 0 |
| San Bernardino (CA) | 91 | 46 | 45 | 9 | 9 | 0 |
| San Francisco (CA) | 65% | 9% | 55% | 35% | 34% | 1% |
| Santa Clara (CA) | 93 | 22 | 71 | 7 | 7 | 0 |
| Ventura (CA) | 96 | 38 | 58 | 4 | 4 | 0 |
| Broward (FL) | 37 | 18 | 19 | 63 | 62 | 1 |
| Dade (FL) | 64 | 9 | 55 | 36 | 34 | 2 |
| Hillsborough (FL) | 33 | 16 | 17 | 67 | 66 | 1 |
| Orange (FL) | 47 | 15 | 32 | 53 | 53 | -- |
| Fulton (GA) | 44 | 24 | 21 | 56 | 56 | 0 |
| Honolulu (HI) | 84% | 43% | 41% | 16% | 16% | 0% |
| Cook (IL) | 45 | 43 | 2 | 55 | 55 | 0 |
| DuPage (IL) | 55 | 28 | 27 | 45 | 44 | 1 |
| Marion (IN) | 73 | 37 | 36 | 27 | 24 | 3 |
| Jefferson (KY) | 63 | 56 | 7 | 37 | 37 | 0 |
| Baltimore (city) (MD) | 75 | 39 | 36 | 25 | 25 | 0 |
| Wayne (MI) | 40 | 28 | 13 | 60 | 60 | 0 |
| Jackson (MO) | 41 | 37 | 4 | 59 | 59 | 0 |
| St. Louis (MO) | 51% | 33% | 18% | 49% | 48% | 1% |
| Bronx (NY) | 72 | 63 | 9 | 28 | 28 | 0 |
| Erie (NY) | 80 | 40 | 40 | 20 | 20 | 0 |
| Kings (NY) | 85 | 47 | 38 | 15 | 15 | 0 |
| Monroe (NY) | 52 | 28 | 25 | 48 | 48 | 0 |
| New York (NY) | 79 | 59 | 20 | 21 | 21 | 0 |
| Queens (NY) | 69 | 54 | 15 | 31 | 31 | 0 |
| Suffolk (NY) | 79 | 32 | 47 | 21 | 17 | 4 |
| Hamilton (OH) | 55% | 37% | 17% | 45% | 42% | 2% |
| Allegheny (PA) | 49 | 16 | 33 | 51 | 51 | 0 |
| Philadelphia (PA) | 47 | 19 | 28 | 53 | 53 | 0 |
| Shelby (TN) | 86 | 56 | 30 | 14 | 13 | 2 |
| Dallas (TX) | 53 | 27 | 26 | 47 | 46 | 1 |
| Harris (TX) | 84 | 38 | 46 | 16 | 16 | -- |
| King (WA) | 92 | 38 | 54 | 8 | 6 | 3 |
| Milwaukee (WI) | 75 | 42 | 33 | 25 | 24 | 1 |

Note:  Sentences to incarceration may have also included a probation term. Sentences
to prison, jail, and probation may have included a fine, restitution, or community service.
Fines included restitution or community service in some instances.
Detail may not add to 100% because of rounding.
 --Less than 0.5%.

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

December 2013, NCJ 243777

*State Court Processing Statistics*

# Felony Defendants in Large Urban Counties, 2009 - Statistical Tables

Brian A. Reaves, Ph.D., *BJS Statistician*

Between 1990 and 2009, the average age of persons convicted of felonies in the 75 largest counties in the United States increased from 28 to 32 years. About 27% of convicted felons in 2009 were age 40 or older, compared to 10% in 1990 (**figure 1**).

As the average age of convicted felons increased between 1990 and 2009, the severity of the criminal histories of these older offenders also increased. In 2009, about two-thirds (68%) of convicted felons age 40 or older had at least one prior felony conviction, compared to less than half (45%) in 1990 (**figure 2**). Defendants age 40 or older were the only age group with an increase in the probability of incarceration for a felony conviction between 1990 (71%) and 2009 (77%) (not shown in figure).

Due to the increased percentage of older offenders in felony courts and their greater likelihood of incarceration, 27% of those sentenced to incarceration after a felony conviction in 2009 were age 40 or older, compared to 9% in 1990 (**figure 3**). By 2009, 34% of state prison inmates were age 40 or older, compared to 18% in 1990.

In addition to these age-related trends, from 1990 to 2009—

- The percentage of defendants charged with a public-order offense increased from 7% to 13%, while the percentage of property defendants dropped from 34% to 29%.

- The percentage of female defendants rose from 14% to 17%.

- The percentage of pretrial releases that included financial conditions climbed from 37% to 61%, including an increase from 24% to 49% in the use of surety bonds.

**FIGURE 1**
**Age of defendants convicted of a felony in the 75 largest counties, 1990, 2000, and 2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990, 2000, and 2009.

**FIGURE 2**
**Defendants convicted of a felony in the 75 largest counties who had at least 1 prior felony conviction, by age at arrest, 1990, 2000, and 2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990, 2000, and 2009.

**FIGURE 3**
**Age of defendants convicted of a felony and sentenced to prison in the 75 largest counties, 1990, 2000, and 2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990, and 2009.

*Bureau of Justice Statistics • Statistical Tables*



The findings in this report are based on data from the Bureau of Justice Statistics' (BJS) State Court Processing Statistics (SCPS) program. The SCPS program periodically tracks a sample of felony cases filed in the nation's 75 most populous counties. Data are collected on arrest charges, demographic characteristics, criminal histories, pretrial processing, adjudication, and sentencing. This report presents findings from the SCPS data collection that tracked cases filed in May 2009. In addition to the 2009 results, selected trends observed since 1990 are also presented.

## Section 1: Arrest charges

- About 56,000 felony cases were filed in the 75 largest counties during May 2009. Drug defendants (33%) represented the largest category of felony defendants, followed by those charged with a property offense (29%) or a violent offense (25%) (**table 1**).

- By specific offense, 18% of defendants were charged with nontrafficking drug offenses and 15% with drug trafficking. The next most frequent case types were assault (12%), burglary (9%), larceny/theft (8%), and robbery (7%) (**figure 4**).

- The majority (55%) of felony defendants faced at least one additional charge. About 40% were charged with at least one additional felony, and 15% were charged with a misdemeanor in addition to the primary felony charge (**table 2**).

- The majority of the defendants whose most serious arrest charge was rape (65%), murder (60%), burglary (56%), drug trafficking (55%), or robbery (54%) were charged with one or more additional felonies.

- Between 1990 and 2009, more than 3 in 5 felony defendants were charged with either a drug offense or property offense, and about 1 in 4 was charged with a violent offense (**figure 5**).

- The percentage of defendants charged with a property offense declined from 34% in 1990 to 29% in 2009. The percentage of defendants charged with a public-order offense rose from 7% in 1990 to 13% in 2009.

- The percentage of defendants charged with a violent offense in 2009 (25%) approached that observed in 1990 (27%) after dropping to a low of 23% in 2004 and 2005.

- Drug defendants represented 33% of felony cases in both 1990 and 2009, but they accounted for 37% of cases between 1996 and 2006.

## List of tables and figures - Arrest charges

**TABLE 1.** Felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 4.** Most frequently charged offenses of felony defendants in the 75 largest counties, 2009

**FIGURE 5.** Most serious arrest charge category for felony defendants in the 75 largest counties, 1990–2009

**TABLE 2.** Level of second most serious charge for felony defendants in the 75 largest counties, by most serious arrest charge, 2009

## TABLE 1
**Felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Number | Percent |
|---|---|---|
| All offenses | 55,902 | 100% |
| Violent offenses | 13,938 | 24.9% |
| Murder | 374 | 0.7 |
| Rape | 584 | 1.0 |
| Robbery | 3,782 | 6.8 |
| Assault | 6,469 | 11.6 |
| Other violent | 2,728 | 4.9 |
| Property offenses | 16,241 | 29.1% |
| Burglary | 4,819 | 8.6 |
| Larceny/theft | 4,700 | 8.4 |
| Motor vehicle theft | 1,439 | 2.6 |
| Forgery | 1,458 | 2.6 |
| Fraud | 1,887 | 3.4 |
| Other property | 1,937 | 3.5 |
| Drug offenses | 18,220 | 32.6% |
| Trafficking | 8,287 | 14.8 |
| Other drug | 9,933 | 17.8 |
| Public-order offenses | 7,504 | 13.4% |
| Weapons | 2,052 | 3.7 |
| Driving-related | 2,324 | 4.2 |
| Other public-order | 3,128 | 5.6 |

Note: Data for the specific arrest charge were available for 99.7% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

## FIGURE 4
**Most frequently charged offenses of felony defendants in the 75 largest counties, 2009**

Most serious arrest charge



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

## FIGURE 5
**Most serious arrest charge category for felony defendants in the 75 largest counties, 1990–2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

**TABLE 2**
**Level of second most serious charge for felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | No other charges | Most serious additional charge | | |
|---|---|---|---|---|---|
| | | | Total | Felony | Misdemeanor |
| All offenses | 100% | 45% | 55% | 40% | 15% |
| Violent offenses | 100% | 37% | 62% | 49% | 13% |
| Murder | 100% | 39 | 61 | 60 | 1 |
| Rape | 100% | 32 | 68 | 65 | 3 |
| Robbery | 100% | 39 | 61 | 54 | 7 |
| Assault | 100% | 38 | 62 | 46 | 16 |
| Other violent | 100% | 34 | 67 | 47 | 20 |
| Property offenses | 100% | 47% | 53% | 42% | 11% |
| Burglary | 100% | 33 | 67 | 56 | 11 |
| Larceny/theft | 100% | 62 | 38 | 28 | 10 |
| Motor vehicle theft | 100% | 48 | 52 | 44 | 8 |
| Forgery | 100% | 38 | 62 | 51 | 11 |
| Fraud | 100% | 44 | 56 | 49 | 7 |
| Other property | 100% | 59 | 41 | 20 | 21 |
| Drug offenses | 100% | 46% | 54% | 36% | 18% |
| Trafficking | 100% | 33 | 67 | 55 | 12 |
| Other drug | 100% | 56 | 44 | 21 | 23 |
| Public-order offenses | 100% | 52% | 47% | 31% | 16% |
| Weapons | 100% | 36 | 64 | 51 | 13 |
| Driving-related | 100% | 52 | 48 | 32 | 16 |
| Other public-order | 100% | 62 | 37 | 19 | 18 |

Note: Data for the second most serious arrest charge were available for 93.0% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

# Section 2: Demographic characteristics

- In 2009, the overall average age at arrest for felony defendants in the 75 largest counties was 32 (**table 3**). This was four years older than the average age of 28 observed in 1990.

- The average age at arrest for defendants charged with robbery in 2009 was 25, the youngest average age for any charged offense. Nearly half (46%) of robbery defendants were age 20 or younger, compared to 18% of defendants overall. Fifteen percent of robbery defendants were age 17 or younger, compared to 3% of defendants overall.

- Defendants charged with a driving-related offense had the oldest average age at arrest (37). Thirty-nine percent of defendants charged with a driving-related offense were age 40 or older, compared to 25% of defendants overall.

- The proportion of defendants age 40 or older has increased from about 1 in 10 in 1990 to about 1 in 4 since 2004. Since 1996, just over 3 in 10 defendants have been age 24 or younger, a smaller proportion than in 1990 and 1992, when about 4 in 10 defendants were in this age category (**figure 6**).

- An estimated 17% of defendants were female in 2009. This was a slight increase compared to 1990, when females represented 14% of defendants (**table 4**).

- In 2009, the most frequently charged offenses among female felony defendants were fraud (37%), forgery (34%), and larceny/theft (31%). Female felony defendants were least often charged with a weapons-related offense (4%).

- Nearly half (45%) of all defendants were non-Hispanic blacks in 2009. The highest percentages of black defendants were among those charged with robbery (62%), a weapons offense (61%), or murder (57%). The lowest percentages were among those charged with a driving-related offense (28%) or fraud (32%) (**table 5**).

- Nearly a third of all defendants were non-Hispanic whites (30%). More than a third of the defendants charged with a driving-related offense (39%) or larceny/theft (37%) were white. About a quarter (24%) of all defendants were Hispanic, including nearly a third of defendants charged with a driving-related offense (31%), motor vehicle theft (30%), or murder (30%).

- Black males accounted for more than half (55%) of defendants age 17 or younger. Among defendants age 40 or older, 37% were black males, 28% were white males, and 16% were Hispanic males (**figure 7**).

---

## List of tables and figures - Demographic characteristics

**TABLE 3.** Age at arrest of felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 6.** Age at arrest of felony defendants in the 75 largest counties, 1990–2009

**TABLE 4.** Sex of felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 5.** Race and Hispanic or Latino origin of felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 7.** Race and Hispanic or Latino origin and sex of felony defendants in the 75 largest counties, by age at arrest, 2009

**TABLE 3**
**Age at arrest of felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | 17 or younger | 18–20 | 21–24 | 25–29 | 30–34 | 35–39 | 40-49 | 50 or older | Average age at arrest |
|---|---|---|---|---|---|---|---|---|---|---|
| **All offenses** | 100% | 3% | 15% | 17% | 17% | 13% | 10% | 17% | 8% | 32 yrs. |
| **Violent offenses** | 100% | 6% | 18% | 19% | 15% | 11% | 9% | 14% | 7% | 30 yrs. |
| Murder | 100% | 7 | 21 | 22 | 14 | 13 | 11 | 8 | 5 | 28 |
| Rape | 100% | 3 | 14 | 13 | 17 | 19 | 7 | 14 | 14 | 33 |
| Robbery | 100% | 15 | 31 | 20 | 11 | 5 | 6 | 8 | 3 | 25 |
| Assault | 100% | 3 | 14 | 20 | 17 | 14 | 10 | 15 | 7 | 31 |
| Other violent | 100% | 2 | 11 | 16 | 16 | 13 | 11 | 20 | 11 | 33 |
| **Property offenses** | 100% | 2% | 18% | 16% | 15% | 12% | 11% | 17% | 9% | 31 yrs. |
| Burglary | 100% | 5 | 28 | 20 | 13 | 10 | 8 | 13 | 4 | 28 |
| Larceny/theft | 100% | 1 | 14 | 15 | 14 | 11 | 11 | 21 | 13 | 34 |
| Motor vehicle theft | 100% | 3 | 20 | 20 | 19 | 10 | 9 | 13 | 5 | 29 |
| Forgery | 100% | 0 | 11 | 14 | 18 | 16 | 14 | 18 | 10 | 33 |
| Fraud | 100% | 1 | 7 | 10 | 16 | 15 | 16 | 20 | 15 | 35 |
| Other property | 100% | 2 | 16 | 19 | 19 | 14 | 12 | 13 | 6 | 30 |
| **Drug offenses** | 100% | 1% | 12% | 17% | 18% | 14% | 10% | 20% | 9% | 33 yrs. |
| Trafficking | 100% | 1 | 14 | 18 | 19 | 14 | 9 | 17 | 7 | 31 |
| Other drug | 100% | 1 | 10 | 15 | 18 | 14 | 11 | 22 | 10 | 34 |
| **Public-order offenses** | 100% | 1% | 10% | 14% | 18% | 15% | 12% | 19% | 10% | 33 yrs. |
| Weapons | 100% | 3 | 17 | 21 | 21 | 14 | 10 | 11 | 4 | 29 |
| Driving-related | 100% | 0 | 3 | 8 | 18 | 17 | 14 | 25 | 14 | 37 |
| Other public-order | 100% | 1 | 12 | 14 | 16 | 14 | 12 | 20 | 11 | 34 |

Note: Data on age of defendants were available for 99.2% of all cases.  Detail may not sum to total due to rounding. In many of the SPCS jurisdictions, all persons age 17 (and in some jurisdictions, all persons age 16) charged with a felony were legally classified as adults and were processed in an adult criminal court.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 6**
**Age at arrest of felony defendants in the 75 largest counties, 1990–2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

**TABLE 4**
**Sex of felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | Male | Female |
|---|---|---|---|
| **All offenses** | 100% | 83% | 17% |
| **Violent offenses** | 100% | 86% | 14% |
| Murder | 100% | 91 | 9 |
| Rape | 100% | 100* | -- |
| Robbery | 100% | 90 | 10 |
| Assault | 100% | 82 | 18 |
| Other violent | 100% | 84 | 16 |
| **Property offenses** | 100% | 77% | 23% |
| Burglary | 100% | 89 | 11 |
| Larceny/theft | 100% | 69 | 31 |
| Motor vehicle theft | 100% | 84 | 16 |
| Forgery | 100% | 66 | 34 |
| Fraud | 100% | 63 | 37 |
| Other property | 100% | 83 | 17 |
| **Drug offenses** | 100% | 84% | 16% |
| Trafficking | 100% | 88 | 12 |
| Other drug | 100% | 81 | 19 |
| **Public-order offenses** | 100% | 88% | 12% |
| Weapons | 100% | 96 | 4 |
| Driving-related | 100% | 88 | 12 |
| Other public-order | 100% | 84 | 16 |

Note: Data on sex of defendants were available for 98.8% of all cases.
--Less than 0.5%.
*Rounded from 99.5%.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 5**
**Race and Hispanic or Latino origin of felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | White[a] | Black/African American[a] | Hispanic/Latino | Other[a,b] |
|---|---|---|---|---|---|
| All offenses | 100% | 30% | 45% | 24% | 2% |
| Violent offenses | 100% | 24% | 48% | 26% | 2% |
| Murder | 100% | 12 | 57 | 30 | 2 |
| Rape | 100% | 29 | 42 | 26 | 3 |
| Robbery | 100% | 15 | 62 | 22 | 1 |
| Assault | 100% | 26 | 45 | 27 | 2 |
| Other violent | 100% | 35 | 35 | 29 | 2 |
| Property offenses | 100% | 34% | 41% | 22% | 2% |
| Burglary | 100% | 30 | 42 | 26 | 1 |
| Larceny/theft | 100% | 37 | 43 | 18 | 2 |
| Motor vehicle theft | 100% | 28 | 40 | 30 | 2 |
| Forgery | 100% | 30 | 50 | 19 | 1 |
| Fraud | 100% | 43 | 32 | 21 | 4 |
| Other property | 100% | 38 | 39 | 20 | 3 |
| Drug offenses | 100% | 29% | 45% | 25% | 1% |
| Trafficking | 100% | 22 | 53 | 23 | 1 |
| Other drug | 100% | 34 | 39 | 26 | 1 |
| Public-order offenses | 100% | 30% | 44% | 23% | 2% |
| Weapons | 100% | 15 | 61 | 23 | 1 |
| Driving-related | 100% | 39 | 28 | 31 | 3 |
| Other public-order | 100% | 34 | 46 | 18 | 2 |

Note: Data on both race and Hispanic or Latino origin of defendants were available for 96.2% of all cases. Detail may not sum to total due to rounding.
[a]Excludes persons of Hispanic or Latino origin.
[b]Includes persons identifying as American Indian or Alaska Native; Asian, Native Hawaiian, or other Pacific Islander; and persons identifying as two or more races.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 7**
**Race and Hispanic or Latino origin and sex of felony defendants in the 75 largest counties, by age at arrest, 2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

# Section 3: Criminal history

- In 2009, 13% of felony defendants in the 75 largest counties were on probation at the time of arrest, down from a peak of 18% in 1990. Defendants charged with motor vehicle theft (18%) or burglary (17%) were the most likely to have been on probation when arrested on the current felony charge (**table 6**).

- About 5% of defendants were on parole at the time of arrest in 2009, compared to 8% in years prior to 1996. In 2009, an estimated 8% of those charged with a weapons offense and 7% of those charged with rape were parolees at the time of arrest.

- About 3 in 4 defendants had been arrested at least once prior to the arrest on the current felony charge. Nearly all of the defendants with an arrest record had multiple prior arrest charges. About half (51%) of all defendants had five or more prior arrest charges, and more than a third (36%) had 10 or more (**table 7**).

- Defendants whose most serious current arrest charge was a driving-related offense (88%) were the most likely to have been arrested previously. Those charged with fraud (60%) were the least likely to have one or more prior arrests.

- Defendants charged with motor vehicle theft (42%), drug trafficking (42%), other drug offense (41%), or a driving-related offense (41%) were the most likely to have 10 or more prior arrest charges. Those charged with rape (22%) were the least likely to have a prior arrest.

- In 2009, 61% of defendants age 17 or younger had no prior arrests, down from a high of 75% in 1994. In 2009, the majority of defendants age 25 or older had five or more prior arrest charges (**figure 8**).

- About 3 in 5 defendants had been arrested previously on a felony charge. Drug (69%) and public-order (66%) defendants were more likely to have a prior felony arrest than those charged with a property (59%) or violent (55%) offense (**table 8**).

- Among property defendants, those charged with burglary (66%) or motor vehicle theft (66%) were the most likely to have been previously arrested for a felony. Those charged with fraud (48%) were the least likely to have a felony arrest record.

- An estimated 17% of all defendants had 10 or more prior felony arrest charges, including 27% of those charged with motor vehicle theft. Rape (10%) and fraud (11%) defendants were the least likely to have 10 or more prior felony charges.

- Between 1990 and 2009, the percentage of defendants with at least one prior arrest increased from 68% to 75%. The proportion of defendants with multiple prior arrests rose from 59% to 68% during this period. The percentage of defendants who had 10 or more prior arrests increased from an estimated 22% in 1990 to 36% in 2009 (**figure 9**).

- The percentage of defendants with a felony arrest record increased from about 55% prior to 1996 to more than 60% since 2002. The percentage with multiple prior felony arrests rose from 43% to 52% during the same period. The percentage with 10 or more prior felony arrests nearly doubled during this time, from 9% in 1990 to 17% in 2009.

- About 3 in 5 defendants had at least one prior conviction. The percentage of defendants with one or more prior convictions was highest among those charged with a driving-related offense (76%) and lowest among those charged with fraud (43%) (**table 9**).

- An estimated 14% of all defendants had 10 or more prior convictions, including 17% of those charged with larceny/theft, motor vehicle theft, or drug trafficking.

- An estimated 43% of defendants had at least one prior felony conviction. About half of those charged with a drug offense (50%), a weapons offense (49%), or motor vehicle theft (48%) had a felony conviction record. Fraud defendants (30%) were the least likely to have a prior felony conviction (**table 10**).

- Overall, 30% of defendants had multiple prior felony convictions, and 11% had five or more. An estimated 17% of defendants charged with motor vehicle theft and 15% of drug defendants had at least five prior felony convictions.

- For 13% of defendants in 2009, the most serious prior conviction was a violent felony. Fraud defendants (5%) were the least likely to have a prior conviction for a violent felony in 2009 (**table 11**).

- An estimated 17% of defendants in 2009 had a prior conviction record that consisted of only misdemeanors. About a third of defendants charged with a driving-related offense (33%) were in this category.

- Most defendants age 17 or younger (86%) or ages 18 to 20 (64%) had no prior convictions of any type. Among defendants age 25 or older, about a third had no prior convictions, and about half had a felony conviction record (**figure 10**).

- Between 1990 and 2009, the percentage of defendants with at least one prior conviction increased from 53% to 60%. The percentage of defendants with multiple prior convictions rose from 40% to 49% during this period (**figure 11**).

- The percentage of defendants with a felony conviction record increased from 36% in 1990 to 43% in 2009. The percentage with multiple prior felony convictions rose from 21% to 31% during the same period.

---

## List of tables and figures - Criminal history

**TABLE 6.** Felony defendants on probation or parole at time of arrest in the 75 largest counties, by most serious current arrest charge, 2009

**TABLE 7.** Number of prior arrest charges for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009

**FIGURE 8.** Number of prior arrest charges for felony defendants in the 75 largest counties, by age at arrest, 2009

**TABLE 8.** Number of prior felony arrest charges for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009

**FIGURE 9.** Prior arrest record for felony defendants in the 75 largest counties, 1990–2009

**TABLE 9.** Number of prior convictions for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009

**TABLE 10.** Number of prior felony convictions for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009

**TABLE 11.** Most serious prior conviction for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009

**FIGURE 10.** Most serious prior conviction for felony defendants in the 75 largest counties, by age at arrest, 2009

**FIGURE 11.** Prior conviction record for felony defendants in the 75 largest counties, 1990–2009

**TABLE 6**
**Felony defendants on probation or parole at time of arrest in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Parole | Probation |
|---|---|---|
| All offenses | 5% | 13% |
| Violent offenses | 4% | 11% |
| Murder | 4 | 13 |
| Rape | 7 | 9 |
| Robbery | 5 | 13 |
| Assault | 4 | 10 |
| Other violent | 4 | 9 |
| Property offenses | 5% | 14% |
| Burglary | 6 | 17 |
| Larceny/theft | 5 | 12 |
| Motor vehicle theft | 6 | 18 |
| Forgery | 4 | 10 |
| Fraud | 3 | 10 |
| Other property | 3 | 12 |
| Drug offenses | 6% | 13% |
| Trafficking | 6 | 12 |
| Other drug | 6 | 15 |
| Public-order offenses | 5% | 12% |
| Weapons | 8 | 13 |
| Driving-related | 2 | 14 |
| Other public-order | 5 | 11 |

Note: Data on probation and parole status at time of arrest were available for 98.7% of all cases.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 7**
**Number of prior arrest charges for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Total | Without prior arrest | With prior arrest | | | | |
|---|---|---|---|---|---|---|---|
| | | | Total | Number of prior arrest charges | | | |
| | | | | 1 | 2–4 | 5–9 | 10 or more |
| All offenses | 100% | 25% | 75% | 7% | 16% | 15% | 36% |
| Violent offenses | 100% | 31% | 69% | 8% | 16% | 15% | 30% |
| Murder | 100 | 34 | 66 | 3 | 15 | 14 | 33 |
| Rape | 100 | 34 | 66 | 8 | 18 | 19 | 22 |
| Robbery | 100 | 30 | 70 | 9 | 16 | 14 | 31 |
| Assault | 100 | 29 | 71 | 8 | 16 | 16 | 31 |
| Other violent | 100 | 38 | 62 | 8 | 16 | 13 | 25 |
| Property offenses | 100% | 28% | 72% | 8% | 15% | 14% | 36% |
| Burglary | 100 | 23 | 77 | 6 | 15 | 17 | 39 |
| Larceny/theft | 100 | 30 | 70 | 8 | 13 | 12 | 37 |
| Motor vehicle theft | 100 | 22 | 78 | 8 | 13 | 15 | 42 |
| Forgery | 100 | 31 | 69 | 6 | 14 | 15 | 34 |
| Fraud | 100 | 40 | 60 | 8 | 18 | 12 | 22 |
| Other property | 100 | 26 | 74 | 9 | 16 | 15 | 34 |
| Drug offenses | 100% | 20% | 80% | 6% | 17% | 16% | 41% |
| Trafficking | 100 | 22 | 78 | 6 | 16 | 14 | 42 |
| Other drug | 100 | 18 | 82 | 7 | 17 | 17 | 41 |
| Public-order offenses | 100% | 20% | 80% | 6% | 18% | 18% | 39% |
| Weapons | 100 | 21 | 79 | 6 | 17 | 20 | 36 |
| Driving-related | 100 | 12 | 88 | 5 | 21 | 20 | 41 |
| Other public-order | 100 | 24 | 76 | 7 | 15 | 15 | 38 |

Note: Data on the number of prior arrest charges were available for 97.3% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 8**

**Number of prior arrest charges for felony defendants in the 75 largest counties, by age at arrest, 2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 8**

**Number of prior felony arrest charges for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Total | Without prior felony arrest | | | With prior felony arrest | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Nonfelony only | No prior arrests | Total | Number of prior felony arrest charges | | | |
| | | | | | | 1 | 2–4 | 5–9 | 10 or more |
| All offenses | 100% | 38% | 13% | 25% | 62% | 10% | 19% | 15% | 17% |
| Violent offenses | 100% | 45% | 13% | 31% | 55% | 10% | 18% | 14% | 13% |
| Murder | 100% | 42 | 8 | 34 | 58 | 9 | 14 | 14 | 20 |
| Rape | 100% | 46 | 12 | 34 | 54 | 9 | 23 | 13 | 10 |
| Robbery | 100% | 42 | 12 | 30 | 58 | 11 | 18 | 16 | 14 |
| Assault | 100% | 43 | 14 | 29 | 57 | 10 | 20 | 14 | 14 |
| Other violent | 100% | 52 | 14 | 38 | 48 | 10 | 16 | 10 | 12 |
| Property offenses | 100% | 41% | 13% | 28% | 59% | 9% | 18% | 14% | 19% |
| Burglary | 100% | 34 | 10 | 23 | 66 | 10 | 21 | 15 | 21 |
| Larceny/theft | 100% | 43 | 13 | 30 | 57 | 9 | 16 | 13 | 19 |
| Motor vehicle theft | 100% | 34 | 13 | 22 | 66 | 6 | 19 | 14 | 27 |
| Forgery | 100% | 43 | 12 | 31 | 57 | 11 | 14 | 12 | 19 |
| Fraud | 100% | 52 | 13 | 40 | 48 | 9 | 14 | 13 | 11 |
| Other property | 100% | 43 | 18 | 26 | 57 | 10 | 17 | 14 | 16 |
| Drug offenses | 100% | 31% | 11% | 20% | 69% | 11% | 21% | 18% | 20% |
| Trafficking | 100% | 32 | 10 | 22 | 68 | 10 | 20 | 18 | 21 |
| Other drug | 100% | 30 | 12 | 18 | 70 | 12 | 21 | 18 | 19 |
| Public-order offenses | 100% | 34% | 15% | 20% | 66% | 12% | 21% | 16% | 16% |
| Weapons | 100% | 31 | 10 | 21 | 69 | 10 | 24 | 19 | 16 |
| Driving-related | 100% | 37 | 24 | 12 | 63 | 14 | 21 | 13 | 16 |
| Other public-order | 100% | 35 | 10 | 24 | 65 | 12 | 19 | 18 | 17 |

Note: Data on number of prior felony arrest charges were available for 97.3% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 9**

**Prior arrest record for felony defendants in the 75 largest counties, 1990–2009**

Percent of defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

**TABLE 9**

**Number of prior convictions for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Total | Without prior conviction | With prior conviction | | | | |
|---|---|---|---|---|---|---|---|
| | | | Total | Number of prior convictions | | | |
| | | | | 1 | 2–4 | 5–9 | 10 or more |
| All offenses | 100% | 40% | 60% | 11% | 20% | 15% | 14% |
| Violent offenses | 100% | 47% | 53% | 12% | 19% | 12% | 9% |
| Murder | 100% | 52 | 48 | 12 | 16 | 14 | 7 |
| Rape | 100% | 49 | 51 | 12 | 19 | 12 | 8 |
| Robbery | 100% | 48 | 52 | 14 | 17 | 12 | 10 |
| Assault | 100% | 45 | 55 | 11 | 21 | 13 | 10 |
| Other violent | 100% | 52 | 48 | 11 | 19 | 11 | 7 |
| Property offenses | 100% | 44% | 56% | 11% | 18% | 13% | 15% |
| Burglary | 100% | 39 | 61 | 11 | 19 | 15 | 15 |
| Larceny/theft | 100% | 46 | 54 | 9 | 15 | 13 | 17 |
| Motor vehicle theft | 100% | 38 | 62 | 12 | 20 | 14 | 17 |
| Forgery | 100% | 43 | 57 | 12 | 18 | 13 | 14 |
| Fraud | 100% | 57 | 43 | 10 | 16 | 9 | 9 |
| Other property | 100% | 41 | 59 | 13 | 20 | 14 | 12 |
| Drug offenses | 100% | 34% | 66% | 12% | 21% | 16% | 16% |
| Trafficking | 100% | 37 | 63 | 11 | 20 | 15 | 17 |
| Other drug | 100% | 32 | 68 | 12 | 22 | 18 | 16 |
| Public-order offenses | 100% | 32% | 68% | 12% | 24% | 19% | 13% |
| Weapons | 100% | 35 | 65 | 13 | 24 | 18 | 10 |
| Driving-related | 100% | 24 | 76 | 13 | 30 | 21 | 12 |
| Other public-order | 100% | 35 | 65 | 11 | 20 | 19 | 16 |

Note: Data on number of prior convictions were available for 99.3% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 10**

**Number of prior felony convictions for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Total | Without prior felony conviction | | | With prior felony conviction | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Nonfelony only | No prior conviction | Total | Number of prior felony convictions | | | |
| | | | | | | 1 | 2–4 | 5–9 | 10 or more |
| All offenses | 100% | 57% | 17% | 40% | 43% | 13% | 19% | 9% | 2% |
| Violent offenses | 100% | 64% | 16% | 47% | 36% | 13% | 16% | 6% | 2% |
| Murder | 100% | 60 | 9 | 52 | 40 | 13 | 14 | 13 | 0 |
| Rape | 100% | 63 | 15 | 49 | 37 | 14 | 12 | 8 | 2 |
| Robbery | 100% | 61 | 13 | 48 | 39 | 13 | 17 | 7 | 2 |
| Assault | 100% | 63 | 18 | 45 | 37 | 13 | 16 | 6 | 2 |
| Other violent | 100% | 70 | 17 | 52 | 30 | 12 | 13 | 4 | 1 |
| Property offenses | 100% | 59% | 16% | 44% | 41% | 11% | 16% | 9% | 4% |
| Burglary | 100% | 56 | 17 | 39 | 44 | 13 | 18 | 8 | 5 |
| Larceny/theft | 100% | 59 | 13 | 46 | 41 | 11 | 16 | 10 | 4 |
| Motor vehicle theft | 100% | 52 | 14 | 38 | 48 | 11 | 20 | 13 | 4 |
| Forgery | 100% | 60 | 17 | 43 | 40 | 13 | 13 | 9 | 5 |
| Fraud | 100% | 70 | 13 | 57 | 30 | 9 | 13 | 5 | 4 |
| Other property | 100% | 62 | 21 | 41 | 38 | 11 | 16 | 8 | 3 |
| Drug offenses | 100% | 50% | 16% | 34% | 50% | 13% | 22% | 11% | 4% |
| Trafficking | 100% | 51 | 13 | 37 | 49 | 13 | 22 | 11 | 4 |
| Other drug | 100% | 50 | 18 | 32 | 50 | 14 | 22 | 11 | 4 |
| Public-order offenses | 100% | 53% | 21% | 32% | 47% | 15% | 22% | 9% | 2% |
| Weapons | 100% | 51 | 16 | 35 | 49 | 18 | 22 | 7 | 2 |
| Driving-related | 100% | 57 | 33 | 24 | 43 | 15 | 20 | 6 | 1 |
| Other public-order | 100% | 50 | 15 | 35 | 50 | 13 | 22 | 13 | 2 |

Note: Data on number of prior felony convictions were available for 99.5% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 11**

**Most serious prior conviction for felony defendants in the 75 largest counties, by most serious current arrest charge, 2009**

| Most serious current arrest charge | Total | Without prior conviction | Total | Most serious prior conviction | | | |
|---|---|---|---|---|---|---|---|
| | | | | Felony | | | Misdemeanor |
| | | | | Total | Violent | Nonviolent | |
| All offenses | 100% | 40% | 60% | 43% | 13% | 31% | 17% |
| Violent offenses | 100% | 47% | 53% | 36% | 15% | 21% | 16% |
| Murder | 100% | 52 | 48 | 40 | 17 | 23 | 9 |
| Rape | 100% | 49 | 51 | 37 | 13 | 24 | 15 |
| Robbery | 100% | 48 | 52 | 39 | 17 | 22 | 13 |
| Assault | 100% | 45 | 55 | 37 | 16 | 21 | 18 |
| Other violent | 100% | 52 | 48 | 30 | 11 | 19 | 17 |
| Property offenses | 100% | 44% | 56% | 41% | 10% | 31% | 16% |
| Burglary | 100% | 39 | 61 | 44 | 12 | 32 | 17 |
| Larceny/theft | 100% | 46 | 54 | 41 | 10 | 31 | 13 |
| Motor vehicle theft | 100% | 38 | 62 | 48 | 12 | 36 | 14 |
| Forgery | 100% | 43 | 57 | 40 | 9 | 31 | 17 |
| Fraud | 100% | 57 | 43 | 30 | 5 | 25 | 13 |
| Other property | 100% | 41 | 59 | 38 | 11 | 27 | 21 |
| Drug offenses | 100% | 34% | 66% | 50% | 12% | 37% | 16% |
| Trafficking | 100% | 37 | 63 | 49 | 12 | 37 | 13 |
| Other drug | 100% | 32 | 68 | 50 | 12 | 37 | 18 |
| Public-order offenses | 100% | 32% | 68% | 47% | 15% | 32% | 21% |
| Weapons | 100% | 35 | 65 | 49 | 15 | 34 | 16 |
| Driving-related | 100% | 24 | 76 | 43 | 10 | 33 | 33 |
| Other public-order | 100% | 35 | 65 | 50 | 19 | 30 | 15 |

Note: Data on the most serious prior violent and nonviolent felony conviction were available for 99.5% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 10**

**Most serious prior conviction for felony defendants in the 75 largest counties, by age at arrest, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 11**

**Prior conviction record for felony defendants in the 75 largest counties, 1990–2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

# Section 4: Pretrial release and detention

- In 2009, 62% of felony defendants in the 75 largest counties were released prior to case disposition (**table 12**). With the exception of 2004 (57%) and 2006 (58%), the percentage of defendants released has been in the 62% to 64% range in each SCPS study year.

- An estimated 38% of defendants were detained until case disposition in 2009. About 1 in 10 detained defendants (4% of defendants overall) was denied bail. Nearly half (45%) of murder defendants were denied bail, compared to 8% or less of defendants charged with other offenses.

- Defendants charged with a drug (65%), property (63%), or public-order (63%) offense in 2009 were more likely to be released prior to case disposition than defendants charged with a violent offense (55%).

- The release rate for defendants charged with a violent offense ranged from 18% for murder defendants to 63% for assault defendants. Roughly half of robbery (44%) and rape (52%) defendants were released prior to case disposition.

- Among property defendants, 49% of those charged with motor vehicle theft or burglary were released prior to case disposition. Considerably higher percentages of defendants charged with fraud (80%), forgery (71%), or larceny/theft (68%) were released.

- Defendants without a criminal justice status (68%) were much more likely to be released than defendants on probation (44%) or parole (31%). Likewise, defendants without a prior conviction (75%) were much more likely to be released than those with 10 or more prior convictions (41%) (**table 13**).

- About half of released defendants were out of custody within 1 day of arrest and three-quarters were released within a week. Overall, 89% of releases occurred within 1 month of arrest; however, 41% of the releases of murder defendants occurred within 1 month (**table 14**).

- About 3 in 5 pretrial releases in 2009 included financial conditions. About 4 in 5 financial releases, and about half (49%) of all releases, used private surety bonds, which was the most common method of pretrial release in 2009. Other types of financial release included deposit bond (7% of all releases) and full cash bond (5% of all releases) (**figure 12**).

- About 2 in 5 pretrial releases were nonfinancial and did not require the posting of any type of financial bond. The most common type of nonfinancial release used in 2009 was release on recognizance (23% of all releases), followed by conditional release (10% of all releases) and unsecured bond (5% of all releases).

- About 9 in 10 detained defendants had a bail amount set but were unable to meet the financial conditions required to secure release. Those with a bail amount set under $5,000 (71%) were nearly 3 times as likely to secure release as defendants with a bail amount of $50,000 or more (27%) (**figure 13**).

- For nearly half of forgery defendants (46%) and larceny/theft defendants (44%) with a set bail, the amount was less than $5,000. Nearly all murder defendants (95%) and more than half of rape (59%) and robbery (52%) defendants with a bail amount had it set at $50,000 or more (**table 15**).

- Overall, detained defendants had a median bail amount of $25,000, compared to $6,000 for released defendants. Detained murder defendants had the highest median bail amount ($1,000,000), followed by detained rape defendants ($100,000) (**table 16**).

- Between 1990 and 2009, the percentage of pretrial releases involving financial conditions rose from 37% to 61%. Nearly all of this increase was due to a rise in the use of surety bonds, which accounted for nearly twice the percentage of releases in 2009 (49%) as in 1990 (24%) (**figure 14**).

- Among defendants who were released prior to case disposition, about 3 in 10 (29%) committed some type of misconduct while in a release status (**table 17**). This a similar proportion to that recorded in previous SCPS studies.

- The percentage of defendants charged with pretrial misconduct was highest for drug (32%) and property (31%) defendants, and lowest for those released after being charged with a violent offense (23%).

- In 2009, 17% of released defendants missed a scheduled court appearance, resulting in a bench warrant being issued for their arrest (**table 18**). This was about the same percentage as in 2006, but lower than the 24% rate observed prior to 1996 (not shown in table).

- In 2009, failure-to-appear rates were lowest for murder (5%) and rape (7%) defendants, and highest for those released after being charged with motor vehicle theft (28%).

- An estimated 16% of released defendants were rearrested for a new offense while in a pretrial release status (**table 19**). This was within the 13% to 21% range observed across other SCPS study years.

- Rates of rearrest were highest among robbery (24%) and burglary (22%) defendants. About half of the rearrests in 2009 involved a new felony charge.

# List of tables and figures - Pretrial release and detention

**TABLE 12.** Felony defendants released before or detained until case disposition in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 13.** Felony defendants released prior to case disposition in the 75 largest counties, by criminal history, 2009

**TABLE 14.** Time from arrest to release for felony defendants released before case disposition in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 12.** Type of pretrial release for felony defendants in the 75 largest counties, 2009

**FIGURE 13.** Pretrial of release of felony defendants in the 75 largest counties, by bail amount, 2009

**TABLE 15.** Bail amount for felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 16.** Median and mean bail amounts for felony defendants in the 75 largest counties, by pretrial release/detention outcome and most serious arrest charge, 2009

**FIGURE 14.** Use of financial conditions for pretrial release of felony defendants in the 75 largest counties, 1990–2009

**TABLE 17.** Released felony defendants committing misconduct in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 18.** Released felony defendants who failed to make a scheduled court appearance in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 19.** Released felony defendants rearrested prior to case disposition in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 12**
**Felony defendants released before or detained until case disposition in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | Released before case disposition | | | | Detained until case disposition | | |
| | | Total released | Financial release | Nonfinancial release | Emergency release | Total detained | Held on bail | Denied bail |
|---|---|---|---|---|---|---|---|---|
| All offenses | 100% | 62% | 38% | 24% | -- | 38% | 34% | 4% |
| Violent offenses | 100% | 55% | 37% | 19% | -- | 45% | 39% | 6% |
| Murder | 100% | 18 | 6 | 7 | 0 | 82 | 42 | 45 |
| Rape | 100% | 52 | 32 | 8 | 0 | 48 | 55 | 5 |
| Robbery | 100% | 44 | 28 | 18 | -- | 56 | 48 | 6 |
| Assault | 100% | 63 | 44 | 20 | 0 | 37 | 33 | 4 |
| Other violent | 100% | 62 | 38 | 21 | 0 | 38 | 37 | 4 |
| Property offenses | 100% | 63% | 36% | 27% | 1% | 37% | 33% | 3% |
| Burglary | 100% | 49 | 35 | 18 | -- | 51 | 44 | 3 |
| Larceny/theft | 100% | 68 | 39 | 30 | 1 | 32 | 28 | 2 |
| Motor vehicle theft | 100% | 49 | 29 | 23 | -- | 51 | 45 | 3 |
| Forgery | 100% | 71 | 37 | 30 | 1 | 29 | 26 | 6 |
| Fraud | 100% | 80 | 42 | 32 | 1 | 20 | 21 | 3 |
| Other property | 100% | 71 | 29 | 39 | 1 | 29 | 28 | 3 |
| Drug offenses | 100% | 65% | 39% | 26% | -- | 35% | 31% | 3% |
| Trafficking | 100% | 63 | 45 | 22 | -- | 37 | 30 | 3 |
| Other drug | 100% | 66 | 34 | 30 | 1 | 34 | 32 | 3 |
| Public-order offenses | 100% | 63% | 44% | 19% | -- | 37% | 32% | 6% |
| Weapons | 100% | 65 | 46 | 17 | 0 | 35 | 34 | 3 |
| Driving-related | 100% | 73 | 51 | 19 | 0 | 27 | 25 | 4 |
| Other public-order | 100% | 61 | 37 | 20 | 0 | 39 | 35 | 8 |

Note: Data on detention or release outcome were available for 98.3% of all cases. Detail may not sum to total due to rounding.
-- Less than 0.5%.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 13**
**Felony defendants released prior to case disposition in the 75 largest counties, by criminal history, 2009**

| Criminal history | Number of defendants | Released prior to case disposition | | | Detained until case disposition | | |
| | | Total released | Financial release | Nonfinancial release | Total | Held on bail | Denied bail |
|---|---|---|---|---|---|---|---|
| **Criminal justice status** | | | | | | | |
| None | 40,674 | 68% | 41% | 27% | 32% | 28% | 3% |
| On probation | 7,107 | 44 | 28 | 16 | 56 | 50 | 6 |
| On parole | 2,801 | 31 | 19 | 11 | 69 | 63 | 7 |
| **Prior arrest record** | | | | | | | |
| No prior arrests | 13,453 | 75% | 45% | 31% | 25% | 20% | 3% |
| Misdemeanor arrest only | 6,851 | 74 | 44 | 30 | 26 | 24 | 2 |
| Felony arrest | 33,752 | 54 | 35 | 19 | 46 | 41 | 5 |
| **Number of prior convictions** | | | | | | | |
| None | 22,096 | 75% | 45% | 31% | 25% | 21% | 3% |
| 1 | 6,312 | 65 | 40 | 25 | 35 | 31 | 4 |
| 2–4 | 10,998 | 58 | 38 | 20 | 42 | 37 | 5 |
| 5–9 | 8,220 | 47 | 31 | 15 | 53 | 47 | 5 |
| 10 or more | 7,530 | 41 | 24 | 16 | 59 | 55 | 4 |
| **Most serious prior conviction** | | | | | | | |
| Any type of felony | 23,935 | 47% | 31% | 16% | 53% | 47% | 5% |
| Violent felony | 7,128 | 43 | 27 | 15 | 57 | 51 | 6 |
| Nonviolent felony | 16,807 | 50 | 33 | 16 | 50 | 46 | 5 |
| Misdemeanor | 9,196 | 66 | 39 | 26 | 34 | 30 | 3 |

Note: Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 14**

**Time from arrest to release for felony defendants released before case disposition in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Number of defendants | Percent of released defendants who were released within— | | |
|---|---|---|---|---|
| | | 1 day | 1 week | 1 month |
| All offenses | 28,562 | 50% | 75% | 89% |
| Violent offenses | 6,464 | 41% | 67% | 84% |
| Murder | 40 | 26 | 26 | 41 |
| Rape | 215 | 38 | 64 | 75 |
| Robbery | 1,472 | 27 | 56 | 76 |
| Assault | 3,523 | 46 | 71 | 87 |
| Other violent | 1,212 | 46 | 69 | 86 |
| Property offenses | 8,647 | 55% | 76% | 89% |
| Burglary | 2,072 | 38 | 64 | 82 |
| Larceny/theft | 2,703 | 61 | 82 | 91 |
| Motor vehicle theft | 619 | 46 | 70 | 89 |
| Forgery | 887 | 53 | 77 | 89 |
| Fraud | 1,232 | 66 | 80 | 90 |
| Other property | 1,135 | 66 | 85 | 92 |
| Drug offenses | 9,579 | 50% | 79% | 91% |
| Trafficking | 4,333 | 44 | 74 | 89 |
| Other drug | 5,246 | 55 | 84 | 94 |
| Public-order offenses | 3,872 | 51% | 76% | 91% |
| Weapons | 1,080 | 42 | 72 | 87 |
| Driving-related | 1,380 | 64 | 82 | 94 |
| Other public-order | 1,412 | 45 | 73 | 91 |

Note: Data on time from arrest to adjudication were available for 83.9% of all cases. Release data were collected for up to one year.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 12**

**Type of pretrial release for felony defendants in the 75 largest counties, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 13**

**Pretrial release of felony defendants in the 75 largest counties, by bail amount, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 15**

**Bail amount for felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Number | Total | $4,999 or less | $5,000–$9,999 | $10,000–$24,999 | $25,000–$49,999 | $50,000 or more |
|---|---|---|---|---|---|---|---|
| All offenses | 36,036 | 100% | 28% | 15% | 21% | 12% | 25% |
| Violent offenses | 9,621 | 100% | 17% | 11% | 19% | 13% | 40% |
| Murder | 152 | 100% | 3 | 0 | 0 | 3 | 95 |
| Rape | 450 | 100% | 4 | 10 | 14 | 13 | 59 |
| Robbery | 2,543 | 100% | 11 | 8 | 15 | 14 | 52 |
| Assault | 4,597 | 100% | 22 | 13 | 22 | 13 | 30 |
| Other violent | 1,878 | 100% | 17 | 13 | 18 | 12 | 41 |
| Property offenses | 10,044 | 100% | 35% | 17% | 20% | 10% | 17% |
| Burglary | 3,438 | 100% | 23 | 16 | 23 | 13 | 25 |
| Larceny/theft | 2,788 | 100% | 44 | 17 | 18 | 10 | 11 |
| Motor vehicle theft | 927 | 100% | 35 | 16 | 18 | 11 | 21 |
| Forgery | 853 | 100% | 46 | 16 | 23 | 6 | 8 |
| Fraud | 1,046 | 100% | 38 | 19 | 18 | 7 | 17 |
| Other property | 992 | 100% | 42 | 15 | 21 | 8 | 14 |
| Drug offenses | 11,326 | 100% | 28% | 15% | 23% | 14% | 20% |
| Trafficking | 5,423 | 100% | 19 | 15 | 21 | 16 | 28 |
| Other drug | 5,903 | 100% | 37 | 14 | 24 | 13 | 12 |
| Public-order offenses | 5,045 | 100% | 31% | 19% | 21% | 9% | 20% |
| Weapons | 1,458 | 100% | 22 | 17 | 21 | 14 | 26 |
| Driving-related | 1,570 | 100% | 40 | 21 | 20 | 5 | 14 |
| Other public-order | 2,017 | 100% | 31 | 18 | 22 | 9 | 20 |

Note: Data on bail amount were available for 96.9% of defendants for whom a bail amount was set. Table excludes defendants given nonfinancial release. Detail may not sum to total due to rounding.

Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 16**

**Median and mean bail amounts for felony defendants in the 75 largest counties, by pretrial release/detention outcome and most serious arrest charge, 2009**

| Most serious arrest charge | Median bail amount | | | Mean bail amount | | |
|---|---|---|---|---|---|---|
| | Total | Released | Detained | Total | Released | Detained |
| All offenses | $10,000 | $6,000 | $25,000 | $55,400 | $19,600 | $97,900 |
| Violent offenses | $25,000 | $10,000 | $50,000 | $115,000 | $29,300 | $199,200 |
| Murder | 1,000,000 | 125,000 | 1,000,000 | 1,195,900 | 219,200 | 1,096,400 |
| Rape | 50,000 | 25,000 | 100,000 | 173,800 | 52,300 | 1,353,900 |
| Robbery | 50,000 | 15,000 | 60,000 | 84,900 | 38,800 | 246,500 |
| Assault | 15,000 | 10,000 | 50,000 | 74,300 | 22,200 | 112,300 |
| Other violent | 25,000 | 10,000 | 50,000 | 153,700 | 31,100 | 146,000 |
| Property offenses | $7,500 | $5,000 | $19,000 | $33,200 | $13,700 | $55,600 |
| Burglary | 15,000 | 10,000 | 25,000 | 43,900 | 19,700 | 63,700 |
| Larceny/theft | 5,000 | 3,500 | 15,000 | 22,700 | 9,300 | 43,800 |
| Motor vehicle theft | 9,000 | 3,500 | 15,000 | 30,000 | 16,500 | 38,600 |
| Forgery | 5,000 | 4,000 | 7,500 | 19,000 | 8,900 | 33,900 |
| Fraud | 5,000 | 5,000 | 25,000 | 28,100 | 10,800 | 64,800 |
| Other property | 5,000 | 4,000 | 20,000 | 46,400 | 16,600 | 80,100 |
| Drug offenses | $10,000 | $7,500 | $20,000 | $34,200 | $19,200 | $53,700 |
| Trafficking | 20,000 | 10,000 | 30,000 | 45,200 | 28,200 | 72,000 |
| Other drug | 7,500 | 5,000 | 15,000 | 24,000 | 9,500 | 39,900 |
| Public-order offenses | $10,000 | $5,000 | $20,000 | $33,800 | $15,600 | $60,700 |
| Weapons | 11,100 | 7,950 | 35,000 | 47,800 | 21,900 | 85,900 |
| Driving-related | 5,000 | 5,000 | 10,000 | 20,000 | 11,200 | 39,600 |
| Other public-order | 10,000 | 5,000 | 15,000 | 34,400 | 15,100 | 55,800 |

Note: Data on bail amount were available for 96.9% of all defendants for whom a bail amount was set. Bail amounts have been rounded to the nearest hundred dollars. Table excludes defendants given nonfinancial release.

Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 14**

**Use of financial conditions for pretrial release of felony defendants in the 75 largest counties, 1990–2009**

Percent of released defendants



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

**TABLE 17**

**Released felony defendants committing misconduct in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Number | Percent with any pretrial misconduct |
|---|---|---|
| All offenses | 32,824 | 29% |
| Violent offenses | 7,275 | 23% |
| Murder | 46 | 15 |
| Rape | 229 | 19 |
| Robbery | 1,623 | 31 |
| Assault | 3,853 | 23 |
| Other violent | 1,524 | 17 |
| Property offenses | 9,812 | 31% |
| Burglary | 2,391 | 35 |
| Larceny/theft | 3,091 | 27 |
| Motor vehicle theft | 718 | 41 |
| Forgery | 963 | 29 |
| Fraud | 1,377 | 26 |
| Other property | 1,272 | 33 |
| Drug offenses | 11,190 | 32% |
| Trafficking | 5,141 | 33 |
| Other drug | 6,049 | 32 |
| Public-order offenses | 4,547 | 28% |
| Weapons | 1,234 | 27 |
| Driving-related | 1,545 | 26 |
| Other public-order | 1,768 | 31 |

Note: Data on misconduct were available for 96.4% of all cases. Types of misconduct included failure to appear in court, rearrest for a new offense, or a technical violation of release conditions that resulted in the revocation of pretrial release. Data were collected for up to one year.

Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 18**
**Released felony defendants who failed to make a scheduled court appearance in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Made all court appearances | Failed to appear in court | | |
|---|---|---|---|---|
| | | Total | Percent returned to court | Percent remained a fugitive |
| All offenses | 83% | 17% | 13% | 3% |
| Violent offenses | 90% | 10% | 8% | 2% |
| Murder | 95% | 5 | 0 | 5 |
| Rape | 93% | 7 | 5 | 3 |
| Robbery | 90% | 10 | 10 | -- |
| Assault | 90% | 10 | 7 | 2 |
| Other violent | 90% | 10 | 7 | 2 |
| Property offenses | 81% | 18% | 14% | 4% |
| Burglary | 82% | 18 | 15 | 3 |
| Larceny/theft | 83% | 17 | 14 | 3 |
| Motor vehicle theft | 72% | 28 | 22 | 5 |
| Forgery | 84% | 16 | 10 | 5 |
| Fraud | 83% | 17 | 12 | 5 |
| Other property | 79% | 21 | 13 | 3 |
| Drug offenses | 79% | 20% | 17% | 3% |
| Trafficking | 82% | 18 | 15 | 3 |
| Other drug | 78% | 22 | 18 | 4 |
| Public-order offenses | 83% | 16% | 12% | 4% |
| Weapons | 87% | 13 | 11 | 2 |
| Driving-related | 82% | 18 | 11 | 5 |
| Other public-order | 82% | 18 | 14 | 3 |

Note: Data on the court appearance record and fugitive status were available for 95.1% of cases involving a defendant released prior to disposition. All defendants who failed to appear in court and were not returned to the court during the 1-year study period were counted as fugitives. Some of these defendants may have been returned to the court at a later date. Detail may not sum to total due to rounding.
-- Less than 0.5%.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 19**
**Released felony defendants rearrested prior to case disposition in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Total | Not rearrested | Rearrested | | |
|---|---|---|---|---|---|
| | | | Total | Felony | Misdemeanor |
| All offenses | 100% | 84% | 16% | 8% | 7% |
| Violent offenses | 100% | 85% | 15% | 6% | 7% |
| Murder | 100% | 100 | 0 | 0 | 0 |
| Rape | 100% | 86 | 14 | 3 | 8 |
| Robbery | 100% | 76 | 24 | 11 | 11 |
| Assault | 100% | 86 | 14 | 6 | 8 |
| Other violent | 100% | 92 | 8 | 4 | 3 |
| Property offenses | 100% | 83% | 17% | 8% | 6% |
| Burglary | 100% | 78 | 22 | 12 | 7 |
| Larceny/theft | 100% | 86 | 14 | 6 | 6 |
| Motor vehicle theft | 100% | 81 | 19 | 12 | 6 |
| Forgery | 100% | 83 | 17 | 8 | 7 |
| Fraud | 100% | 88 | 12 | 5 | 1 |
| Other property | 100% | 82 | 18 | 8 | 9 |
| Drug offenses | 100% | 84% | 16% | 8% | 6% |
| Trafficking | 100% | 82 | 18 | 10 | 8 |
| Other drug | 100% | 86 | 14 | 7 | 5 |
| Public-order offenses | 100% | 85% | 15% | 6% | 7% |
| Weapons | 100% | 83 | 17 | 6 | 9 |
| Driving-related | 100% | 89 | 11 | 5 | 5 |
| Other public-order | 100% | 83 | 17 | 7 | 8 |

Note: Rearrest data were available for 95.1% of released defendants. Rearrest data were collected for 1 year. Rearrests occurring after the end of this 1-year study period were not included in the table. Information on rearrests occurring in jurisdictions other than the one granting the pretrial release were not always available. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

# Section 5: Adjudication

- The median time from arrest to adjudication for felony defendants in 2009 was 111 days (**table 20**). This was the highest median recorded in any SCPS year and was about a month longer than the low of 79 days recorded in 1998.

- The median time from arrest to adjudication ranged from more than 1 year for murder to less than 3 months for motor vehicle theft and drug offenses other than trafficking. Overall, 85% were adjudicated within 1 year; however, a third of murder cases were adjudicated within 1 year.

- Overall, the median time from arrest to adjudication was shorter for detained defendants (68 days) than for those released prior to case disposition (163 days). The difference existed for all offenses, ranging from 40 days for robbery defendants to about 120 days for defendants charged with fraud, forgery, motor vehicle theft, or drug trafficking (**figure 15**).

- Among cases that were adjudicated within the 1-year study period, 66% resulted in a conviction. Just over half (54%) of defendants were convicted of a felony and 12% were convicted of a misdemeanor. Nearly all convictions were the result of a guilty plea rather than a trial (**table 21**).

- In most cases when a defendant was not convicted, it was because the charges against the defendant were dismissed. About a quarter of all cases ended in this manner. An estimated 9% of cases resulted in a deferred adjudication or diversion outcome.

- Defendants charged with assault (35%) were more than 3 times as likely to have their case dismissed as those charged with a driving-related offense (10%) and about twice as likely to have their case dismissed as those charged with drug trafficking (18%) or murder (17%).

- The percentage of convictions was highest for defendants charged with a driving-related offense (84%), followed by drug trafficking defendants (73%). The lowest conviction rate was for those charged with assault (56%) (**figure 16**).

- The probability that a defendant would eventually be convicted of the original felony charge was highest for those charged with a driving-related offense (64%), murder (60%), or drug trafficking (55%). The lowest probability was for those charged with rape (35%) and assault (33%).

- Felony assaults accounted for 6% of SCPS convictions in 2009, compared to about 12% of the cases as originally charged (see table 1). Overall, an estimated 18% of the convictions for cases originally charged as felonies were at the misdemeanor level (**table 22**).

- Conviction rates were higher for defendants who were detained until case disposition (77%) than for those who were released (59%). This was true across all offense categories (**figure 17**).

- The percentage of felony defendants convicted in 2009 (66%) was within the range of the 64% to 68% observed in all other SCPS study years, except 1994 (72%). The felony conviction rate of 54% recorded in 2009 was in the middle of the 50% to 58% range observed in other SCPS study years (**figure 18**).

---

## List of tables and figures - Adjudication

**TABLE 20.** Time from arrest to adjudication for felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 15.** Median number of days from arrest to adjudication in the 75 largest counties, by detention-release outcome, 2009

**TABLE 21.** Adjudication outcome for felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**FIGURE 16.** Conviction percents for felony defendants in the 75 largest counties, by most serious arrest charge, 2009

**TABLE 22.** Felony defendants in the 75 largest counties, by most serious conviction offense, 2009

**FIGURE 17.** Adjudication outcome for felony defendants in the 75 largest counties, by detention-release outcome and most serious arrest charge category, 2009

**FIGURE 18.** Conviction rates for felony defendants in the 75 largest counties, 1990–2009

**TABLE 20**

**Time from arrest to adjudication for felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Median time | Percent of cases adjudicated within— | | | | |
|---|---|---|---|---|---|---|
| | | 1 week | 1 month | 3 months | 6 months | 1 year |
| All offenses | 111 days | 5% | 21% | 45% | 67% | 85% |
| Violent offenses | 145 days | 2% | 12% | 35% | 58% | 78% |
| Murder | * | 1 | 2 | 6 | 11 | 33 |
| Rape | 247 | 2 | 6 | 17 | 36 | 72 |
| Robbery | 152 | 2 | 12 | 31 | 57 | 74 |
| Assault | 131 | 2 | 14 | 39 | 63 | 81 |
| Other violent | 140 | 2 | 12 | 37 | 60 | 80 |
| Property offenses | 101 days | 4% | 19% | 48% | 69% | 83% |
| Burglary | 101 | 4 | 19 | 47 | 69 | 82 |
| Larceny/theft | 98 | 4 | 17 | 48 | 69 | 84 |
| Motor vehicle theft | 76 | 7 | 30 | 57 | 78 | 88 |
| Forgery | 101 | 7 | 22 | 47 | 69 | 82 |
| Fraud | 124 | 3 | 15 | 41 | 62 | 75 |
| Other property | 106 | 4 | 20 | 46 | 68 | 81 |
| Drug offenses | 92 days | 8% | 29% | 50% | 71% | 83% |
| Trafficking | 123 | 4 | 19 | 41 | 64 | 79 |
| Other drug | 65 | 12 | 37 | 59 | 77 | 86 |
| Public-order offenses | 110 days | 7% | 20% | 45% | 67% | 82% |
| Weapons | 117 | 5 | 21 | 43 | 66 | 81 |
| Driving-related | 118 | 5 | 17 | 41 | 66 | 80 |
| Other public-order | 95 | 9 | 23 | 49 | 69 | 84 |

Note: Data on time from arrest to adjudication were available for 98% of all cases. Detail may not sum to total due to rounding.
*Median time was greater than 1 year.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 15**

**Median number of days from arrest to adjudication in the 75 largest counties, by detention-release outcome, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 21**

**Adjudication outcome for felony defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Number of defendants | Total convicted | Convicted | | | | | | Not convicted | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Felony | | | Misdemeanor | | | | | | |
| | | | Total | Plea | Trial | Total | Plea | Trial | Total | Dismissed | Acquitted | Other outcome* |
| All offenses | 48,939 | 66% | 54% | 53% | 2% | 12% | 11% | --% | 26% | 25% | 1% | 9% |
| Violent offenses | 11,601 | 61% | 49% | 46% | 3% | 13% | 12% | 1% | 33% | 31% | 2% | 6% |
| Murder | 217 | 70 | 70 | 51 | 18 | 0 | 0 | 0 | 28 | 17 | 12 | 2 |
| Rape | 412 | 68 | 57 | 50 | 7 | 11 | 10 | 1 | 27 | 24 | 3 | 5 |
| Robbery | 3,217 | 66 | 59 | 57 | 2 | 7 | 7 | -- | 29 | 28 | 1 | 5 |
| Assault | 5,484 | 56 | 39 | 37 | 2 | 16 | 15 | 1 | 37 | 35 | 2 | 7 |
| Other violent | 2,271 | 67 | 54 | 51 | 3 | 13 | 13 | -- | 28 | 27 | 1 | 5 |
| Property offenses | 14,314 | 67% | 55% | 53% | 2% | 12% | 12% | --% | 24% | 23% | --% | 9% |
| Burglary | 4,325 | 68 | 60 | 59 | 1 | 9 | 8 | -- | 23 | 22 | 1 | 9 |
| Larceny/theft | 4,088 | 66 | 51 | 49 | 2 | 15 | 15 | -- | 25 | 24 | -- | 10 |
| Motor vehicle theft | 1,324 | 67 | 62 | 60 | 2 | 6 | 5 | -- | 26 | 25 | 0 | 7 |
| Forgery | 1,281 | 71 | 57 | 55 | 1 | 15 | 14 | -- | 20 | 19 | 1 | 10 |
| Fraud | 1,587 | 64 | 53 | 51 | 1 | 13 | 12 | -- | 21 | 20 | -- | 14 |
| Other property | 1,709 | 67 | 47 | 45 | 2 | 20 | 20 | 0 | 29 | 29 | 0 | 3 |
| Drug offenses | 16,456 | 66% | 56% | 56% | 1% | 9% | 9% | --% | 24% | 23% | --% | 11% |
| Trafficking | 7,232 | 73 | 62 | 61 | 1 | 11 | 10 | 1 | 19 | 18 | -- | 8 |
| Other drug | 9,224 | 60 | 52 | 51 | -- | 8 | 8 | -- | 27 | 27 | -- | 13 |
| Public-order offenses | 6,568 | 73% | 58% | 57% | 2% | 14% | 14% | --% | 22% | 21% | 1% | 6% |
| Weapons | 1,798 | 67 | 57 | 57 | 1 | 9 | 9 | -- | 27 | 26 | 1 | 6 |
| Driving-related | 2,063 | 84 | 69 | 67 | 2 | 15 | 15 | 0 | 10 | 10 | 0 | 6 |
| Other public-order | 2,708 | 68 | 51 | 49 | 2 | 17 | 16 | -- | 27 | 27 | -- | 5 |

Note: Table excludes cases that were still pending adjudication at the end of the 1-year study period. Data on adjudication outcome were available for 99.9% of cases that had been adjudicated. Detail may not sum to total due to rounding.

--Less than 0.5%.

*Includes diversion and deferred adjudication. Murder cases were tracked for up to 2 years.

Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 16**

**Conviction percents for felony defendants in the 75 largest counties, by most serious arrest charge, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 22**
**Felony defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Number | Percent |
|---|---|---|
| All offenses | 32,504 | 100% |
| All felonies | 26,750 | 82.3% |
| Violent offenses | 5,088 | 15.7% |
| Murder | 134 | 0.4 |
| Rape | 153 | 0.5 |
| Robbery | 1,561 | 4.8 |
| Assault | 2,047 | 6.3 |
| Other violent | 1,194 | 3.7 |
| Property offenses | 8,156 | 25.1% |
| Burglary | 2,331 | 7.2 |
| Larceny/theft | 2,394 | 7.4 |
| Motor vehicle theft | 735 | 2.3 |
| Forgery | 685 | 2.1 |
| Fraud | 851 | 2.6 |
| Other property | 1,160 | 3.6 |
| Drug offenses | 9,345 | 28.8% |
| Trafficking | 4,113 | 12.7 |
| Other drug | 5,232 | 16.1 |
| Public-order offenses | 4,144 | 12.8% |
| Weapons | 1,114 | 3.4 |
| Driving-related | 1,426 | 4.4 |
| Other public-order | 1,605 | 4.9 |
| Misdemeanors | 5,754 | 17.7% |

Note: Data on most serious conviction charge were available for 99.5% of all cases. Total for all felonies includes cases that could not be classified into 1 of the 4 major offense categories. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 17**
**Adjudication outcome for felony defendants in the 75 largest counties, by detention-release outcome and most serious arrest charge category, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 18**
**Conviction rates for felony defendants in the 75 largest counties, 1990–2009**

Percent of defendants convicted

Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

# Section 6: Sentencing

- About two-thirds (65%) of convicted defendants in the 75 largest counties in 2009 received their sentence within 1 day of the conviction date. Sentences for misdemeanors (83%) were more likely than sentences for felonies (60%) to occur within 1 day. Overall, 93% of sentences were handed out within 2 months of the conviction date (**table 23**).

- About 75% of the defendants convicted of a felony were sentenced to incarceration in a state prison or local jail, compared to 56% of those convicted of a misdemeanor. About 1 in 4 felony convictions and 1 in 3 misdemeanor convictions resulted in a probation sentence (**table 24**).

- Convictions for murder (100%), rape (89%), or robbery (89%) were the most likely to result in a sentence to incarceration. Felony convictions were least likely to result in an incarceration sentence when they were for forgery (64%) or a nontrafficking drug offense (64%).

- Overall, incarceration sentences were almost evenly divided between prison (36%) and jail (37%) in 2009. Felony convictions were more likely to result in a sentence to prison (42%) than jail (33%). Nearly all incarceration sentences for misdemeanor convictions were to jail (53%) rather than prison (3%).

- Nearly all (98%) murder convictions resulted in a prison sentence, as did 84% of rape convictions. About half of the defendants convicted for weapons offenses (53%), burglary (53%), or assault (47%) were sentenced to prison.

- The percentage of defendants eventually convicted and sentenced to incarceration was highest for those originally charged with a driving-related offense (65%), murder (55%), motor vehicle theft (55%), or robbery (52%). The percentage was lowest for those charged with forgery (37%), assault (40%), fraud (42%), or larceny/theft (42%) (**figure 19**).

- The mean length of prison sentences received for felony convictions in 2009 was 52 months and the median length was 30 months. These averages are about the same as in 2004 and 2006, but lower than those recorded in years prior to 1998. In 2009, the median prison sentence for violent offenses (48 months) was twice as long as for nonviolent offenses (24 months) (**table 25**).

- Convictions for murder resulted in the longest median prison sentence (360 months). About 1 in 5 murderers received a life sentence. The next longest median sentences were for rape (120 months) and robbery (60 months). The median prison sentence for an assault,

burglary, or drug trafficking conviction was 36 months.

- Overall, the mean jail sentence was 5 months and the median was 4 months. Four percent of jail sentences were for more than 1 year. Convictions for robbery (8%) or a weapons offense (8%) were the most likely to result in a jail term exceeding 1 year (**table 26**).

- In 2009, the overall median length for probation sentences was 33 months, about the same as in past years. The median sentence was longer for felonies (30 months) than for misdemeanors (12 months). The median sentence for property-related felonies (24 months) was shorter than for other felony offense categories (36 months). About 1 in 4 sentences for violent and public-order offenses exceeded 36 months (**table 27**).

- About 3 in 10 probation sentences included a fine, including 36% of those for drug offenses. Treatment was required in nearly 3 in 10 probation sentences, including nearly half (45%) of those for drug offenses. About 1 in 4 probation sentences required community service (23%), and 1 in 5 required restitution. More than a third of the probation sentences for property offenses required restitution (**table 28**).

- Among defendants convicted of a violent felony, about 5 in 10 were sentenced to prison if they had no prior felony convictions. About 6 in 10 of those with a single prior felony and 7 in 10 of those with multiple prior felony convictions received a prison sentence (**figure 20**).

- Among defendants convicted of a nonviolent felony, 55% of those with multiple prior felony convictions received a prison sentence, compared to 40% of those with a single prior felony conviction and 23% of those with no prior felony convictions.

- From 1990 to 2009, the percentage of felony convictions resulting in an incarceration sentence ranged from 71% to 77%, and the use of prison sentences ranged from 35% to 44%. Prior to 1996 and after 2004, more felony convictions resulted in a sentence to prison than to jail. In other years, the two types of sentences were used with about the same frequency (**figure 21**).

- Between 1990 and 2009, the percentage of felony convictions resulting in an incarceration sentence remained the same for defendants under age 40. For defendants age 40 or older convicted of a felony, the percentage sentenced to incarceration increased from 71% in 1990 to 77% in 2009 (**figure 22**).

# List of tables and figures - Sentencing

**TABLE 23.** Time from conviction to sentencing for convicted defendants in the 75 largest counties, by most serious conviction offense, 2009

**TABLE 24.** Most severe type of sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009

**FIGURE 19.** Felony defendants convicted and sentenced to incarceration in the 75 largest counties, by most serious arrest charge 2009

**TABLE 25.** Length of prison sentence received by defendants convicted of a felony in the 75 largest counties, by most serious conviction offense, 2009

**TABLE 26.** Length of jail sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009

**TABLE 27.** Length of probation sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009

**TABLE 28.** Conditions of probation sentence received most often by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009

**FIGURE 20.** Type of sentence received for a felony conviction in the 75 largest counties, by prior conviction record, 2009

**FIGURE 21.** Most severe type of sentence received by defendants convicted of a felony in the 75 largest counties, 1990–2009

**FIGURE 22.** Defendants convicted of a felony who were sentenced to incarceration in the 75 largest counties, by age at arrest, 1990, 2000, and 2009

**TABLE 23**

**Time from conviction to sentencing for convicted defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Number of defendants | Percent of convicted defendants sentenced within— | | |
|---|---|---|---|---|
| | | 1 day | 1 month | 2 months |
| All offenses | 31,141 | 65% | 82% | 93% |
| **All felonies** | 25,940 | 60% | 78% | 92% |
| **Violent offenses** | 4,795 | 48% | 74% | 90% |
| Murder | 117 | 31 | 68 | 83 |
| Rape | 137 | 37 | 68 | 87 |
| Robbery | 1,458 | 47 | 73 | 86 |
| Assault | 1,929 | 51 | 77 | 93 |
| Other violent | 1,155 | 48 | 71 | 91 |
| **Property offenses** | 7,869 | 62% | 79% | 92% |
| Burglary | 2,245 | 61 | 79 | 93 |
| Larceny/theft | 2,314 | 71 | 84 | 95 |
| Motor vehicle theft | 725 | 58 | 82 | 94 |
| Forgery | 658 | 50 | 73 | 90 |
| Fraud | 809 | 52 | 69 | 90 |
| Other property | 1,118 | 66 | 83 | 94 |
| **Drug offenses** | 8,980 | 67% | 83% | 95% |
| Trafficking | 3,939 | 61 | 78 | 92 |
| Other drug | 5,041 | 71 | 86 | 96 |
| **Public-order offenses** | 3,980 | 59% | 78% | 93% |
| Weapons | 1,068 | 54 | 76 | 93 |
| Driving-related | 1,387 | 60 | 77 | 92 |
| Other public-order | 1,525 | 61 | 79 | 92 |
| **Misdemeanors** | 5,501 | 83% | 90% | 96% |

Note: Data on time from conviction to sentencing were available for 96% of convicted  defendants. Total for all felonies includes 17 cases that could not be classified into 1 of the 4 major offense categories.

Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 24**
**Most severe type of sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Total | Percent of convicted defendants sentenced to— | | | | | |
|---|---|---|---|---|---|---|---|
| | | Incarceration | | | Nonincarceration | | |
| | | Total | Prison | Jail | Total | Probation | Other |
| All offenses | 100% | 73% | 36% | 37% | 27% | 25% | 3% |
| All felonies | 100% | 75% | 42% | 33% | 25% | 24% | 1% |
| Violent offenses | 100% | 83% | 57% | 27% | 17% | 16% | 1% |
| Murder | 100% | 100 | 98 | 2 | 0 | 0 | 0 |
| Rape | 100% | 89 | 84 | 5 | 11 | 8 | 3 |
| Robbery | 100% | 89 | 71 | 18 | 11 | 10 | 1 |
| Assault | 100% | 81 | 47 | 34 | 19 | 18 | 1 |
| Other violent | 100% | 78 | 47 | 31 | 22 | 21 | 1 |
| Property offenses | 100% | 75% | 42% | 33% | 25% | 25% | 1% |
| Burglary | 100% | 79 | 53 | 26 | 21 | 20 | 1 |
| Larceny/theft | 100% | 72 | 40 | 32 | 28 | 27 | 0 |
| Motor vehicle theft | 100% | 77 | 46 | 31 | 23 | 21 | 2 |
| Forgery | 100% | 64 | 29 | 34 | 36 | 36 | 0 |
| Fraud | 100% | 71 | 33 | 38 | 29 | 29 | 0 |
| Other property | 100% | 78 | 32 | 46 | 22 | 21 | 1 |
| Drug offenses | 100% | 71% | 34% | 37% | 29% | 28% | 1% |
| Trafficking | 100% | 80 | 45 | 35 | 20 | 19 | 1 |
| Other drug | 100% | 64 | 26 | 39 | 36 | 35 | 1 |
| Public-order offenses | 100% | 79% | 46% | 34% | 21% | 20% | 1% |
| Weapons | 100% | 80 | 53 | 28 | 20 | 19 | 0 |
| Driving-related | 100% | 83 | 44 | 39 | 17 | 16 | 1 |
| Other public-order | 100% | 75 | 42 | 33 | 25 | 24 | 1 |
| Misdemeanors | 100% | 56% | 3% | 53% | 44% | 31% | 13% |

Note: Data on type of sentence were available for 94.6% of convicted defendants. Sentences to incarceration that were wholly suspended were included under probation. Fifteen percent of prison sentences and 57% of jail sentences included a probation term. Sentences to incarceration or probation may include a fine, restitution, community service, treatment, or other court-ordered conditions. Other sentences may include fines, community service, restitution, and treatment. Total for all felonies includes 17 cases that could not be classified into 1 of the 4 major offense categories. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 19**
**Felony defendants convicted and sentenced to incarceration in the 75 largest counties, by most serious arrest charge, 2009**



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 25**
**Length of prison sentence received by defendants convicted of a felony in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious felony conviction offense | Number of defendants | Number of months | | Percent receiving a maximum sentence length in months of— | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | Median | 1–24 | 25–48 | 49–72 | 73–120 | 120 or more* | Life |
| All offenses | 10,769 | 52 mo | 30 mo | 48% | 24% | 13% | 8% | 8% | -- |
| Violent offenses | 2,707 | 91 mo | 48 mo | 28% | 24% | 13% | 15% | 19% | -- |
| Murder | 111 | 373 | 360 | 0 | 0 | 8 | 2 | 70 | 20 |
| Rape | 115 | 142 | 120 | 6 | 19 | 9 | 24 | 42 | 0 |
| Robbery | 1,038 | 90 | 60 | 22 | 23 | 15 | 20 | 20 | 0 |
| Assault | 898 | 62 | 36 | 33 | 32 | 13 | 11 | 12 | 0 |
| Other violent | 546 | 75 | 36 | 40 | 20 | 11 | 14 | 15 | 0 |
| Property offenses | 3,236 | 40 mo | 24 mo | 52% | 23% | 14% | 7% | 3% | -- |
| Burglary | 1,191 | 52 | 36 | 42 | 25 | 16 | 11 | 6 | -- |
| Larceny/theft | 901 | 31 | 24 | 61 | 21 | 13 | 5 | 1 | 0 |
| Motor vehicle theft | 329 | 34 | 24 | 61 | 20 | 10 | 7 | 2 | 0 |
| Forgery | 194 | 32 | 24 | 53 | 27 | 17 | 1 | 1 | 0 |
| Fraud | 256 | 47 | 36 | 44 | 29 | 15 | 5 | 7 | 0 |
| Other property | 365 | 29 | 24 | 61 | 21 | 17 | 1 | 0 | 0 |
| Drug offenses | 3,022 | 40 mo | 24 mo | 53% | 25% | 13% | 5% | 5% | 0% |
| Trafficking | 1,748 | 49 | 36 | 42 | 29 | 16 | 7 | 6 | 0 |
| Other drug | 1,275 | 29 | 18 | 68 | 19 | 8 | 1 | 3 | 0 |
| Public-order offenses | 1,799 | 31 mo | 24 mo | 62% | 23% | 10% | 3% | 2% | 0% |
| Weapons | 564 | 38 | 24 | 52 | 28 | 11 | 4 | 4 | 0 |
| Driving-related | 609 | 31 | 23 | 65 | 18 | 12 | 2 | 3 | 0 |
| Other public-order | 626 | 26 | 18 | 68 | 22 | 8 | 2 | -- | 0 |

Note: Data on length of prison sentence were available for over 98.1% of all cases in which a defendant received a prison sentence. Fifteen percent of prison sentences included a probation term and 14% included a fine. Total for all offenses includes 5 cases that could not be classified into 1 of the 4 major offense categories.  Detail may not sum to total due to rounding.
--Less than 0.5%.
*Excludes life sentences.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 26**
**Length of jail sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Number of defendants | Number of months | | Percent receiving a maximum sentence in months of— | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | Median | 1 or less | 2–3 | 4–6 | 7–9 | 10–12 | 13 or more |
| All offenses | 11,281 | 5 mo | 4 mo | 28% | 21% | 25% | 8% | 15% | 4% |
| **All felonies** | 8,526 | 5 | 4 | 26% | 20% | 26% | 9% | 15% | 4% |
| Violent offenses | 1,277 | 6 | 6 | 16% | 19% | 26% | 13% | 23% | 3% |
| Robbery | 264 | 9 | 9 | 5 | 13 | 19 | 21 | 34 | 8 |
| Assault | 644 | 6 | 6 | 17 | 20 | 29 | 14 | 18 | 3 |
| Other violent | 357 | 5 | 4 | 24 | 24 | 25 | 7 | 20 | 1 |
| Property offenses | 2,592 | 6 | 4 | 24% | 21% | 26% | 9% | 16% | 5% |
| Burglary | 591 | 7 | 6 | 13 | 20 | 26 | 10 | 24 | 7 |
| Larceny/theft | 740 | 6 | 4 | 22 | 24 | 23 | 8 | 15 | 7 |
| Motor vehicle theft | 222 | 7 | 6 | 8 | 10 | 44 | 16 | 16 | 5 |
| Forgery | 225 | 4 | 3 | 27 | 28 | 26 | 8 | 10 | 1 |
| Fraud | 299 | 5 | 3 | 26 | 29 | 26 | 11 | 5 | 3 |
| Other property | 515 | 4 | 2 | 43 | 13 | 22 | 5 | 15 | 2 |
| Drug offenses | 3,318 | 5 | 3 | 31% | 21% | 26% | 7% | 10% | 3% |
| Trafficking | 1,371 | 6 | 5 | 24 | 21 | 29 | 8 | 13 | 5 |
| Other drug | 1,946 | 4 | 3 | 37 | 22 | 24 | 7 | 8 | 2 |
| Public-order offenses | 1,335 | 5 | 4 | 27% | 19% | 27% | 7% | 17% | 3% |
| Weapons | 294 | 7 | 6 | 26 | 9 | 22 | 13 | 21 | 8 |
| Driving-related | 546 | 5 | 3 | 33 | 20 | 28 | 4 | 13 | 2 |
| Other public-order | 494 | 5 | 5 | 20 | 24 | 28 | 7 | 18 | 2 |
| **Misdemeanors** | 2,755 | 5 | 3 | 34% | 25% | 19% | 4% | 16% | 3% |

Note: Data on length of jail sentence were available for 98.8% of all cases in which a defendant received a jail sentence. Table excludes portions of sentences that were suspended. Fifty-seven percent of jail sentences included a probation term and 19% included a fine. Murder and rape have been excluded from the detail because too few convictions for these offenses resulted in a jail sentence. The overall total for violent offenses, however, does include these cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 27**
**Length of probation sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Number of defendants | Number of months | | Percent receiving a sentence in months of— | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Mean | Median | 1–12 | 13–24 | 25–36 | 37–60 | 61 or more |
| All offenses | 7,586 | 31 mo | 33 mo | 22% | 34% | 29% | 13% | 2% |
| **All felonies** | 6,009 | 33 | 30 | 15% | 35% | 32% | 15% | 2% |
| Violent offenses | 750 | 35 | 36 | 14 | 33 | 28 | 21 | 4 |
| Property offenses | 1,946 | 32 | 24 | 14 | 39 | 28 | 18 | 1 |
| Drug offenses | 2,515 | 31 | 36 | 15 | 34 | 39 | 10 | 2 |
| Public-order offenses | 791 | 35 | 36 | 16 | 32 | 25 | 23 | 4 |
| **Misdemeanors** | 1,577 | 20 | 12 | 52% | 29% | 16% | 1% | 1% |

Note: Data on length of probation sentence were available for 97.4% of all cases in which the most severe type of sentence a defendant received was probation. Eighteen percent of those sentenced to probation also received a fine. Total for felonies includes 7 cases that could not be classified into 1 of the 4 categories. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 28**
**Conditions of probation sentence received most often by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009**

| Most serious conviction offense | Number of defendants | Percent whose sentence to probation included— | | | |
| --- | --- | --- | --- | --- | --- |
| | | Fine | Treatment | Community service | Restitution |
| All offenses | 7,454 | 28% | 27% | 23% | 20% |
| All felonies | 5,887 | 28 | 29 | 22 | 21 |
|   Violent offenses | 712 | 26 | 29 | 27 | 22 |
|   Property offenses | 1,916 | 19 | 18 | 23 | 37 |
|   Drug offenses | 2,492 | 36 | 45 | 21 | 7 |
|   Public-order offenses | 760 | 27 | 16 | 22 | 26 |
| Misdemeanors | 1,567 | 27 | 13 | 26 | 14 |

Note: Total for felonies includes 7 cases that could not be classified into 1 of the 4 felony offense categories. A defendant may have received more than one type of probation condition. Not all defendants sentenced to probation received probation conditions. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 20**
**Type of sentence received for a felony conviction in the 75 largest counties, by prior conviction record, 2009**

Percent of violent felony convictions



Percent of nonviolent felony convictions



Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**FIGURE 21**
**Most severe type of sentence received by defendants convicted of a felony in the 75 largest counties, 1990–2009**

Percent of felony convictions



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990–2009.

**FIGURE 22**
**Defendants convicted of a felony who were sentenced to incarceration in the 75 largest counties, by age at arrest, 1990, 2000, and 2009**

Percent sentenced to incarceration



Source: Bureau of Justice Statistics, State Court Processing Statistics, 1990, 2000, and 2009.

# Methodology

### Sample design

The State Court Processing Statistics (SCPS) sample was designed and selected by U.S. Census Bureau staff. It is a two-stage stratified sample, with 40 of the nation's 75 largest counties selected at stage one and a systematic sample of state court felony filings (defendants) within each county selected at stage two.

The 40 counties were divided into four first-stage strata based on overall population, arrests, and felony filing information. The first stratum was designed to include 10 counties selected with certainty because of their large number of court filings; however, one of these counties (Clark County, Nevada) did not provide the requested data and was excluded from the final data file and analyses. Hence, the first-stage weight for stratum one counties was changed from 1.00 to 1.111. The remaining counties were allocated to the three noncertainty strata based on the variance of felony court filings, population, and arrest data.

SCPS first-stage design

| Stratum | Number of counties | | |
|---|---|---|---|
| | Sample | Universe | Weight |
| One | 9 | 10 | 1.111 |
| Two | 7 | 12 | 1.714 |
| Three | 9 | 18 | 2.0 |
| Four | 14 | 35 | 2.5 |

The second-stage sampling (filings) was designed to represent all defendants who had felony cases filed with the court during the month of May 2009. The participating jurisdictions provided data for every felony case filed on selected days during that month. Depending on the first-stage stratum in which it had been placed, each jurisdiction provided filings data for 5, 10, or 20 selected business days in May 2009. Data from jurisdictions that were not required to provide a full month of filings were weighted to represent the full month.

SCPS second-stage design

| Stratum | Number of days of filings provided | Weight |
|---|---|---|
| One | 5.0 | 4.0 |
| Two | 10.0 | 2.0 |
| Three | 10.0 | 2.0 |
| Four | 20.0 | 1.0 |

See table 29 for county-by-county sampling information.

Once the sample lists were generated, the data on felony cases filed in the selected counties were collected from a variety of sources. These included court administrative files, pretrial case management systems, jail records, prosecutor offices, state criminal history record files, and other statistical agencies. In some counties, the required information was manually transferred from official records to a SCPS data collection form. In other counties, an electronic download of the requested SCPS data was provided by the county.

### Special adjustment for Cook County

An issue arose with the data provided by Cook County, Illinois, a stratum one county. In 2009, BJS's data collection agent, Regional Justice Information Service (REJIS), received a data extract from the Cook County Circuit Court. The extract encompassed all felony cases that were filed or had an initial hearing in the Cook County Circuit Court for five randomly selected business days in May 2009. This approach differed from prior SCPS years for Cook County, in which the sample list covered felony cases filed in Cook County municipal courts and then tracked those cases as they were either disposed in the municipal courts or bound over to the circuit courts. Since the 2009 Cook County file contained only those felony cases processed in the Circuit Court, it did not include the municipal court component that had been covered in previous SCPS projects.

This issue was addressed through a two-step process. Previous data obtained for 248 cases disposed in Cook County municipal courts in 2006 were added to the 2009 data. The use of these data was based on the assumption that the types of cases filed and disposed in the municipal courts had not changed since 2006. This assumption was validated by examining municipal court dispositions in Cook County from 2000 through 2009. The addition of the 248 cases from 2006 brought the number of Cook County cases in the 2009 SCPS data file to 1,229 cases (i.e., 248 municipal or lower court cases and 981 circuit or upper court cases).

The new preliminary number of felony cases filed in Cook County was then adjusted to take into account declines in felony caseloads from 2006 to 2009. In 2009, 31,106 felony cases were filed in Cook County courts, which equates to about 598 felony cases filed per week. In 2006, 716 felony cases were filed in Cook County in a 1 week period. An adjustment was calculated to account for this overall decline in the Cook County caseload from 2006 to 2009 (598/716 = .83546). This adjustment was applied to the 2006 number of lower (248), upper (397), and pending (71) cases to generate an estimate of these cases in 2009 (i.e., 207, 332, and 59, respectively). The cases in the 2009 file were then weighted so that their totals would reflect these 2009 case type estimates.

## Data summary

The 2009 SCPS collected data for 16,694 defendants charged with a felony offense during May 2009 in 39 large counties. These cases were part of a sample that was representative of the estimated 56,083 felony defendants whose cases were processed in the nation's 75 largest counties during that month. Defendants charged with murder were tracked for up to 2 years and all other defendants were followed for up to 1 year.

This report is based on data collected from the following 39 counties: Arizona (Maricopa, Pima); California (Los Angeles, Orange, San Bernardino, Ventura); Connecticut (Hartford); Florida (Broward, Miami-Dade, Hillsborough; Orange); Hawaii (Honolulu); Illinois (Cook); Indiana (Marion); Maryland (Baltimore, Montgomery, Prince George's); Michigan (Oakland, Wayne); Missouri (Saint Louis); New Jersey (Essex, Middlesex); New York (Bronx, Kings, Nassau, New York, Suffolk); North Carolina (Wake); Ohio (Cuyahoga, Franklin, Hamilton); Tennessee (Shelby); Texas (Dallas, El Paso, Harris, Tarrant); Utah (Salt Lake City); Washington (King); and Wisconsin (Milwaukee).

Because the data come from a sample, a sampling error and confidence intervals are associated with each reported number. Confidence intervals and standard errors for several key variables in the SCPS database are reported in tables 30 and 31. These confidence intervals show where the reported SCPS numbers would fall 95% of the time under repeated sampling. For example, the confidence interval for the total number of felony defendants in the nation's 75 largest counties ranged from 51,723 to 60,081 defendants. In other words, if repeated sampling of felony case processing in the nation's 75 largest counties was undertaken, there is a 95% confidence that the number of felony defendants would fall between 51,723 and 60,081.

## Offense categories

Felony offenses were classified into 16 categories for this report. They were further classified into the four major crime categories of violent, property, drug, and public-order. The following lists are a representative summary of the crimes in each category; however, these lists are not meant to be exhaustive. All offenses, except murder, include attempts and conspiracies to commit.

### Violent offenses

**Murder**—Includes homicide, nonnegligent manslaughter, and voluntary homicide. Excludes attempted murder (classified as felony assault), negligent homicide, involuntary homicide, or vehicular manslaughter, which are classified as other violent offenses.

**Rape**—Includes forcible intercourse, sodomy, or penetration with a foreign object. Does not include statutory rape or nonforcible acts with a minor or someone unable to give legal consent, nonviolent sexual offenses, or commercialized sex offenses.

**Robbery**—Includes unlawful taking of anything of value by force or threat of force. Includes armed, unarmed, and aggravated robbery, carjacking, armed burglary, and armed mugging.

**Assault**—Includes aggravated assault, aggravated battery, attempted murder, assault with a deadly weapon, felony assault or battery on a law enforcement officer, and other felony assaults. This offense category does not include extortion, coercion, or intimidation.

**Other violent offenses**—Includes vehicular manslaughter, involuntary manslaughter, negligent or reckless homicide, nonviolent or nonforcible sexual assault, kidnapping, unlawful imprisonment, child or spouse abuse, cruelty to a child, reckless endangerment, hit-and-run with bodily injury, intimidation, and extortion.

### Property offenses

**Burglary**—Includes any type of entry into a residence, industry, or business with or without the use of force with the intent to commit a felony or theft. Does not include possession of burglary tools, trespassing, or unlawful entry for which the intent is not known.

**Larceny/theft**—Includes grand theft, grand larceny, and any other felony theft, including burglary from an automobile, theft of rental property, and mail theft. This offense category does not include motor vehicle theft, receiving or buying stolen property, fraud, forgery, or deceit.

**Motor vehicle theft**—Includes auto theft, receiving and transferring an automobile, unauthorized use of a vehicle, possession of a stolen vehicle, and larceny or taking of an automobile.

**Forgery**—Includes forging of a driver's license, official seals, notes, money orders, credit or access cards or names of such cards or any other documents with fraudulent intent, uttering a forged instrument, counterfeiting, and forgery.

**Fraud**—Includes possession and passing of worthless checks or money orders, possession of false documents or identification, embezzlement, obtaining money by false pretenses, credit card fraud, welfare fraud, Medicare fraud, insurance claim fraud, fraud, swindling, stealing a thing of value by deceit, and larceny by check.

**Other property offenses**—Includes receiving or buying stolen property, arson, reckless burning, damage to property, criminal mischief, vandalism, criminal trespassing, possession of burglary tools, and unlawful entry for which the interest is unknown.

### Drug offenses

**Drug trafficking**—Includes trafficking, sales, distribution, possession with intent to distribute or sell, manufacturing, and smuggling of controlled substances. This category does not include possession of controlled substances.

**Other drug offenses**—Includes possession of controlled substances, prescription violations, possession of drug paraphernalia, and other drug law violations.

### Public-order offenses

**Weapons offenses**—Includes the unlawful sale, distribution, manufacture, alteration, transportation, possession, or use of a deadly weapon or accessory.

**Driving-related offenses**—Includes driving under the influence of drugs or alcohol, driving with a suspended or revoked license, and any other felony in the motor vehicle code.

**Other public-order offenses**—Includes flight/escape, parole or probation violations, prison contraband, habitual offender, obstruction of justice, rioting, libel, slander, treason, perjury, prostitution, pandering, bribery, and tax law violations.

### Pretrial release

**Released defendant**—Includes any defendant who was released from custody prior to the disposition of his or her case by the court. It also includes defendants who were detained for some period of time before being released and defendants who were returned to custody after being released because of a violation of the conditions of pretrial release. The terms "on pretrial release" and "released pending disposition" are both used in this report to refer to all released defendants.

**Detained defendant**—Includes any defendant who remained in custody from the time of arrest until the disposition of his or her case by the court. This report also refers to detained defendants as "not released."

**Failure to appear**—Occurs when a court issues a bench warrant because the defendant failed to appear as scheduled.

### Types of financial release

**Surety bond**—A bail bond company signs a promissory note to the court for the full bail amount and charges the defendant a fee for the service (usually 10% of the full bail amount). If the defendant fails to appear, the bond company is liable to the court for the full bail amount. Frequently the bond company requires collateral from the defendant in addition to the fee.

**Deposit bond**—The defendant deposits a percentage (usually 10%) of the full bail amount with the court. The deposit is returned after the disposition of the case, but the court often retains a small portion for administrative costs. If the defendant fails to appear in court, he or she is liable to the court for the full bail amount.

**Full cash bond**—The defendant posts the full bail amount in cash with the court. If the defendant makes all court appearances, the cash is returned. If the defendant fails to appear in court, the bond is forfeited.

**Property bond**—Involves an agreement made by the defendant as a condition of pretrial release requiring that property valued at the full bail amount be posted as an assurance of his or her appearance in court. If the defendant fails to appear in court, the property is also known as "collateral bond."

### Types of nonfinancial release

**Release on recognizance** (ROR)—The court releases the defendant on a signed agreement that he or she will appear in court as required. In this report, the ROR category includes citation releases in which arrestees are released pending their first court appearance on a written order issued by law enforcement or jail personnel.

**Unsecured bond**—The defendant pays no money to the court but is liable for the full amount of bail upon failure to appear in court.

**Conditional release**—The defendant is released under specified conditions. A pretrial services agency usually conducts monitoring or supervision, if ordered for a defendant. In some cases, such as those involving a third-party custodian or drug monitoring and treatment, another agency may be involved in the supervision of the defendant. Conditional release sometimes includes an unsecured bond.

### Other type of release

**Emergency release**—Defendants are released in response to a court order placing limits on a jail's population.

**TABLE 29**
**Population, sampling weights, and number of cases, by SCPS jurisdiction, 2009**

| County (state) | Population | Sampling weights | | | Number of cases | |
|---|---|---|---|---|---|---|
| | | Filings | County[a] | Total | Unweighted | Weighted |
| Total | | | | | 16,694 | 56,089 |
| Maricopa (AZ) | 3,803,779 | 4 | 1.11 | 4.44 | 539 | 2,395 |
| Pima (AZ) | 975,580 | 1 | 2.50 | 2.50 | 545 | 1,363 |
| Los Angeles (CA) | 9,787,400 | 4 | 1.11 | 4.44 | 1,112 | 4,942 |
| Orange (CA) | 2,987,177 | 2 | 1.71 | 3.43 | 533 | 1,827 |
| San Bernardino (CA) | 2,013,960 | 4 | 1.11 | 4.44 | 339 | 1,507 |
| Ventura (CA) | 815,130 | 1 | 2.50 | 2.50 | 288 | 720 |
| Hartford (CT) | 891,667 | 2 | 2.00 | 4.00 | 455 | 1,820 |
| Broward (FL) | 1,733,310 | 2 | 1.71 | 3.43 | 829 | 2,842 |
| Hillsborough (FL) | 1,214,050 | 2 | 1.71 | 3.43 | 481 | 1,649 |
| Miami-Dade (FL) | 2,463,943 | 4 | 1.11 | 4.44 | 419 | 1,862 |
| Orange (FL) | 1,131,551 | 2 | 2.00 | 4.00 | 569 | 2,276 |
| Honolulu (HI) | 943,177 | 1 | 2.50 | 2.50 | 157 | 393 |
| Cook (IL) | 5,181,728 | 4 | 1.11 | 4.44[b] | 1,229 | 2,658 |
| Marion (IN) | 898,394 | 2 | 1.71 | 3.43 | 528 | 1,810 |
| Baltimore (MD) | 801,808 | 1 | 2.50 | 2.50 | 328 | 820 |
| Montgomery (MD) | 959,013 | 1 | 2.50 | 2.50 | 305 | 763 |
| Prince George's (MD) | 856,161 | 1 | 2.50 | 2.50 | 415 | 1,038 |
| Oakland (MI) | 1,200,890 | 1 | 2.50 | 2.50 | 253 | 633 |
| Wayne (MI) | 1,837,536 | 4 | 1.11 | 4.44 | 290 | 1,289 |
| Saint Louis (MO) | 998,618 | 1 | 2.50 | 2.50 | 365 | 913 |
| Essex (NJ) | 781,943 | 4 | 1.11 | 4.44 | 217 | 964 |
| Middlesex (NJ) | 805,204 | 1 | 2.50 | 2.50 | 479 | 1,198 |
| Bronx (NY) | 1,376,261 | 2 | 1.71 | 3.43 | 346 | 1,186 |
| Kings (NY) | 2,487,751 | 2 | 2.00 | 4.00 | 319 | 1,276 |
| New York (NY) | 1,583,431 | 2 | 1.71 | 3.43 | 366 | 1,255 |
| Suffolk (NY) | 1,487,206 | 1 | 2.50 | 2.50 | 467 | 1,168 |
| Wake (NC) | 883,624 | 1 | 2.50 | 2.50 | 502 | 1,255 |
| Cuyahoga (OH) | 1,285,082 | 2 | 1.71 | 3.43 | 490 | 1,680 |
| Franklin (OH) | 1,155,408 | 2 | 2.00 | 4.00 | 128 | 512 |
| Hamilton (OH) | 802,149 | 2 | 2.00 | 4.00 | 243 | 972 |
| Shelby (TN) | 922,541 | 2 | 2.00 | 4.00 | 455 | 1,820 |
| Dallas (TX) | 2,346,378 | 4 | 1.11 | 4.44 | 100 | 444 |
| El Paso (TX) | 786,759 | 1 | 2.50 | 2.50 | 446 | 1,115 |
| Harris (TX) | 4,034,866 | 4 | 1.11 | 4.44 | 569 | 2,529 |
| Tarrant (TX) | 1,784,078 | 2 | 2.00 | 4.00 | 389 | 1,556 |
| Salt Lake (UT) | 1,016,795 | 2 | 2.00 | 4.00 | 160 | 640 |
| Fairfax (VA) | 1,065,142 | 1 | 2.50 | 2.50 | 437 | 1,093 |
| King (WA) | 1,912,012 | 2 | 2.00 | 4.00 | 267 | 1,068 |
| Milwaukee (WI) | 942,668 | 1 | 2.50 | 2.50 | 335 | 838 |

Note: In some of the 40 counties included in the 2009 SCPS study, prosecutors did not screen out any felony arrests before filing charges. In these counties, the SCPS sample cases are representative of all felony cases received by prosecutors and any cases subsequently screened out by the prosecutor are included in the SCPS dismissal category. In other counties, all felony arrests were reviewed by prosecutors before the decision to file felony charges was made. Weights are rounded to second decimal place. Populations are Census Bureau figures for July 1, 2009.
[a]Clark County (NV), a stratum one county, did not provide the requested data and was dropped from the study. This changed the first-stage weight for stratum one counties from 1.00 to 1.111.
[b]The sampling weight for Cook County was adjusted to 2.16. See *Methodology*, page 33, for more information.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 30**
**Standard errors and confidence intervals for felony in defendants in the 75 largest counties, by most serious arrest charge, 2009**

| Most serious arrest charge | Estimate | Standard error | 95% confidence interval | |
|---|---|---|---|---|
| | | | Lower bound | Upper bound |
| Number of felony cases | | | | |
| All offenses | 55,902 | 2,132 | 51,723 | 60,081 |
| Violent offenses | 13,938 | 618 | 12,727 | 15,149 |
| Murder | 370 | 37 | 297 | 442 |
| Rape | 669 | 56 | 559 | 778 |
| Robbery | 3,451 | 234 | 2,992 | 3,910 |
| Assault | 6,386 | 352 | 5,696 | 7,076 |
| Other violent | 2,419 | 244 | 1,941 | 2,897 |
| Property offenses | 16,241 | 747 | 14,777 | 17,705 |
| Burglary | 4,495 | 303 | 3,901 | 5,089 |
| Larceny/theft | 5,268 | 340 | 4,601 | 5,934 |
| Motor vehicle theft | 1,661 | 121 | 1,424 | 1,898 |
| Forgery | 1,416 | 109 | 1,203 | 1,630 |
| Fraud | 2,128 | 167 | 1,801 | 2,455 |
| Other property | 1,980 | 203 | 1,582 | 2,378 |
| Drug offenses | 18,220 | 863 | 16,529 | 19,911 |
| Trafficking | 8,487 | 487 | 7,533 | 9,442 |
| Other drug | 12,745 | 668 | 11,435 | 14,054 |
| Public-order offenses | 7,504 | 423 | 6,675 | 8,333 |
| Weapons | 1,958 | 145 | 1,674 | 2,242 |
| Driving-related | 1,837 | 231 | 1,384 | 2,289 |
| Other public-order | 2,830 | 257 | 2,326 | 3,334 |

Note: Data for the specific arrest charge were available for 99.7% of all cases. Detail may not sum to total due to rounding.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.

**TABLE 31**
**Standard errors and confidence intervals for felony in defendants in the 75 largest counties, by selected characteristics, 2009**

| Most serious arrest charge | Estimate | Standard error | 95% confidence interval | |
|---|---|---|---|---|
| | | | Lower bound | Upper bound |
| **Mean age at arrest** | | | | |
| 17 or younger | 2.8% | 0.3% | 2.2% | 3.4% |
| 18–20 | 14.9 | 0.4 | 14.1 | 15.7 |
| 21–24 | 16.9 | 0.3 | 16.3 | 17.5 |
| 25–29 | 16.6 | 0.3 | 16.0 | 17.2 |
| 30–34 | 12.9 | 0.3 | 12.3 | 13.5 |
| 35–39 | 10.4 | 0.3 | 9.8 | 11.0 |
| 40 or older | 25.5 | 0.4 | 24.7 | 26.3 |
| **Sex** | | | | |
| Male | 83.1% | 0.4% | 82.3% | 83.9% |
| Female | 16.9 | 0.4 | 16.1 | 17.7 |
| **Race/Hispanic origin** | | | | |
| White[a] | 29.6% | 1.4% | 26.9% | 32.3% |
| Black/African-American[a] | 44.7 | 2.3 | 40.2 | 49.2 |
| Hispanic/Latino | 24.1 | 2.0 | 20.2 | 28.0 |
| Other[a,b] | 1.7 | 0.4 | 0.9 | 2.5 |
| **Criminal justice status at arrest** | | | | |
| None | 74.1% | 1.1% | 71.9% | 76.3% |
| Probation | 14.1 | 1.0 | 12.1 | 16.1 |
| Parole | 5.1 | 0.5 | 4.1 | 6.1 |
| **Number of prior felony arrests** | | | | |
| No prior arrests | 24.9% | 1.1% | 22.7% | 27.1% |
| Nonfelony arrests only | 12.6 | 0.6 | 11.4 | 13.8 |
| 1 | 10.4 | 0.4 | 9.6 | 11.2 |
| 2–4 | 19.2 | 0.5 | 18.2 | 20.2 |
| 5–9 | 15.4 | 0.4 | 14.6 | 16.2 |
| 10 or more | 17.4 | 0.9 | 15.6 | 19.2 |
| **Number of prior felony convictions** | | | | |
| No prior convictions | 40.0% | 1.1% | 37.8% | 42.2% |
| Nonfelony convictions only | 16.6 | 0.6 | 15.4 | 17.8 |
| 1 | 12.9 | 0.4 | 12.1 | 13.7 |
| 2–4 | 18.6 | 0.5 | 17.6 | 19.6 |
| 5–9 | 8.9 | 0.4 | 8.1 | 9.7 |
| 10 or more | 3.1 | 0.3 | 2.5 | 3.7 |
| **Most serious prior conviction** | | | | |
| None | 16.6% | 0.6% | 15.4% | 17.8% |
| Misdemeanor | 43.4 | 0.9 | 41.6 | 45.2 |
| Felony | 40.0 | 1.1 | 37.8 | 42.2 |
| **Released before case disposition** | | | | |
| Total released | 61.8% | 1.2% | 59.4% | 64.2% |
| Financial conditions | 38.2% | 1.9% | 34.5% | 41.9% |
| Surety bond | 26.4 | 1.9 | 22.7 | 30.1 |
| Deposit bond | 4.0 | 0.7 | 2.6 | 5.4 |
| Full cash bond | 3.0 | 0.5 | 2.0 | 4.0 |
| Property bond | 0.6 | 0.2 | 0.2 | 1.0 |
| Nonfinancial conditions | 23.7% | 1.7% | 20.4% | 27.0% |
| Recognizance | 14.3 | 1.4 | 11.6 | 17.0 |
| Conditional | 6.4 | 0.8 | 4.8 | 8.0 |
| Unsecured bond | 3.2 | 0.7 | 1.8 | 4.6 |
| Emergency release | 0.4% | 0.2% | 0.0% | 0.8% |

**Table 31 (continued)**
**Standard errors and confidence intervals for felony in defendants in the 75 largest counties, by selected characteristics, 2009**

| Most serious arrest charge | Estimate | Standard error | 95% confidence interval | |
| | | | Lower bound | Upper bound |
|---|---|---|---|---|
| **Detained until case disposition** | | | | |
| Total detained | 38.2% | 1.2% | 35.8% | 40.6% |
| Held on bail | 33.7 | 1.4 | 31.0 | 36.4 |
| Denied bail | 4.0 | 0.3 | 3.4 | 4.6 |
| **Mean bail amount** | | | | |
| Total | $55,679 | $6,181 | $43,564 | $67,794 |
| Released defendants | $19,650 | $1,770 | $16,181 | $23,119 |
| Detained defendants | $98,386 | $10,544 | $77,720 | $119,052 |
| **Pretrial misconduct** | | | | |
| Total misconduct | 29.2% | 1.0% | 27.2% | 31.2% |
| Failure to appear | 17.0 | 0.9 | 15.2 | 18.8 |
| Rearrest | 15.8 | 0.9 | 14.0 | 17.6 |
| **Adjudication outcome** | | | | |
| Convicted | 66.0% | 1.6% | 62.9% | 69.1% |
| Felony | 54.5 | 1.8 | 51.0 | 58.0 |
| Misdemeanor | 11.7 | 1.0 | 9.7 | 13.7 |
| Dismissal/acquittal | 25.4 | 1.2 | 23.0 | 27.8 |
| Other outcome | 8.5 | 1.0 | 6.5 | 10.5 |
| **Most severe sentence type** | | | | |
| Prison | 35.7% | 1.0% | 33.7% | 37.7% |
| Jail | 36.8 | 2.1 | 32.7 | 40.9 |
| Probation | 24.7 | 1.7 | 21.4 | 28.0 |
| Other | 2.8 | 0.5 | 1.8 | 3.8 |
| **Mean sentence length** | | | | |
| Prison | 79.4 mo | 11.1 mo | 57.6 mo | 101.1 mo |
| Jail | 5.2 | 0.2 | 4.8 | 5.7 |
| Probation | 31.7 | 1.1 | 29.6 | 33.9 |

[a]Excludes persons of Hispanic or Latino origin.
[b]Includes persons identifying as American Indian or Alaska Native; Asian, Native Hawaiian, or other Pacific Islander; and persons identifying as two or more races.
Source: Bureau of Justice Statistics, State Court Processing Statistics, 2009.



The Bureau of Justice Statistics, located in the Office of Justice Programs, U.S. Department of Justice, collects, analyzes, and disseminates statistical information on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government. William J. Sabol is acting director.

These statistical tables were prepared by Brian A. Reaves of BJS. Andrew Tiedt provided verification.

Morgan Young and Irene Cooperman (Lockheed Martin) edited the report. Tina Dorsey produced the report.

December 2013, NCJ 243777



**Office of Justice Programs**
**Innovation • Partnerships • Safer Neighborhoods**
**www.ojp.usdoj.gov**



# Incarceration's Front Door:
## The Misuse of Jails in America

FEBRUARY 2015 (UPDATED 7/29/15)

CENTER ON SENTENCING AND CORRECTIONS



Ram Subramanian • Ruth Delaney • Stephen Roberts • Nancy Fishman • Peggy McGarry

## FROM THE PRESIDENT

*Incarceration's Front Door* addresses what is arguably one of the chief drivers of difficulty in our troubled criminal justice system: jails.

The report's encyclopedic examination of jail use—who's in jail and the myriad paths leading there—is meant to inform. But it should also unnerve and incite us to action. As Vera's president, I observe injustice routinely. Nonetheless even I—as this report came together—was jolted by the extent to which unconvicted people in this country are held in jail simply because they are too poor to pay what it costs to get out. I was startled by the numbers of people detained for behavior that stems primarily from mental illness, homelessness, or addiction. I was dismayed by how even a brief stay in jail can be destructive to individuals, their families, and entire communities. And I've been at this work for a while now.

I suspect that many readers will come to this report thinking that jail is reserved only for those too dangerous to be released while awaiting trial or those deemed likely to flee rather than face prosecution. Indeed, jails are necessary for some  people. Yet too often we see ordinary people, some even our neighbors, held for minor violations such as driving with a suspended license, public intoxication, or shoplifting because they cannot afford bail as low as $500. Single parents may lose custody of their children, sole wage-earners in families, their jobs—while all of us, the taxpayers, pay for them to stay in jail.

*Incarceration's Front Door* reviews the research and interrogates the data from a wide range of sources to open a window on the widespread misuse of jails in America. It also draws on Vera's long experience in the field and examples from jurisdictions of different sizes and compositions to suggest how the negative consequences of this misuse can be mitigated. Indeed, this report marks a bittersweet homecoming for Vera as our very first project was The Manhattan Bail Project, which showed that many, if not most, people accused of committing a crime can be relied on to appear in court without having to post bail or be held until trial. The lessons we learned and shared in 1961 have not stuck nearly enough.

As the report makes clear, jails are all around us—in nearly every town and city. Yet too few of us know who's there or why they are there or what can be done to improve them. I hope that *Incarceration's Front Door* provides the critical insight to inspire you to find out more.

Nicholas Turner
President and Director
Vera Institute of Justice

# Contents

4       Gateway to the criminal justice system

7       Decades of growth

11      Portrait of the jailed

12      Costs and consequences

18      Six key decision points that influence the use
        and size of jails

        20      Arrest

        25      Charge

        29      Pretrial release and bail

        36      Case processing

        38      Disposition and sentencing

        41      Reentry and community supervision

46      Conclusion

48      Endnotes

# Gateway to the criminal justice system

Though there is hardly a town without one or a big city without several, jails are rarely on the radar of most Americans. There are more than 3,000 jails in the United States, holding 731,000 people on any given day—more than the population of Detroit and nearly as many people as live in San Francisco.[1] This number, high as it may be, is only a one-day snapshot. In the course of a typical year, there are nearly 12 million jail admissions—equivalent to the populations of Los Angeles and New York City combined and nearly 19 times the annual admissions to state and federal prisons.[2] Although in common parlance jails are often confused with prisons—the state or federal institutions where most of those convicted of crimes and given a sentence of imprisonment are sent—jails are locally run facilities, primarily holding people arrested but not yet convicted, and are the place where most people land immediately following arrest. Jails are the gateway to the formal criminal justice system in a country that holds more people in custody than any other country on the planet.[3]

Intended to house only those deemed to be a danger to society or a flight risk before trial, jails have become massive warehouses primarily for those too poor to post even low bail or too sick for existing community resources to manage. Most jail inmates—three out of five people—are legally presumed innocent, awaiting

## Locked up: Annual admissions

Jails have a much broader reach than prisons. Although state and federal prisons hold about twice the number of people on any given day than jails do, jails have almost 19 times the number of annual admissions than prisons do.



Local jails
11,700,000



State & federal prisons
631,000

trial or resolution of their cases through plea negotiation in facilities that are often overcrowded, noisy, and chaotic.[4] (See Figure 1.) While jails do hold people accused of serious, violent crimes, nearly 75 percent of the population of both sentenced offenders and pretrial detainees are in jail for nonviolent traffic, property, drug, or public order offenses.[5] In New York City, nearly 50 percent of cases which resulted in some jail time were for misdemeanors or lesser charges.[6] In Los Angeles County, a study of the jail system in 2008 by the Vera Institute of Justice (Vera) found that the single largest group booked into the jail consisted of people charged with traffic and vehicular offenses.[7]

Although most defendants admitted to jail over the course of a year are released within hours or days, rather than weeks or months, even a short stay in jail is more than an inconvenience. Being detained is often the beginning of a journey through the criminal justice system that can take many wrong turns. Just a few days in jail can increase the likelihood of a sentence of incarceration and the harshness of that sentence, reduce economic viability, promote future criminal behavior, and worsen the health of those who enter—making jail a gateway to deeper and more lasting involvement in the criminal justice system at considerable costs to the people involved and to society at large. These costs are also borne by their families and communities, depressing economies, contributing to increased crime, and breaking familial and social bonds. For the disproportionately high number of those who enter jails from minority communities, or who suffer from mental illness, addiction, and homelessness, time spent in jail exacerbates already difficult conditions and puts many on a cycle of incarceration from which it is extremely difficult to break free.

Recent criminal justice reform efforts have focused in the main on reducing the number of people in state prisons.[8] Prompted by ballooning state corrections budgets and a plummeting crime rate, policymakers across the political spectrum have been willing to re-examine the punitive policies that relied on incarceration as a principal crime control strategy.[9] This new policy environment has also been encouraged and buoyed by consistent public opinion polls that show most Americans support alternatives to incarceration—particularly for nonviolent offenses—and research demonstrating that certain types of law-breakers can be safely and more effectively supervised in the community.[10]

Given the complex role jails play in compounding the manifold negative consequences of mass incarceration in America—well acknowledged today on both sides of the aisle—local policymakers and their constituents interested in reducing recidivism, improving public safety, and promoting stronger, healthier communities might do well to take a hard look at how the jail in their city or county is used. To help foster public debate and action by public officials, this report offers an overview of the nation's misuse of jails. It examines the characteristics of the people who typically cycle in and out of jails; some of the key policies that contributed to the rise in the use of jail; and the impact of jail incarceration on individuals, families, and communities. It also looks at key decision points where strategies can be adopted to decrease the misuse of jails within the American criminal justice system.

## Figure 1: Convicted and unconvicted jail inmates, 2013



38% Convicted

62% Unconvicted

Source: Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables.* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014), appendix table 3, p. 11

## WHAT IS A JAIL?



The history of jails in English-speaking countries, including America, can be traced back to twelfth-century England during the reign of King Henry II who ordered their construction and placed them under the control of the crown's local government representative, the county sheriff. Their primary purpose was to detain people awaiting trial and those convicted but awaiting punishment. The earliest reference to jails in the United States is to the construction of a "people pen" in 1632 in prerevolutionary Boston. Mirroring the brutal British penal codes and practices of the day, the dominant form of criminal punishment in colonial America was corporal—with serious crimes punishable by death, physical mutilation, branding, or whipping, and lesser offenses by public ridicule and humiliation through the use of the stocks, the pillory, the public cage, or the ducking stool. But with the conversion of Philadelphia's Walnut Street Jail into the country's first penitentiary in 1790—as part of penal reform championed by the Quakers—incarceration as punishment soon became the default response for serious law-breaking and with it the modern prison system was born.[a]

Today jails are, with few exceptions, municipal or county-level confinement facilities that are administered by local law enforcement agencies or departments of correction.[b] Like their historical antecedents they are used to detain people awaiting trial who are deemed a flight risk or a danger to public safety. But many also house a range of other people caught up in the criminal system as described below. Jails range in size from small "lock-ups" that hold no more than a handful of people to networks of facilities, such as the eight jails in Los Angeles County that house approximately 20,000 inmates.[c] Their costs are mainly paid for by a municipality or county with reimbursements sometimes coming from the state or federal governments.

Unlike state prisons, which almost exclusively hold people serving state sentences, jail populations are heterogeneous, making them particularly challenging to manage.

Jails may house:

> **Pretrial detainees** held from the time they are arrested until they post bail, are released on their own recognizance or to some form of pretrial community supervision, or until the cases against them are settled by trial or plea.

> **Locally sentenced inmates** convicted of minor crimes for which they have received short custodial sentences, typically a year or less but longer in some states.[d]

> **State sentenced inmates** convicted of more serious crimes awaiting transfer to a state prison or assigned to serve their sentence in a

local facility due to prison overcrowding. Local jurisdictions are paid to house these overflow inmates. This latter trend is most significant in California, where the state department of correction is under court order to reduce crowding in prisons.[e]

> **Apprehended probation violators** who are either awaiting a hearing on an alleged violation of the terms of their supervision in the community, or serving the remainder of their sentence in local confinement.

> **Apprehended parole violators** awaiting a hearing on an alleged violation or transfer back to state prison.

> **Pretrial federal detainees** awaiting trial on federal charges, in jurisdictions where no federal detention beds are available. Local jurisdictions are paid to house these inmates.

> **Apprehended pretrial or sentenced inmates from other jurisdictions** awaiting transfer or housed at the jail due to unavailability of beds in the other state or local jurisdiction.

> **Immigration and Customs Enforcement (ICE) detainees** held at the request of the U.S. government pending adjudication of immigration violations or deportation.  Local jurisdictions are paid to house these inmates.

[a] For a brief overview of the history of jails, see http://law.jrank.org/pages/1399/Jails-Historical-perspective.html.
[b] Six states—Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont—do not have locally-run jails and instead run unified correctional systems, meaning that both prisons and jails are under the jurisdiction of the state's Department of Corrections. See Barbara Krauth, *A Review of the Jail Function within State Unified Corrections Systems* (1997), 2, http://static.nicic.gov/Library/014024.pdf, p. 2.
[c] Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project,* (New York: NY: Vera Institute of Justice, 2011), i.
[d] Individuals sentenced to a jail rather than a prison sentence are usually convicted of a misdemeanor—a low-level criminal offense that typically has no more than a maximum custodial sentence of a year. Some states, such as Texas, allow jail sentences for certain felony offenders (known as "state jail felonies"), while in other states, such as Pennsylvania, certain types of misdemeanors expose individuals to incarceration of more than one year.
[e] See *Brown v. Plata*, 131 S.Ct. 1910 (2011).

# Decades of growth

By every measure, the scale at which jails operate has grown dramatically over the past three decades. The number of annual admissions nearly doubled, from six million in 1983 to 11.7 million in 2013.[11] While there are no national data on how many unique individuals these admissions represent, data from Chicago and New York City suggest that a small minority is responsible for upwards of one-half of all admissions to jail—that is, some people return to jail over and over. In Chicago, 21 percent of the people admitted to jail between 2007 and 2011 accounted for 50 percent of all admissions.[12] In New York City, from 2008

through mid-year 2013, just shy of 500 people were admitted to jail 18 times or more, accounting for more than 10,000 jail admissions and 300,000 days in jail.[13] The number of people in jail on any given day has also climbed—from 224,000 people in 1983 to 731,000 in 2013, the latest year for which data are available.[14]

### Jail's revolving door in New York City, 2008 - 2013



**473** people were admitted to jail 18 times or more:

> 85% charged with misdemeanor or violation

> 21% had a serious mental illness

> 99.4% had a substance use disorder



Accounting for more than **10,000** jail admissions



and more than **300,000** days in jail

The rate of confinement (that is, the proportion of the population in jail at any one time) also rose markedly over roughly the same time: increasing from 96 per 100,000 U.S. residents in 1983 to a peak of 259 per 100,000 in 2007.[15] The rate has since declined to 231 per 100,000 in 2013.[16]  This growth in the confinement rate continued for years after crime rates started to decline (see Figure 2.) Both

## Figure 2: Crime and jail rates per 100,000



Source: For jail rates, see Craig A. Perkins, James J. Stephan, and Allen J. Beck, *Jails and Jail Inmates: 1993-94.* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1995); Allen J. Beck and Jennifer C. Karberg, *Prison and Jail Inmates at Midyear 2000.* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2001); Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables.* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014); and for crime rates, see Uniform Crime Reporting Statistics - UCR Data Online at http://www.ucrdatatool.gov/.

violent and property crime rates peaked in 1991 and have been declining steadily ever since—nationally, violent crime is down 49 percent from its highest point more than 20 years ago and property crime is down 44 percent.[17]

While the country has continued to grow safer—at least by the most common measures of public safety—an ever-larger proportion of the population is being sent to jail, though research demonstrates that there is little causal connection between improved public safety and an increased use of incarceration.[18] Notably, much of this growth in jail use tracks the rise of drug crime enforcement. From 1981 until 2006, when they peaked, total drug arrests more than tripled, from 560,000 to 1.9 million, and the drug arrest rate (per 100,000) grew 160 percent. The share of people in jail accused or convicted of a drug crime increased sharply in the 1980s,

## Figure 3: Drug arrests, 1981–2012



Source: Howard N. Snyder, and Joseph Mulako-Wangota, Bureau of Justice Statistics. With underlying data from the FBI's Uniform Crime Reporting (UCR) Program, the information presented in this figure was generated using the Arrest Data Analysis Tool at www.bjs.gov.

## Figure 4: Drug defendants and inmates as share of jail populations



Source: For the 1983 drug share, see Allen J. Beck, *Profile of Jail Inmates, 1989* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991); and for 2002, see Doris J. James, *Profile of Jail Inmates, 2002* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004).

from nine percent in 1983 to 23 percent in 1989, and has hovered there ever since (see Figures 3 and 4).[19]

Not only are more people ending up in jail, those who get there are spending more time behind bars. The length of stay increased from an average of 14 days in 1983 to 23 days in 2013.[20] Although the national data on length of stay do not distinguish between those held pretrial and those sentenced to a term in jail, this increase is nevertheless a significant and worrisome trend. Moreover, since the proportion of jail inmates that are being held pretrial has grown substantially in the last thirty years—from about 40 to 62 percent—it is highly likely that the increase in the average length of stay is largely driven by longer stays in jails by people who are unconvicted of any crime.

## Length of stay in jails

Average length of stay in days has been increasing over the past 30 years.



14 DAYS



23 DAYS

## ABOUT THE DATA

Wherever possible, the authors of this report support their analysis of the current state of jails in the United States with reference to the latest available national data—most of which are collected by the U.S. Department of Justice's Bureau of Justice Statistics (BJS). The BJS releases jail reports with statistical tables annually as part of its *Prison and Jail Inmates at Midyear* series. These reports include data on jail capacities, population counts, and demographic breakdowns. They do not, however, include more detailed data on such topics as the severity of charges or the prevalence of mental health issues. The last time the BJS released data on these topics was in 2002 in its *Survey of Inmates in Local Jails*, a detailed survey of a sample of nationally representative jail inmates. These surveys were conducted in five-to-seven year intervals from 1972 through 2002, but have not been conducted since. This report includes figures from the latest survey where the survey's findings are still relevant and more recent figures are not available. The authors also draw attention to data from local jurisdictions when doing so can illuminate an issue or a notable trend.

# Portrait of the jailed

While jails still serve their historical purpose of detaining those awaiting trial or sentencing who are either a danger to public safety or a flight risk, they have come to hold many who are neither. Underlying the behavior that lands someone in jail, there is often a history of substance abuse, mental illness, poverty, failure in school, and victimization. Sixty-eight percent of people in jail have a history of abusing drugs, alcohol, or both.[21]  Forty-seven percent of jail inmates have not graduated from high school or passed the General Educational Development (GED) test.[22]

Nationally, African Americans are jailed at almost four times the rate of white Americans.[23] Despite making up only 13 percent of the U.S. population, African Americans account for 36 percent of the jail population (see Figure 5).[24] Locally, disparities can be even starker: in New York City, for example, blacks are jailed at nearly 12 times the rate of whites and Latinos more than five times the rate of whites.[25]

Among the many disadvantaged people in jails, the largest group by far is people with a mental illness. Jails have been described as the "treatment of last resort" for those who are mentally ill and as "de facto mental hospitals" because they fill the vacuum created by the shuttering of state psychiatric hospitals

## Figure 5: Racial disparities



WHITE   BLACK   WHITE   BLACK

Source: Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014) and United States Census Bureau of the Census "QuickFacts."

## Mental illness and substance use disorders in jails



Serious mental illnesses



72% of people in jail with a serious mental illness also have a substance use disorder.



Diagnosable substance use disorders

and other efforts to deinstitutionalize people with serious mental illness during the 1970s, which occurred without creating adequate resources to care for those displaced in the community.[26]

Serious mental illness, which includes bipolar disorder, schizophrenia, and major depression, affects an estimated 14.5 percent of men and 31 percent of women in jails—rates that are four to six times higher than in the general population.[27] According to the BJS, 60 percent of jail inmates reported having had symptoms of a mental health disorder in the prior twelve months.[28] People with serious mental illnesses are often poor, homeless, and likely to have co-occurring substance use disorders and, thus when untreated, are far more prone to the kinds of public order offenses and minor crimes that have been the focus of law enforcement in recent years and have helped swell jail populations.[29]

The prevalence of people with mental illness in jail is at odds with the design, operation, and resources in most jails. Characterized by constant noise, bright lights, an ever-changing population, and an atmosphere of threat and violence, most jails are unlikely to offer any respite for people with mental illness. Coupled with the near-absence of mental health treatment, time in jail is likely to mean further deterioration in their illness. According to the latest available data, 83 percent of jail inmates with mental illness did not receive mental health care after admission.[30] The lack of treatment in a chaotic environment contributes to a worsening state of illness and is a major reason why those with mental illness in jail are more likely to be placed in solitary confinement, either as punishment for breaking rules or for their own protection since they are also more likely to be victimized.[31]

While most people with serious mental illness in jails, both men and women, enter jail charged with minor, nonviolent crimes, they end up staying in jail for longer periods of time. In Los Angeles, for example, Vera found that users of the Department of Mental Health's services on average spent more than twice as much time in custody than did the general custodial population—43 days and 18 days respectively.[32]

# Costs and consequences

The growth of jails has been costly in many ways, contributing little, if at all, to the enhancement of public safety. From 1982 to 2011, local expenditures on corrections—largely building and running jails—increased nearly 235 percent.[33] The increasing direct costs of operating jails, however, are matched by the indirect costs and consequences of jailing people who do not need to be there or holding them for longer than necessary. These consequences—in lost wages, worsening

## BEYOND MENTAL ILLNESS

For people with mental illness in jail, their illness is often at the center of several interrelated problems. A BJS study published in 2006—the most recent national study of its kind—showed that people with mental illness in jail are more likely than others to experience homelessness, unemployment, and substance abuse.[a]

> Seventeen percent of people with mental illness in jail were homeless in the year before their arrest, compared to nine percent of the rest of the jail population.

> Nearly a third of the people in jail with mental illness were unemployed in the month before arrest, compared to less than a quarter of the rest of the jail population.

> Thirty-four percent of people with mental illness in jail were using drugs at the time of their arrest compared to 20 percent of the rest of the jail population. Fifteen percent of people with mental illness were using both drugs and alcohol at the time of their arrest compared to seven percent of the rest of the jail population.

[a] Doris J. James and Lauren Glaze, *Mental Health Problems of Prison and Jail Inmates* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2006), p.4.

physical and mental health, possible loss of custody of children, a job, or a place to live—harm those incarcerated and, by extension, their families and communities. Ultimately, these consequences are corrosive and costly for everyone because no matter how disadvantaged people are when they enter jail, they are likely to emerge with their lives further destabilized and, therefore, less able to be healthy, contributing members of society.[34]

Of the more than $60 billion spent annually on correctional institutions, $22.2 billion, or about one third, is spent by local jurisdictions.[35] Even this figure fails to capture the true costs of jails to local jurisdictions, as money spent on jails—for pension plans for staff for example, or healthcare for inmates—often comes out of the budget of non-correctional agencies. Cities and counties have to cover most costs themselves, drawing on the same pool of tax revenue that supports schools, transportation, and an array of other public services.[36]

## Figure 6: Pretrial detention and sentencing

Compared to low-risk defendants released prior to trial, those detained before trial were…



…more likely to receive a sentence of imprisonment

…more likely to be given a longer prison sentence

**4x** more likely

**3x** longer

Source: Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (New York: The Laura and John Arnold Foundation, 2013).

## Figure 7: Pretrial detention and reoffending

Compared to low-risk defendants held for no more than 24 hours, those held for 8-14 days were…



…more likely to be rearrested before trial

…more likely to recidivate after sentence completion

**56%**

**51%**

Source: Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *The Hidden Costs of Pretrial Detentions*. (New York: The Laura and John Arnold Foundation, 2013).

## WORSE CASE OUTCOMES AND DECREASED PUBLIC SAFETY

Recent research supported by the Laura and John Arnold Foundation on people held in jail pending the resolution of the charge(s) against them (commonly referred to as "pretrial detention")—with data drawn from counties in two states in different parts of the country—has reignited interest in pretrial policies and practices. Researchers found that even a relatively short period in jail pretrial—as few as two days—correlates with negative outcomes for defendants and for public safety when compared to those defendants released within 24 hours. While results varied by length of detention and risk level, in virtually every category, those detained were more likely to be rearrested before trial, to receive a sentence of imprisonment, to be given a longer term of imprisonment, and to recidivate after sentence completion (see Figures 6 and 7). The probabilities were especially high for low-risk individuals and for those held for their entire pretrial period and remained true even when researchers controlled for relevant factors including risk level, supervision status, offense type, offense level, time at risk in the community, demographics, and other factors.[37]

Earlier research had noted that those held pretrial may be more likely to receive custodial as well as longer sentences because defendants already in jail receive and accept less favorable plea agreements and do not have the leverage to press for better ones.[38] In the Arnold Foundation study, however, the harsher sentences held even for those detained for only a few days (and who, therefore, did have the freedom to hold out for a more favorable offer from prosecutors). For the much smaller number of defendants who go to trial, research has found that jurors tend to view defendants brought to court in jail uniforms and shackles as guilty regardless of the merits of the case.[39] For policymakers interested in reducing incarceration at both the state and local levels, this research has major implications: reducing detention, especially for low- and medium-risk defendants, can help reduce incarceration by lowering recidivism and prison terms.

## DIFFERENTIAL RACIAL IMPACT

Community-level consequences of incarceration are most evident in African American and Latino communities whose members are disproportionately represented in jails across the country. While blacks and Latinos combined make up 30 percent of the general population, they are 51 percent of the jail population.[40] This disparity is caused by myriad and interconnected factors, including policing practices that concentrate law enforcement activities in low-income, minority communities, combined with the socio-economic disadvantages experienced by residents in those neighborhoods.[41] Black males, in particular, are arrested at a younger age and at higher rates than their white counterparts, often giving them a longer "rap" sheet regardless of the charges or the eventual dispositions of the cases.[42] Schools in minority neighborhoods are more likely to have law enforcement officers on site and to embrace "zero tolerance" policies.[43] "Stop, question, and frisk" policies have been shown to target young men of color, especially black men.[44] Black men are also more likely to be arrested for drug crimes despite similar rates of use when compared to whites.[45] With arrest records on file at earlier ages, subsequent contacts with police result in more severe case outcomes as these young men come of age.[46]

Black men are also disproportionately held pretrial as a result of an inability to post monetary bail. Although their bail amounts are similar to bail amounts set for whites, black men appear to be caught in a cycle of disadvantage. Because they are incarcerated at higher rates they are more likely to be unemployed and/or in debt, resulting in more trouble posting bail.[47]

Moreover, these disparities persist at sentencing. Black men in the state and federal justice systems tend to receive longer sentences than their white counterparts convicted of similar crimes—differences that become more pronounced as the severity of sentences increase.[48]

## ACCUMULATION OF CRIMINAL JUSTICE DEBT

Many jails, courts, and other criminal justice agencies charge for the services they provide, including jails that charge for clothing and laundry, room and board, medical care, rehabilitative programming, and even core functions such as booking.[49] In addition, most jails have contracts with private telephone and video conferencing companies that charge higher rates to inmates than they do in the community.[50] While each individual fee may be small, they add up. Some people have been required to pay thousands of dollars in fines and fees.[51] Even when jurisdictions offer payment plans, they often include surcharges and other fees.[52] Add to this child support payments, credit card debt, rent, and other living expenses that can accumulate during incarceration—often with late charges or compounded interested tacked on—the financial picture for many leaving jail is very bleak.

Moreover, fees may continue to accrue after release. If convicted, an individual may be ordered to pay restitution; if sentenced to probation or court-ordered programming or treatment, a person may also have to pay supervision fees plus

the programming costs.[53] For many, these payments are impossible to make: people who spend more than a few days in jail, and who often work at low-wage jobs to begin with, risk losing their jobs and may find getting new ones extremely challenging, especially if they have supervision and programming obligations that interfere with the work day.[54]  This, in turn, increases their vulnerability to being incarcerated again. In Florida, for example, agencies expect to collect only nine percent of fines and fees assessed.[55]

Although debtors prisons were formerly abolished in the United States almost two hundred years ago, many people today are returned to jail for non-payment of fines and fees.[56]  Although the use of incarceration for failure to pay a debt is unconstitutional absent evidence that a person willfully refuses despite an ability to pay (and that alternative punitive measures are unavailable), there are no specific guidelines for how judges should evaluate a defendant's ability to pay, resulting in both inconsistency in the application of this rule, and a risk that people are returned to custody simply for being poor.[57]

According to one study that examined prison and jail incarceration together, individuals who do manage to find work after release earn less on average than their counterparts who have never been incarcerated.[58] Among formerly incarcerated men in that study—two-thirds of whom were employed before being incarcerated—hourly wages decreased by 11 percent, annual employment by nine weeks, and annual earnings by 40 percent as a result of time spent in jail or prison (See Figure 8.)

## Figure 8: Incarceration reduces earnings power

Estimated effect of incarceration on male wages, weeks worked annually, and annual earnings, predicted at age 45



Source: The Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* (Washington, DC: The Pew Charitable Trusts, 2010).

Public benefit programs may not be able to help. For those who were receiving or were eligible for benefits like food stamps or Medicaid, a jail stay can cause a suspension or termination of that support.[59] Suspended benefits can be more easily restarted upon release, whereas terminated benefits can take years to reinstate.[60] Even a short gap in benefits, however, can have serious consequences for the large number of people leaving jail who have debt, little or no income from work, and may also have a chronic illness—an end result that is particularly disproportionate when people are accused of non-serious offenses, such as a traffic or ordinance violation.

Housing can also be a challenge for people jailed for even a short period of time. Those in debt may find it impossible to afford market-rate housing, and, much like employers, many landlords are unwilling to rent to someone with a criminal record (of arrest or conviction or both). Staying with family members can also be problematic, especially if they live in public housing as many local public housing authorities ban, at least temporarily, those with a criminal record.[61] A survey in Baltimore found that people who have spent time in jail or prison are much less likely to hold a lease or mortgage after release than they were prior to being confined.[62] Another study showed that people are far more likely to become homeless for some period following release from jail, even when the charges are dismissed.[63]

## DECLINING HEALTH

Given high levels of need and the constant churning of their population, most jails struggle to deliver health care that meets minimally accepted standards of care in the community. This is particularly critical as people in jail report high rates of medical problems.[64] Moreover, conditions in jail—especially crowding and poor sanitation—can be especially harmful to the many in custody with chronic health problems, particularly mental illness, and facilitate the spread of contagious diseases.[65] The greater prevalence of contagious diseases in jails affects both the families and communities to which those incarcerated there return.[66] Since most people do not stay in jail for very long, it is difficult to provide them adequate care while incarcerated or to connect them to treatment in the community upon release.[67] Lack of continuity of care is likely a large part of the reason why people with mental illness tend to cycle in and out of jail.

## HARM TO FAMILIES AND COMMUNITIES

Families and communities also suffer from the misuse of jails. For families, the consequences are manifold—financial, structural, and emotional. Communities where rates of incarceration are high tend to experience declines in social and economic well-being as well as in public safety.[68]

Families face considerable financial consequences when a member goes to jail.  They may have to pool limited family resources to post bail or to pay for jail telephone calls and other services, and they may experience a loss of income or housing when the incarcerated person was the primary earner or leaseholder.

To some degree, every family— regardless of socio-economic circumstances— is temporarily broken apart when a member is jailed, with the consequences most pronounced when the jailed person has children. In particular, when mothers go to jail, their children are more likely to experience a change in care-giver or to enter foster care.[69] A study of mothers in Illinois' Cook County Jail found that those whose children entered foster care upon their incarceration were half as likely to reunite with their children upon release when compared to non-incarcerated mothers with children in foster care.[70]

Jails can make conditions in already struggling communities worse. Jail admissions tend to be concentrated in neighborhoods with elevated rates of poverty, crime, and racial segregation, and low rates of educational attainment and employment—and which are also often heavily policed.[71] In turn, high rates of incarceration further destabilize these communities, often leading to increased rates of crime and even higher levels of police enforcement.[72]

# Six key decision points that influence the use and size of jails

Although there is new appetite for reducing America's reliance on incarceration, scaling back jail populations will be a complicated task. How and why so many people cycle through jails is the result of decisions dispersed among largely autonomous system actors—which together make up one system of incarceration. These include the police who choose to arrest, release, or book people into jail; prosecutors who determine whether to charge or divert arrested persons; pretrial services program providers who make custody and release recommendations; judges, magistrates, or bail commissioners who decide whom to detain or release, and under what conditions; other court actors, from attorneys and judges to administrators, whose action or inaction can accelerate or delay pending cases; and community corrections agencies who choose how and when to respond to persons who violate their conditions of supervision in the community. Release and detention decisions may also depend on the existence of critical community services that can provide the supports needed to keep people charged with crimes out of custody.

Given that all of these actors may be driven by contradictory goals or incentives and may operate with varying degrees of knowledge of, or enthusiasm for, alternatives to jail incarceration, it can be very difficult to align or coordinate their efforts to ensure that jails are used only when absolutely necessary to serve the public good. But it's not impossible.

New York City provides a good example of how changes in local system practices across agencies can work in concert to reduce the number of people in custody. New York substantially decreased its jail and prison (as well as community corrections) populations between 2000 and 2009, primarily as a result of changes in policy and practice around arrest and the use of alterna-

*How and why so many people cycle through jails is the result of decisions dispersed among largely autonomous system actors.*

tives to incarceration and other diversion programs, requiring in tandem policy changes across the police department, the courts, and district attorneys' offices. Throughout that period, the crime rate in the city continued to fall.[73]

Because jail admissions and length of stay—the two main determinants of jail populations—are a function of decisions made by multiple criminal justice system actors at the local level, opportunities can and do arise along the trajectory of a typical individual case to prevent a person from going to jail unnecessarily or to release him or her as soon as safely possible. However, in practice, seizing the opportunity at any given point can be challenging and will require some coordination among system actors since their actions in large part depend on information provided or action taken by others in the system.

## DIAGNOSING LOS ANGELES COUNTY'S OVERCROWDED JAILS



"Bigger and more expensive jails aren't the only solution," noted a 2012 *Los Angeles Times* editorial titled "LA County Jails: What's the Fix?"[a] The editorial drew on Vera's analysis of Los Angeles County jails and the systems that fill them. Los Angeles County is the largest county in the United States, and it also operates the largest jail system. Eight jails are fed by 88 municipalities with 47 law enforcement agencies, and more than 30 courthouses with more than 400 judges. In 2009, the Los Angeles County Chief Executive Office and its Criminal Justice Coordination Committee contracted with Vera to study persistent overcrowding in the jails and make recommendations for safely and efficiently alleviating it.

Understanding this complex operation and the problem of overcrowding began with an analysis of administrative data from nine agencies involving the 800,000 cases booked into the county jail system in 2007 and 2008. Vera reviewed policies, procedures, and practices from the agencies that influence the size of the jail population (including police departments, the courts, the prosecutor and public defender offices, the probation department, the state corrections and parole agencies, and the L.A. County Sheriff's Department), convened focus groups and meetings and conducted more than 100 confidential interviews.

Over the course of two years, researchers matched information from the nine major databases to track the progress of more than 54,000 cases from arrest to disposition within that time frame. The study analyzed the flow of people into and out of jail and through the court process. Through analysis of individual cases and large administrative data sets, the researchers created profiles of typical offenders and identified trends in jail usage. Their analysis also revealed key decision points that influence the size of the jail population, as well as bottlenecks that cause delays that keep people in jail longer than necessary.

On the basis of this analysis, Vera issued a final report to the county that reviewed the issues and challenges identified and made 39 recommendations—that ranged from pretrial screening and bail schedules to the integration of key databases—to reduce jail crowding and improve the effectiveness of the justice system.[b]  In particular, the report detailed the many obstacles to effective responses to people with mental illness caught up in the criminal justice system and the lack of diversion options.

[a] Editorial Board, "L.A. County's broken jails: What's the fix?" *Los Angeles Times*, January 30, 2012.
[b] Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project: Final Report* (New York, NY: Vera Institute of Justice, 2011).

Six key decision points—arrest, charge, pretrial release/bail, case processing, disposition and sentencing, and supervision and reentry—are explored in the sections that follow through an analysis of who is involved, what typically happens, and what could happen otherwise to reduce jail incarceration through the implementation of strategic reforms.

## ARREST

Arrest is a person's entry point into the criminal justice system. An incident occurs and law enforcement—the police or sheriff's department—is called to the scene, or there is an interaction with or observation by law enforcement in the course of regular duties, such as a traffic stop or a street encounter.

What happens at arrest is an important determinant of the flow and number of accused persons who enter jail. The police have several choices when responding to reported or observed criminal activity. They decide whether to decline intervention; whether an arrest, summons, or verbal warning is warranted; or whether to refer an individual to services outside the criminal justice system, such as community mental health or substance abuse programs. Even when a police officer feels that circumstances justify an arrest, that decision does not have to open the door to jail. Under most state laws, the officer may take the suspect to the station house to be photographed and fingerprinted and where a more detailed background check can be completed.[74] Where available, computers in cars or hand-held tablets allow police officers to conduct some of these procedures in the field. Law enforcement can then release the defendant using a "notice-to-appear" or "desk appearance" ticket to secure a promise from the person to appear in court when required.[75]

How the police make an arrest decision is influenced by a number of intersecting factors and dynamics on a precinct, departmental, local, state, and federal level. While state and federal laws define what constitutes a criminal offense, local political pressures, policy decisions, and departmental priorities will play a larger role in how and when police resources are used and where they are deployed. In some jurisdictions, pressure from public officials—often

*Even when a police officer feels that circumstances justify an arrest, that decision does not have to open the door to jail.*

responding to the concerns of residents and businesses to combat low-level, quality-of-life offenses (see "Broken Windows Policing" on page 21.) —has led to zero-tolerance policing policies that may also require arresting anyone who breaks the law. This may increase the number of misdemeanor or non-criminal arrests (ordinance violations) for drug possession, vagrancy, loitering, and other public order offenses. Meanwhile, political or community pressures may determine which neighborhoods to target, how and when line officers are deployed, and which arrest protocols to follow, including whether pre-arrest (e.g., cite and release) or post-arrest (e.g., the provision of an appearance ticket at the police precinct) diversion options are available for certain types of offenses.

Other important dynamics on the department and community level may also be at play. Some police departments institute informal or formal arrest quotas or targets and link performance evaluations and career advancement to compliance with them.[76] These policies have been the subject of extensive litigation, so it is difficult to estimate how prevalent they remain. In some cash-strapped municipalities, police officers understand that they need to make more arrests in order to raise revenue through fines, fees, and asset forfeiture—as has been the focus of some press coverage in the wake of recent events in Ferguson, Missouri.[77] On the other hand, police departments in resource-poor neighborhoods may

## BROKEN WINDOWS POLICING



Published in the *Atlantic Monthly* in 1982, George Kelling and James Q. Wilson's essay titled "Broken Windows" has had a large and lasting influence on police strategy around the nation.[a] In it the authors argued that quality-of-life offenses, such as graffiti or public intoxication, can give residents the impression that neighborhood crime is on the rise, causing residents to become fearful, avoid public areas, and lose trust in local law enforcement. The authors also suggested that criminals may become emboldened by this decay, which they may perceive as a marker of an apathetic community and an ineffective police force, leading to an increase in serious crime. Kelling and Wilson posited "broken windows" as an evocative metaphor of the disarray that may ensue: "If a window in a building is broken and is left unrepaired, all the rest of the windows will soon be broken."

The broken windows theory was zealously adopted by police forces around the country in the 1990s and early 2000s. Quality-of-life and low-level offenses or infractions were targeted through zero-tolerance and stop-and-frisk policies as a way of preventing more serious crime from flourishing.[b] In 1994, New York City Police Commissioner William Bratton implemented broken windows policing which resulted in a steep increase in misdemeanor marijuana arrests—from 1,851 arrests in 1994 to more than 50,000 in 2000, a 2,760% increase.[c]

Despite the ubiquity of this approach, there is little evidence that broken windows policing is effective at reducing overall crime.[d] An exhaustive review of research by the National Research Council concluded that there is not strong evidence that aggressively responding to minor offenses, particularly with arrest, effectively reduces or prevents more serious crime.[e] Furthermore, critics argue that these types of policies often target low-income, minority communities and are, therefore, applied inequitably.

It is worth noting that Kelling and Wilson did not argue explicitly for more arrests of disorderly community members. Instead, they suggested that police officers should help uphold social norms in the communities they serve by reducing public nuisances, such as redirecting an intoxicated loiterer to a less public area of town. As originally formulated, their theory supports increased *interactions* with residents, but not necessarily increased arrests or citations. In an interview in 2015, Kelling explained, "Broken windows is a tactic, an essential part of community policing, that works with the community to identify problems and set priorities...We don't want police to just be making arrests."[f]

[a] George L. Kelling and James Q. Wilson, "Broken Windows," *Atlantic Monthly* (March 1, 1982).
[b] Bernard E. Harcourt and Jens Ludwig, "Broken Windows: New Evidence from New York City and a Five-City Social Experiment," *University of Chicago Law Review* 73 (2006): 271-319.
[c] Bernard E. Harcourt and Jens Ludwig, "Reefer Madness: Broken Windows Policing and Misdemeanor Marijuana Arrests in New York City, 1989-2000," *University of Chicago Public Law & Legal Theory Working Paper* 142 (2006) and Andrew Golub, Bruce D. Johnson, and Eloise Dunlap, "The Race/Ethnicity Disparity in Misdemeanor Marijuana Arrests in New York City," *Criminology & Public Policy* 6, no. 1 (2007): 131-164.
[d] See Bernard E. Harcourt and Jens Ledwig, "Broken Windows," edited by Wesley Skogan and Kathleen Frdyl, in *Fairness and Effectiveness in Policing: The Evidence* (Washington, DC: National Academy of Sciences, 2004); Jeffrey Fagan and Garth Davies, "Street Stops and Broken Windows: Terry, Race, and Disorder in New York City," *Fordham Urban Law Journal* 28, no. 2 (2000): 457-504; and Center for Evidence-Based Crime Policy, George Mason University "Broken Windows Policing," http://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/broken-windows-policing/
[e] See for example, Skogan and Frdyl, 2004.
[f] Patt Morison, "'Broken Windows' Policing Isn't Broken, Says Criminologist George L. Kelling," *Los Angeles Times*, January 6, 2015.

have no other option but to arrest and jail when responding to certain types of people—those who are intoxicated, mentally ill, or drug addicted—because of a lack of partnerships with community-based treatment and triage centers, or because such community resources simply do not exist.

The likelihood that arrest will lead to a jail booking has increased steadily over the years. Thirty years ago, when crime rates overall were higher, there were 51 admissions into jail for every 100 arrests.[78] By 2012, the most recent year for which national data are available, that number had climbed to 95 admissions per 100 arrests.[79] While not all admissions come from arrests—warrants for people suspected of parole and probation violations, for example, provide another route to jail—the growth in admissions even as arrest rates have declined reflects changing policies rather than growth in more serious crimes by high-risk individuals. According to an analysis of 17 state courts, nearly 78

# Thirty-year trends: Arrest and booking rates per 100,000

Even as arrest rates have decreased sharply—tracking crime rates—bookings into jail have continued to grow. In 1983 there were only half as many bookings as arrests while in 2012 bookings nearly matched arrests, suggesting a greater propensity to hold many who in earlier times would have been released.



percent of all cases in which a district attorney files charges involve people accused of misdemeanor crimes; and in some jurisdictions such as New York City, many of these are for minor drug offenses.[80] Drug crimes are the only offenses for which the arrest rate continued to increase throughout the 1990s and into the new century.[81]

## POLICING DIFFERENTLY: ALTERNATIVES TO ARREST AND DETENTION



**Citation and release.** The New Orleans Police Department is just one among many law enforcement agencies that is relying more on citation and release. In the summer of 2008, the city council enacted an ordinance mandating the use of a summons rather than arrest when police encounter people who commit a municipal offense other than domestic violence. From 2009 through 2011, the use of summonses in cases other than domestic violence and public intoxication increased from 41 percent to more than 70 percent. Arrests correspondingly dropped from 59 percent to 30 percent.[a] This change in approach not only conserves costly jail beds, it is also an enormous time-saver for officers, allowing them to focus on serious public safety concerns.

**Pre-booking diversion programs.** The Law Enforcement Assisted Diversion (LEAD) Program in King County, Washington, identifies people arrested for lower-level drug and prostitution offenses and diverts them away from the criminal justice system and into community-based services.[b] When police-initiated diversion programs like this are effective, they yield benefits all around—for individuals, their families, and communities—and reserve expensive criminal justice system resources for more serious cases.

**Programs for offenders with behavioral health issues.** Every police officer in Portland, Oregon, receives training in how to respond to a suspect who appears to suffer from mental illness or is under the influence of drugs or alcohol.[c] Beyond basic training, the department established a special corps of officers who volunteer and receive more intensive training to focus on calls for service involving unstable people. The department is also involved in prevention, running a Mobile Crisis Unit that pairs an officer with a licensed mental health professional who can connect people with appropriate mental health services in the community. And for people whose mental illness or substance use disorder is driving their repeated encounters with law enforcement—typically as suspects in drug or property crimes—the department participates in a Service Coordination Team that offers treatment in lieu of detention. Between 2008 and 2010, the team saved the county nearly $16 million in jail costs alone. The work in Portland reflects an emerging trend nationally in which police departments are forging innovative and powerful partnerships with local mental health service providers.

[a] Criminal Justice Leadership Alliance, "Use of Summonses versus Custodial Arrest for Municipal Offenses," December 8, 2010, and Criminal Justice Leadership Alliance, "Use of Summonses versus Custodial Arrest for Municipal Offenses," July 14, 2011, unpublished reports provided to Vera in its role as a member of the alliance.
[b] "Law Enforcement Assisted Diversion," http://leadkingcounty.org/.
c City of Portland, Police Bureau, "Behavioral Health Unit," http://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/broken-windows-policing/
[d] Cameron Smith, *Report of the Reset Subcommittee on Public Safety* (Boston: Crime & Justice Institute, 2010), 16, http://www.oregon.gov/CJC/docs/pubsafe_subcomreport_final.pdf.

The policies and pressures that have led police officers to arrest and detain a larger proportion of criminal suspects are not unchangeable, though they may receive considerable public support, as zero-tolerance policies have until recently. Some law enforcement agencies are focusing on community crime prevention strategies that do not always involve detaining people. They are making more use of citation and release, partnering with service agencies to divert certain groups of defendants away from the justice system altogether, and increasing their capacity to respond constructively to people with a mental health or substance abuse problem.

## CHARGE

After a police officer has arrested and detained someone suspected of breaking the law, the person has to be formally charged in order for the case to proceed—and that decision has to be made quickly following a custodial arrest.[82] It is up to the prosecutor to accept or decline the case, and if he or she chooses the former, to determine what charge(s) to file, which usually occurs during arraignment. The prosecutor's charging decisions are important to the outcome of the criminal case and the accused person's future, but they also have significant influence on jail populations.

Prosecutors screen new arrests, looking at whether the elements of the alleged crime are present in the arrest complaint and whether the quality of evidence seems sufficient to support charges against the person. Prosecutors may reduce, increase, or dismiss charges, depending on the information provided to them by the police, or request additional information before making a decision.

Once a prosecutor determines that a case is legally sufficient to move forward, he or she brings charges, unless there is clear exculpatory evidence or if institutional policy in the public interest determines otherwise.[83] Because the initial charge is used as a baseline from which the prosecutor can pivot later in the case through plea negotiations, few legally sufficient cases are dismissed or diverted at this early point in the process, even though the prosecutor has wide discretion to do both.

When a person is formally charged, the type and severity of the initial charge(s), as well as any charge enhancements invoked, influence bail amounts and eligibility for non-financial pretrial release as well as diversion programs or community-based sanctions designed to address underlying problems. In turn, these charge decisions influence whether the person will be detained pretrial (and for how long) and, if convicted, be given a custodial sentence.

Some district attorney offices are re-evaluating their handling of certain cases, declining to prosecute some types or relying more on alternatives to prosecution, which do not require filing formal charges, such as problem-solving courts and other pre-charge diversion programs. This shift in course, while hardly widespread across the nation's 3,000 counties, does reflect a belief among some prosecutors that jails are not always the best option for ensuring public safety, and a growing desire among them to reduce the number of people exposed to the collateral consequences that accrue to people who are charged with a criminal offense and spend time in jail.[84]

While it is easy enough to do so in individual cases, systematic efforts to move away from a reliance on prosecution and jail detention will require district attorneys to participate in an analysis of their current jail populations and the longer-term outcomes for specific categories of people, charges, and dispositions. With a view to producing improved public safety, district attorneys

*District attorneys can serve as leaders in the creation of community-based solutions to crime problems and in the early identification of defendants suitable for diversion.*

## IN LIEU OF PROSECUTION



**Decline to prosecute.** In July 2014, Kings County (Brooklyn, NY) District Attorney Kenneth P. Thompson decided to stop prosecuting most people arrested for low-level marijuana offenses.[a] Mr. Thompson said in a memo that the new policy was established to keep nonviolent individuals, especially young people of color, out of the criminal justice system because open cases as well as convictions can become barriers to employment, housing, and higher education. The policy was established after years of steady increases in misdemeanor marijuana arrests, including more than 8,000 such arrests in the year ending June 30, 2014.

**Community prosecution.** In communities from Denver, Colorado to Milwaukee, Wisconsin, assistant district attorneys are assigned to work in specific neighborhoods, often co-locating in police stations, to develop partnerships with neighborhood organizations and learn the problems (whether a "drug house" or a poorly lit bus stop) that make places less safe.[b] They work with community members to develop prevention strategies to reduce both crime and arrests and with victims to better understand their fears and losses and to explain court processes. Together with service providers, prosecutors also identify those whose behavior is a nuisance or worse in the neighborhood, and help keep them out of the criminal justice system if that can be done safely.

**Pre-charge diversion.** The Hennepin County (Minnesota) District Attorney's Office partners with a local nonprofit, Operation de Novo, Inc., to provide an alternative to prosecution for people with no felony history and a limited misdemeanor history who have been arrested for a felony-level property crime where restitution is no more than $2500—people who otherwise are likely to be detained pretrial and to receive a jail sentence.[c] Operation de Novo case managers work with eligible arrestees to set requirements and goals for the year, which include community service and victim restitution. Those who successfully complete the program have a way to "pay their debt" to society and their victim without the added burden of a criminal conviction. In one recent year, the program handled 828 felony cases, collected and returned $440,200 in restitution to victims, and oversaw 10,720 hours of client community service.[d]

**Community courts.** Many cities run courts located in local communities that take a problem-solving approach to crime. Focusing primarily on misdemeanor, quality-of-life offenses—such as simple drug possession, theft,

prostitution, drinking in public, and trespassing—these courts work with community-based organizations to create opportunities for participants to do required community service and to offer support designed to reduce their re-offending.[e] While some community courts intervene after an individual has been formally charged and pled guilty, the City of San Francisco runs 10 neighborhood courts that operate as true alternatives to prosecution.[e] Prosecutors refer eligible misdemeanor cases to volunteer adjudicators who are residents of the neighborhood and use restorative justice practices to hold individuals accountable for their actions, address any underlying problems, and meet the needs of victims. Once individuals comply with the directives of the neighborhood court, prosecutors dismiss their cases.

[a] Stephanie Clifford and Joseph Goldstein, "Brooklyn Prosecutor Limits When He'll Target Marijuana, *New York Times*, July 8, 2014.
[b] See Center for Court Innovation, "Denver's Community Justice Councils," *http://www.courtinnovation.org/research/denver%E2%80%99s-community-justice-councils?url=research%2F5%25-2Fall&mode=5&type=all&page=2* and Milwaukee County District Attorney's Office, *The Milwaukee Community Prosecution Model,* http://county.milwaukee.gov/ImageLibrary/User/jkrueger/Electronic/CP_Program_Description1.pdf.
[c] Authors' interview with Niki Leicht, Executive Director, Operation de Novo, Inc., December 3, 2014.
[d] Spurgeon Kennedy et al., *Promising Practices in Pretrial Diversion* (Washington, DC: National Association of Pretrial Services Agencies, 2006), 11; for an overview of adult diversion programs in Hennepin County, see http://www.operationdenovo.org/.
[e] For information about community courts, including examples from around the country, see Center for Court Innovation, "Community Court," http://www.courtinnovation.org/research/4/publication.
[f] City and County of San Francisco, District Attorney, "Neighborhood Courts," http://www.sfdistrictattorney.org/index.aspx?page=178.

can serve as leaders in the creation of community-based solutions to crime problems and in the early identification of defendants suitable for diversion, especially those whose underlying problems contribute to their criminal behavior—such as mental illness, substance abuse, or homelessness. Population and outcome analyses can help produce a risk assessment instrument for use at initial case review.[85] (See "What is Risk Assessment?" on page 31.)

To be viable and effective in these cases, alternative to prosecution programs must have strong links to communities. Such links allow prosecutors to identify service providers to which they can refer troubled people; to establish realistic conditions and goals for those diverted; and to build public understanding and support for their use of diversion and other programs.[86]

## RIGHT-SIZING THE JAIL IN NEW ORLEANS

Following the devastation of Hurricane Katrina, and the major issues with the criminal justice system in New Orleans it revealed, members of the New Orleans City Council asked Vera to conduct an assessment of the city's justice system and to identify the areas most in need of change.[a] At the time Katrina struck, New Orleans had a population of 455,188 and the Orleans Parish Prison (the city's local jail) had a capacity of 8,000 and typically held more than 6,000. (By comparison, New York City, with a population of 8.4 million, has a jail population of 11,408.)  The jail was heavily damaged and the Federal Emergency Management Agency agreed to pay most of the costs of constructing a new one. The sheriff proposed a new jail of 5,400 beds, despite the drop in the city's post-storm population to 370,000.[a]

Vera's final report to the city in 2007 looked at ways to reduce the jail population and to create more options for both pretrial defendants and those sentenced.[b] Its top two recommendations: address the long wait time from arrest and booking to arraignment—then averaging 64 days—and create a pretrial screening process, based on an objective assessment of individual risk, on which judges would base their release or detention decisions.

Vera established an office in New Orleans to work with city officials (the Mayor's Office, the district attorney, the Orleans Public Defender, the courts, the city council, the New Orleans Police Department, and others), civic institutions, and organizations with deep roots in the communities most affected by the criminal justice system to develop and implement these and other changes. By 2011, a working group of city officials staffed by Vera had succeeded in reducing the average time before arraignment from 64 days to 10.5 days. Another working group helped the court implement a system of vertical case allotment that makes much more efficient use of resources for the public defender and prosecutor offices. And, today, the police in New Orleans issue a far higher percentage of summons in lieu of arrest than ever before.

In 2012, with support from many of these agencies and community organizations, Vera developed a comprehensive pretrial services system for the city that includes: universal screening; interviews with defendants; investigation of information prior to the first court appearance; the use of a risk assessment instrument to guide release decisions; the ability to supervise defendants; and a court-date reminder system to help defendants meet their obligations. Finally, as the city nears completion of its new jail, the mayor's office has committed to a smaller jail of 1,438 beds.

Vera's experience in post-Katrina New Orleans demonstrates that reform is possible but requires thorough data analysis, collaborative and productive relationships with community leaders and elected officials, and early positive outcomes demonstrating enhanced justice, efficiency, and public safety.

[a] Katy Reckdahl, "Orleans Parish Prison Size Recommendation Issued," *The Times Picayune* November 19, 2010.
[b] Vera Institute of Justice, *A Report Submitted to the Criminal Justice Committee of the New Orleans City Council* (New York, NY: Vera Institute of Justice, 2007).

## PRETRIAL RELEASE AND BAIL

Once a person has been arrested, there is a presumption that the person will be released pending the outcome of his or her case, unless the individual poses a danger to persons or property or seems likely to flee.[87] In some jurisdictions, police commanders have the authority to release people directly from the station house using a bail schedule. In most places, however, the bail or release decision is made by a judge, magistrate, or bail commissioner. These officers of the court have considerable discretion in evaluating the person's circumstances and making decisions about release. They can set conditions or require assurances, such as bail, to facilitate release whenever possible.[88] The presumption that defendants should be released unless they present a clear danger or pose a flight risk to avoid prosecution is rooted in the principle that people are innocent until proven guilty and should be treated as such. Actual pretrial release practices, however, are at odds with this fundamental principle, as illustrated by the fact that today six out of 10 people in jail are detained pretrial.[89]

In 1990, most felony defendants who were freed from jail pending the resolution of their cases were released on non-financial conditions (comparable national data on misdemeanor defendants are not available).[90] Nearly 20 years later, in 2009 (the latest year for which data are available), those released on their own recognizance (also referred to as ROR) made up only 23 percent of all felony defendants released pretrial.[91] While an additional 15 percent were released on other types of non-financial bail, the remaining 61 percent of defendants were required to post financial bail, either by providing the whole or a portion of the total amount or equivalent collateral, or by hiring a bail bondsman to post the sum in the form of a private surety bond for a non-refundable fee.[92] Among 2009 felony cases, private surety bonds accounted for four out of five releases that involved money and close to half of all releases.[93] In addition to requiring bail more frequently, judges also increased bail amounts. The average bail amount in felony cases increased 43 percent (in constant dollar values) between 1992 and 2009, from $38,800 to $55,400.[94] As a result of these factors, more and more defendants remain in jail simply because they cannot pay their way out.

## Financial and non-financial release conditions

Felony defendants who were freed from jail pending the resolution of their cases were more likely to have been released on recognizance or other non-financial conditions in 1990 than in 2009 and were more likely to have been released on private bonds or other financial conditions in 2009 than in 1990.



In the years since Vera launched The Manhattan Bail Project in 1961—the nation's first experiment with pretrial services—numerous studies have pointed to the same, highly reliable indicators associated with success or failure on release during the pretrial period (i.e., whether or not defendants stay out of trouble or show up to court when required).[95] In particular, community ties through family and work are strong predictors of success, while a record of prior convictions, especially felonies, a history of juvenile arrests, and a history of failure to appear in court are associated with failure.[96] Even for those with some risk of failure, the chance of success can be improved and the risk mitigated with additional support and supervision in the community. Noticeably missing from either list is the financial means to pay bail, which is not a strong predictor of pretrial success (defined as remaining arrest-free during the pretrial period and appearing at scheduled court dates).[97] Indeed, as bail amounts increased, pretrial failure rates remained steady at about 30 percent.[98]

Putting this research into practice is within the reach of most jurisdictions.[99] Using these risk factors—and any others chosen by the court—the court or pretrial services agency administers the assessments. These typically involve gathering information on the defendant's criminal history as well as requesting personal information (e.g., length of residence at current address, current employment status, etc.) from the defendant and verifying it through phone calls.

## WHAT IS RISK ASSESSMENT?[a]

The foundation of good criminal justice and correctional practices is the administration of a validated risk or risk and needs assessment tool to defendants and offenders. Risk assessment instruments measure the likelihood that a person will reoffend if or when released into the community. Needs assessments identify a person's criminogenic needs—that is, personal deficits and circumstances known to predict criminal activity if not changed.

Today's assessment tools measure *static* (those things that can't be changed, such as age, criminal history, etc.) and *dynamic* (those that can, such as drug addiction, anti-social peers, etc.) risk factors, criminogenic needs, and strengths or protective factors present in a person's behavior, life, or history. There are a variety of assessment tools available for different purposes. Some are proprietary while others are available at no cost. Whatever tool is used in whatever context, states and counties must validate them using data from their own populations.

Assessment tools are used to some degree in all states and in many counties at a number of decision points in the criminal justice process and in a variety of settings. Judges and releasing authorities use information from assessment tools to guide decisions regarding pretrial release or detention and release on parole; corrections agencies use them for placement within correctional facilities, assignment to supervision level or to specialized caseloads, and for recommendations regarding conditions of release. Since the best tools evaluate the person's dynamic or changeable risk factors and needs, they should be re-administered routinely to determine whether current supervision or custody levels and programming are still appropriate.

A 2012 survey conducted by Vera found that a majority of community supervision agencies and releasing authorities routinely utilize assessment tools. Responses from 72 agencies across 41 states indicated that 82 percent of respondents regularly assessed both risk and need. While these self-reported numbers may be inflated, the responses do show correctional agency awareness of the importance of assessments.

[a] Adapted from Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, 2013), p. 16.

Each factor of the collected information is assigned a numerical score weighted to its relevance to pretrial failure. The greater the association of the factor with pretrial failure, the higher the score assigned to it.[100]

## What's keeping them in?

In this view of 2013 New York City jail data, more than 50% of jail inmates held until case disposition remained in jail because they couldn't afford bail of $2,500 or less. Most of these were misdemeanor cases.

Low bail = $2,500 or less.



13% Felony, low bail

42% Felony, high or no bail

41% Misdemeanor or Violation, low bail

4% Misdemeanor or Violation, high bail

*Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial.*

Despite the predictive accuracy of risk assessments, few of the more than 3,000 court systems in the United States rely on these tools to make decisions about pretrial release. Some jurisdictions have implemented bail schedules in the interest of standardizing bail amounts. These link bail amounts to the severity of the initial charge, with criminal charge serving as a proxy for risk of re-arrest and flight, and the bail amount meant to mitigate that risk.[101] Unfortunately, the severity of the initial charge(s)—a decision entirely within the discretion of the prosecutor—has not been shown to be a good predictor of public safety or appearance in court. And this practice can lead to some serious unintended consequences for both individuals and public safety: low-risk defendants who cannot afford to post bail linger in jail, while some high-risk defendants are released because they can afford a large bail amount.[102]

Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial. Almost everyone is offered monetary bail, but the majority of defendants cannot raise the money quickly or, in some cases, at all. Many who cannot make bail initially will be released at some point pending trial. However, 38 percent of felony defendants will spend the entirety of their pretrial periods in jail.[103] Yet, only one in ten of these defendants is detained because he or she is denied bail. The rest simply cannot afford the bail amount the judge sets.[104] For example, in New York City in 2013, 54 percent of jail inmates held until their cases had been disposed remained in jail because they could not afford bail of $2,500 or less—with 31 percent of the non-felony defendants held on bond amounts of $500 or less.[105]

## FACILITATING PRETRIAL RELEASE



**Risk assessment.** Kentucky has a single statewide agency that assesses all defendants using a locally validated risk assessment instrument. In recent years, the court has released 70 percent of all defendants pretrial, with only four percent requiring bail.[a] Outcomes for people released without monetary bail in Kentucky are far better than for those released nationally with such bail. In Kentucky, just eight percent of defendants at liberty in the community were rearrested during the pretrial period and 10 percent missed a court date.[b] Among people released on bail nationwide, 16 percent were rearrested and 17 percent missed a court date.[c]

**Early bail hearings.** A growing number of jurisdictions are moving to hold most bail hearings within 24 hours of arrest—a move that is crucial given recent research that shows long-term outcomes are considerably worse for defendants held in jail longer than 24 hours, even if they are later released.[d] There are two ways to achieve this: holding bail hearings within 24 hours of arrest and authorizing pretrial services agencies to release defendants assessed as low risk. In Delaware, magistrates work around the clock to review cases and make initial bail determinations (in part by using a risk assessment instrument) within the first 24 hours of arrest.[e] In Connecticut, the pretrial services agency assesses and releases low-risk defendants at their discretion, reporting an 11 percent failure to appear rate among those released.[f]

**Pretrial supervision.** Developing the capacity to monitor and assist defendants during the pretrial period makes it possible for judges and other court officers who make release and detention decisions to release higher-risk people who would otherwise be detained pending trial. The work with defendants typically involves establishing specific parameters for their behavior during the pretrial period and linking them with service providers in the community to help them address longstanding problems and remind them about upcoming court dates.[g] Washington, DC's Pretrial Services Agency (DCPTS) has a very robust release and supervision program: 85 percent of defendants are released on ROR or with conditions supervised by DCPTS—and of that 85 percent, in 2012, just 11 percent were rearrested while released, and 11 percent failed to appear.[h]

In 2006, Cocinino County, Arizona found that about 23 percent of the jail population were defendants who were detained after failing to appear at scheduled court dates. The county tested several court reminder systems for defendants who received citations in the field. The failure to appear rate was reduced from 25 percent in the control group to six percent in the reminder

group when the caller spoke directly to the defendant, 15 percent when a message was left with another person, and 21 percent when a message was left on an answering service.[i] In this and other areas, research shows that tailoring release conditions to a defendant's circumstances both facilitates release and increases success during the pretrial period.[j]

[a] Tara Boh Klute and Mark Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges and Recommendations* (Frankfurt, KY: Pretrial Services, Administrative Office of the Courts, 2012).
[b] Ibid.
[c] Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009-Statistical Tables* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 2013)
[d] Laura and John Arnold Foundation, *Research Summary: Pretrial Criminal Justice Research* (New York, NY: Laura and John Arnold Foundation, 2013).
[e] Alan Davis, *Legal Memorandum No.11-294* (Georgetown, DE: Delaware Justice of the Peace Courts, 2011).
[f] See State of Connecticut, Judicial Branch, *Adult Services Bail Intake/Assessment Procedures 4.1* (Connecticut: Court Support Services Division, 2013); James Carrollo, bail regional manager, Adult Probation and Bail Services, Connecticut Court Support Services Division, telephone interview by Vera, on April 8, 2014).
[g] Donna Makowiecki and Thomas J. Wolf, "Enter...Stage Left...U.S. Pretrial Services," Federal Probation 71, no. 2 (2007): 7-9; see also William Henry, "The Pretrial Services Act: 25 Years Later," *Federal Probation* 71, no. 2 (2007): 16.
[h] Pretrial Services Agency of the District of Columbia, *Congressional Budget Justification and Performance Budget Request, Fiscal Year 2014* (April 2013), 7.
[i] Marie VanNostrand, Kenneth Rose, and Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (Washington, DC:  Pretrial Justice Institute, 2011), 17-19.
[j] Ibid., pp. 27-29.

As this illustrates, bail amounts are not set in relation to an individual's ability to pay. This fact hurts some groups more than others, given socio-economic disparities in the United States.[106] A recent study shows that although black men are detained pretrial at higher rates than white men or black or white women, bail amounts are not set higher for them.[107] Rather, as stated above, black men appear to be caught in a cycle of disadvantage: incarcerated at higher rates and, therefore, more likely to be unemployed and/or in debt, they have more trouble posting bail.

When out-of-reach bail amounts are combined with overloaded courts, a situation arises in which defendants can spend more time in jail pretrial than the longest sentence they could receive if convicted.[108] These cases, in particular, turn our ideals about justice upside down. Sentenced to "time served" and released, the system punishes these individuals while they are presumed to be innocent, and then releases them once they are found guilty.

Building on the broad discretion judges have in deciding whether or not to release someone pretrial and the sizeable body of evidence about how to set release conditions, judges need not rely on bail. There are other options for the safe release of many more defendants either on their own recognizance or with the aid of special conditions and supervision. These options, deployed under the umbrella term of pretrial services, require jurisdictions to develop the capacity to conduct formal risk assessments, to speed the time from arrest to initial bail hearing, and to invest in pretrial supervision resources to enable the non-financial release of those deemed too high a risk for ROR. Most important, the success of pretrial services depends on the trust of and appropriate use by the court or its designees.

*Judges need not rely on bail. There are other options for the safe release of many more defendants either on their own recognizance or with the aid of special conditions and supervision.*

# Diversion and release opportunities during the typical criminal case trajectory



**CASE PROCESSING**

**ARREST**
- Referral to Services or Treatment
- Cite & Release

**CHARGE**
- Decline to Prosecute
- Referral to Diversion Programs

**PRETRIAL RELEASE ASSESSMENT**
- Release on Recognizance
- Release with:
  > Non-Financial Conditions
  > Pretrial Supervision
  > Financial Conditions

**ARRAIGNMENT**
- Dismiss Charge
- Referral to:
  > Diversion Programs
  > Problem-Solving Court

**BAIL REVIEW**
- Release on Recognizance
- Release with:
  > Non-Financial Conditions
  > Pretrial Supervision
  > Financial Conditions

**TRIAL OR PLEA NEGOTIATION**

**DISPOSITION & SENTENCING**

NOT GUILTY

GUILTY

ACCEPT PLEA

CUSTODIAL SENTENCE

RELEASE FOR TIME SERVED

COMMUNITY SUPERVISION & RE-ENTRY

DETAINED IN JAIL

Legend:
- Detained in jail, sentenced to custody, or revoked back to custody for violation
- Released from custody

## CASE PROCESSING

Given the large proportion of defendants detained pending the resolution of their cases, the speed—or lack thereof—at which cases are processed through the courts has a direct impact on jail populations. When defendants are detained throughout the process, the duration of the case equals the number of days, weeks, or months a defendant is held in jail. Even when a defendant is released at some point prior to being adjudicated, delays earlier in the process extend his or her time behind bars. A large sample of defendants in Los Angeles County, all accused of felony crimes and all detained pretrial, spent 53 days on average in jail by the time their cases were resolved.[109] More than 25 percent of the people in jail pretrial had stays longer than 80 days, with more than 800 defendants spending in excess of 200 days in jail until case resolution.[110]

Unlike previous decision points that focus on a moment in time, the processing of a case encompasses the entire adjudication process, from a person's initial appearance in court through disposition and sentencing. A slow pace is most evident in the official delays that occur at different points in the process. Postponements or continuances occur routinely, despite laws meant to guarantee a speedy trial.[111] In larger jurisdictions, with high-volume court dockets, the sheer number of cases coupled with the routine use of postponements can cause chronic case backlogs that leave people waiting in jail for months, sometimes years, even when the case is ultimately dismissed.[112] A recent analysis of New Jersey's jail population, for example, revealed that **nearly half of all pending cases, mostly involving defendants detained pretrial, were in backlog status.**[113]

Cases can be postponed or continued for any number of reasons, and literally everyone involved in the adjudication of a case—courts and potentially also juries and witnesses, pretrial services, prosecutors and defense attorneys, police, and jail administrators—can either initiate or indirectly cause a postponement. Of all the possible causes, three broad categories—lack of readiness, logistical challenges, and the tactical use of delays—are particularly instructive to examine in the context of their impact on jail populations.

Lack of readiness on both sides of a case is a leading reason for delays, and may be in part a result of an overburdened court system flooded by huge misdemeanor case loads.[114] A study of 54 misdemeanor marijuana cases scheduled to go to trial in the Bronx revealed that the district attorney requested adjournments in 80 percent of cases because the prosecutor was not ready to proceed—meaning they were not ready on 75 of 89 trial dates.[115]

Aside from the complexities of an actual trial—and very few cases go to trial—the processing of a criminal case includes many stages and events, all of which require coordination among different agencies and individuals.[116] This is a logistical challenge under the best circumstances and a morass under the worst. Complicated plea or sentencing negotiations; defendants who fail to show up in court for hearings because of miscommunication between the court

*Lack of readiness, logistical challenges, and the tactical use of delays are particularly instructive to examine in the context of their impact on jail populations.*

## CASE PROCESSING REFORMS



**Time limits with real consequences.** Overcrowded conditions in the Bernalillo County Jail caused primarily by a backlog of roughly 3,000 cases, many involving defendants held pretrial, compelled the New Mexico Supreme Court to announce new rules aimed at limiting court delays.[a] Under the new rules, which take effect in February 2015, all criminal cases will be assigned to one of three tracks according to the complexity of the case and must adhere to a specific timeline.[b] The clock starts at arraignment and a postponement requires the presiding judge to issue a written finding of good cause. The rules are also designed to prevent postponing trials to accommodate prolonged plea bargaining as well as last-minute pleas filed on the eve of a trial. Importantly, both sides in a case will be subject to sanctions and fines for failing to meet the established deadlines, and the supreme court will also be tracking which judges are allowing cases to fall behind the timetables.

**Special backlog courts.** Some jurisdictions, including both Bronx County, New York, and Bernalillo County, New Mexico, have recently enlisted the services of judges from other counties or hired new judges to oversee special court dockets designed to clear backlogged cases. In the Bronx, cases that are more than two years old receive priority and judges assigned to these cases are mandated to either bring the case to trial or compel the two sides to reach a plea agreement.[c]

**Case consolidation.** To address the inherent inefficiencies and delays that happen when a person has open cases in more than one court—cases that may range in nature and severity from traffic violations to felonies—officials in Orange County, California adopted a policy to "package" cases. Under the policy, a single justice center becomes the physical locus and administrative body for resolving all open cases countywide that involve a particular defendant.[d] Implementing the policy required updating and consolidating separate court databases to enable easy searches and access to all related files. Case consolidation not only speeds case processing, reducing stays in jail pretrial, it also generates more accurate information for jail administrators about a person's expected length of stay.

[a] Mike Gallagher, "New Rule Aims To Unclog Courts, Cut Jail Population," *Albuquerque Journal,* November 13, 2014, http://www.abqjournal.com/495530/news/new-rule-aims-to-unclog-courts.html; for recommendations to reduce jail overcrowding in Bernalillo County, see Bernalillo County Criminal Justice Reform Commission, *Preliminary Report to Interim Courts, Corrections and Justice Committee,* September 2014 at www.nmlegis.gov/LCS/handouts/CJRS%20092414%20Item%203%20BernCo%20Crim%20Justice%20Reform%20Commission%20report.pdf

[b] Ibid.

[c] James McKinley, "Bronx Courts Make Gains in Reducing Court Backlogs," *The New York Times,* December 11, 2013; New York State Unified Court System (NY Courts), "State Court System Reports Dramatic Cut in Bronx Felony Case Inventory, Announces Plan to Slash the Borough's Misdemeanor Backlog and Names New Bronx Appointment," press release (New York: NY Courts, December 11, 2013), http://www.nycourts.gov/press/PDFs/PR13_14a.pdf.

[d] Cherie Garofalo, *The Impact of Coordinating Multiple Criminal Cases in the Multiple Court Sites of the Orange County Superior Court* (Williamsburg, VA: National Center for State Courts, Institute for Court Management, 2011).

and jail; problems producing witnesses or evidence; and scheduling conflicts, especially involving defendants that have pending cases in more than one court, are among the many logistical problems that commonly occur. Misdemeanor courts are also often training grounds for young prosecutors and defense attorneys, and their cases typically take longer to resolve than they might if more seasoned attorneys were handling them.[117]

Both sides in a criminal case may use postponements for tactical purposes. Prosecutors might delay a case in an attempt to pressure a defendant to plead guilty, especially if the person is held in jail and prolonging the case will extend his or her time behind bars.[118] On their part, defenders believe that some delays may benefit their clients, since the quality of the prosecution's evidence usually degrades with time. In particular, delays can make it harder for prosecutors to maintain contact with key witnesses and may also have a negative effect on the credibility of witness testimony because memories fade over time.[119]

Delays in case processing come at great cost to the counties and municipalities holding defendants pretrial; to the agencies involved as cases drag on with multiple court appearances and conferences; to victims for whom justice is delayed; and to the detained people and their families in severed ties, lost wages, accumulated debt, and other burdens commonly associated with an extended stay in jail. Recognizing that greater efficiencies in case processing benefit everyone, jurisdictions have made efforts to significantly reduce delays and clear case backlogs.

## DISPOSITION AND SENTENCING

A criminal case comes to its conclusion at the point of disposition and sentencing. This can occur at arraignment or any point thereafter. In most cases, defendants plead or are found guilty by a court, have their case dismissed, or are found not guilty. Since 94 to 97 percent of criminal convictions are reached through a negotiated plea, much of the decision-making power in disposition remains with the prosecutor, who can leverage the initial charge decision and the amount of money bail requested to bring a case more quickly to a close with a plea deal.[120] Particularly for defendants on low-level charges—who have been detained pretrial due to an inability to pay bail, a lack of pretrial diversion options, or an inability to qualify for those options that are available—a guilty plea may, paradoxically, be the fastest way to get out of jail.[121]

Even at the point of disposition, there are options that allow for the release of people from custody without their having to accept a permanent guilty plea, which can have lasting collateral consequences for employment, housing, immigration status, and access to public benefits. Alternative resolutions such as conditional discharge, deferred prosecution, or adjournment in contemplation of dismissal provide for release conditioned by continuing lawful behavior with ongoing supervision and, in some cases, other requirements like participation in a treatment program or community service. If the conditions of the discharge or adjournment are met, the case will be dismissed. Some problem-solving courts will require that participants enter a guilty plea in order to participate,

## INVESTING IN ALTERNATIVE DISPOSITIONS



**Problem-solving courts.** Lawmakers in Indiana recently authorized the use of problem-solving courts as a condition of a misdemeanor sentence. Even a county sheriff can refer someone to a problem-solving court.[a] Indiana is among a growing number of states and localities that are investing in problem-solving courts. These courts tend to focus on groups of people with distinct needs—substance abuse, mental illness, homelessness, post-traumatic stress disorder as a result of participation in combat, and a history of prostitution—and aim to hold people accountable while also addressing their needs. They can be a way for individuals to wipe the slate clean, since success typically guarantees that prosecutors will vacate a guilty plea, if filed, and dismiss the charges.

As of 2013, approximately 2,800 drug courts and more than 300 mental health courts were operating in jurisdictions across the country, with other types of problem-solving courts in development.[b] While many of these courts are limited to misdemeanor cases, many others, such as one in Baltimore, specifically handle felony drug cases, or other felony cases where the defendant has a substance use disorder, through referrals from the district attorney's office.[c] Equally innovative, Michigan passed laws in 2013 that provide a framework for counties to establish and run mental health courts and explicitly allow participation by people who have previously participated in a similar program.[d]

**Pretrial diversion.** Some states are expanding their post-charge diversion programs so that more defendants can participate. In 2013, for example, New Jersey's conditional dismissal program in the state's misdemeanor court expanded to defendants charged with non-drug misdemeanor crimes, such as trespassing and shoplifting.[e] Similarly, in the same year, the Alabama legislature authorized district attorneys to establish pretrial diversion programs in their jurisdictions open to defendants charged with misdemeanors, traffic offenses, property crimes, most drug crimes, and other offenses within prescribed limits.[f] Finally, understanding that most behavior change is slow and subject to setbacks, Colorado passed a law in 2013 allowing judges to impose additional conditions rather than pull individuals out of the state's deferred judgment program following any violation of program terms in order to enhance the likelihood of eventual success by participants in the program.[g]

[a] Indiana HB 1016 (2013).
[b] For information on drug courts, see National Institute of Justice, "Drug Courts," http://www.nij.gov/topics/courts/drug-courts/Pages/welcome.aspx. For information on mental health courts, see Council of State Governments Justice Center, "Mental Health Courts," http://csgjusticecenter.org/mental-health-court-project/ and Substance Abuse and Mental Health Administration, "Adult Mental Health Treatment Court Database," http://gainscenter.samhsa.gov/grant_programs/adultmhc.asp. For information on newly created problem-solving courts, see Ram Subramanian and Rebecka Moreno, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends* (New York, NY: Vera Institute of Justice, 2014) 19-21.
[c] See Juliette Mackin et al., *Baltimore City Circuit Court Adult Drug Treatment Court and Felony Diversion Initiative: Outcome and Cost Evaluation Final Report*, (Portland, OR: NPS Research, 2009).
[d] Michigan HB 4694 (2013). This law was tie-barred with three other enacted bills—HB 4695, HB 4696 and HB 4697— all of which deal with more detailed aspects of mental health court operations, procedures, and requirements.
[e] New Jersey A 3598. NJ has two diversion programs, the Pre-Trial Intervention Program (PTI) and the Conditional Discharge Program (CDP), both of which result in the dismissal of charges upon successful completion. PTI only applies to felonies, and CDP only applies to misdemeanors and (now) petty offenses. Upon successful completion of the program, charges are dismissed and individuals can apply to have their records expunged six months after dismissal.
[f] Alabama HB 494 (2013). This law applies only to district attorneys operating in the absence of a local act. Additional laws were passed in 2013 granting the authority to establish discretionary pretrial diversion programs to any governing body of a municipality generally (HB 648) as well as specifically to Huntsville (HB 452), Geneva County (HB 495), Irondale (HB 638), Fultondale (HB 644), Hoover (HB 645), St. Clair County (HB 649), and Alabaster (SB 467).
[g] Colorado SB 250 (2013).

with sentencing deferred pending completion of programming and conditions. Successful participants will have those pleas vacated and charges either dismissed or reduced, or will be given a non-custodial sentence.

For those whose cases are not dismissed or deferred pending dismissal in some manner, a guilty plea or finding can lead to a custodial sentence in state prison or jail, a period of confinement in a residential community corrections or treatment facility, a sentence of probation supervision, or a split sentence of confinement followed by a period of community supervision. Those who have already served time in jail pre-disposition may receive a sentence of time served: for low-level cases, time served may actually exceed the custodial sentence they could have received if convicted of the offense. Those ultimately serving time in jails will primarily be lower-level felons and misdemeanants, serving sentences on average of less than one year.

As the overall size of the jail population has risen, so too has the number of people held in jails post-conviction—despite the fact that the sentenced population has been steadily declining as a percentage of the jail population since the 1990s. In 1990, sentenced inmates represented 48.5 percent of the population.[122] By 2000, it had declined to 44 percent, and by 2013, the sentenced population was 38 percent of the total jail population.[123]  This decline does not mean that fewer people are receiving custodial jail sentences, particularly in light of the concurrent rise in the number of sentenced felons serving lengthy sentences in state prisons. It is simply that the number of people held in jails pretrial has been rising at a faster rate, and these people are staying for longer periods of time. As noted above, some of those pretrial days will count towards time served but will not later be captured statistically as post-conviction time.

In light of decades of mass incarceration and the myriad collateral consequences that can beset a person with a criminal record, many jurisdictions are now moving to resolve more cases in ways that hold people accountable without using incarceration as punishment or burdening them with a criminal conviction.[124] Building on lessons learned from the first generation of alternatives to incarceration, including problem-solving courts and post-charge diversion programs, jurisdictions are working to create clear and focused eligibility criteria and use validated risk and needs assessment tools to better match people with programs.[125] They are also trying to improve success rates and address one of the most persistent challenges—finding ways to respond effectively to non-compliant participants instead of punishing bad behavior with jail time.[126]

## USING ADMINISTRATIVE DATA TO PRIORITIZE JAIL REENTRY SERVICES



Prior to the late 1990s, jail reentry and jail discharge planning were virtually unheard of, and few jails provided services to support people as they left custody. However, in the past decade, jails have begun to implement new service models with the aim of reducing recidivism. While they are an important innovation, jail reentry services typically have inadequate funding and programming, and most are swamped by the extent of the demand.

In collaboration with the New York City Department of Correction (DOC), Vera's Substance Use and Mental Health Program developed and validated (for men) a low-cost and easy-to-implement tool—called the Service Priority Indicator (SPI)—that jail officials could use to identify those who would benefit most from access to the system's limited discharge planning resources.[a]

Using existing data recorded in the DOC's jail management database, researchers identified four risk factors for recidivism—age at jail admission, current charge, number of prior DOC admissions, and recent DOC admissions—and assigned a score to each based on the strength of its correlation with readmission to DOC custody. The scores, which range from zero to seven, were then grouped into four service priority levels, equivalent to having low, medium, high, or very high risk of readmission, with those at the greatest risk of recidivism also identified as very high priority for receiving discharge planning services. Vera's research also found that those identified by the SPI as having a very high service priority tended to stay in jail longer and were more likely to be released upon completion of their sentences—offering a window of opportunity to provide jail-to-community reentry services.

[a] Qing Wei and Jim Parsons, *Using Administrative Data to Prioritize Jail Reentry Services: Findings from the comprehensive Transition Planning Project* (New York, NY: Vera Institute of Justice, 2012).

## REENTRY AND COMMUNITY SUPERVISION

There are several ways in which sentenced offenders come under community supervision. They can be directly sentenced to probation, their sentence can be split between terms of incarceration and probation, or part of their custodial sentence can be served in the community on parole at the discretion of the paroling authorities.

Community supervision usually entails the adherence to certain conditions set by the judge if on probation, or the paroling authority if on parole. In addition, the supervising agency or agent can set the type and intensity of programming and other rules, such as the number of required office visits. People who fail to follow their conditions face sanctions, including revocation to prison or jail.

Although in some jurisdictions the conditions or rules of supervision are guided by risk and needs assessments, in practice many do not conduct thorough assessments and end up applying a generic set of requirements for all people on supervision. In the case of low-risk offenders, this can actually increase their risk of failure.[127]

Positive activities like school, work, and religious participation can be impeded by unnecessarily restrictive terms of supervision and obligations, including restrictions on movement, having a driver's license suspended, curfews, frequent reporting, and mandatory programming that does not reduce risk.[128] In some jurisdictions, a violation as minor as missing a scheduled appointment can result in an immediate return to jail; and when a former prisoner or probationer is accused of violating the terms of his or her conditional release, he or she is often sent to jail to await the adjudication of the suspected violation.

However, when the person on supervision and the supervising officer thoughtfully incorporate the results of a risk and needs assessment into the terms of supervision and needed services and supports are available, then a term of community supervision can be of great benefit to the person and his or her family, reduce the likelihood of future incarceration, and make a positive contribution to public safety.[129]

*A term of community supervision can be of great benefit to the person and his or her family, reduce the likelihood of future incarceration, and make a positive contribution to public safety.*



## IMPROVING COMMUNITY SUPERVISION AND RESTRUCTURING CRIMINAL JUSTICE DEBT

**Community supervision: calibrating conditions to risk.** The most important change needed to improve supervision and reduce recidivism is the adoption and careful implementation of a validated risk and needs assessment tool at the time of release from jail, when a person is placed on probation, and at regular intervals throughout the supervision term. While growing numbers of states have mandated that state agencies use such tools and their results to guide supervision, their use on the local level needs to be more widely adopted.[a]

Jurisdictions interested in instituting or expanding supervision options for low-risk offenders might look to Georgia, which recently implemented an automated reporting system for the roughly 80,000 low-risk probationers under supervision.[b] The call-in system triggers further scrutiny from the supervising officer if a probationer provides a non-standard response to a series of questions. Georgia, which has approximately 820 probation officers, has been able to allocate more resources to the 25,000 medium- and high-risk probationers under supervision by using this system, thus increasing public safety and improving supervision quality. The system also reduced the cost of supervising low-risk offenders from $1.68 to $0.45 per day.[c]

**Implementing graduated responses in community supervision.** More and more jurisdictions are relying on graduated responses and sanctions to respond to people who violate the conditions of their release or to reward the accomplishments of those who are making marked improvements in compliance.[d]  Agencies have developed grids that match types of rule-breaking with particular punishments that increase in severity depending on the number of times a person has broken a particular rule or the number of rules broken at any one time and have created an array of rewards or recognition according to the level or length of compliance and achievement (securing a GED, for example). In a number of jurisdictions, such as Oregon and Kansas, technical revocations went down after implementing such policies.[e]

**Implementing other evidence-based practices.** A critical piece of evidence-based practice is determining the level of supervision and the intensity of programming and interventions needed—through the use of validated risk and needs assessments—and then applying the results across populations in order to ensure that the appropriate resources are available. Once risk and needs are identified, only programs and strategies that have been proven to work should be employed in addressing those risks and needs. For example, research has amply demonstrated the effectiveness of motivational interviewing and the use of options like cognitive-behavioral treatment, which have been adopted in many jurisdictions.[f] There are still many agencies, however, that have yet to integrate these and other practices into their supervision.

**Making basic reentry tools available to everyone leaving confinement.** While challenged with high inmate turnover and heterogeneous populations, jails are nonetheless well-situated for reentry efforts. They typically are located near the communities to which people in jail will return, making outreach efforts easy to accomplish. Using a risk and needs assessment instrument, jail reentry staff can work with community providers to develop reentry plans for people leaving jail that target specific needs.[g]  Jurisdictions such as Douglas County in Kansas and Davidson County in Tennessee have introduced case planning and evidence-based programming in jail, and have developed networks of reentry providers that meet people while they are still in jail, work with them to build their case plans, and meet them on release day to assist with the transition home.[h]

**Allowing debt payment plans.** Professionals who supervise people in the community, pretrial or post-conviction, understand the heavy burden of criminal justice debt—which often drives many people back to jail—but they lack the authority to adjust payments or provide relief in other ways. Efforts to implement reforms in this area can face considerable resistance, since fines and fees help to fund courts, pretrial services, jails, and com-

munity supervision. In jurisdictions where budgets are especially tight, the pressure to collect fees in full can be great.[i] Despite these challenges, some jurisdictions are making efforts to reduce criminal justice debt burdens.

Community supervision agencies in South Carolina have the authority to restructure payment plans, stretching a person's criminal justice debt over more years as a way to reduce monthly payments.[j]  Washington State allows judges to waive the interest people have accrued on debt to the criminal justice system that is not restitution, where people show that the payment of the accrued interest will cause hardship for them and their family, or if they have made a good faith effort to pay.[k] Maine allows community service in lieu of cash payments, and Ohio, West Virginia, and New York allow for modified child support payments following a period of incarceration.[l] Even where such options exist, however, people may not know about them or be able to navigate the court process to take advantage of these rights—especially those who do not have a supervision agent in the community from whom they can seek advice and assistance.

[a] Nancy LaVigne, et al, *Justice Reinvestment Initiative State Assessment Report* (Washington, DC: The Urban Institute, 2014).

[b] J. Ginn, *Georgia Probation Program Lets Some Offenders Phone It In,* (New York, NY: Council of State Governments, 2014), at http://www.csg.org/pubs/capitolideas/enews/issue100_2.aspx.

[c] Ibid.

[d] For example see Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, July 2013), 18-19; and Lauren-Brooke Eisen and Juliene James, *Reallocating Justice Resources: A Review of State 2011 Sentencing Trends* (New York, NY: Vera Institute of Justice, 2012), 14-15.

[e] See for example, Oregon Department of Corrections, *The Effectiveness of Community-Based Sanctions in Reducing Recidivism* (Salem, OR: Oregon Department of Corrections, 2002), 25-27; and Kansas Department of Corrections, *Kansas Behavior Response/Adjustment Grid,* http://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-14/14137.pdf.

[f] See, for example, Steve Aos, *Evidence-based Adult Corrections Programs: What Works and What Does Not* (Olympia, WA: Washington State Institute of Public Policy, 2006); and Janeen Buck Willison, et al., *Process and Systems Change Evaluation Findings from the Transition from Jail to Community Initiative* (Washington, DC: Urban Institute, 2008).

[g] See Jim Parsons, "Addressing the Unique Challenges of Jail Reentry," in *Offender Reentry,* edited by M. Crow and J. Ortiz Smykla (Burlington, MA: Jones and Bartlett Learning, 2014), 105-123; and Amy Solomon et al., *Life after Lockup,* (Washington, DC: Urban Institute, 2008).

[h] Willison, et al., 2008.

[i] American Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors Prisons,* (New York, NY: American Civil Liberties Union, 2010), 25, 50 and 55; Council on State Governments, *Repaying Debts,* (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 33; A. Bannon, M. Nagrecha, and R. Diller, *Criminal Justice Debt: a Barrier to Reentry* (New York, NY: Brennan Center for Justice, 2010), 30-31.

[j] South Carolina SB 1154 (2010).

[k] Washington SB 5423 (2011). This excludes restitution.

[l] West Virginia HB 4521 (2012); New York AB 8178 (2009); Maine HP 1032 (2013).

With or without formal supervision, people who have experienced lengthy jail or prison stays need basic reentry support.[130] Most immediate, people being released from incarceration need valid identification cards—necessary to gain them access to any benefits to which they may be entitled such as Medicaid—and assistance with opening a bank account and applying for housing and job opportunities.  If those being released have chronic medical conditions, providing them with medications and referrals to medical care in the community are fundamental to their functioning. Permanent housing, avenues to education, and long-term employment come next. At the state level, corrections officials are making significant efforts to address these reentry needs upon release, but assistance at the local jail level is far more scarce.

While many factors can diminish a person's chances of successfully reentering the community, debt is one of the most toxic. Criminal justice fines and fees follow people from jail and prison back into the community and, combined with other financial burdens, can become a major barrier to finding and maintaining employment, housing, family relationships, community ties, and stable mental and physical health—the very conditions known to support success. In some jurisdictions, non-payment of fines and fees results in immediate arrest and additional jail time.[131] There are accounts of people who deliberately skip supervision appointments or miss court dates because they cannot pay their fines, setting in motion a process that eventually will lead them back to jail.[132] When fines and fees loom large, some people may actually choose to return to jail rather than face their debts.[133]

To end the cycling of people in and out of jail, jurisdictions are taking steps to improve community supervision by better matching conditions of release to assessed risk and relying on graduated responses to rule-breaking in place of automatic jail time. Some jurisdictions have also made progress in developing jail reentry resources, and a few jurisdictions are tackling through legislation the issue of debt and the barriers it creates for people trying to get back on their feet.

# Conclusion

Jails matter. Yet against a national backdrop of declining crime rates, most of the debate about incarceration in recent years has focused on prisons. A significant body of research shows that our reliance on incarceration as a primary crime control policy has had only a marginal impact on public safety. As a result, there is an emerging consensus that it has not been worth the fiscal and human costs. The role that local jails play in this story has not, until recently, garnered similar attention or analyses. That is starting to change and the new focus could not be timelier. With nearly 12 million annual admissions—almost 19 times those to state and federal prisons—jails have an impact that is both far-reaching and profound.

While jails serve an important function in local justice systems—primarily to hold people who are deemed, by reliable means, unlikely to appear in court or likely to reoffend if released while their cases are processed—this is no longer exclusively what jails are or whom they hold. With so many people cycling through them—some many times over—jurisdictions need to ensure that jails, while doing their part to keep the public secure, take seriously their responsibility to treat those in their custody with dignity, in settings that are safe, healthy, and able to help people return quickly to their communities or adjust to serving their sentences elsewhere. As this report has documented, this is not necessarily what jails do today.

The misuse of jails is neither inevitable nor irreversible. But to chart a different course will take leadership and vision. No single decision or decision maker in a local justice system determines who fills the local jail. While some jurisdictions  have made strides in developing, implementing, and evaluating off-ramps from the path that leads to the jailhouse door, change at one point in the system will have limited impact if other key actors and policies pull in the opposite direction. To both scale back and improve how jails are used in a sustainable way, localities must engage all justice system actors in collaborative study and action. Only in this way can jurisdictions hope to make the systemic changes needed to stem the tide of people entering jails and to shorten the stay for those admitted.

*The misuse of jails is neither inevitable nor irreversible.*

# ENDNOTES

1   For the number of jail jurisdictions, see James Stephan and Georgette Walsh, Census of Jail Facilities, 2006 (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2011), 1; For the average daily jail population in 2013 see Todd D. Minton and Daniela Golinelli, Jail Inmates at Midyear 2013 - Statistical Tables (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014), 6; for population data from the 2010 census see U.S. Census Bureau, *State and Country Quickfacts – Detroit, Michigan,* http://quickfacts.census.gov/qfd/states/26/2622000.html, and U.S. Census Bureau, *State and Country Quickfacts – San Francisco, California,* http://quickfacts.census.gov/qfd/states/06/0667000.html.

2   For the 2013 jail admissions data see, Minton and Golinelli, 2014, 4; for population data from the 2010 census see U.S. Census Bureau, *State and Country Quickfacts – Los Angeles, California,* http://quickfacts.census.gov/qfd/states/06/0644000.html; and U.S. Census Bureau, *State and Country Quickfacts – New York, New York,* http://quickfacts.census.gov/qfd/states/36/3651000.html. For annual admissions to state and federal prisons, see E. Ann Carson, *Prisoners in 2013* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014).

3   For comparison incarceration rates, see International Centre for Prison Studies, "World Prison Brief," http://www.prisonstudies.org/highest-to-lowest/prison-population%20total?field_region_taxonomy_tid=All&=Apply.

4   Although not explicitly articulated in the Constitution, the presumption of innocence is regarded as a crucial element of the constitutional right to due process under the law and "a basic component of a fair trial under our system of criminal justice." See *Estelle v. Williams,* 425 U.S. 501, 503 (1976). The primary import of this presumption today is the allocation of the burden of proof in criminal trials. See *Bell v. Wolfish* 441 U.S. 520, 533 (1979). According to this legal doctrine, prosecutors are required to prove guilt beyond a reasonable doubt. See *Coffin v. United States,* 156 U.S. 432, 460 (1895) and *Kentucky v. Whorton,* 441 U.S. 786, 790 (1979) (Stewart, J., dissenting). At common law, the presumption of innocence had a wider meaning. It also protected defendants during the time between charge and conviction, ensuring that most individuals would remain at liberty prior to trial and that those individuals unable to make bail and held in pretrial detention were not there to be punished, but merely held in safe and humane custody in order to return them to court for trial. See William Blackstone, *Commentaries on the Laws of England, Vol. IV,* 297 (1765). Regarding the protections the presumption has historically implied during the pretrial period, until relatively recently U.S. law largely conformed with the common law, since bail was presumed in all non-capital cases. See *Judiciary Act of 1798,* 1 Stat. 73 §33 (1798). With statutory changes between the 1960s and 1980s, however, public safety considerations are now taken when judges make pretrial release and detention decisions. See *Bail Reform Act 1966* and *Bail Reform Act 1984.* For defendants held in jail prior to trial—whether for failure to post bail or due to a potential risk posed to the community—the presumption continues to protect against the consideration of pretrial detention as evidence of guilt. See *Wolfish,* 441 U.S.  at 533. For reports on jail conditions of confinement, see for example, Roy L. Austin, deputy assistant attorney general, U.S. Department of Justice, Civil Rights Division, to George Touart, interim county administrator, and Sheriff David Morgan, Escambia County, Pensacola, FL, *Re: Investigation of the Escambia County Jail,* May 22, 2013; Grace Chung Becker, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, and Patrick J. Fitzgerald, United States attorney, Northern District of Illinois, to Todd H. Stroger, president, Cook County Board, and Thomas Dart, sheriff, Cook County, Chicago, IL, *Re: Cook County Jail, Chicago, IL,* July 11, 2008; Loretta King, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, to Marlin N. Gusman, criminal sheriff, Orleans Parish, New Orleans, LA, *Re: Orleans Parish Prison System, New Orleans, Louisiana,* September 11, 2009; Jocelyn Samuels, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, and Preet Bharara, United States attorney, Southern District of New York, to Mayor Bill de Blasio, Commissioner Joseph Ponte, NYC Department of Correction, and Zachary Carter, Corporation Counsel of the City of New York, New York, *Re: CRIPA Investigation*

*of the New York City Department of Correction Jails on Rikers Island,* August 4, 2014; and Jonathan Smith, chief, U.S. Department of Justice, Civil Rights Section, Special Litigation Section, and André Birotte, Jr., United States Attorney, Central District of California, to Anthony Peck, deputy county counsel, Monterey Park, CA, and Stephanie Jo Reagan, principal deputy county counsel, Los Angeles County Department of Mental Health, Los Angeles, CA, *Re: Mental Health Care and Suicide Prevention Practices at Los Angeles County Jails,* June 4, 2014.

5   Doris J. James, *Profile of Jail Inmates, 2002,* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004), 3.

6   Approx. 20,000 of 43,000 people who were detained following arraignment faced non-felony charges. See New York City Criminal Justice Agency, *Annual Report 2013* (New York: New York City Criminal Justice Agency, 2014), 30.

7   Traffic and vehicular charges made up 26 percent (161,000) of all charges. See Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (Los Angeles, CA: Vera Institute of Justice, 2011), xv. This study was done prior to the enactment of the *Public Safety Realignment Act* (AB 109) of 2011 which transferred a large number of convicted felony offenders in state prison or on parole to the authority of California's 58 counties. For recent research on the impact of AB 109 on jail populations, see Magnus Lofstrom and Steven Raphael, *Impact of Realignment on County Jail Populations* (San Francisco, CA: Public Policy Institute of California, 2013).

8   For example, at least 29 states have taken steps to reform mandatory penalties since 2000, and many more in the last few years have taken steps to expand community-based sentencing options, such as drug treatment probation programs targeting high-risk, previously prison-bound drug-addicted offenders or reclassifying offenses by creating more gradation in felony levels per type of criminal offense or lowering low-level crimes from felonies to misdemeanors. For more information regarding recent state sentencing and corrections reforms, see for example, Adrienne Austin, *Criminal Justice Trends: Key Legislative Changes in Sentencing Policy, 2001-2010* (New York, NY: Vera Institute of Justice, 2010); Lauren-Brooke Eisen and Juliene James, *Reallocating Justice Resources: A Review of State 2011 Sentencing Trends* (New York, NY: Vera Institute of Justice, 2012); Ram Subramanian and Ruth Delaney, *Playbook for Change? States Reconsider Mandatory Sentences* (New York, NY: Vera Institute of Justice, 2014); Ram Subramanian and Rebecka Moreno, *Drug War Détente? A Review of State-level Drug Law Reform* (New York, NY: Vera Institute of Justice, 2014); and Ram Subramanian and Rebecka Moreno, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends* (New York, NY: Vera Institute of Justice, 2014). Also see Alison Lawrence, *Trends in Sentencing and Corrections: State Legislation* (Washington, DC: National Conference of State Legislatures, 2013); Nicole D. Porter, *The State of Sentencing 2013: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2014); and Nicole D. Porter, *The State of Sentencing 2012: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2013).

9   For information about the impact of the fiscal crisis and low crime rates on sentencing and corrections, see Ram Subramanian and Rebecca Tublitz, *Realigning Justice Resources: A Review of Population and Spending Shifts in Prison and Community Corrections* (New York, NY: Vera Institute of Justice, 2012), 20. Also see Alison Shames and Michael Woodruff, *The Continuing Fiscal Crisis in Corrections: Setting A New Course* (New York, NY: Vera Institute of Justice, 2010), 4.

10   For results of public opinion polls which show that most Americans support alternatives to incarceration for nonviolent offenses, see Pew Center on the States, *Public Opinion on Sentencing and Corrections Policy in America* (Washington, DC: The Pew Charitible Trusts, 2012), also see Jill Mizell, *An Overview of Public Opinion and Discourse on Criminal Justice Issues* (New York, NY: The Opportunity Agenda, 2014), 19-22. For research demonstrating that community-based drug treatment programs, for example, are more effective than incarceration for drug offenders, see S. Aos et al., *Washington's Drug Offender*

*Sentencing Alternative: An Evaluation Of Benefits And Costs* (Olympia, WA: Washington State Institute for Public Policy, 2005); M. Finigan et al., *The Impact of a Mature Drug Court over 10 Years of Operation: Recidivism and Costs* (Portland, Oregon: NPC Research, Inc., 2007); S. B. Rossman et al., *The Multi-Site Adult Drug Court Evaluation: The Impact of Drug Courts* (Washington, DC: Urban Institute, Justice Policy Center, 2011); and  E.L. Sevigny, B.K. Fuleihan, and F.V. Ferdik, "Do drug courts reduce the use of incarceration?: A meta-analysis," *Journal of Criminal Justice*, 41, no.6 (2013): 416-425. For research that demonstrates that community-based sanctions are more effective than incarceration for certain types of offenders more generally, see for example, Christopher T. Lowenkamp and Edward J. Latessa, "Understanding the Risk Principle: How and Why Correctional Interventions Harm Low-Risk Offenders," *Topics in Community Corrections* (Washington, DC: National Institute of Corrections, 2004).

11  For 1983 admissions, see Craig A. Perkins, James J. Stephan, and Allen J. Beck, *Jails and Jail Inmates 1993-94*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1995), 13. For 2013 admissions, see Minton and Golinelli, 2014, p.4.

12  David E. Olson and Koert Huddle, "An Examination of Admissions, Discharges & the Population of the Cook County Jail, 2012", *Social Justice*, Paper 16 (2013), http://ecommons.luc.edu/social_justice/16/

13  Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan* (City of New York: Mayor Bill de Blasio, 2014), 6, http://nyc.gov/BHTF.

14  For 1983 jail population, see Allen J. Beck, *Profile of Jail Inmates 1989*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991), 3. For 2013 jail population, see Minton and Golinelli,  2014, p.6.

15  For 1993 rate, see Perkins, Stephan, and Beck, 1995, p. 2. For 2007 rate, see Minton and Golinelli, 2014, p.6.

16  Minton and Golinelli, 2014, p.6.

17  Uniform Crime Reporting Statistics - *UCR Data Online*, http://www.ucrdatatool.gov/. The violent crime rate decreased from 758 to 387 and the property crime rate decreased from 5,140 to 2,859.

18  Pew Center on the States, *State of Recidivism: The Revolving Door of America's Prisons* (Washington, DC: Pew Charitable Trusts, 2011); Don Stemen, *Reconsidering Incarceration: New Directions for Reducing Crime* (New York, NY: Vera Institute of Justice, 2007). Also see J. Travis, B. Western, and S. Redburn, eds. *The Growth of Incarceration in the United States: Exploring Causes and Consequence* (Washington, DC: National Research Council, 2014).

19  For drug arrest rates, see Howard N. Snyder and Joseph Mulako-Wangota, *Arrest Data Analysis Tool*, (Washington, DC: Bureau of Justice Statistics, 2013), selecting Drug Abuse Violation—Total at www.bjs.gov, (accessed Nov. 29, 2014). For 1983 and 1989 drug jailing rates, see Beck, 1991, p.11; for later drug jailing rates, see Doris J. James, *Profile of Jail Inmates, 2002* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004).

20  Authors' approximations based on data from Beck, 1991, p. 7; and Minton and Golinelli, 2014, p. 6. To approximate length of stay (LOS) from aggregate annual admissions (ADM) and average daily populations (ADP), we used the formula LOS = ADP/(ADM/365). The numbers are intended to illustrate the trend more than precise estimates.

21  The percentage is a weighted average for those with and without mental illness who abused drugs or alcohol from Doris J. James and Lauren Glaze, *Mental Health Problems of Prison and Jail Inmates* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2006), 5-6.

22  Caroline Wolf Harlow, *Education and Correctional Populations* (Washington, DC: US Department of Justice, Office of Justice Programs,

Bureau of Justice Statistics, 2003), 2.

23  Authors' calculations based on Minton and Golinelli, 2014, p. 2; and Bureau of the Census, "U.S. Census QuickFacts," http://quickfacts.census.gov/qfd/states/00000.html. Using racial breakdowns of jail populations and U.S. Census figures from 2010, we determined that African Americans are jailed at a rate of 751 per 100,000 and whites are jailed at a rate of 168 per 100,000.

24  Minton and Golinelli, 2014, p. 7; and Bureau of the Census, "U.S. Census QuickFacts" at http://quickfacts.census.gov/qfd/states/00000.html.

25  Authors' calculations based on New York City Independent Budget Office, *NYC's Jail Population: Who's There and Why?* (New York: New York City Independent Budget Office, 2012), http://ibo.nyc.ny.us/cgi-park2/?p=516; and Bureau of the Census,  "U.S. Census QuickFacts," http://quickfacts.census.gov/qfd/states/00000.html. The population of the Rikers Island jail is 57 percent black, 33 percent Latino, and 7 percent white. The population of New York City is 22 percent black, 29 percent Latino, and 33 percent white.

26  J. Blecher, "Are jails replacing the mental health system for the homeless mentally ill?," *Community Mental Health Journal* 24, no. 3 (1988): 185-95; D. Shenson, N. Dubler, and D. Michaels, "Jails and prisons: The new asylums?," *American Journal of Public Health* 80, no. 6 (1990): 655-694. For history of the deinstitutionalization of the mentally ill generally, see Bernard E. Harcourt, *Reducing Mass Incarceration: Lessons from the Deinstitutionalization of Mental Hospitals in the 1960s* (Chicago: University of Chicago Public Law & Legal Theory Working Paper No. 335, 2011). Also see Richard G. Frank and Sherry A. Glied, *Better But Not Well: Mental Health Policy in the United States since 1950* (Baltimore, MD: The Johns Hopkins University Press, 2006).

27  Henry J. Steadman, F.C. Osher, et al., "Prevalence of Serious Mental Illness Among Jail Inmates," *Psychiatric Services* 60, no. 6, (June, 2009): 761; and although women still make up a relatively small proportion of the jail population—14 percent in 2013— their share has been steadily increasing, up from 11 percent since 2000, Minton and Golinelli, 2014, p. 7.

28  James and Glaze, 2006, p. 1. Symptoms of a mental disorder were based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV). For a general discussion of mental illness in jails, see Travis, Western, and Redburn, 2014.

29  H. Richard Lamb and Linda Weinberger, "The Shift of Psychiatric Inpatient Care From Hospitals to Jails and Prisons," *Journal of the American Academy of Psychiatry and the Law Online* 33, no. 4 (2005): 529, 531. Also see H. Richard Lamb, Linda Weinberger, and Walter DeCuir, "The Police and Mental Health," *Psychiatric Services* 53, Issue 10 (2002): 1266, 1269 at http://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.53.10.1266.

30  James and Glaze, 2006, p. 9.

31  David H. Cloud, Ernest Drucker, Angela Browne, and Jim Parsons, "Public Health and Solitary Confinement in the United States," *American Journal of Public Health*.

32  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (Los Angeles, CA: Vera Institute of Justice, 2011), xix.

33  For 1982 expenditures, see Tracey Kyckelhahn, *Justice Expenditures and Employment, FY 1982-2007* (Washington, DC: Department of Justice, 2011), 6; for 2011 expenditures, see Tracey Kyckelhahn, *Local Government Corrections Expenditures, FY 2005–2011*, (Washington, DC: Department of Justice, Bureau of Justice Statistics, 2013), 1-4, 7. The 2011 report shows local expenditures on corrections as $7,068 million in 1982 (in 2007 dollars) and the 2013 report shows local expenditures on corrections to be $26,400 million in 2011 (in 2011 dollars). When both figures are adjusted to constant 2011 dollars, the increase is about 235 percent.

34  A. L.  Solomon, *Life after lockup: Improving reentry from jail to the*

community (Washington, DC: Urban Institute, Justice Policy Center, 2008), 15-24.

35  Kyckelhahn, 2013, p. 4.

36  State funds and other sources of revenue, including fines and fees, may cover a small percentage of operating costs. Barbara Krauth and Karin Stayton, *Fees Paid by Jail Inmates: Fee Categories, Revenues, and Management Perspectives in a Sample of U.S. Jails* (Washington, DC: U.S. Department of Justice, National Institute of Corrections, 2005), 2-4, 6-7, 15-17, 36-38, 40-41.

37  Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *The Hidden Costs of Pretrial Detention* (New York, NY: The Laura and John Arnold Foundation, 2013), 11. Lowenkamp et al.'s research in this area does not explore the causes of these negative outcomes. One, as yet untested, hypothesis could be that detained low- and moderate-risk individuals suffer the same over-programming consequences as low- and moderate-risk probationers and parolees who recidivate at higher rates when they receive overly-intensive supervision as compared to those who receive supervision matched to their assessed risk. For research on assessed risk and intervention level, see D.A. Andrews and James Bonta, *The psychology of criminal conduct* (Albany, NY: Lexis Nexis/Anderson Pub. Research, 2010) on the negative impact of high-intensity supervision and interventions with low- and medium-low risk probationers and parolees.

38  See Lowenkamp, VanNostrand, and Holsinger, 2013, p. 10-11; John S. Goldkamp, *Two Classes of Accused: A study of Bail and Detention in American Justice* (Cambridge, MA: Ballinger Pub. Co., 1979); and Malcolm Feeley, *The Process is the Punishment: Handling Cases in a Lower Criminal Court*, (New York: Russell Sage Foundation, 1979). For a comprehensive review of current research, see Jeffrey David Manns, *Liberty Takings: a Framework for Com[p]ensating Pretrial Detainees* (Cambridge, MA: Harvard Law School, John M. Olin Center for Law, Economics, and Business, 2005); and The Pretrial Justice Institute, *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process*, (Washington, DC, Pretrial Justice Institute/MacArthur Foundation 2012).

39  Goldkamp, 1979; Feeley, 1979; and Manns, 2005.

40  For racial breakdowns of jail populations, see Minton and Golinelli, 2014, p. 6. For racial breakdowns of the general population, see U.S. Census QuickFacts, http://quickfacts.census.gov/qfd/states/00000.html.

41  For the example of New York City, see Jeffrey Fagan and Garth Davies, "Street Stops and Broken Windows: Terry, Race, and Disorder in New York City," *Fordham Urban Law Journal* 28, no.2 (2000): 457-464.

42  Marc Mauer and Nazgol Ghandnoosh, *Incorporating Racial Equity into Criminal Justice Reform* (Washington, DC: The Sentencing Project, 2014), 6-7.

43  For research demonstrating that schools in minority neighborhoods are more likely to have law enforcement officers on site, see Aaron Kupchik and Geoff Ward "Race, Poverty, and Exclusionary School Security: An Empirical Analysis of US Elementary, Middle, and High Schools," *Youth Violence and Juvenile Justice* 12, no. 4 (2013): 332-354; and Allison Ann Payne and Kelly Welch, "Modeling the Effects of Racial Threat on Punitive and Restorative School Discipline Practices," *Criminology* 48, no. 4 (2010): 1019-1062.

44  For information about stop and frisk practices in New York, see Jennifer Fratello, Andres Rengifo, and Jennifer Trone, *Coming of Age in the Era of Stop and Frisk* (New York, NY: Vera Institute of Justice, 2013).

45  Mauer and Ghandnoosh, 2014, pp. 6-7.

46  Robert Brame, Shawn Bushway, Ray Paternoster, Michael Turner, "Demographic Patterns of Cumulative Arrest Prevalence by Ages 18 and 23," *Crime and Delinquency*, 60(3), (2014), 1.

47  Tina Frierburger and Carly Hilinski. "The Impact of Race, Gender, and Age on the Pretrial Decision," *Criminal Justice Review* 35(3), (2010), 330.

48  American Civil Liberties Union, *Racial Disparities in Sentencing: Hearing on Reports of Racism in the Justice System of the United States.* (Washington, DC: American Civil Liberties Union, 2014), 1-3.

49  Barbara Krauth and Karin Stayton, pp. 7-35.

50  These fees include medical visits (including pharmacy prescriptions, eye care, and dental), telephone use, per diem/pay to stay, booking, photocopying, barber/hair care, bonding, escort/transportation, notary, laundry, check-processing, detoxification at intake, substance abuse testing, substance abuse treatment, weekend programs, electronic monitoring, community service, GED testing, jail industries/jobs programs, work release, vocational aptitude testing, and day reporting. See Krauth and Stayton, 2005, pp. 7-35.

51  See American Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors Prisons* (New York, NY: American Civil Liberties Union, 2010), 6-8; and Council on State Governments, *Repaying Debts* (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 7-8. Also see, A. Bannon, M. Nagrecha, and R. Diller, *Criminal Justice Debt: a Barrier to Reentry* (New York, NY: Brennan Center for Justice, 2010), 7-10.

52  Bannon, Nagrecha, and Diller, 2010, p.10.

53  Council on State Governments, *Repaying Debts* (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 2.

54  In addition, more and more employers are conducting criminal background checks as part of their hiring processes. Some surveys suggest that 90 percent of employers conduct such checks, and they are not always limited to convictions. NELP found that in one survey, over 90 percent of employers reported requiring criminal background checks as a part of hiring decisions. They may also inquire about previous arrests or criminal charges, regardless of the outcome. See Michelle Natividad Rodriguez and Maurice Emsellem, *65 Million Need not Apply: The Case for Reforming Criminal Background Checks for Employment* (Washington, DC: The National Employment Law Project, 2011), 1.

55  Bannon, Nagrecha, and Diller, 2010, p.13.

56  See American Civil Liberties Union, 2010, p. 5; Council on State Governments, 2007 p. 3; Bannon, Nagrecha, and Diller, 2010, pp. 19-26; Douglass Evans, *The Debt Penalty—Exposing the Financial Barriers to Offender Reintegration* (New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York, 2014), 1.

57  *Bearden v. Georgia*, 461 U.S. 660, 668-69 (1983).

58  Bruce Western and Becky Pettit, *Collateral Costs: Incarceration's Effect on Economic Mobility* (Washington, DC: the Pew Charitable Trusts, 2010), 11.

59  When an individual enrolled in Medicaid is detained, the majority of states terminate Medicaid benefits, despite federal guidance that allows for the suspension of Medicaid for individuals involved in the criminal justice system whose eligibility for the program is not linked to Supplemental Security Income. See Anita Cardwell and Meaghan Gilmore, *County Jails and the Affordable Care Act: Enrolling Eligible Individuals in Health Coverage* (Washington, DC: National Association of Counties, 2012), 3.

60  Each federal program has different eligibility criteria in relation to prison or jail stays. See Social Security Administration, *What Prisoners Need to Know* (Washington, DC: Social Security Administration, 2010), http://www.ssa.gov/pubs/EN-05-10133.pdf; U.S. Department of Veterans Affairs, "Incarcerated Veterans," http://www.benefits.va.gov/persona/veteran-incarcerated.asp .

61  See Corrinne A. Carey, *No second chance: People with criminal records denied access to public housing* (New York, NY: Human Rights Watch, 2004), 3, http://www.hrw.org/reports/2004/usa1104/usa1104.pdf; and Stephen Metraux, Caterina Roman, and Richard Cho, "Incarceration and Homelessness," (Washington DC: National Symposium on Homelessness Research, 2007), 9.

62  A survey found that 63 percent of homeless formerly incarcerated people in Baltimore, MD surveyed had owned or rented a home prior to incarceration, but only 29 percent owned or rented a home after release. The survey does not distinguish between jail and prison, but notes that 41 percent of respondents were incarcerated for a year or less. See Center for Poverty Solutions, *Barriers to Stability: Homelessness and Incarceration's Revolving Door in Baltimore City* (Baltimore, MD: Open Society Foundations, 2003), 14-15.

63  See Greg A. Greenbergand and Richard Rosenheck, "Jail Incarceration, Homelessness, and Mental Health: A National Study," *Psychiatric Services* 59, no. 2 (2008): 170-177; National Association of Counties, Corporation for Supportive Housing, *Supportive Housing for Justice-Involved Frequent Users of County Public Systems* (Washington, DC.: National Association of Counties, 2013), 3.

64  More than half (53 percent) of female jail inmates reported having a current medical problem, compared to about a third (35 percent) of male jail inmates. See Laura M. Maruschak, *Medical Problems of Jail Inmates*, (Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2006), 1, http://www.bjs.gov/content/pub/pdf/mpji.pdf.

65  See Richard G Frank and Sherry A. Glied, *Better But Not Well: Mental Health Policy in the United States since 1950* (Baltimore, MD: Johns Hopkins University Press, 2006); Kathleen N. Ly et al., "The increasing burden of mortality from viral hepatitis in the United States between 1999 and 2007," *Annals of Internal Medicine* 156, no. 4 (2012): 271-278; Jessica R. MacNeil, Mark N. Lobato, and Marisa Moore, "An unanswered health disparity: tuberculosis among correctional inmates, 1993 through 2003," *American Journal of Public Health* 95 no. 10 (2005): 1800; Marushka L. Silveira, 2006, p. 1.

66  Nicholas Freudenberg, "Jails, prisons, and the health of urban populations: A review of the impact of the correctional system on community health" *Journal of Urban Health: Bulletin of the New York Academy of Medicine* 78, no. 2 (2011): 214–235.

67  Dora M. Dumont et al., "Public health and the epidemic of incarceration," *Annual Review of Public Health* 33 (2012): 331-333; Andrew P. Wilper et al., "The health and health care of US prisoners: results of a nationwide survey," *American Journal of Public Health* 99, no. 4 (2009): 666-672; Sasha Abramsky and Jamie Fellner, *Ill-Equipped: US Prisons and Offenders with Mental Illness* (New York: Human Rights Watch, 2003), 16, 22, 40.

68  Nicholas Freudenberg, Jessie Daniels, Martha Crum, Tiffany Perkins, and Beth E. Richie, "Coming Home From Jail: The Social and Health Consequences of Community Reentry for Women, Male Adolescents, and Their Families and Communities," *American Journal of Public Health.* 95 (2005): 1725.

69  In 2005, 79 percent of women in jail were mothers, with nearly 250,000 children between them.  See Susan McCampbell, *The Gender-Responsive Strategies Project: Jail Applications* (Washington, DC: National Institute of Corrections, US Department of Justice, 2005), 2, 4.

70  Steve Christian, *Children of Incarcerated Parents* (Washington, DC: National Council of State Legislatures, 2009), 5.

71  Todd Clear's research looks at the impact of incarceration on communities, including high rates of community members in both jail and prison. Todd R. Clear, "The Effects of High Imprisonment Rates on Communities," *Crime and Justice* 37, no. 1 (2008): 97-132, 114-117. Also see Andrew Petteruti and Nastassia Walsh, *Jailing Communities: The Impact of Jail Expansion and Effective Public Safety Strategies* (Washington DC: Justice Policy Institute, 2008), 18-20; and Nancy G. La Vigne, Pamela Lachman, Shebani Rao, Andrea Matthews. *Stop and Frisk: Balancing Crime Control with Community Relations* (Washington, DC: Urban Institute, 2014): 20-21.

72  Todd R. Clear, *Imprisoning communities: How mass incarceration makes disadvantaged neighborhoods worse* (Oxford: Oxford University Press, 2007).

73  James Austin and Michael Jacobson, *How New York City Reduced Mass Incarceration: A Model for Change?* (New York, NY: Vera Institute of Justice, 2013), 25.

74  State laws allow citation and release primarily in response to traffic violations, infractions, low-level misdemeanors, and sometimes low-level felonies. Louisiana, Oregon, and New York, for example, offer this for some felonies. Both state laws and departmental policies range widely in terms of presuming or allowing this practice. There are states and/or municipalities, for example, that list specific crimes for which a citation is the presumed response, absent mitigating circumstances, while others provide no guidance at all. See National Conference of State Legislatures, *Citation in Lieu of Arrest* (2013)

75  Ibid. With varying degrees of formality, officers consider an array of factors, including whether the suspect seems to pose a danger to persons or property and the person's criminal record, including any outstanding warrants; whether or not the suspect and any family members reside locally and the suspect's employment status and other possible ties to the community as indicators of the likelihood that the person will appear in court; and whether the suspect is under the influence of drugs or alcohol or appears to be mentally ill. See for example, Mary T. Phillips, *The Past, Present , and Possible Future of Desk Appearance Tickets in New York City,* (New York: New York City Criminal Justice Agency, 2014). In some small jurisdictions, the police may also require the person to post a small amount of bail to create an incentive for the person to appear in court for arraignment.

76  The practice of "for-profit" or "quota" policing can result in unlawful stops, summonses, and arrests. Quotas are requirements that an officer issue a certain number of violations within a specific timeframe and are sometimes imposed to accrue court fines and fees from defendants to help reduce budgetary deficits in cities or counties. See for example, New York Civil Liberties Union report "NYCLU Lawsuit Challenges Primitive Quota System in Bronx Precinct" (New York, NY: New York Civil Liberties Union, 2012), http://www.nyclu.org/news/nyclu-lawsuit-challenges-punitive-quota-system-bronx-precinct. While it still remains a practice in some jurisdictions, there has been much investigation and litigation in jurisdictions across the United States, including in Georgia, New Jersey, Illinois, and New York, regarding the illegality of violation and ticket quotas.  See for example, *Fraternal Order of Police, Lodge 1 v City of Camden,*  Civ. No 10-1502 (D.N.J. Sep. 26, 2013); Plaintiff's Complaint, *Craig Matthews v City of New York, Raymond Kelly*, 12 Civ.1354 (S.D.N.Y. filed Feb. 23, 2012).

77  For research on civil forfeiture, see Marian R. Williams, Jefferson E. Holcomb, Tomislav V. Kovandzic, and Scott Bullock, *Policing for Profit: The Abuse of Civil Asset Forfeiture* (Washington, DC: Institute for Justice, March 2010) http://www.ij.org/policing-for-profit-the-abuse-of-civil-asset-forfeiture-4; J. Worrall,  and T. Kovandzic, "Is Policing For Profit? Answers from Asset Forfeiture" *Criminology and Public Policy* 7 (2008): 219-244; and John L. Worrall, "Addicted to the Drug War: The Role of Civil Asset Forfeiture as Budgetary Necessity in Contemporary Law Enforcement" *Journal of Criminal Justice 29* (2001): 171–187. For an example of press coverage about Missouri, see Radley Balko, "How Municipalities in St. Louis County, MO., Profit From Poverty," *Washington Post,* September 3, 2014.

78  Authors' calculation from Bureau of Justice Statistics, *Jail Inmates 1984* (Washington, DC: US Department of Justice, Bureau of Justice Statistics, 1986), 2; and Snyder and Mulako-Wangota, 2013. In 1983 there were 11.7 million arrests and 6 million jail admissions.

79  Authors' calculation from Minton and Golinelli, 2014, p. 4; and Snyder and Mulako-Wangota, 2013. In 2012 there were 12.2 million arrests and 11.6 million jail admissions.

80  For the analysis of 17 state courts, see Robert LaFountain et al., *Examining the Work of State Courts: An Analysis of 2010 State Court Caseloads* (Washington DC: National Center for State Courts, 2012), 24. For the analysis of misdemeanor arrests in New York City, see Preeti

Chauhan et al., *Trends in Misdemeanor Arrests in New York* (New York: John Jay College of Criminal Justice, 2014).

81  The arrest rate for drug crimes peaked in 2006. See Howard N. Snyder and Joseph Mulako-Wangota, Bureau of Justice Statistics. With underlying data from the FBI's Uniform Crime Reporting (UCR) Program, U.S. drug arrest estimates were generated using the Arrest Data Analysis Tool at http://www.bjs.gov.

82  The U.S. Constitution affords defendants adversarial safeguards in criminal proceedings including a timely judicial determination of probable cause as a pre-requisite to detention under the Fourth Amendment. See *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Similarly, under the Sixth Amendment the Court found that there must be a reasonable time between arrest and arraignment. See *Barker v. Wingo*, 407 U.S. 514, 530-31 (1972). These holdings have been codified under Federal Rule of Criminal Procedure 5.1, which states that a person arrested in the United States must be presented "without unnecessary delay" to a magistrate or judge.  See Fed. Rules Cr. Proc. Rule 5, 18 U.S.C.A., FRCRP Rule 5. The Supreme Court subsequently found that in order to satisfy *Gerstein*'s promptness requirement, a jurisdiction that chooses to combine probable cause determinations with other pretrial proceedings must do so as soon as is reasonably feasible, but no later than 48 hours after arrest. See *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). States that combine "probable cause determinations" with initial court appearances have interpreted "unnecessary delay" to mean no more than 48 hours. See Pen C §825; CCP §§134-135; Govt C §§6700, 6706; *People v Lee*  3 CA3d 514, 521 (1970). Despite the Supreme Court's 48 hour mandate, many jurisdictions provide a 72-hour window for arraignment. Typically state statutes do not permit law enforcement to detain a person for more than 72 hours before arraignment and others comport with the Supreme Court mandate of 48 hours and some even fewer. For example, in New York and Washington, DC, statute requires 24 hours and in California legislature interprets "unnecessary delay" as no more than 48 hours, not including holidays. See Kimyetta R. Robinson, *From Arrest to Appeal: A Guide to Criminal Cases in The New York State Courts* (New York, NY: The Fund for Modern Courts, 2005), 12; also see Washington, DC Super. Ct. R. Crim. P. 5(c).—a defendant has the right to an immediate probable cause determination; Pen C §825; CCP §§134-135; Govt C §§6700, 6706. *People v Lee* 3 CA3d 51 (1970). However, while courts have found that unreasonable pre-arraignment detention is unconstitutional, there is no remedy for the violation.

83  See *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), "In our system, so long as prosecutor has probable cause to believe that the accused committed offense defined by statute, decision whether to prosecute, and what charge to file or bring before a grand jury, and generally rests entirely in his discretion."  However, "a prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." See *U.S. v. Goodwin*, 457 U.S. 368 (1982). Also see, for example, *Hassan v Magistrates Court*, 191 N.Y.S. 2nd 238, 243 (Sup. Ct. 1959), "Just because a crime has been committed, it does not follow that there must necessarily be a prosecution for it lies with the district attorney to determine whether the acts which may fall within the literal letter of the law should as a matter of public policy not be prosecuted." Additionally, recognizing the prosecution's broad enforcement and discretionary power, the American Bar Association created a rule in its Model Rules for Professional Responsibility to guide prosecutors' duties.  See Model Rules of Professional Conduct Rule 3.8 (2005).

84  For examples of recent state reforms that expand deferred prosecution programs out of concern about collateral consequences of criminal convictions see Ram Subramanian and Rebecka Moreno, *Relief in Sight? States Rethink the Collateral Consequences of Criminal Conviction, 2009-2014* (New York, NY: Vera Institute of Justice, 2014).

85  For information on the history of risk assessment in criminal justice, see D.A. Andrews, James Bonta, and J. Stephen Wormith, "The Recent Past and Near Future of Risk and/or Need Assessment," *Crime & Delinquency* 52,  no. 1 (2006): 7-27.

86  National Association of Pretrial Services Agencies, *Promising Practices in Pretrial Diversion* (Washington, DC: National Association of Pretrial Services Agencies, 2010).

87  Broadly, bail refers to conditions put upon an accused person to ensure that, if released from custody, he or she reappears for trial. See *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.") While the Eighth Amendment prohibits *excessive* bail, the Constitution does not create an absolute right to bail. See *United States v. Salerno*, 481 U.S. 739, 754-55 (1987). Presently, there is a presumption towards releasing people pending trial. However, if an individual is deemed to pose a safety risk or flight risk, then pretrial detention is allowed. See *Salerno*, 418 U.S. at 751 (Government's interest in public safety can outweigh an individual's liberty interest.) The decision whether or not to release a defendant is usually made first at arraignment or another initial court appearance, and can be revisited multiple times during the movement of a case through the courts.

88  For example, under Federal bail law, see 18 U.S.C. § 3142, *as amended in 1984*, courts can deal with an individual charged with a crime pending trial in several ways. If a judicial officer can determine that the individual doesn't pose a safety or flight risk, the individual should be released upon his or her own recognizance, or after promising to pay money for failure to appear: see § 3142(b). Second, if the judicial officer feels more safeguards are necessary to ensure either the individual's reappearance or to ensure the safety of the community, the court can impose further conditions (for example, compliance with a curfew, electronic monitoring, or prohibitions on firearm possession): see § 3142(c). Determinations for either outcome are made by considering the nature of the offense, the weight of evidence against the individual, the history and character of the individual, and whether the individual poses a significant risk to the community: see § 3142(g). Alternatively, an individual may be temporarily detained in order to facilitate the revocation of any other conditional release he or she may be under—for example, if the individual is on probation, parole, or awaiting trial for another offense: see § 3142(d). However, temporary detainment is only triggered if an individual poses a flight or safety risk: see § 3142(d)(2). Finally, only some individuals can be detained until trial. Those charged with crimes of violence, certain drug offenses, certain repeat offenses, and offenses carrying maximum life sentences trigger the ability for the court to hold a hearing to determine whether indefinite detention is warranted: see § 3142(f). Additionally, individuals whose pose a significant flight risk or are likely to obstruct justice or threaten witnesses are also eligible for indefinite detention. Ibid. Typically, at the hearing, the government must show, by clear and convincing evidence, that no conditions of release can reasonably assure the safety of the community. However, certain charges—including certain drug offenses, certain acts of terrorism, and many offenses involving a minor victim—carry a presumption of detention that the defendant must rebut: see § 3142(e). At the state level, bail laws vary. For an overview of differences among state bail laws, see Pretrial Justice Institute's "Matrix of Bail Laws," http://www.pretrial.org/wpfb-file/matrix-of-state-bail-laws-april-2010-pdf/.

89  Minton and Golinelli, 2014, p.1.

90  Pheny Z. Smith, *Felony Defendants in Large Urban Counties, 1990* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 1993), 8; and Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009-Statistical Tables* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 2013), 1.

91  Reaves, 2013, p.15.

92  Ibid.

93  Ibid. A surety bond is an agreement between the court and a third person (the surety) to pay a certain amount if the defendant named in the agreement fails to appear in court.  The bond may be secured, requiring an actual payment of the sum or some portion of it in court pending the appearance of the defendant, or unsecured, requiring only the promise to pay if the defendant doesn't appear.  Private surety agents, known as bail bondsmen, charge a nonrefundable fee in exchange for paying or

promising to pay the amount necessary to get someone out of jail. They may also require some kind of collateral from the defendant that will be forfeited if he or she fails to show up for court dates. Some states, most recently Kentucky, have outlawed private for-profit sureties.

94  Reaves, 2013, p. 19; Brian A. Reaves and Paul Smith, *Felony Defendants in Large Urban Counties, 1992* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 1995), 20. The 1992 mean bail ($25,400) is shown in 2009 dollars.

95  See Marion Katsive, *New Areas for Bail Reform: A Report on the Manhattan Bail Reevaluation Project* (New York, NY: Vera Institute of Justice, 1968).  See generally Kristin Bechtel, Christopher T. Lowenkamp and Alex Holsinger, "Identifying the Predictors of Pretrial Failure: A Meta-Analysis" *Federal Probation* 75, no. 2 (2011).

96  Bechtel, Lowenkamp, and Holsinger, 2011, pp.1-2.

97  Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail* (Washington, DC: Justice Policy Institute, 2012), 3-4, 21-22.

98  Reaves, 2013, pp. 15, 20.

99  Donna Makowiecki and Thomas Wolf, "Enter...Stage Left...U.S. Pretrial Services," *Federal Probation* 71, no. 2: 7-9; also see William Henry, "The Pretrial Services Act: 25 Years Later," *Federal Probation* 71, no. 2 (2007): 16.

100  Bechtel, Lowenkamp and Holsinger, 2011.

101  For example, see the Los Angeles County 2011 Felony Bail Schedule, http://www.metalaw.us/resource/Bail%20Schedule_Infractions_Misdemeanors.pdf; and see Pretrial Justice Institute, *Rational and Transparent Bail Decisions: Moving from a Cash-based to a Risk-based Process* (Washington, DC: Pretrial Justice Institute, 2012) 18-42; Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Option* (Washington, DC: Pretrial Justice Institute, 2013).

102  Timothy Schnacke, *Money as a Criminal Justice Stakeholder: The Judge's Decision to Release or Detain a Defendant Pretrial* (Washington, DC: National Institute of Corrections, U.S. Department of Justice, 2014) 30-39.

103  Reaves, 2013, p. 15.

104  Ibid.

105  13,352 felony defendants (including remands) and 10,868 non-felony defendants were not released prior to disposition. 3,407 non-felony defendants with bonds of $500 or less were not released prior to disposition. See New York Criminal Justice Agency, *New York Criminal Justice Agency Annual Report* (New York: Criminal Justice Agency, 2013), 30.

106  Frierburger and Hilinski, 2010, p. 330.

107  Ibid.

108  Jamie Fellner, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City* (New York, NY: Human Rights Watch, 2010), 27-30.

109  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project*, 68.

110  Ibid.

111  The Sixth Amendment of the U.S. Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy trial." This same protection is also embodied in the Fourteen Amendment's due process clause. In 1974, the Speedy Trial Act 18 U.S.C. §§ 3161-3174— later amended in 1979— set forth time limits for completing federal prosecutions providing for dismissal of the criminal action if there are delays without good cause. Each state has its own speedy trial provision, embodied in legislation, court rulings, or both.

112  A recent *New Yorker* essay tells the story of one young man who spent three years in jail, missing both his junior and senior years in high school and insisting on his innocence, before the Bronx district attorney dismissed the charges against him. See Jennifer Gonnerman, "Before the Law: A boy was accused of taking a backpack. The courts took the next three years of his life," *The New Yorker*, October 6, 2014. According to a *New York Times* investigation, he is just one of many defendants whose cases are stalled in the Bronx courts. See William Glaberson, "Faltering Courts Mired in Delays," *The New York Times*, April 13, 2013, http://www.nytimes.com/2013/04/14/nyregion/justice-denied-bronx-court-system-mired-in-delays.html. Also see William Glabeerson's four-part report, "Justice Denied: Inside the Bronx's Dysfunctional Court System," *The New York Times*, April 13, 14, 15 and 30, 2013.

113  Marie VanNostrand, *New Jersey Jail Population Analysis: Identifying Opportunities to Safely and Responsibly Reduce Jail Population* (Trenton, NJ: Drug Policy Alliance, 2013), 14.

114  See note 80. Also, see Jenny Roberts, "Crashing the Misdemeanor System," *Washington and Lee Law Review* 70 (2013) and Jenny Roberts, "Why Misdemeanors Matter: Defining Effective Advocacy in Lower Criminal Courts," *U.C. Davis Law Review* 45 (2011).

115  The Bronx Defenders Fundamental Fairness Project, *No Day in Court: Marijuana Possession Cases and the Failure of the Bronx Criminal Courts* (Bronx, NY: The Bronx Defenders, 2013).

116  After arraignment, for example, a criminal case will typically include a preliminary meeting between the two sides to see whether the case can be resolved short of having a trial. For felonies, in some jurisdictions a grand jury will be convened to examine the evidence and determine whether charges should be brought. There will also likely be pretrial hearings, some which will deal with procedural or constitutional issues related to the evidence procured by law enforcement and depending on the outcome, a judge may decide to alter course. The judge may require more information, another hearing, may bind the case over on different charges, or reduce or dismiss the charges. If convicted, there is usually a gap in time between conviction and sentencing, in part because the sentencing judge may require a report about the defendant to inform the sentencing decision—a report that is typically put together by the court's probation department Sometimes the victim and character witnesses might be called to the judge in determining an appropriate sentence.

117  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (2011), 71.

118  See note 121. Also, ibid. p. 70.

119  See William Glaberson for example, "For 3 Years After Killing, Evidence Fades as a Suspect Sits in Jail," *The New York Times* April 15, 2013 http://www.nytimes.com/2013/04/14/nyregion/justice-denied-bronx-court-system-mired-in-delays.html.

120  More than 97 percent of federal convictions and 94 percent of state convictions are the result of guilty pleas. See Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics Online,* Table 5.22.2010,  http://www.albany.edu/sourcebook/pdf/t5222010.pdf; and S. Rosenmerkel, M. Durose, and D. Farole, *Felony Sentences in State Courts, 2006–Statistical Tables* (Washington, DC: Bureau of Justice Statistics, 2009), 1; also see Lindsey Devers, *Plea and Charge Bargaining: Research Summary* (Washington, DC: Bureau of Justice Assistance, 2011), 1. For a brief discussion on the relative power prosecutors have in plea bargaining see Rodney J. Uphoff, "The Criminal Defense Lawyer As Effective Negotiator: A Systemic Approach" *Clinical Law Review* 2 (1995): 73, 88-89 & n. 63 (1992).

121   See for example *People v. Llovet*, N.Y.LJ., Apr. 24, 1998 (Kings Cty. Crim. Ct.) which found that "many of the pleas of guilty to misdemeanors were by defendants who could achieve their freedom only by pleading guilty. (Plead guilty and get out, maintain your innocence and remain incarcerated in lieu of bail.) Thus if all defendants had the economic wherewithal to make bail, it is clear that many

fewer…would plead guilty to misdemeanors." Also see Gerard E. Lynch, "Our Administrative System of Criminal Justice," *Fordham Law Review* 66 (1998): 2117, 2146 ("Pleading guilty at the first opportunity in exchange for a sentence of 'time [already] served' is often an offer that cannot be refused.")

122   James J. Stephan and Louis W. Jankowski, *Jail Inmates, 1990*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991), 2.

123   Minton and Golinelli, 2014, p.7.

124   See Subramanian and Moreno, 2014, p. 11.

125   For a discussion of treatment matching and dosage strategies that incorporate criminogenic risk and needs assessments, see April Pattavina and Faye S. Taxman, *Simulation strategies to reduce recidivism: Risk need responsivity (RNR) modeling for the criminal justice system* (New York, NY: Springer, 2013).

126   These strategies have not been without criticism. Advocates for health-based approaches to addiction argue that drug courts have made the criminal justice system more punitive toward addiction by penalizing relapse with incarceration and dropping from programs those who are not able to abstain from drug use for a sufficient period of time as determined by a judge. See Drug Policy Alliance, *Drug Courts Are Not the Answer: Toward a Health-Center Approach to Drug Use* (New York, NY: Drug Policy Alliance, 2011), 16. Critics have also pointed to a phenomenon known as 'net widening,' which refers to "well-meaning police officers and prosecutors arrest[ing] and charg[ing] more offenders under the assumption that something worthwhile could happen to such offenders once they were in the penal system and eligible for drug court rehabilitation," Joel Gross, "The Effects of Net-Widening on Minority and Indigent Drug Offenders: A Critique of Drug Courts," *University of Maryland Law Journal of Race, Religion, Gender and Class* 10 (2010): 161, 167. They note that many of those individuals are low-level offenders—often with no criminal record and no record of addiction—who might have otherwise not been brought into the system. See Eric Miller, "Drug Courts and Judicial Interventionism," *Ohio State Law Journal* 65 (2004): 1483, 1569. Mental health advocates have put forth similar arguments regarding mental health courts. See, e.g., Susan Stefan & Bruce J. Winick, "A Dialogue on Mental Health Courts," *Psychology, Public Policy & Law* 11 (2005): 507.

127   Christopher T. Lowenkamp and Edward J. Latessa, "Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders," *Topics in Community Corrections*, Annual Issue (2004).

128   See Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, Center on Sentencing and Corrections, July 2013), 12.  See also, Lowenkamp and Latessa, 2004.

129   McGarry et al., 2013, pp. 15-19.

130   For information about jail reentry challenges, see Talia Sandwick et al., *Making The Transition: Rethinking Jail Reentry in Los Angeles County* (New York, NY: Vera Institute of Justice, 2013); Amy L. Solomon et al., *Life After Lockup: Improving Reentry from Jail to the Community* (Washington, DC: Urban Institute Justice Policy Center, 2008); Jim Parsons, "Addressing the Unique Challenges of Jail Reentry" in *Offender Reentry: Rethinking Criminology and Criminal Justice*, edited by Matthew S. Crow and John Ortiz Smykla (Burlington, MA: Jones & Bartlett Learning, 2014).

131   American Civil Liberties Union, 2010, p. 73; and Bannon, Nagrecha, and Diller, 2010, p. 11. See also Alexes Harris, Heather Evans, and Katherine Beckett, "Drawing blood from stones: Legal debt and social inequality in the contemporary United States," *American Journal of Sociology*, 115 no. 6 (2014): 1782-1785; and Douglas Evans, Douglas, *The Debt Penalty — Exposing the Financial Barriers to Offender Reintegration* (New York, NY: Research & Evaluation Center, John Jay College of Criminal Justice, City University of New York, 2014), 8-9.

132   American Civil Liberties Union, 2010, p. 22. Bannon,  Nagrecha, and Diller, 2010, p. 24.

133   Ibid, p. 23.

# Acknowledgments

The authors would like to thank Jennifer Trone for her deft assistance in the writing of this report. A special thank you to Sean Addie, Vedan Anthony-North, Christina Dominguez, Sophie Gebreselassie, Christine Herrman, Kaitlin Kall, Maia Spotts, and Elizabeth Swavola for their research and other support.

We would especially like to thank Patricia Connelly for her invaluable assistance in the planning and editing of this report; Carl Ferrero for creating the charts, graphs, and infographics; and Mary Crowley and Daniel Wilhelm for their insight and guidance throughout the project.

We would like to thank Laurie Garduque, Patrick Griffin, and Soledad McGrath of the MacArthur Foundation for their support throughout the development of this report.

This report was created with support from the John D. and Catherine T. MacArthur Foundation as part of its Safety and Justice Challenge initiative, which seeks to address over-incarceration by changing the way America thinks about and uses jails. Core to the Challenge is a competition designed to support efforts to improve local criminal justice systems in jurisdictions across the country that are working to safely reduce over-reliance on jails, with a particular focus on addressing disproportionate impact on low-income individuals and communities of color. More information is available at www.SafetyandJusticeChallenge.org.




© Vera Institute of Justice 2015. All rights reserved. An electronic version of this report is posted on Vera's website at www.vera.org/incarcerations-front-door.

Cover photograph © Ed Kashi/VII

The Vera Institute of Justice is an independent nonprofit organization that combines expertise in research, demonstration projects, and technical assistance to help leaders in government and civil society improve the systems people rely on for justice and safety. For more information, visit www.vera.org.

For more information about this report, contact Ram Subramanian, director of publications, Center on Sentencing and Corrections, at rsubramanian@vera.org.

**Suggested Citation**

Ram Subramanian et al. *Incarceration's Front Door: The Misuse of Jail in America.*
New York, NY: Vera Institute of Justice, 2015.



Vera Institute of Justice
233 Broadway, 12th Floor
New York, NY 10279
Tel: (212) 334-1300
Fax: (212) 941-9407

Washington DC Office
1100 First St. NE, Suite 950
Washington, DC 20002
Tel: (202) 465-8900
Fax: (202) 408-1972

New Orleans Office
546 Carondelet St.
New Orleans, LA 70130
Tel: (504) 593-0937
Fax: (212) 941-9407

Los Angeles Office
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 223-2442
Fax: (213) 955-9250

**Department of Justice**

LIBRARY

PS
668
.K36
copy 2

TESTIMONY BY ATTORNEY GENERAL ROBERT F. KENNEDY ON BAIL LEGISLATION
BEFORE THE SUBCOMMITTEES ON CONSTITUTIONAL
RIGHTS AND IMPROVEMENTS IN JUDICIAL MACHINERY
OF THE
SENATE JUDICIARY COMMITTEE
11:15 a.m., August 4, 1964

The legislation you consider today is new evidence of the deep con-
cern of Congress that all Americans receive equal treatment in our courts,
whatever their wealth. This subject has been one of great interest to us
at the Department of Justice and I am very happy to come here to testify
about the three measures before you, S. 2838, S. 2839, and S. 2840. They
are, in general, excellent solutions to aspects of an increasingly disturb-
ing problem.

That problem, simply stated is: the rich man and the poor man do not
receive equal justice in our courts. And in no area is this more evident
than in the matter of bail.

Bail has only one purpose -- to insure that a person who is accused
of a crime will appear in court for his trial. We presume a person to be
innocent until he is proven guilty, and thus the purpose of bail is not
punishment. It is not harassment. It is not to keep people in jail. It
is simply to guarantee appearance in court.

This is a legitimate purpose for a system of justice. In practice,
however, bail has become a vehicle for systematic injustice. Every year
in this country, thousands of persons are kept in jail for weeks and even
months following arrest. They are not yet proven guilty. They may be no
more liklly to flee than you or I. But, nonetheless, most of them must
stay in jail because, to be blunt, they cannot afford to pay for their
freedom.

I am talking about a very large number of Americans. In fiscal 1963,
the number of federal prisoners alone held in jail pending trial exceeded
22,000. The average length of their detention was nearly 29 days.

Like figures can be compiled from state and local jurisdictions. On
a single day last year, for example, there were 1,300 persons being held
prior to trial in the Los Angeles County jail. In St. Louis, 79 percent
of all defendants are detained because they cannot raise bail. In
Baltimore the figure is 75 percent.

A 1962 American Bar Association survey of felony cases showed high
percentages of pre-trial detention in New Orleans, Detroit, Boston, San
Francisco and Miami. And similar conditions exist in smaller communities.

- 2 -

In Montgomery County, Maryland, nearly 30 percent of jail inmates are persons awaiting grand jury action or trial.  The heart of the problem is that their guilt has not been established.  Yet they must wait in jail for three to six months.

The main reason for these statistics is that our bail setting process is unrealistic and often arbitrary.  Various studies demonstrate that bail is set without regard to a defendants character, family ties, community roots or financial condition.  Rather, what is often the sole consideration in fixing bail is the nature of the crime.

In the federal court system, Rule 46 of the Federal Rules of Criminal Procedure directs the courts to consider "financial ability of the defendant to give bail" and the "character of the defendant," as well as the "nature and circumstances of the offense charged" and the "weight of evidence against him."

Bail is often set, however, by judges who do not know or consider these facts or measure the likelihood of flight.  What is the result?  Bail is set in an amount which may seem small to the judge or the prosecutor, but which to the defendant might well mean prison.

For example, according to one survey, 17 percent of those whose bail was set at $500 in the District of Columbia had to stay in jail.  In New York City, the figure was 25 percent.  Among those whose bail was set at $2,500, the figures rose to 78 percent in the District of Columbia and to 63 percent in New York City.

A survey of federal districts by our distinguished Committee on Poverty and the Administration of Federal Criminal Justice showed that with bail set at $500 or under, it was still an impossible amount for 11 percent of defendants in Connecticut, 36 percent in the Northern District of Illinois, 78 percent in Sacramento and 29 percent in San Francisco.

Such figures are even more disturbing when we recognize that these defendants not only could not raise $500, but were unable even to raise the fifty or seventy-five premium for securing bond from professional bail bondsmen.

The system distorts justice even for the defendant who can afford the bail bond.  Having money is not enough.  He must pass muster with the bondsmen.  This procedure has been aptly described by Judge Skelly Wright:

> ...The professional bondsmen hold the keys to the jail in their pockets.  They determine for whom they will act as surety -- who in their judgment is a good risk.  The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees remain in jail.  The court and the commissioner are relegated to the relatively unimportant chore of fixing the amount of bail. (Pannell v. U.S., 320 F. 2d 698 (D.C. Cir. 1963)).

What is the justice in a system which, when the stakes are jail or freedom, can leave the decision up to a private businessman? Plainly, our bail system has changed what is a constitutional right into an expensive privilege.

It is expensive not only to the individual, but also to society. Federal, state and local governments must spend millions each year on food, care, clothing, and constantly growing detention facilities. In 1963, for example, the cost of maintaining only those prisoners held in local jails awaiting federal trial totaled $2,000,000. Local governments are faced with similar expenses. In the District of Columbia, the cost of pre-trial detention in 1962 was $500,000. In New York, it was more than $10,000,000.

Such costs alone should be a matter of widespread attention. What should impart even greater urgency to our attention is the human cost, and that is incalculable.

The man who must wait in jail before trial often will lose his job. He will lose his freedom to help prepare his own defense. And he will lose his self-respect. He is treated, in almost every jurisdiction, just like the convicted criminal. Even though he may finally be found innocent and released, he is tagged, nonetheless, as a jailbird.

This impact was described in a recent New York Assembly report:

> We doubt whether any innocent person (as all before trial are presumed to be) can remain unscarred by detention under such a degree of security as New York's detention houses impose. The indignities of repeated physical search, regimented living, crowded cells, utter isolation from the outside world, unsympathetic surveillance, outrageous visitor's facilities, Fort Knox-like security measures, are surely so searing that one unwarranted day in jail in itself can be a major social injustice. (Bail, Report of Judiciary Committee of the N.Y. State Assembly, ch. 3, Legis.Doc. No. 37 (1963)).

The cruelty of the bail system is documented by case after case of persons so confined and then acquitted. Recently, in Los Angeles, a man was forced to stay in jail awaiting trial for a minor crime because he could not afford bail. His case came to trial after 207 days. He was acquitted.

A Pennsylvania man who could not raise $300 spent 54 days in jail awaiting trial on a traffic offense -- the maximum penalty for which was five days in jail.

In Glen Cove, New York, Daniel Walker was arrested on suspicion of robbery and spent 55 days in jail for want of bail. Meanwhile, he lost his job, his car was repossessed, his credit destroyed, and his wife had to move in with her parents. Later, he was found to be the victim of mistaken identity and released. But it took him four months simply to find another job.

- 4 -

There are other injustices in the present bail system.  The Committee on Poverty and the Administration of Federal Criminal Justice concluded that a man forced to stay in jail before a trial is more likely to be convicted.  If convicted, he is more likely to get a jail term.  And, if sentenced to a jail term, he is likely to get a longer sentence.

These conclusions are supported by controlled experiment.  We are waiting now for the detailed results of such a study made in New York, to be published shortly.  This study indicates that even among parallel defendants, charged with identical crimes, the defendant who must stay in jail will not fare as well as his counterpart who was released on bail.

In summary then our present bail system inflicts hardship on defendants and it inflicts considerable financial cost on society.  Such cruelty and cost should not be tolerated in any event.  But when they are needless, then we must ask ourselves why we have not developed a remedy long ago.  For it is clear that the cruelty and the cost of the bail system are needless.

Today, bail reform projects are underway in a number of communities — throughout the country.  These projects demonstrate that if a court is provided and considers fundamental facts about each defendant, it can make a reasonable estimate of his likelihood of flight--and that many persons jailed for want of bail could be released safely without it.

The pioneering example of such a system--and of its effectiveness-- is the Manhattan Bail Project, conducted under the auspices of the Vera Foundation.  I understand that the very able Director of that Project, Mr. Herbert Sturz, will appear before you tomorrow to discuss the project in some detail.  Thus, let me only note now that so far, 3,200 persons have been released without bail on the recommendation of Project workers.  Less than 1 percent have failed to appear for trial.  This compares with a default rate of about 3 percent for those freed on bail.

The District of Columbia has begun a bail project, modeled on the New York project.  In its first 100 days, all 54 defendants who were released on project recommendation have appeared for trial.

A similar project is underway in Des Moines, where only 3 of the first 121 defendants released failed to appear.  Two of these were traffic offenders, who showed up voluntarily, one day late.

Other projects are underway in St. Louis, Chicago, San Francisco, Los Angeles, and Tulsa.  Others are planned in Seattle, Syracuse, Reading, Akron, Cleveland, Atlanta, Boston, Milwaukee, Newark, Iowa City, New Haven and Philadelphia.

Meanwhile, since 1961, the Department of Justice has worked to improve the present system in federal courts -- and to provide assistance to interested state and local authorities.  Our starting point was to appoint the committee on poverty and the administration of federal criminal justice.

- 5 -

Among the problems it considered was bail and pre-trial release.

Following one of the committee's recommendations, we instructed all United States Attorneys to recommend that the greatest possible number of persons possible be released on their own recognizance.  In the year since that instruction was issued, 6,000 defendants in federal criminal cases have been released on recognizance.  The default rate has been 2.5 percent -- about the same as that for defendants released on bail bonds.

The Eastern District of Michigan deserves special mention.  There, for 20 years, the judges have been making bail determinations after receiving information from the United States Attorney about the defendants.  In 1963, 773 defendants were released on their word.  Of these only 9 -- 1.1 percent -- failed to appear.  This is a district, it should be noted, where the courthouse is only five minutes away from the Canadian border.

Our most recent step at the federal level came last May, when, in conjunction with the Vera Foundation, we convened the National Conference on Bail and Criminal Justice.  Over 400 delegates from every state, judges, prosecutors, defense lawyers, professors -- even bail bondsmen -- came to Washington to study the bail system.  The consensus of the Conference was clear:  the system was in drastic need of overhauling.

This three-day conference set in motion a widespread awakening to the need for bail reform at local and state levels.  Requests for information and assistance have poured in, and we have rendered advice, assistance, and information to many communities working on the problem.  In this climate of increasing awareness of the need for reform, the bills being considered by this committee introduced by Senator Ervin and others sensitive to the problem, are particularly timely.  You have already received our detailed recommendations on these bills, but I would like to offer several observations about them today.

S. 2838 would spell out more clearly and fully the authority of a court or commissioner to release defendants on their own recognizance.  It would state that the courts, as a matter of policy, should favor pre-trial release whenever possible.  As you know, this bill is similar to the proposed amendment to Criminal Rule 46 of the Federal Rules of Criminal Procedure.  Both of these proposals seek to put into positive law what we have learned is the only rational approach to bail setting procedure.  S. 2838 also would amend Section 3146 of Title 18, the bail-jumping statute, expressly to include persons who fail to appear after release on their own recognizance.

S. 2839 would provide that all defendants sentenced to terms of imprisonment shall be credited with time spent in jail -- whether awaiting trial or awaiting sentence after trial.  At present, the law limits this credit to those defendants convicted of crimes for which a minimum mandatory sentence must be imposed.  This, too, is a most meritorious change.

S. 2840 offers an alternative to the traditional bail procedure.  It provides that in lieu of a surety bond, a defendant may deposit with the court 10 percent of the bail set by the court.  This, as you know, is the

- 6 -

refundable deposit system, with which Illinois is now experimenting.  Reports submitted to the Bail Conference indicated that the system is working successfully, and I heartily recommend enactment of legislation along these lines.

Montesquieu once wrote that:

"In the state of nature...all men are born equal, but they cannot continue in this equality.  Society makes them lose it, and they recover it only by the protection of the laws."

These three bills can help provide such protection for all our citizens, whatever the size of their purse.  These bills can help to improve the administration of justice in the federal system.  They can establish a philosophy for state jurisdictions to emulate.

I am confident that Congress will follow the excellent lead of your two subcommittees and enact this legislation promptly.  This is a cause in which there is great work to be done.